UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

MALCOLM G. SCHAEFER,           )
    300 Meridian Court             )
    New Bern, North Carolina 28562 )
                                   )
    Plaintiff,                     )     CIVIL ACTION
                                   )
v.                             )
                                   )     FILE NO. _____
THE HONORABLE PETE GEREN,      )
SECRETARY OF THE ARMY,         )
    101 Army Pentagon              )
    Washington, D.C. 20310-0101    )
                                   )
    Defendant.                     )

## COMPLAINT

This is a complaint for declaratory judgment and for injunctive relief.

## JURISDICTION

1.    Jurisdiction in this matter is conveyed by 28 U.S.C. § 1331 and by the Administrative

Procedure Act, 5 U.S.C. § 702 et. seq.

2.    Venue is proper as the Defendant is found in this district.

## PARTIES

3.    Plaintiff Malcolm G. Schaefer is a former United States Army Major having served in

The Judge Advocate General's Corps (hereinafter "JAG Corps" or "JAG").

4.    Defendant, The Honorable Pete Geren, in his official capacity, is Secretary of the Army.

<u>FACTS</u>

*Introduction*

5.     Plaintiff is a former U.S. Army commissioned officer.  He graduated from West Point in 1990.  He served in the Infantry from 1990 to 1996. After his graduation from the University of Virginia School of Law, he served in the U.S. Army Judge Advocate General's Corps (hereinafter "JAG Corps" or "JAG") from 1996 to 2001.

6.     Plaintiff was honorably discharged on September 14, 2001, with a medical discharge. Defendant issued Plaintiff a Certificate of Discharge or Release from Active Duty (hereinafter "DD 214" or "discharge certificate").  The DD 214 was handed to Plaintiff and he departed Fort Benning that day.

7.     Defendant violated the U.S. Constitution and federal laws and regulations to rescind Plaintiff's disability discharge, to compel him back into the armed forces, and to court-martial him without probable cause.  Defendant then erroneously discharged Plaintiff a second time, on October 1, 2002, this time with a general discharge.

8.     The second discharge, dated October 1, 2002, is a legal nullity.

9.     Plaintiff was improperly returned to active duty after being medically discharged and issued a DD 214.  Upon his involuntary return to active duty, Plaintiff was improperly court-martialed for fraudulent separation under Article 83, UCMJ; was improperly given a General Officer Memorandum of Reprimand ("GOMOR"); was improperly given an adverse Officer Efficiency Report ("OER"); and was improperly given a DD 214 showing a general discharge and separation in lieu of court-martial.

10.     All of these results were created because Defendant wrongfully applied Article 3(b), UCMJ, 10 U.S.C. § 803(b), and Article 32, UCMJ, 10 U.S.C. § 832, and Article 34,

UCMJ, 10 U.S.C. § 834, to Plaintiff, and because Defendant failed to follow its own regulations governing the physical disability evaluation system ("PDES") and military orders. Defendant's conduct throughout Plaintiff's case, on multiple fronts, was "arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations."

*Plaintiff's Disability*

11.    Plaintiff graduated from the United States Military Academy, West Point, New York, in 1990, and was commissioned a Second Lieutenant of Infantry at that time. Plaintiff completed the Infantry Officer Basic Course, U.S. Army Ranger School and Pathfinder School between 1990 and 1991. Plaintiff was then stationed as an Honor Guard platoon leader in the 3d U.S. Infantry (The Old Guard) at Fort Myer, Virginia. Plaintiff's duties as an Infantry Lieutenant required him to conduct daily physical training, rucksack marching, and tactical field training. Plaintiff's duties in the Honor Guard required Plaintiff to conduct ceremonial duties that included long marches in specialized built-up shoes and extremely long periods of standing with knees locked. Beginning in 1991, Plaintiff began experiencing knee pain in both knees. The pain would cause him to stop during the middle of a run and walk. His symptoms occurred as flare-ups, and the flare-ups occurred daily and lasted hours, depending upon use and activity level. His symptoms included pain, weakness, stiffness, inflammation, fatigue, and lack of endurance.

12.    Beginning with, during, and as a result of his service as an Infantry Lieutenant, Plaintiff's knees deteriorated to the point that he underwent left knee surgery in 1996 and then right knee surgery in January 1999.

13.    Plaintiff was selected in 1993 for participation in the Army's Funded Legal Education Program (hereinafter "FLEP").  Plaintiff attended the University of Virginia School of Law at government expense, graduated in 1996, and was serving a 6-year Active Duty Service Obligation in the U.S. Army Judge Advocate General's Corps until his discharge on September 14, 2001.  He was assigned to Fort Benning, Georgia at the time of his discharge and during the last several years preceding his discharge.

14.    After Plaintiff's second knee surgery, Plaintiff participated in vigorous physical rehabilitation to no avail.  In addition to his treatment by military health care providers, Plaintiff went to civilian practitioners at the Hughston Sports Medicine Hospital for second opinions and alternative therapy.  By April 2000, it became apparent to Plaintiff, his treating physicians, and his treating physical therapists, that Plaintiff was not fit to run, parachute, walk long distances, march with a rucksack, or conduct other such military activities that included impact on his knees.

15.    Try as it did, Defendant never found a single piece of evidence suggesting Plaintiff misrepresented or exaggerated his medical condition.  On the contrary, all medical evidence demonstrated that Plaintiff made great efforts toward improving his medical condition before submitting his case to the physical disability evaluation system.

16.    On September 27, 2000, the Fort Benning Commanding General, Major General John M. LeMoyne, referred Plaintiff into the Army's Physical Disability Evaluation System (hereinafter "PDES").

*The Physical Disability Evaluation System (PDES)*

17.    The PDES is a creature of congressional statute and agency regulation.  The PDES is authorized and governed by 10 U.S.C. § 1201 et. seq., Department of Defense Directive

(hereinafter "DODD") 1332.18 and Department of Defense Instruction (hereinafter "DODI") 1332.38.  In the case of any Army service member, the PDES is further governed by AR 635-40.  The Secretary of the Army, "[U]nless otherwise specified in [AR 635-40], reserves all powers, functions, and duties of the Army Physical Disability Evaluation System." Id. at para. 2-1.

18.     10 U.S.C. § 1203 provides for the separation of service members who have served on active duty more than thirty (30) days.  At all times relevant to this action, Plaintiff was an eligible member for the application of 10 U.S.C. § 1203 because, as defined at 10 U.S.C. § 1201 (c), Plaintiff was a "member of a regular component of the armed forces entitled to basic pay."

19.     10 U.S.C. § 1203 (a) provides in pertinent part that "[u]pon a determination by the Secretary concerned that a member described in section 1201(c) of this title is unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay ... , the member may be separated from the member's armed force, with severance pay computed under section 1212 ..."

20.     United States Code Title 10 (Armed Forces), Subtitle A (General Military Law), Part II (Personnel), Chapter 61 (Retirement or Separation for Physical Disability), requires the Department of Defense and each military department to establish a physical disability evaluation system.

21.     The Secretary of Defense has directed that "[t]he [P]DES shall consist of four elements: medical evaluation; physical disability evaluation, to include appellate review; counseling; and final disposition." DODD 1332.18 para. 3.2.

22.    The Army divides responsibility for these four elements of the PDES (medical evaluation, physical disability evaluation, counseling and final disposition) among four separate entities.    Those are the Medical Evaluation Board ("MEB"), the Physical Evaluation Board ("PEB"), the U.S. Army Physical Disability Agency ("USAPDA"), and the U.S. Total Army Personnel Command ("PERSCOM").    These four entities perform the following functions:

a.    The MEB determines whether the soldier has an injury or disease of sufficient magnitude that the soldier should be considered for separation from the Army. Army Regulation 635-40, para. 3-1, para. 4-9, and para. 4-11.    If so, the MEB refers a soldier to a PEB.  Id. at para. 4-13.

b.    The PEB determines whether a soldier is fit or unfit for duty and what percentage of disability the soldier should be awarded.  Army Regulation 635-40, para. 4-17 et. seq.

c.    The USAPDA reviews the decision of the PEB and approves, corrects, revises findings or sends back for reconsideration to the PEB.  Army Regulation 635-40, para. 4-22.    Upon completion of a case, USAPDA forwards the case to PERSCOM for "final disposition."

d.    The PERSCOM is responsible for final disposition of the soldier's case by issuing orders or instructions, Army Regulation 635-40, para. 4-24, and for the overall operation of the PDES, AR 635-40, para. 2-3(a).

23.    The regulations which govern the PDES make clear that JAG officers get treated the same as Infantry and other combat arms officers.    Only General, Flag, and Medical Officers get treated differently.    After Plaintiff's pending disability discharge became

known to the JAG Corps, Defendant erroneously attempted to treat Plaintiff's disability case like that of a General or Medical Officer. In doing so, Defendant acted arbitrarily and capriciously, in violation of the provision that "[t]he applicable standards for all determinations related to physical disability evaluation shall be consistently and equitably applied." DODI 1332.38, para. 4.3.

24.    Only General, Flag, and Medical Officers get treated differently in the PDES. The Secretary of Defense has instructed that "[a]n officer in pay grade O-7 or higher or a medical officer in any grade shall not be determined unfit because of physical disability if the member can be expected to perform satisfactorily in an assignment appropriate to his or her grade, qualifications, and experience. Thus, the inability to perform specialized duties or the fact the member has a condition which is cause for referral to a PEB is not justification for a finding of unfitness." DODI 1332.38, Encl 3, Part 3, para. E3.P3.4.2.

25.    The first step in the PDES is known as the Medical Evaluation Board ("MEB"). Plaintiff's treating physician initiated an MEB on December 28, 2000. The purpose of an MEB, as described by Army Regulation (hereinafter "AR") 635-40, is to document a soldier's medical status and duty limitations. The MEB is required to determine the soldier's medical qualification for retention in the service. Medical retention standards are specified by another regulation, AR 40-501. An MEB can make one of three recommendations. It can: (a) return the soldier to duty, (b) return the soldier to limited duty, or (c) refer the soldier to a Physical Evaluation Board ("PEB"). If the MEB determines a soldier does not meet retention standards, the board will recommend referral to the next step in the PDES -- The Physical Evaluation Board ("PEB").

26.    At Plaintiff's MEB, three senior Army physicians unanimously referred Plaintiff's case to the second step in the PDES, the PEB.

27.    There are three Army PEBs -- one in Texas, one in Washington state, and one in Washington, D.C.  Plaintiff's case went to the Texas PEB.  Each PEB is composed of a "PEB President" and two other senior officers.  The PEBs are supervised by the Commanding General, U.S. Army Physical Disability Agency (hereinafter "USAPDA"), also in Washington, D.C.

28.    In June 2001, the Texas PEB found Plaintiff "unfit for duty" and recommended a discharge from the Army with severance pay.

29.    On June 13, 2001, the Fort Benning PEB Liaison Officer (Alternate), Ms. Debbie Koons, informed Plaintiff of the PEB results, informed him of his legal rights, and counseled him as required by AR 635-40.  Among other things, she counseled him that the "PEB findings and recommendations are not final until approved for the SA [Secretary of the Army]."  See AR 635-40, Appendix C ("Counseling"), para. C-7(e).  Ms. Koons told Plaintiff that his case would still be subject to review and modification by the U.S. Army Physical Disability Agency (USAPDA) in Washington, D.C.  She told him that if the USAPDA made no changes, the USAPDA would forward the case to the U.S. Total Army Personnel Command (PERSCOM) for the issuance of discharge orders.  She told him he would know that his disability discharge case was final when he received a phone call from the Fort Benning U.S. Army Transition Center informing him that his discharge orders were "ready for pick-up," or words to that effect.

30.    The PEB forwards its cases to the USAPDA.  The USAPDA screens PEB cases before sending them to PERSCOM.  In Plaintiff's case, USAPDA review was discretionary, not

mandatory.  USAPDA review would have been mandatory if Plaintiff was a medical doctor or a general officer, but no special rules apply to Judge Advocates' cases.  AR 635-40, para. 4-22. "Once the PEB makes a final determination, either through a formal or an informal process, the PEB then forwards the case to the USAPDA, which determines whether the PEB's findings were fair, equitable, consistent with the facts, and in accord with the governing laws and regulations. AR 635-40 ¶¶ 4-21, 4-22."

*Plaintiff's Discharge Orders*

31.  On July 3, 2001, the Fort Benning U.S. Army Transition Center called Plaintiff and told him his orders were "ready for pick-up."  The orders were dated July 2, 2001 and were designated as "DEPARTMENT OF THE ARMY, HEADQUARTERS, UNITED STATES ARMY INFANTRY CENTER, FORT BENNING, GEORGIA ... ORDERS 183-2200" (hereinafter "Orders # 183-2200").  Plaintiff went to the Transition Center office that day and picked up Orders # 183-2200.

32.  The next day, July 4, 2001, was a training holiday.  The day after that, July 5, 2001, in the morning, Plaintiff called his Judge Advocate technical branch supervisor, Colonel James Quinn, and told Colonel Quinn about Orders # 183-2200.

33.  Orders # 183-2200 specifically stated: ""After processing, you are discharged from the Component shown."  The orders further stated:  "Any temporary commissions or appointments held are terminated."  Most important, the orders stated plainly: "Date of discharge unless changed or rescinded: 14 September 2001."  By their express terms, Orders # 183-2200 automatically discharged Plaintiff on 14 September 2001.

34.  Orders # 183-2200 show that Plaintiff's Component was the "RA," or Regular Army.  By virtue of his discharge on September 14, 2001, Plaintiff thus became a "full-fledged

civilian," without any continued obligation to the U.S. Army Reserves, Individual Ready Reserve, or any other Component of any armed forces.

35.    Orders # 183-2200 were issued by the Adjutant General of Fort Benning, Georgia, for the Commanding General of Fort Benning. Installation Adjutants General have authority to issue discharge orders on behalf of the Commander, U.S. Army Total Personnel Command ("PERSCOM"). See AR 600-8-15, paragraph 1-11b ("Orders are the function of the Adjutant General ...").

36.    Orders # 183-2200 were not issued by the USAPDA. These orders could not have been issued by the USAPDA, because the USAPDA is not an orders issuance authority.

37.    During the July 5th phone call, Plaintiff told Colonel Quinn that he had personal and professional concerns about Colonel Dick Gordon, Fort Benning Staff Judge Advocate, finding out about the nature of his pending discharge -- i.e., medical disability. Colonel Quinn told Plaintiff that the only person that had to be informed of Orders # 183-2200 was Lieutenant Colonel David Diner, the person that would be responsible for filling Plaintiff's vacant slot as the Senior Defense Counsel for Forts Benning, Buchanan, McPherson, Rucker, and Redstone Arsenal. Colonel Quinn told Plaintiff they could still wait a bit to notify Diner, because they were still "more than 60 days out" from the discharge date. Colonel Quinn told Plaintiff that he, Plaintiff, should otherwise go about informing others of his pending discharge, as a professional courtesy, as he saw fit.

38.    On the morning of Friday, July 13, 2001, Colonel Quinn and Plaintiff together called Lieutenant Colonel David Diner, the JAG Corps Company-Grade Assignments Officer, located at the JAG Corps Personnel, Plans & Training Office (hereinafter "PPTO"). They told Diner that Plaintiff's discharge date was September 14, 2001.

*Plaintiff's Discharge Outprocessing*

39.  The following week, the week of July 16th, PPTO advertised the upcoming September vacancy at the Fort Benning Trial Defense Service (TDS) Field Office (Plaintiff's office) on a website known as the "Weekly Captains Assignments News," a web-page intended to get other JAG Captains to notify PPTO about specific jobs they would be interested in having.  There were no other Captains scheduled to leave the Fort Benning TDS office anytime in 2001, so it became obvious to Plaintiff's fellow TDS Captains that Plaintiff was bound to depart in September.

40.  During the same week, the week of July 16th, at the same time PPTO was advertising Plaintiff's vacant slot on its website, the same PPTO individuals began secretly to take actions that might cause a reversal of Plaintiff's disability discharge.  Colonel Quinn knew about it, and he asked Colonel Clyde ("Butch") Tate, the Chief of PPTO, for permission to let Plaintiff know what was happening, so that the Schaefer family could adjust their plans for transitioning into the civilian sector.  Colonel Tate directed Colonel Quinn to keep the matter secret from Plaintiff.

41.  Plaintiff began job hunting and transitioning into civilian life.  The new Acting Regional Defense Counsel, Major Martha Foss at Fort Bragg, discussed with Plaintiff during mid-to-late July the ETS Award Recommendation (i.e., an end-of-service award) that she was preparing for him at Colonel Quinn's behest.  Major Foss asked Plaintiff to provide "bullet comments" that could be placed on the Award Recommendation document.  Colonel Quinn also checked on Plaintiff's transitioning.  On Thursday or Friday, July 26 or July 27, Colonel Quinn left Plaintiff a message to call him.  Plaintiff called Colonel Quinn at his home in Engleside, Virginia (Colonel Quinn's home phone 703-455-8606)

that Sunday evening at 6:36 p.m.  The two had an 11-minute conversation, in which Colonel Quinn told Plaintiff he was "just checking up" on the Schaefer family, how everyone was doing, and how the Plaintiff's plans for civilian life were going.  As directed by Colonel Tate, Colonel Quinn did not inform Plaintiff of Colonel Tate's interest in reversing Plaintiff's disability discharge.

42.    Lieutenant Colonel Pete Zolper became Plaintiff's new Regional Defense Counsel on or about August 6, 2001.  Plaintiff called him to inform him, as a professional courtesy, that he would be gone as of September 14.  Lieutenant Colonel Zolper had already been informed about Plaintiff's pending discharge orders.  Colonel Quinn and Lieutenant Colonel Diner's replacement, Major Mike Mulligan, had informed him.  But Zolper "misunderstood their guidance" and mistakenly told Plaintiff, on August 6, that he might not be discharging because PPTO was "trying to get a re-look board."

43.    During the next four days, Plaintiff had several phone conversations with several individuals and was told several different things about what was happening in his case. The hallmark quality of these phone conversations was the note of secrecy, deception and misdirection on the part of those speaking to Plaintiff about what was happening in his case and why it was happening.

44.    After August 10, everything went silent between Plaintiff and PPTO, USAPDA, and the PEB.  There were no further phone calls, no faxes, no mailings, no orders, no verbal directives, no paper -- nothing.  The only thing Plaintiff had to go on was the general "message" behind the phone calls of August 6 through August 10.  That general "message" was that: (a) PPTO was not pleased with Plaintiff for having gone through the PDES and keeping them "out of the loop," (b) PPTO was seeking to get Plaintiff's

discharge reversed, and (c) PPTO might be successful in getting Plaintiff's discharge reversed, or they might be unsuccessful.

45.    On Wednesday, August 29, Plaintiff was promoted to Major.  Colonel Quinn could not be present at the promotion ceremony.  Colonel Quinn called Plaintiff the next morning, Thursday, August 30th.  After congratulating Plaintiff on his promotion, Colonel Quinn asked Plaintiff if he had "heard any news or got any new paperwork," to which Plaintiff replied, "No."  Colonel Quinn asked Plaintiff, "So are you still sitting on orders?" and Plaintiff replied, "Yes."  Nothing further was said.

46.    Unbeknownst to Plaintiff, between August 10 and August 31, PPTO and the USAPDA's Command Legal Advisor had worked in concert to develop, purportedly, "substantial new evidence" that was then used to substantiate their return of Plaintiff's disability case to the Texas PEB with a "proposed modification."

47.    This "substantial new evidence" was not new <u>medical</u> evidence.  It was strictly <u>non-medical</u> evidence.  There was no evidence questioning Plaintiff's medical condition and his physical limitations.  Rather, there was only evidence of Plaintiff's outstanding performance as a Judge Advocate and hallmark qualities of excellence, hard work, integrity, and leadership.  This is commonly referred to, in the disability evaluation community, as "performance data."

48.    In the absence of any revocation order and in the midst of complete silence from PPTO and other involved persons, Plaintiff's outprocessing appointments continued.

49.    On September 13, 2001, Plaintiff, by counsel, wrote Defendant informing Defendant that Plaintiff would proceed with his separation under his existing orders.

50.    On September 14, 2001, Plaintiff was validly discharged.  There was no revocation of his self-executing separation orders on that date.  Defendant issued Plaintiff a Certificate of Discharge or Release from Active Duty (hereinafter "DD 214" or "discharge certificate").  The DD 214 was handed to Plaintiff and he departed Fort Benning that day.  Plaintiff later received his severance pay which was electronically deposited into his checking account.

51.    On September 14, 2001, in conjunction with his discharge, Plaintiff surrendered his military ID card to Defendant.

52.    In the seminal case concerning the effect of a discharge upon jurisdiction, the 1985 Court of Military Appeals decision in U.S. v. Howard, 20 M.J. 353 (C.M.A. 1985), the Court was tasked to identify the "moment" of a discharge.  Government lawyers urged the court to permit the Secretary of the Army, by regulation, to establish the moment of discharge.  The court refused.  Instead, the court held that a discharge is effective upon "delivery" of the form DD 214, the discharge certificate.

53.    In Plaintiff's case, Defendant "delivered" Plaintiff a valid DD 214 that became irrevocable as of midnight on September 14, 2001.

*Plaintiff Was Following His Orders*

54.    "All persons in the military service are required to strictly obey and promptly execute the legal orders of their lawful seniors."  AR 600-20, Army Command Policy, para. 4-2 (titled "Obedience to Orders").

55.    Plaintiff was never told by anyone in authority that his Orders # 183-2200 had been revoked or would be revoked.  Therefore, Plaintiff always had the good faith belief that Orders # 183-2200 were validly subsisting orders.

56.   Given the strong language of our military courts concerning the presumption of lawfulness afforded military orders, it would not be an exaggeration to say that servicemembers are expected to "blindly" follow their orders.  Not even "the freedom to think and believe" can excuse disobedience of a lawful order, because "allowing private judgment by a soldier as to which orders to obey would be 'unthinkable and unworkable'."  United States v. New, 55 M.J. 95, 108 (2001) (citations omitted)

57.   "Orders are required for ... separation."  AR 600-8-105, para. 1-15.  "The requirements for orders and permanent orders and their contents as described in this regulation take precedence over conflicting instruction in other directives or regulations."  Id.

58.   There is no Army Regulation which makes the USAPDA an orders issuing authority.  Quite the contrary, the regulation governing the USAPDA expressly states that the issuance of orders is the responsibility of PERSCOM and not the USAPDA.  Compare Army Regulation 635-40, paragraphs 2-3 and 2-4.  At paragraph 2-3, it states that "The Commander, PERSCOM, will -- ... (b) Accomplish final administrative actions in processing physical disability cases;  issue needed orders or other instructions for the [Secretary of the Army] ..."  (emphasis added).

59.   Only the Adjutant General of Fort Benning, Georgia, could properly revoke Orders # 183-2200, and this they did not do at any time prior to September 14, 2001.  See AR 600-8-105, Military Orders, para. 2-21 ("Amendments, revocations, and rescissions ... (a) Only the organization that published the original order may amend, rescind, or revoke the order.").

60.   Valid orders remain effective and enforceable unless revoked.  There are, generally speaking, only three kinds of orders:  those that are issued, those that are revoked, and

those that are illegal.  A soldier must follow an issued order, must follow a revocation, and must question or challenge an illegal order.

*The Purported Second PEB Was Void*

61.    By September 5, 2001, Plaintiff was two-thirds to three-quarters complete with all out-processing appointments.

62.    On September 5, 2001, Plaintiff was served with the DA Form 199 now referred to as "PEB #2."

63.    PEB #2 purported to find Plaintiff fit for duty, but it did not purport to revoke Orders # 183-2200.

64.    Plaintiff nonconcurred with PEB #2.  Plaintiff, by regulation, had ten (10) days to respond to PEB #2.  His deadline to respond was September 17, 2001, a date which fell after his ordered separation.

65.    On September 13, 2001, Plaintiff, through counsel, wrote Defendant informing Defendant that PEB #2 was a legal nullity for the same reasons as set forth in this Complaint, and further informing Defendant that Plaintiff would proceed with his separation under his existing orders.

66.    From its inception, the JAG Corps' and the USAPDA's attempt to reverse Plaintiff's original PEB determination was arbitrary and capricious.  PEB #2 was in fact void *ab initio*.

67.    PEB #2 had no authority to reconsider PEB #1.  USAPDA had no authority to refer Plaintiff's case back to the PEB for reconsideration.  Final agency action had already occurred.   The only exception would have been a request by USAPDA to PERSCOM asking that PERSCOM return the case to USAPDA pursuant to AR 635-40, Appendix E,

paragraph E-9 (e).  This never occurred in Plaintiff's case.  This exception governs cases like Plaintiff's -- a "[r]equest for deviation from established discharge date … for other than medical reasons."  USAPDA was acting upon non-medical evidence, performance data, only.

68.    Because jurisdiction over Plaintiff's disability case no longer rested with USAPDA, it had no authority to return the case to the PEB.  Because PEB #2 had no authority to act, PEB #2 was an improperly constituted board.  "Proceedings of an improperly constituted PEB are null and void."  AR 635-200, para. 4-19.

69.    After Plaintiff's pending disability discharge became known to the JAG Corps, Defendant erroneously attempted to treat Plaintiff's disability case like that of a General or Medical Officer.  Defendant acted arbitrarily and capriciously, in violation of the provision that "[t]he applicable standards for all determinations related to physical disability evaluation shall be consistently and equitably applied."  DODI 1332.38, para. 4.3.  The regulations which govern the PDES make clear that JAG officers get treated the same as Infantry and other combat arms officers.  Only General, Flag, and Medical Officers get treated differently.

*Events Following Plaintiff's First Discharge*

70.    On September 18, 2001, Orders # 183-2200 were revoked, but this was after Plaintiff was already discharged, which is contrary to law.

71.    On October 29, 2001, Plaintiff was ordered back to active duty.  Defendant ordered Plaintiff to report for duty to the Staff Judge Advocate at Fort Benning, Georgia, at 9:00 a.m. on November 5, 2001.

72.     Plaintiff refused.  On November 1, 2001, Plaintiff sought a temporary restraining order in the U.S. District Court, Middle District of Georgia.  Plaintiff was a resident of Columbus, Georgia, at that time.

73.     On November 1, 2001, Plaintiff was charged with a violation of Article 83, Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. § 883 (Fraudulent Discharge).  10 U.S.C. § 883(b) cases arise under the jurisdictional provisions of Article 3(b), UCMJ, 10 U.S.C. § 803(b).  Fraudulent discharge cases are interchangeably referred to in the military, and in this Complaint, by reference to Article 83, UCMJ, Article 3(b), UCMJ, or simply "Article 3(b)."

74.     The government's lone charge alleged that Plaintiff "did, at or near Fort Benning, Georgia, on or about 14 September 2001, by means of knowingly presenting ORDERS 183-220[0] dated 01 July 2001 authorizing his release from active duty, when in fact he knew those orders were void, procure himself to be separated from the U.S. Army."

75.     On November 15, 2001, Plaintiff involuntarily returned to active duty, only because the U.S. District Court, Middle District of Georgia, ordered him to do so.  That Court concluded that "The legislative history of Article 3(b) as well as the way it has been applied by Federal Civil Courts and Military Courts indicate that if the Army charges Plaintiff with fraudulently obtaining his discharge then the Plaintiff will be subject to military control." 174 F.Supp.2d 1374, 1384 (M.D.Ga. 2001).  Defendant had asserted *in personam* jurisdiction over Plaintiff pursuant to Article 3(b) by charging Plaintiff with fraudulent discharge.  For that reason alone, upon the grounds of comity and deference, the U.S. District Court, Middle District of Georgia, ordered Plaintiff back to military control.

76.    The U.S. District Court, Middle District of Georgia, order obligated Plaintiff to return to military duty *at Fort Benning, Georgia*, as was specified in the Defendant's Order to Return to Duty that was the subject of that TRO litigation.  He was assigned to a JAG agency located in Arlington, Virginia, but did not report there for duty.

77.    On December 3, 2001, Plaintiff's counsel wrote Defendant demanding:

a.    That the U.S. Army renounce any claim of personal jurisdiction over Plaintiff except for his physical presence at any pretrial hearing or court-martial.  In effect, this request was to treat Plaintiff the same as Article 2(d), UCMJ, 10 U.S.C. § 802(d), treats military reservists during court-martial proceedings.

b.    That Defendant expedite efforts to obtain Plaintiff a military defense counsel.

c.    That Defendant expedite the initiation of the Article 32, UCMJ, pretrial investigation in recognition of Plaintiff's speedy trial rights.

d.    On December 3, 2001, Defendant responded by denying the request set forth in subparagraph (a), above.

e.    Immediately after the Defendant denied Plaintiff's request described in subparagraph (a), above, Plaintiff sought the same relief by way of a habeas petition filed on December 6, 2001, in the Court of Appeals for the Armed Forces (CAAF).

78.    On December 5, 2001, Defendant reassigned and reattached Plaintiff *to Fort Myer, Virginia*, placing him under the control of Fort Myer's garrison commander.  He remained assigned to a JAG agency in Arlington, Virginia, but did not report there for duty.

79. After Plaintiff's involuntary return to service, Defendant never sent Plaintiff to Arlington, Virginia, to Fort Myer, Virginia, or to Washington, D.C., to perform military duties (only for legal proceedings). Instead, Plaintiff was always required to report for duty at Fort Benning, Georgia.

80. On December 6, 2001, Plaintiff filed his <u>first</u> of three Petitions for Writ of Habeas Corpus. This first habeas petition was filed in the United States Court of Appeals for the Armed Forces (CAAF), located in Washington, D.C.

   a. The named respondent was the Commanding Officer of the U.S. Army Legal Services Agency, located in Arlington, Virginia. This was the official that initiated the court-martial against Plaintiff.

   b. The stated issue was "[w]hether, during the pendency of a court-martial where the sole charge is a violation of Article 83, UCMJ, fraudulent discharge, an individual with a facially valid DD 214 can be maintained under military control."

   c. This relief requested was the same as that requested, and then denied, in the exchange of letters between Plaintiff's counsel and Defendant on December 3, 2001 (see above).

81. Defendant amended its charge against Plaintiff on December 7, 2001. The amended charge alleged that Plaintiff "did, at or near Fort Benning, Georgia, on or about 14 September 2001, by means of knowingly false representations that he was eligible for discharge from the U.S. Army based on ORDERS 183-2200 dated 2 July 2001, when in fact he knew the basis for those orders had been overturned, procure himself to be separated from the U.S. Army."

82. After being returned to military control, Plaintiff asserted his civilian status consistently. He signed no document in the capacity of Army Major. He filed petitions styled in his name followed by the parenthetical "(Formerly Major, Judge Advocate General's Corps)." Documents he signed included the proviso that "[t]his is submitted for administrative purposes only. I do not recognize jurisdiction over me by the US Army. I am a civilian."

83. Defendant never re-issued Plaintiff a military ID card at any time after September 14, 2001.

84. The military's equivalent of a grand jury is known as an Article 32, UCMJ, pre-trial investigation. It is more commonly referred to simply as the "Article 32." In Plaintiff's case, the Article 32 Investigating Officer ("IO") was a senior JAG lawyer.

85. In the court-martial case against Plaintiff, the Article 32 investigation began on December 10, 2001.

86. The Article 32 included two days of hearings, one on January 15, 2002, at Fort McNair, Washington, D.C., and one on January 23, 2002, at Fort Benning, Georgia.

87. On January 18, 2002, between the two Article 32 hearings, the Court of Appeals for the Armed Forces (CAAF) summarily denied, without analysis or opinion, Plaintiff's first Petition for a Writ of Habeas Corpus (first of three).

88. On January 24, 2002, Plaintiff filed a second Petition for Writ of Habeas Corpus, this time with the Army Court of Criminal Appeals (ACCA), located in Arlington, Virginia.

   a. The named respondent was the Fort Myer, Virginia, Garrison Commander. This was the command to which Plaintiff was reassigned on or about December 5, 2001.

b.      The stated issue was "[w]hether, during the pendency of a court-martial where the sole charge is a violation of Article 83, UCMJ, fraudulent discharge, an individual with a facially valid DD 214 can be maintained under military control."

c.      The stated issue was the same as Plaintiff's first Petition for Writ of Habeas Corpus, except that it was now raised in a different court and against a different respondent.

89.    On February 5, 2002, the Article 32 IO concluded that the charge should be dismissed and that no court-martial should be convened. The Article 32 Investigating Officer found, *inter alia*, that:

a.      "When the [Plaintiff] reported for separation processing, he did so in accordance with orders that had been lawfully issued and which remained in effect at the time of his separation."

b.      "…the Army's attempted revocation of [Plaintiff's] separation orders on 18 September 2001, four days after his separation, was a legal nullity."

c.      "…the investigation did not establish reasonable grounds to believe that [Plaintiff] knowingly misrepresented or deliberately concealed a certain material fact or facts about his eligibility for separation."

d.      "…the allegation that [Plaintiff] knew that basis for his separation orders 'had been overturned' at the time he presented himself for separation is unsupported as a matter of both law and fact."

e.      "The investigation did not reveal evidence that [Plaintiff] committed any act of fraud in the processing of his medical separation case."

f. "I conclude that reasonable grounds do not exist to believe that [Plaintiff] committed the offense alleged."

90. On February 11, 2002, Plaintiff filed a Reply Brief in the Army Court of Criminal Appeals (ACCA) to supplement his habeas petition. This supplement showed the Court the Article 32's no probable cause finding and attached a copy of the Article 32 IO's report of investigation.

91. On February 15, 2002, the Army Court of Criminal Appeals (ACCA), summarily denied, without analysis or opinion, Plaintiff's second Petition for a Writ of Habeas Corpus.

92. On or about February 20, 2002, after the Article 32's finding of no probable cause, Plaintiff again refused to return to Fort Benning. The only trigger for *in personam* jurisdiction over Plaintiff was Defendant's allegation that Plaintiff procured his discharge by fraud. The pretrial investigation found no probable cause. Consequently, Plaintiff contended, Defendant's hold over Plaintiff had evaporated.

93. On February 22, 2002, Defendant threatened to apprehend Plaintiff and place Plaintiff in pretrial confinement if Plaintiff did not report to Fort Benning by 9:00 a.m. on Monday, February 25th. Plaintiff involuntarily returned to duty.

94. On March 1, 2002, the Staff Judge Advocate for the Military District of Washington ("MDW SJA") ignored the Article 32 findings and conclusions. He provided the Commanding General, Military District of Washington, a recommendation to refer the charge to a court-martial.

95. On March 1, 2002, the Commanding General referred the charge to the general court-martial he had convened.

96.    On March 13, 2002, Plaintiff was arraigned before a U.S. Army Military Judge, and the following events occurred during the hearing:

    a.    The U.S. Army Military Judge recused himself from the case for perceived conflicts.

    b.    According to the judge, the perceived conflict stemmed from the fact that the U.S. Army Trial Judiciary fell under the administrative supervision of the same JAG department that had charged Plaintiff.

    c.    The judge informed the parties that the Army's Chief Trial Judge determined, prior to the arraignment, that all U.S. Army Trial Judges were conflicted from hearing the case.

    d.    The Army's Chief Trial Judge, prior to the arraignment, had contacted the Navy's Chief Trial Judge and requested that the Navy's Chief Trial Judge appoint a Naval Service judge to the case.

    e.    A Marine Corps judge was assigned to the case pursuant to that request.

    f.    Questioning by defense counsel suggested the Army's Chief Trial Judge had not considered requesting an Air Force judge.  She also did not consider requesting the Department of Defense General Counsel to locate a judge from among all other services.

97.    On March 29, 2002, Plaintiff's counsel sought to voir dire the Marine Corps judge and did so.  The Marine Corps judge provided his knowledge of his appointment to the case. Upon being asked to recuse himself, he refused.

98.    Between November 15, 2001, and the end of March, 2002, the Government denied
       Plaintiff's six separate requests for conflict-free detailed military counsel and individual
       military counsel, including a request submitted for two different Air Force JAGs.

       a.    In early April, 2002, the Military Judge ordered the Government to find a
             conflict-free military defense counsel.

       b.    On April 8, 2002, the court martial convening authority, the Commanding
             General, Military District of Washington, submitted a request to The Judge
             Advocate General of the Army (TJAG) asking the Army TJAG to find a conflict-
             free JAG to detail to Plaintiff's defense.

       c.    On April 17, 2002, a United States Air Force JAG was detailed to Plaintiff's
             defense.

99.    On or about May 7, 2002, the Office of The Judge Advocate General detailed a JAG from
       its own office to second-chair the Military District of Washington's prosecution team.

100.   On May 7, 2002, Plaintiff filed a <u>third</u> Petition for Writ of Habeas Corpus.  This third
       Petition for Writ of Habeas Corpus was filed in the Court of Appeals for the Armed
       Forces (CAAF).  The named respondent was the United States of America.  This petition
       sought an order permanently removing Plaintiff from military control, declaring Article
       3(b), UCMJ, 10 U.S.C. § 803(b), unconstitutional on its face, and declaring Article 3(b),
       UCMJ, unconstitutional as applied to Plaintiff.

101.   The Marine Corps judge set the trial to begin on June 17, 2002.

102.   On May 24, 2002, Plaintiff filed a Petition in the United States Court of Appeals for the
       Armed Forces (CAAF) styled as a "Petition for Extraordinary Relief, Writ of Prohibition
       and for a Stay of Proceedings."  Plaintiff sought an order prohibiting the Marine Corps

judge from presiding over the court-martial and directing the Secretary of Defense or his designee to appoint a military judge.

103.    On May 31, 2002, the Court of Appeals for the Armed Forces (CAAF), summarily denied, without analysis or opinion, Plaintiff's <u>third</u> Petition for Writ of Habeas Corpus relating to the constitutionality of Article 3(b), UCMJ.

104.    On June 18, 2002, the Court of Appeals for the Armed Forces (CAAF), summarily denied, without analysis or opinion, Plaintiff's "Petition for Extraordinary Relief, Writ of Prohibition and for a Stay of Proceedings" relating to the Marine Corps judge.

105.    The court-martial was dismissed after Plaintiff received a resignation in lieu of court martial and a general discharge.

106.    Plaintiff was issued a General Officer Memorandum of Reprimand (hereinafter "GOMOR") and an adverse Officer Evaluation Report (hereinafter "OER").

107.    A second DD 214 was issued, this one dated October 1, 2002, and indicating that Plaintiff was receiving a general discharge in lieu of court-martial.  Plaintiff did not sign or receive a copy of this second DD 214.

108.    The Office of The Judge Advocate General exerted unlawful command influence in the prosecution of Plaintiff.

109.    Plaintiff sought correction of his military records with the Army Board for Correction of Military Records and was denied relief.

<u>CLAIMS FOR RELIEF</u>

<u>CLAIM 1</u>:

ARTICLE 3(b), UCMJ, 10 U.S.C. § 803 (b), IS UNCONSTITUTIONAL

ON ITS FACE AS VIOLATING ARTICLE III AND

AMENDMENTS IV, V, VI, IX, XIII and IX OF THE U.S. CONSTITUTION

110.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if they were completely restated here.

111.    Subsection (b) of Article 3, UCMJ, states: "Each person discharged from the armed forces who is later charged with having fraudulently obtained his discharge is . . . subject to trial by court-martial on that charge, and is after apprehension subject to this chapter [UCMJ] while in custody of the armed forces for that trial. Upon conviction of that charge he is subject to trial by court-martial for all offenses under this chapter committed before the fraudulent discharge." See 10 U.S.C. §803(b).

112.    Plaintiff was at a minimum presumptively discharged on September 14, 2001, because he received his Honorable Discharge DD 214. Having been presumptively discharged, he was presumptively a civilian ex-servicemember.

113.    Plaintiff was at a minimum presumptively discharged by the mere fact of being charged under Article 3(b), UCMJ, which carries with it a presumption of discharge ("Each person *discharged* from the armed forces who is later charged with having fraudulently obtained his discharge … ) (emphasis added).

114.    Article 3(b), UCMJ, 10 U.S.C. § 803(b), is the jurisdictional basis upon which the Army returned Plaintiff to active duty, court-martialed him, issued him a second discharge, a letter of reprimand and an adverse efficiency report, and refused to recognize Plaintiff's first discharge.

115.    But for the Army's application of Article 3(b), UCMJ, 10 U.S.C. § 803(b), in Plaintiff's case, Plaintiff's military record would reflect his September 14, 2001, honorable discharge for physical disability, his military record would not reflect any service past

September 14, 2001, his military record would not reflect the issuance of a GOMOR and adverse OER, and he would not have been held involuntarily on active duty and subjected to a criminal prosecution.

116. Article 3(b), UCMJ, 10 U.S.C. § 803(b), is unconstitutional on its face.

117. Article 3(b), UCMJ, violates Article III of the U.S. Constitution and Amendments IV, V, VI, IX, XIII, and XIV of the U.S. Constitution.

118. Alternatively (see Claim 3, *infra*), Article 3(b), UCMJ, taken in conjunction with Articles 32 and 34, UCMJ, is unconstitutional on its face because -- in tandem with Articles 32 and 34, UCMJ -- it violates Article III of the U.S. Constitution and Amendments IV, V, VI, IX, XIII, and XIV of the U.S. Constitution.

119. Article 3(b), UCMJ, violates Article III of the U.S. Constitution because it delegates to an Article I court jurisdiction over cases of the type traditionally heard by Article III courts. Congress may not take cases of the type traditionally heard by Article III courts and assign jurisdiction over them to Article I courts.

   a. The military courts established by Congress pursuant to Article I, Section 8, Clause 14 of the U.S. Constitution only have jurisdiction over offenses committed by persons who are members of the armed services both (a) when charged and (b) at the time of the offense.   Solorio v. United States, 483 U.S. 435 (1987), overruling O'Callahan v. Parker, 395 U.S. 258 (1969).

   b. The U.S. Supreme Court has denied Congress the power to authorize the court-martial trial of American civilians, even during times of martial law, Ex parte Milligan, 71 U.S. 2 (1866), even though the civilian accused may have been a member of the armed forces when committing the alleged offense, Toth v.

<u>Quarles</u>, 350 U.S. 11 (1955), even though the accused is a dependent of a servicemember accompanying the servicemember overseas, <u>Reid v. Covert</u>, 354 U.S. 1 (1957), even though the accused is a civilian employee of the military forces at overseas bases and installations. The U.S. Supreme Court has found such trials violate the Fifth and Sixth Amendments to the U.S. Constitution, particularly the right to trial by jury.

    c.    Even though modern day courts-martial provide a modified right to trial by jury, that alone does not rescue 10 U.S.C. § 803(b) from its constitutional infirmities.

120.    Article 3(b), UCMJ, deprives civilian ex-servicemembers of their vital interests in liberty and privacy in violation of the Fourth, Fifth, Sixth, and Ninth Amendments to the Constitution of the United States.

    a.    Article 3(b), UCMJ, has the effect of impressing a civilian ex-servicemember into military service and subjecting him or her to military control and discipline. Article 3(b), UCMJ, prohibits the civilian ex-servicemember from enjoying fundamental liberty interests. This deprives such persons of their liberty, privacy, and due process of law.

    b.    The Fourth, Fifth, Sixth and Ninth Amendments to the U.S. Constitution guarantee and protect vital interests in liberty and privacy, and forbid the United States, and its agencies and officers, from depriving citizens of those rights without due process of law.

121.    Article 3(b), UCMJ, is enforced arbitrarily and capriciously, in violation of the Fifth Amendment's Due Process Clause.

122. Article 3(b), UCMJ, taken in conjunction with Articles 32 and 34, UCMJ, is unconstitutional on its face because -- in tandem with Articles 32 and 34, UCMJ -- it denies civilian ex-servicemembers of their Fifth Amendment right to indictment by Grand Jury.  See Claim 3, *infra*.

123. Article 3(b), violates the Sixth Amendment's guarantee that, "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed … and to have the assistance of counsel for his defence."

   a. Defendant prosecuted Plaintiff in the District of Columbia, at Fort Lesley J. McNair, even though Defendant alleged the crime to have occurred "at or near Fort Benning, Georgia," which is within the Middle District of Georgia.

   b. Defendant denied a half-dozen of Plaintiff's reasonable requests for conflict-free detailed military counsel and individual military counsel.  Ultimately, half-way through pretrial motions, the military judge ordered The Judge Advocate General of the Army to find a conflict-free detailed military defense counsel.  A United States Air Force JAG was detailed to Plaintiff's defense.

124. Article 3(b), UCMJ, violates the Thirteenth Amendment's prohibition against involuntary servitude.

125. The Fourteenth Amendment to the U.S. Constitution, which the U.S. Supreme Court has interpreted to apply to the federal government through the doctrine of "reverse incorporation," guarantees that the federal government shall not deny any citizen the equal protection of the laws.  Article 3(b), UCMJ, deprives a civilian ex-servicemember of their Fourteenth Amendment right to equal protection of the laws.

126.    There is no compelling interest, important interest, or even legitimate governmental interest motivating those deprivations of vital interests in liberty and privacy. Nor are the restrictions on Plaintiff's liberty and privacy necessary, narrowly tailored, or even rationally related to such a governmental interest.

127.    Congress lacked constitutional authority to delegate to the Secretary of Defense and/or Secretary of the Army authority to issue unconstitutional regulations under Article 3(b), UCMJ, 10 U.S.C. § 803(b).

128.    All regulations issued under 10 U.S.C. § 803(b), including but not limited to any regulation affecting the orders issuing process, the discharge of a commissioned officer, the revocation of discharge orders, and the revocation of a DD 214, are unconstitutional on their face.

129.    Plaintiff and others like him have no adequate remedy at law and face the continuing and irreparable loss of their rights.  By reason of these violations of their constitutional rights, Plaintiff and others similarly situated are entitled to declaratory judgment and injunctive relief against the enforcement of 10 U.S.C. § 803(b) and regulations issued under that statute.

130.    Article 3(b), UCMJ, 10 U.S.C. § 803(b), is unconstitutionally vague and overbroad in that it intrudes upon a civilian ex-servicemember's liberties even more broadly than Article 2(d), UCMJ, 10 U.S.C. § 802(d).

    a.    Article 3(b) says nothing about a dischargee's obligation to perform military duties when taken into military custody on a charge of fraudulent procurement of the discharge.

b.     Under Article 2(d), UCMJ, 10 U.S.C. § 802(d), reservists are called to active duty only for military justice proceedings while remaining civilians during the interim time periods.

c.     In this regard, Article 3(b) is not "the least possible power adequate to the end proposed."

d.     This is essentially the same claim as was asserted at the Court of Appeals for the Armed Forces (CAAF) and the Army Court of Criminal Appeals (ACCA) in Plaintiff's first and second Petitions for Writ of Habeas Corpus.

131.    Article 3(b), UCMJ, 10 U.S.C. § 803(b), is unconstitutionally vague and overbroad in that it fails to articulate that the elements of fraud required to sustain a conviction will be the same elements of fraud as found in other federal laws.

132.    Article 3(b), UCMJ, 10 U.S.C. § 803(b), is unconstitutionally vague and overbroad in that it creates a jurisdictional maze in which a civilian ex-servicemember must guess at who is the proper party to name as respondent in a Petition for Writ of Habeas Corpus.

a.     After a civilian ex-servicemember is returned to military control in a case arising under Article 3(b), UCMJ, his status changes to that of a presumptively discharged person being held in military custody for court-martial.

b.     When a person claims that he is presently in custody in violation of the Constitution or laws of the United States, then what he seeks from the federal courts is a writ of habeas corpus.

c.     The writ of habeas corpus has long been recognized as the appropriate remedy for servicemen who claim to be unlawfully retained in the armed forces.  In fact, habeas corpus is that person's exclusive remedy.

d. Under 28 U.S.C. § 2241, a federal court has jurisdiction over a habeas petition only if it has jurisdiction over petitioner's "immediate custodian."

e. This leaves the presumptively discharged person guessing at whether he should file a habeas petition in a U.S. District Court or in a military appellate court, against the Service Secretary in the District of Columbia, against the Post Commander where he is then performing military duties, or against some other commanding officer to which he has been assigned, attached, reassigned or reattached.

f. The combined effect of Article 3(b), UCMJ, and 28 U.S.C. § 2241, exposes the presumptively discharged habeas petitioner to unreasonable delays, dismissals, or transfers of his habeas petition during a time when he is involuntarily held under military control. In this regard, Article 3(b) is not "the least possible power adequate to the end proposed."

133. Article 3(b), UCMJ, 10 U.S.C. § 803(b), is unconstitutionally vague and overbroad, for several other reasons, including but not limited to the following:

a. The statute allows the Army to reach out and claim court-martial jurisdiction over any ex-soldier who has been discharged for an offense committed while on active duty, merely by the bringing of a charge under Article 83, UCMJ.

b. The statute brings under its sweep several million veterans.

c. The number of veterans subject to the statute increases every year, as more and more people are discharged.

d. The statute has an "enormous scope."

e.    Article 3(b), UCMJ, merely requires the bringing of a charge, with no limit on the time period in which the military must bring that charge.

f.    There is <u>no</u> gatekeeper function at all in the statute.  The Supreme Court has been concerned over the last two centuries about the requirement of a gatekeeper function before a civilian can be subjected to trial, whether in a civil court or a court-martial.

g.    Article 3(b), UCMJ, does not require a finding of probable cause; the statute does not require any screening; the statute boldly states that upon the bringing of a charge, the accused may be apprehended and brought back to the military, and while there be subject to military control.

h.    It is very difficult to see any distinction between Article 3(b) in dealing with alleged fraudulent discharge and Article 3(a) as it existed when the Supreme Court struck the latter down in <u>U.S. ex rel. Toth v. Quarles</u>, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

i.    Article 3(b), UCMJ, is not a minimal intrusion or a minimal expansion of military jurisdiction.  The Defendant, as evidenced by the argument of government counsel during the proceedings in Plaintiff's case, does not recognize any statute of limitations as applying to prosecutions of Article 3(b), UCMJ, cases. Government counsel contended that the *mere allegation* of fraudulent discharge means that the discharge is void, and that Plaintiff was still a member of the Army.  Therefore, Plaintiff's absence from the military, under the Army's view, was unauthorized, and unauthorized absence tolls the applicable statute of limitations under the UCMJ.  <u>See</u> 10 U.S.C. §843(c).  This means that <u>every</u>

veteran of the military services of the United States is subject to court-martial by their respective military service at any time during the rest of their lives upon the simple bringing of a charge of fraudulent discharge.  The Supreme Court in U.S. ex rel. Toth v. Quarles, supra, found that this was an "enormous scope".  350 U.S. at 19, 76 S.Ct. at 6.  In light of the historical and constitutional inability of the military to court-martial a civilian, the Supreme Court would not view this as a minimal impingement on the authority of Article III civilian courts.  See, U.S. ex rel. Toth v. Quarles, 350 U.S. at 20, 76 S.Ct. at 7 (". . . no justification for treating the Act as a mere minor increase of congressional power to expand military jurisdiction".)  Likewise, the Supreme Court has been very cautious to make sure that in the area of military-civil court relations, the constitutional rights of citizens are not nibbled away piecemeal, little bit by little bit.  See, Reid v. Covert,  354 U.S. at 39-40, 77 S.Ct. at 1242.

j.  Article 3(b), UCMJ, carries an impermissible presumption of guilt.  To allow a military court to assert jurisdiction over the claim that Plaintiff's discharge was fraudulently procured, so that the military court can determine whether there was fraud in its procurement, presumes he is still in the Army, and that thus the discharge was fraudulent.  In order to exercise jurisdiction over a civilian ex-servicemember, a court-martial must necessarily presume that he is a serviceman.  However, he would only be a serviceman if he is guilty of the very offense for which the Army prosecutes him:  fraudulent separation of service.  Neither the common law nor military law authorizes such a presumption of guilt.  A presumption of innocence is a fundamental tenet of both systems of justice.

k.     As stated by the Supreme Court on more than one occasion, "the least possible power adequate to the end proposed" is what is *constitutionally required* when reviewing court-martial jurisdiction.  See, McElroy v. U.S. ex rel. Guagliardo, supra 361 U.S. 281, 286, 80 S.Ct. 305, 309, 4 L.Ed.2d 282 (1960), citing U.S. ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

134.   10 U.S.C. § 803(b) is not "the least possible power adequate to the end proposed."  The Defendant has alternative remedies available to it, none of which would have raised the constitutional issue now pending before this Court.

a.     Defendant could present its case to the United States Attorney in the district where the fraudulent discharge offense is alleged to have occurred.  That United States Attorney could in turn take the allegation to a grand jury for possible indictment under the fraud statutes in Title 18 of the U.S. Code.  See 18 U.S.C. §§ 287, 1001.  This would trigger the Speedy Trial Act, ensuring swift adjudication.

b.     Defendant could file a civil action for fraud against the civilian ex-servicemember, in the appropriate venue for such action, seeking to prove by a preponderance of the evidence that the discharge was fraudulently obtained.

<u>CLAIM 2</u>:

ARTICLE 3(b), UCMJ, 10 U.S.C. § 803(b), IS UNCONSTITUTIONAL

AS APPLIED TO PLAINTIFF AS VIOLATING ARTICLE III AND

AMENDMENTS IV, V, VI, IX, XIII and XIV OF THE U.S. CONSTITUTION

135.   Plaintiff incorporates by reference all prior paragraphs of this Complaint as if they were completely restated here.

136.    For all of the same reasons that Article 3(b), UCMJ, is unconstitutional on its face, as set forth in Claim 1 of this Complaint, Article 3(b), UCMJ is also, or alternatively, unconstitutional as it was applied to Plaintiff.

137.    For all of the same reasons that Article 3(b), UCMJ, taken in conjunction with Articles 32 and 34, UCMJ, is unconstitutional on its face, as set forth in Claim 1 of this Complaint, Article 3(b), UCMJ, taken in conjunction with Articles 32 and 34, UCMJ, is also, or alternatively, unconstitutional as it was applied in Plaintiff's case because -- in tandem with Articles 32 and 34, UCMJ -- it violated Article III of the U.S. Constitution and Amendments IV, V, VI, IX, XIII, and XIV of the U.S. Constitution.  See also Claim 3, *infra*.

138.    In addition to all the reasons set forth elsewhere in this Complaint establishing that Article 3(b), UCMJ, is unconstitutional on its face or as applied, Article 3(b), UCMJ, is also notably unconstitutional as it was applied to Plaintiff because Plaintiff was a "full-fledged civilian" after receiving his original DD 214.  In those few cases where the constitutionality of 10 U.S.C. § 803(b) has been upheld, the ex-soldier was in some way still in a relationship with the military.  In stark contrast to Ms. Wickham in Wickham v. Hall, 706 F.2d 713 (5th Cir. 1983), Plaintiff herein did not have any continued affiliation with the Army Reserves after September 14, 2001.  Plaintiff had been a member of the Regular Army, meaning that he had no Reserve obligation once he left active duty.  After he received his Honorable Discharge, he was a "full fledged civilian" in the language of the Fifth Circuit majority in Wickham v. Hall, 706 F.2d at 718.

139.    In addition to all the reasons set forth elsewhere in this Complaint establishing that Article 3(b), UCMJ, is unconstitutional on its face or as applied, Article 3(b), UCMJ, is

also notably unconstitutional as it was applied to Plaintiff because, in Plaintiff's case, there was a finding of no probable cause by the Article 32, UCMJ, pretrial investigation -- the military equivalent of a federal grand jury.

<u>CLAIM 3</u>:

ARTICLES 32 AND 34, UCMJ, 10 U.S.C. §§ 832 AND 834, ARE UNCONSTITUTIONAL

AS APPLIED TO PLAINTIFF AS VIOLATING ARTICLE III AND

AMENDMENTS IV, V, VI, IX, XIII and XIV OF THE U.S. CONSTITUTION

140.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if they were completely restated here.

141.    For all of the same reasons that Article 3(b), UCMJ, taken in conjunction with Articles 32 and 34, UCMJ, is unconstitutional on its face and as applied to Plaintiff (as set forth in Claims 1 and 2 of this Complaint), Articles 32 and 34, UCMJ, when applied in a case arising under Article 3(b), UCMJ, are also, or alternatively, unconstitutional as they were applied in Plaintiff's case. Defendant's application of Articles 32 and 34, UCMJ, in Plaintiff's case, violated Article III of the U.S. Constitution and Amendments IV, V, VI, IX, XIII, and XIV of the U.S. Constitution.

142.    Plaintiff was presumptively a civilian while he was being court-martialed on a felony charge.

143.    Plaintiff was presumptively a "full-fledged civilian" while he was being court-martialed on a felony charge.

144.    A violation of Article 83, UCMJ, 10 U.S.C. § 883 (b) is a felony, punishable by confinement for five years.

145.    Since Plaintiff was presumptively a civilian while he was being court-martialed for a violation of 10 U.S.C. § 803(b), Plaintiff should have received the same grand jury protections afforded every civilian facing felony prosecution, namely, that when the grand jury finds no probable cause the criminal prosecution must stop.

146.    The Fifth Amendment provides that no person shall be tried for a felony without first being indicted by a grand jury.

147.    The Fifth Amendment to the U.S. Constitution requires a grand jury indictment for federal criminal charges.  The primary function of the modern grand jury is to review the evidence presented by the prosecutor and determine whether there is probable cause to return an indictment.  If the grand jury refuses to return an indictment, the prosecutor cannot proceed to trial on that charge.

148.    The Fifth Amendment right to indictment by grand jury extends to all persons except those serving in the armed forces.  In any case arising under Article 3(b), UCMJ, this is where the constitutional infirmity for Articles 32 and 34, UCMJ, 10 U.S.C. §§ 832 and 834, begins.

149.    All persons in the regular armed forces are subject to court martial procedures rather than grand jury indictment procedures.

150.    The Fifth Amendment right to indictment by grand jury does not apply in the military; instead, servicemembers are provided the alternative right of a pretrial investigation under 10 U.S.C. § 832 and pretrial review under 10 U.S.C. § 834.

151.    There is a stark difference between a civilian's right to indictment by a grand jury and a servicemember's right to a pretrial investigation.  A grand jury's probable cause

determination is dispositive to the prosecutor's ability to bring the civilian to trial.  The Article 32 Investigating Officer's probable cause determination is advisory only.

152.    Plaintiff's court-martial was convened notwithstanding the Article 32 Investigating Officer's objective finding of no probable cause.  This would not have occurred to Plaintiff if his grand jury rights were applied to his case.

153.    The combined effect of 10 U.S.C. § 803 (b), 10 U.S.C. § 832, and 10 U.S.C. § 834 allows for a person who is in fact a civilian ex-servicemember to be placed in criminal jeopardy to the point of trial by jury in the military court system, even when there is an objective finding of no probable cause at the Article 32 stage, where that civilian, in a federal criminal proceeding that resulted in a finding of no probable cause by a grand jury, would not be subject to further prosecution.

154.    This is exactly what happened in Plaintiff's case.  A U.S. District Court denied his application for a temporary restraining order on the grounds of comity and only because the Army JAG Corps preferred a charge of fraudulent discharge against Plaintiff after the JAG Corps learned Plaintiff filed suit in federal court.  Thereafter an objective finding of no probable cause was made by the Article 32 Investigating Officer.  Notwithstanding that finding of no probable cause, the local Staff Judge Advocate, the MDW SJA, recommended trial by court-martial for a felony offense.

155.    The combined effect of 10 U.S.C. § 803 (b), 10 U.S.C. § 832, and 10 U.S.C. § 834 in Plaintiff's case also highlights how 10 U.S.C. § 803 (b), 10 U.S.C. § 832, and 10 U.S.C. § 834 -- taken together -- violate Article III of the U.S. Constitution.  Even after a finding of no probable cause, the combined effect of these three statutes ultimately delegated to an Article I court jurisdiction over a criminal case of the type traditionally heard by

Article III courts. Congress may not take cases of the type traditionally heard by Article III courts and assign jurisdiction over them to Article I courts.

156. Other facts in Plaintiff's case demonstrate how Articles 34, UCMJ, 10 U.S.C. § 834, is unconstitutional as applied in Plaintiff's case. In Plaintiff's case, the Staff Judge Advocate should have recused himself from the function of giving the convening authority the statutorily-required "pretrial advice." A Staff Judge Advocate from outside the U.S. Army JAG Corps should have performed the 10 U.S.C. § 834 function. This is supported by the following:

a. The fact that the MDW SJA was himself faced with a perceived conflict of interest, being responsible for the prosecution of a JAG officer in a case of importance to the JAG Corps;

b. The fact that, prior to the MDW SJA rendering his pretrial advice in this case, special reports about the litigation against Plaintiff were being disseminated by email worldwide to all Army JAG SJA's;

c. The fact that ultimately the entire U.S. Army Trial Judiciary recused itself from the case, instead bringing a Marine Judge onto the case;

d. The fact that a determination was made that Plaintiff could not get a fair trial by the appointment of a military defense counsel from within the Army, instead an Air Force defense counsel being detailed to Plaintiff's case;

e. The fact that attention to and guidance in Plaintiff's case was being given by the second-highest ranking officer in the JAG Corps, MG John Altenburg;

f. The fact that the Office of The Judge Advocate General (the same agency that created the perceived conflict for all the Army trial judges) detailed a JAG from

its own office to second-chair the Military District of Washington's prosecution team, which either threatened undue influence over the MDW SJA or evidences the conflict-ridden cooperation between the two separate agencies.

CLAIM 4:

FINAL AGENCY ACTION

157. Plaintiff incorporates by reference all prior paragraphs of this Complaint as if they were completely restated here.

158. Defendant's first PEB determination that Plaintiff was "unfit for duty" constituted final agency action.

159. Defendant's issuance of Orders # 183-2200 on July 3, 2001, constituted final agency action.

160. Defendant's delivery of a DD-214 to Plaintiff on September 14, 2001 constituted final agency action.

161. Defendant's issuance on October 1, 2002, of a general discharge is erroneous and *void ab initio* because the Army lacked jurisdiction to take any personnel action *other than* to court-martial Plaintiff under Article 3(b), UCMJ.

162. After midnight on September 14, 2001, Plaintiff was validly discharged because he (a) completed the clearing process, (b) received a final accounting of pay, and (c) was delivered his DD-214. See, e.g., United States v. Brevard, 58 M.J. 124 (C.A.A.F. 2003). Accord, United States v. Melanson, 53 M.J. 1 (C.A.A.F. 2000); Smith v. Vanderbush, 47 M.J. 56 (C.A.A.F. 1997); United States v. Howard, 20 M.J. 353 (C.M.A. 1985).

163. Defendant tried to void Plaintiff's discharge when it tried to convict Plaintiff of procuring that discharge through fraud. The Government failed to convict Plaintiff. If the

Government tries but fails to convict a dischargee of a violation of Article 83, then the Government has tried but failed to void the discharge, and, in that case, the discharge stands and the dischargee remains a civilian.  Wickham v. Hall, 12 M.J. 145, 153 (C.M.A. 1981).

164.    The USAPDA referred Plaintiff's disability evaluation back to the PEB for reconsideration.  The USAPDA had no authority to do this because Plaintiff's case already had a "final decision" entered on it by the Commanding General, PERSCOM, when Orders # 183-2200 were issued.  The only exception would have been a request by the USAPDA to PERSCOM to cancel the discharge instructions pursuant to § E-9(e) of Appendix E of AR 635-40.  Plaintiff was never issued any orders from PERSCOM cancelling his separation and discharge orders.  The subsequent PEB was conducted in violation of the Army's own regulations.

165.    Although not communicating same to Plaintiff, the Army began steps to cancel his discharge orders, but did not effectuate same prior to Plaintiff's honorable discharge on September 14, 2001.

166.    Plaintiff separated pursuant to lawful, self-executing orders, Orders # 183-2200, which were not revoked by any competent authority prior to his date of separation.

167.    PEB # 2 was not final agency action as of the date of Plaintiff's separation and therefore did not form a basis for revocation of Orders # 183-2200 or serve as a revocation of Orders # 183-2200.

168.    Plaintiff did nothing fraudulent with respect to his "eligibility" to separate.  It was not fraud to appear at the Transition Point pursuant to lawful, self-executing discharge orders. It was Plaintiff's legal military duty to do so.

169.   Defendant tried, but failed completely, during the court-martial of Plaintiff, to produce evidence that Plaintiff made a misrepresentation of fact about his medical condition. There is no evidence that Plaintiff concealed evidence from PEB # 1.  There is no evidence that Plaintiff made a false representation of fact to PEB # 1.  Because Defendant could not produce any evidence of fraud tainting PEB # 1, it was left only with the tenuous argument that Plaintiff had an affirmative duty to not follow Orders # 183-2200.

170.   Under the provisions of AR 635-40, Orders # 183-2200 constituted a "final disposition" of Plaintiff's disability case.

171.   Plaintiff's eligibility for separation was fixed by his first PEB finding him unfit for duty. The Secretary of the Army approved this decision and took final action upon this decision by issuing Plaintiff Orders # 183-2200.  That decision was never overturned, and could not have been overturned, without similarly "final" agency action.

CLAIM 5:

ARMY REGULATION 600-8-105 (MILITARY ORDERS)

172.   Plaintiff incorporates by reference all prior paragraphs of this Complaint as if they were completely restated here.

173.   Revocation of military orders is discussed in AR 600-8-105 Military Orders.

174.   This regulation was in effect when Orders # 183-2200 were issued.

175.   Paragraph 2-21(e) of AR 600-8-105 provides, "When there is no evidence of fraud or obvious error and the soldier received actual or constructive delivery, orders discharging a soldier from the service will not be revoked after the effective date of discharge unless the revocation is a written confirmation of verbal orders actually issued before the effective date of discharge."

176.    In Plaintiff's case, prior to September 14, 2001, there was never any order, written or

verbal, by a competent authority, actually issued.

CLAIM 6:

ARBITRARY AND CAPRICIOUS AGENCY ACTION PRIOR TO REVIEW BY ARMY

BOARD FOR CORRECTION OF MILITARY RECORDS (ABCMR)

177.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if they were

completely restated here.

178.    The USAPDA's actions were arbitrary, capricious, unsupported by substantial evidence,

or contrary to applicable statutes and regulations.

179.    PEB #2's actions were arbitrary, capricious, unsupported by substantial evidence, or

contrary to applicable statutes and regulations.

180.    The purported cancellation of Plaintiff's discharge orders, Orders 183-2200 dated 2 July

2001, was without regulatory authority, and thus was *void ab initio*.  USAPDA had no

authority to cancel Plaintiff's discharge orders because those orders were issued by

PERSCOM.  The only exception would have been a request by PDA to PERSCOM to

cancel the discharge instructions pursuant to § E-9.e of Appendix E to AR 635-40.

181.    Procedural irregularity of the USAPDA Remand Decision.  USAPDA had no authority to

refer Plaintiff's case back to the PEB for reconsideration because the case already had a

"final decision" entered on it by PERSCOM.  The only exception would have been a

request by PDA to PERSCOM to cancel the discharge instructions pursuant to § E-9.e of

Appendix E to AR 635-40.

182.    USAPDA had no authority to reconvene the PEB to reconsider PEB #1 because "final

action" had already occurred.  "*Before final action on a case*, the proceedings of a

properly constituted PEB may be returned to the same board for further consideration of findings, correction of errors, or other reasons."  AR 635-40, para. 4-19(p)(1) (emphasis added).

183.    PEB #2 lacked jurisdiction to reconsider PEB #1 and issue revised findings. "Proceedings of an improperly constituted PEB are null and void."  AR 635-40, para. 4-19(p)(2).

184.    USAPDA Counsel erroneously advised his agency to treat Plaintiff's case in the same way a medical doctor's case is treated.

185.    In refusing to acknowledge and file Plaintiff's September 14, 2001, discharge certificate, and by instead filing a litany of adverse documents in Plaintiff's military record after September 14, 2001, certain Department of Army personnel acted on their own subjective belief that Plaintiff's original discharge orders and his original disability finding had been revoked.  Their actions, and the premise upon which their actions were based, were not in good faith, and were erroneous and unreasonable because they failed to follow their own regulations.

## CLAIM 7:

### PLAINTIFF'S ADVERSE POST-DISCHARGE OFFICER EVALUATION REPORT

186.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if they were completely restated here.

187.    The adverse OER filed in Plaintiff's military record after September 14, 2001, should be removed for any one or any combination of the following reasons:

a.      Plaintiff was already discharged as of September 14, 2001, and was not subject to being evaluated as a servicemember;

b.      The OER and the filing of that OER resulted from the unconstitutional application of 10 U.S.C. § 803 (b) and 10 U.S.C. § 832 and 10 U.S.C. § 834 against Plaintiff;

c.      The OER and the filing of the OER resulted from Defendant's failure to follow its own regulations governing the physical disability evaluation system ("PDES") and military orders;

d.      The Senior Rater, Colonel Dick Gordon, as Fort Benning Staff Judge Advocate, had too great a conflict-of-interest as between himself and Plaintiff, as Fort Benning Senior Defense Counsel, to act as Senior Rater.  As Senior Defense Counsel, it was Plaintiff's (and his subordinate attorneys') duty to oppose then-SJA Colonel Gordon's office on all criminal and disciplinary actions against soldiers;

e.      The adverse OER and the filing of that OER in Plaintiff's military record was arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations.

<u>CLAIM 8</u>:

PLAINTIFF'S ADVERSE POST-DISCHARGE

GENERAL OFFICER MEMORANDUM OF REPRIMAND

188.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if they were completely restated here.

189.    The General Officer Memorandum of Reprimand filed in Plaintiff's military record after September 14, 2001, should be removed for any one or any combination of the following reasons:

a.  Plaintiff was already discharged as of September 14, 2001, and was not subject to being reprimanded as a servicemember;

b.  The GOMOR and the filing of that GOMOR resulted from the unconstitutional application of 10 U.S.C. § 803 (b) and 10 U.S.C. § 832 and 10 U.S.C. § 834 against Plaintiff;

c.  The GOMOR and the filing of the GOMOR resulted from Defendant's failure to follow its own regulations governing the physical disability evaluation system ("PDES") and military orders;

d.  The GOMOR and the filing of that GOMOR in Plaintiff's military record was arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations.

## CLAIM 9:

## ARBITRARY AND CAPRICIOUS AGENY ACTION AT THE ARMY BOARD FOR CORRECTION OF MILITARY RECORDS (ABCMR)

190.  Plaintiff incorporates by reference all prior paragraphs of this Complaint as if they were completely restated here.

191.  Plaintiff timely applied to the Army Board for Correction of Military Records asking Defendant to substitute Plaintiff's valid 2001 honorable discharge for Plaintiff's invalid 2002 general discharge.  Plaintiff also asked the ABCMR for other forms of relief -- the same as those sought in this Complaint.  The ABCMR denied that application on or about November 9, 2005.  Plaintiff exhausted all available administrative remedies for relief.

192.  The decision of the Secretary of the Army, acting by and through the Army Board for Correction of Military Records, not to correct the Plaintiff's military records as requested

was, and is, arbitrary, capricious, lacks substantial evidence and is contrary to the evidence and law.

## CLAIM 10:

## ATTORNEYS FEES AND EXPENSES

193.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if they were completely restated here.

194.    The Equal Access to Justice Act ("EAJA") waives the sovereign immunity of the United States for attorney fees to certain prevailing parties in litigation against the United States if the position of the United States was not substantially justified.

195.    In this case the position of the United States was not substantially justified.

196.    Plaintiff is entitled to recover his reasonable attorneys fees and expenses of litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, reasonably incurred in the bringing of and prosecution of this action, said award to be entered against Defendant by this Court at the conclusion of this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff now seeks the following specific items of relief from this Court:

a.    A declaration that the USAPDA's attempted revocation, during August and September of 2001, of Plaintiff's discharge orders, Orders 183-2200 dated 2 July 2001, was void and unlawful;

b.    A declaration that the PEB's August 30, 2001, reconsideration was null and void, having been the action of an improperly constituted board;

c.  A declaration that Plaintiff's Orders 183-2200 remained valid and enforceable, having never been validly rescinded, from July 2, 2001, through the date of Plaintiff's discharge, September 14, 2001;

d.  A declaration that Defendant's attempted revocation of Plaintiff's September 14, 2001, discharge was void and unlawful;

e.  A declaration that the ABCMR's denial of Plaintiff's claims violated the Administrative Procedures Act, 5 U.S.C. § 701 et. seq., except that Plaintiff does not ask this Court to review Plaintiff's claims to the ABCMR for monetary relief;

f.  A declaration that Article 3(b), UCMJ, 10 U.S.C. § 803(b), is unconstitutional on its face;

g.  A declaration that Article 3(b), UCMJ, 10 U.S.C. § 803(b), is unconstitutional as applied;

h.  A declaration that Article 32, UCMJ, 10 U.S.C. § 832, is unconstitutional as applied;

i.  A declaration that Article 34, UCMJ, 10 U.S.C. § 834, is unconstitutional as applied;

j.  A declaration that the combined effect of Articles 32 and 34, UCMJ, 10 U.S.C. §§ 832 and 834, when applied in a case arising under Article 3(b), UCMJ, 10 U.S.C. § 803(b), and when applied to refer a case to court-martial after a finding of no probable cause, is unconstitutional as applied;

k.  An order compelling the following matters be expunged from Plaintiff's military record:

(i)  DD 214 dated October 1, 2002;

(ii)    the GOMOR dated sometime after September 14, 2001;

(iii)    the OER dated sometime after September 14, 2001;

(iv)    All references to a resignation in lieu of court-martial;

(v)    All references to any military service past September 14, 2001;

l.    An order compelling Defendant to record Plaintiff's September 14, 2001, DD 214 discharge certificate in Plaintiff's military record to show an Honorable discharge on September 14, 2001, with "medical discharge" as the reason for separation;

m.    Plaintiff is not asking this Court to award monetary relief in this lawsuit;

n.    Reasonable attorney's fees and costs; and

o.    All other and further relief as the Court may deem just and proper under the circumstances.

Respectfully submitted,

_____

Gary R. Myers
D.C. Bar 157115
78 Clark Mill Road
Weare, New Hampshire 03281
1-800-355-1095
FAX (603) 529-3009
Attorney for Plaintiff

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Malcolm G. Schaefer      88888 | The Honorable Pete Geren, Secretary of the Army |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF       99999 (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Gary Myers Gary Myers, James Culp & Associates 78 Clark Mill Road Weare, NH  03281 800-355-1095 | Case: 1:07-cv-01550 Assigned To : Leon, Richard J. Assign. Date : 8/30/2007 Description: Admn. Agency Review |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ◎ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ⊗ C. Administrative Agency Review | ○ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury ☐ 362 Medical Malpractice ☐ 365 Product Liability ☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act Social Security: ☐ 861 HIA ((1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g) Other Statutes ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act ☒ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment. *(If Antitrust, then A governs)* |

| ○ E. General Civil (Other) | OR | ○ F. Pro Se General Civil |
|---|---|---|

| Real Property ☐ 210 Land Condemnation ☐ 220 Foreclosure ☐ 230 Rent, Lease & Ejectment ☐ 240 Torts to Land ☐ 245 Tort Product Liability ☐ 290 All Other Real Property Personal Property ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage ☐ 385 Property Damage Product Liability | Bankruptcy ☐ 422 Appeal 28 USC 158 ☐ 423 Withdrawal 28 USC 157 Prisoner Petitions ☐ 535 Death Penalty ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition Property Rights ☐ 820 Copyrights ☐ 830 Patent ☐ 840 Trademark Federal Tax Suits ☐ 870 Taxes (US plaintiff or defendant) ☐ 871 IRS-Third Party 26 USC 7609 | Forfeiture/Penalty ☐ 610 Agriculture ☐ 620 Other Food &Drug ☐ 625 Drug Related Seizure of Property 21 USC 881 ☐ 630 Liquor Laws ☐ 640 RR & Truck ☐ 650 Airline Regs ☐ 660 Occupational Safety/Health ☐ 690 Other Other Statutes ☐ 400 State Reapportionment ☐ 430 Banks & Banking ☐ 450 Commerce/ICC Rates/etc. ☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations ☐ 480 Consumer Credit ☐ 490 Cable/Satellite TV ☐ 810 Selective Service ☐ 850 Securities/Commodities/ Exchange ☐ 875 Customer Challenge 12 USC 3410 ☐ 900 Appeal of fee determination under equal access to Justice ☐ 950 Constitutionality of State Statutes ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act) ③ |

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 U.S.C. 1331 and 5 U.S.C. 702 et seq, Review of Administrative Action

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ [ 0 ]    Check YES only if demanded in complaint
JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY** (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE 8/29/07    SIGNATURE OF ATTORNEY OF RECORD   Gen

---

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

