UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MALCOLM G. SCHAEFER,　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　)　　　Civil Action No. 1:07-cv-01550 (RJL)
v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
THE HONORABLE PETE GEREN,　　 )
SECRETARY OF THE ARMY,　　　　)
　　　　　　　　　　　　　　　　)
　　　　　Defendant.　　　　　　)


PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT




Gary R. Myers
D.C. Bar 157115
78 Clark Mill Road
Weare, New Hampshire 03281
1-800-355-1095
FAX (603) 529-3009
Attorney for Plaintiff

TABLE OF CONTENTS

*Page*

Standard of Review ................................................................................................ 1

Argument ............................................................................................................... 2

   I.  DEFENDANT'S MOTION IS CONTRADICTED BY ITS PRIOR CONDUCT ............... 2

   II.  DEFENDANT'S MOTION IS CONTRADICTED BY ITS PRIOR DETERMINATIONS 3

   III.  DEFENDANT'S ERRONEOUS FRAUD CLAIM ................................................ 4

   IV.  DEFENDANT DID NOT PROVE AN ARTICLE 83 OFFENSE, EVEN
   ADMINISTRATIVELY, AND FAILED TO OBJECTIVELY ASSESS PLAINTIFF'S
   SERVICE ...................................................................................................... 5

   V.  DEFENDANT'S ERRONEOUS "SAME AGENCY" ARGUMENT ............................... 8

      A.  Defendant blurs lines between the Chain of Command ................................... 8

      B.  Missing delegation documents ..................................................................... 12

   VI.  DEFENDANT'S ERRONEOUS "LEGAL HOLD" THEORY ...................................... 14

      A.  Where Defendant's "legal hold" theory originated ......................................... 14

      B.  Defendant's "legal hold" Argument .............................................................. 15

      C.  *U.S. v. Williams* was a criminal "continuing jurisdiction" case, not a physical disability
      case ............................................................................................................. 16

      D.  The ABCMR also misused *United States v. Garvin,* another R.C.M. 202(c) case ......... 18

      E. A "legal hold" is found in the Army's regulation governing courts-martial, but not within
      its regulation governing physical disability cases ............................................ 19

   VII.  DEFENDANT MISCHARACTERIZES PLAINTIFF'S "RFGOS" AS BEING THE
   EQUIVALENT OF A GUILTY PLEA, OR PLEA BARGAIN ............................. 19

   VIII.  DEFENDANT ERRONEOUSLY CLAIMS PLAINTIFF VOLUNTARILY
   SUBMITTED TO MILITARY CONTROL ...................................................... 20

      A. Defendant anticipated this case ................................................................... 20

B. Plaintiff attempted to withdraw the RFGOS. The Army either ignored that request or assumed the merits of that request would be decided in the civil courts. ............................. 21

C. Jurisdiction is never waived ........................................................................................ 22

D. Plaintiff adequately reserved his right to bring this controversy to this court ............... 24

E. The RFGOS regulation demonstrates Plaintiff never waived jurisdiction ...................... 24

F. Defendant caused Plaintiff to submit the RFGOS under threat of duress and by other coercion ............................................................................................................................... 24

    (i) Plaintiff submitted the RFGOS while illegally detained in violation of Gerstein v. Pugh ................................................................................................................................ 25

    (ii) Plaintiff submitted the RFGOS only after the Government continued its prosecution despite the finding of no probable cause .......................................................................... 26

G. The balance of equities and the totality of circumstances weigh against the court's dismissal of Plaintiff's case without even reaching the merits of Plaintiff's claims ........... 27

IX. DEFENDANT'S ERRONEOUS CLAIM THAT DISCHARGE #1 WAS REVOKED AFTER-THE-FACT USING THE "WRITTEN CONFIRMATION OF VERBAL ORDERS" AND/OR THE "OBVIOUS ERROR" PRONGS OF ARMY REG 600-8-105 ¶ 2-21(E) ....... 28

X. DEFENDANT'S "NO JAG INPUT" RED HERRING ...................................................... 30

XI. DEFENDANT'S ERRONEOUS CLAIM THAT DISCHARGE #1 WAS REVOKED AFTER-THE-FACT USING THE FRAUD PRONG OF ARMY REG 600-8-105 ¶ 2-21(E) 32

A. Plaintiff was judicially returned to military control for court-martial, not administratively returned to duty ...................................................................................................................... 32

B. Lack of Substantial Evidence of a Fraudulent Separation Offense ................................. 33

C. The *Rooney* Court overlooked a due process forum provided by Congress ................... 33

D. Defendant's interpretation of Army Reg 600-8-105 ¶ 2-21 (e) violates the due process clause of the Fifth Amendment and contradicts 10 U.S.C. § 803 (b), which preempts the field ..................................................................................................................................... 35

XII. DEFENDANT'S REBUTTAL TO PLAINTIFF'S CONSTITUTIONAL CLAIMS ...... 42

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MALCOLM G. SCHAEFER,                )
                                    )
        Plaintiff,                  )
                                    )       Civil Action No. 1:07-cv-01550 (RJL)
v.                                  )
                                    )
THE HONORABLE PETE GEREN,           )
SECRETARY OF THE ARMY,              )
                                    )
        Defendant.                  )

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff was discharged twice from the U.S. Army.[1] Either one or neither is valid. Both cannot coexist. If neither is valid, Plaintiff is still in the Army. Grave concern arises whenever our military exercises control over a citizen of this Nation. *See, e.g.*, *Talbot v. Toth*, 215 F.2d 22, 31 (D.C. Cir. 1954)   ("[T]ransposition from civilian life back into military life … [is a] violent event."). The balance of equities does not lie with the Government in this case.

### *Standard of Review*

The deferential standard of review Defendant describes does not apply to this case as it might when a soldier disputes his performance evaluation, promotion potential or disability percentage rating. Here, there is not the same need to ensure "courts do not become a forum for appeals by every soldier dissatisfied with his or her ratings." Less deference to the military is appropriate where a violation of the Constitution, statutes or regulations is alleged. *See Harmon v. Brucker*, 355 U.S. 579, 582-83 (1958) (Secretary of Army acted in excess of his powers in issuing particular type of discharge to inductees).

---

[1] Hereinafter "discharge #1" and "discharge #2." Also, the term "discharge" is interchangeably described in the military as a "separation," a "DD-214," or a "discharge certificate."

This case is about jurisdiction, a legal question reviewed *de novo. Bell v. Hood*, 327 U.S. 678, 682 (1946). The Army had no jurisdiction over Plaintiff after 14 Sep 2001, especially when it issued discharge #2. Paradoxically, the oft-cited deference-to-the-military case, *Orloff v. Willoughby*, 345 U.S. 83 (1953) (Court refusing to re-assign Dr. Orloff to more specialized medical duties), cuts against Defendant's claim to deference in Plaintiff's jurisdiction-related challenge. "While the courts have found occasion to determine whether one has been lawfully inducted *and is therefore within the jurisdiction of the Army and subject to its orders*, we have found no case where this Court has assumed to revise duty orders as to one lawfully in the service." *Id.* at 94 (emphasis added).

APA standards do not govern exclusively. This case goes well beyond the question whether Defendant simply exercised its administrative discretion, or whether it did so arbitrarily, capriciously, or unsupported by substantial evidence. Plaintiff's Complaint is also properly premised on 28 U.S.C. § 1331 in light of his statutory and constitutional claims. Here, Defendants acts did not constitute exercises of administrative discretion. *Harmon*, 355 U.S. at 582-83. Defendant incorrectly states the ABCMR decision is the "final agency action" to be reviewed. Discharge #1 is the "final agency action" to be reviewed. Plaintiff's case is unique on this very point. Plaintiff was a civilian after discharge #1. We find no other records correction case in which a plaintiff avers the military records to correct were not even <u>military</u> records.

### *Argument*

### I. DEFENDANT'S MOTION IS CONTRADICTED BY ITS PRIOR CONDUCT

First, by the act of prosecuting Plaintiff under Article 3(b), UCMJ, for a violation of 10

U.S.C. § 883(b), Article 83, UCMJ,[2] Defendant contended that Plaintiff was in fact separated on 14 Sep 2001. (AR 105, 2063.) The first element of that charge is "That the accused was separated from an armed force." (AR 111 ¶ 2.) Defendant's charging instrument alleged Plaintiff "did, at or near Fort Benning, Georgia, on or about September 14, 2001, … procure himself to be separated from the U.S. Army." (AR 105; 2063.) Second, by issuing post-discharge #1 revocation Orders 261-2215, Defendant reveals that Army officials believed Orders 261-2215 were necessary. If discharge #1 and Orders 183-2200 were *void ab initio*, it begs the question why Defendant needed to issue Orders 261-2215. The Army's discharge officials, Coraritta Nixon and Mayra Hernandez, issued a revocation order after discharge #1 because that is when they first received authorization to issue a revocation order, and not before. (AR 135-36; 440.)

## II. DEFENDANT'S MOTION IS CONTRADICTED BY ITS PRIOR DETERMINATIONS

After two days of hearings, (AR 1458-2055 verbatim, 115-149 summarized), the Article 32, UCMJ, pre-trial investigation ("Article 32") concluded there was not probable cause to believe Plaintiff committed the offense of Fraudulent Separation. (AR 112 ¶¶ 4-5.) The Investigating Officer (IO) concluded that discharge #1 was valid and irrevocable, and that "…the Army's attempted revocation of [Plaintiff's] separation orders on 18 September 2001, four days after his separation, was a legal nullity." (AR 111 ¶ 3.)

Defendant does not *really* believe discharge #2 is valid. In June 2001, the same Army lawyers defending the case at bar (same JAG office, not same individuals) believed discharge #2 would be invalid, (AR 2798-2801), because, in their own words:

> … Hypothetically, if Schaefer is truly a civilian, then it begs the question
> whether a resignation from the service is even possible. Case law suggests

---

[2] 10 U.S.C. § 803(b) is the same as Article 3(b), UCMJ, and they are the jurisdictional predicate to prosecute a person for a violation of 10 U.S.C. § 883(b), in turn the same as Article 83(2), UCMJ. All four are hereafter referred to simply as "Article 3(b)" or "fraudulent separation."

> that it is not … [citations and discussion omitted] … The court martial in this case derives its jurisdiction from Art. 3(b) of the UCMJ; this limited grant of jurisdiction only extends to cases of fraudulent separation. While this article permits trial, it does not expressly permit a resignation request …4.…The resignation also does not resolve the legal issue concerning the validity of MAJ Schaefer's 14 September 2001 disability discharge…5. These inherit problems strike at the actual validity of any separation accomplished by this resignation…

Every action taken by Defendant <u>after</u> the Article 32 was based upon erroneous legal conclusions, as described throughout the remainder of this brief. Those actions were not based upon new evidence, reweighing evidence, or evidentiary disagreement. The MDW CG did not explain why his decisions departed from the Article 32. The RFGOS decision maker did not explain his departure from (a) the Article 32 or (b) the Civil Litigation Division's legal opinion, (AR 2798-2801). These departures were on the law, not on the facts. They are entitled to little deference (including the characterization of Plaintiff's service as general).

### III. DEFENDANT'S ERRONEOUS FRAUD CLAIM

The crux of the Army's case against Plaintiff has always been a fraud claim.[3] Fraud claims are held to an exacting standard, and circumstances alleged as fraud must be stated with particularity. Fed. R. Civ. P. 9(b); *U. S. ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385-86 (D.C. Cir. 1981) ("[t]he rule…safeguards potential defendants from frivolous accusations of moral turpitude"), *citing Felton v Walston & Co.*, 508 F.2d 577, 581 (2d Cir. 1974) ("one purpose…is to protect reputations of ... professionals from scurrilous and baseless allegations of fraud"), and *Rich v. Touche Ross & Co.*, 68 F.R.D. 243, 245 (S.D.N.Y. 1975) ("(t)he need for this protection (against vague allegations of fraud) is most acute where the potential defendants are

---

[3] Fraud claims ordinarily should not be resolved by summary judgment. They necessarily raise factual issues, such as conflicting interpretations of events and credibility issues. 11 Moore's Federal Practice, 56App.200[34], 56App.-133 (3d ed. 1997); *Gordon v. Miami National Bank*, 406 F.2d 660, 661 (D.C. Cir. 1968); *Schmidt v. McKay*, 555 F.2d 30 (2nd Cir. 1977); *Associated Hardware Supply Co. v. Big Wheel Distributing Co.*, 355 F.2d 114, 121 (3rd Cir. 1966).

professionals whose reputations…are most sensitive to slander"). The moving party must prove

each element by clear and convincing evidence. *Ago v. Begg, Inc.*, 705 F. Supp. 613, 616-17

(D.D.C. 1998), *aff'd* 911 F.2d 819 (D.C. Cir. 1990); *Raynor v. Richardson-Merrill, Inc.*, 643 F.

Supp. 238, 243 (D.D.C. 1986). Speculation, suspicion, and conclusory statements are

insufficient. *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2nd Cir. 1990).

Defendant strategically avoided this higher burden before U.S. District Judge Lawson. In

*Schaefer v. White*, 174 F. Supp.2d 1374 (M.D.Ga. 2001), the Army ousted jurisdiction from

Judge Lawson by charging Plaintiff with fraudulent separation the same day Plaintiff filed for

TRO. (AR 631-32, 667-69.) Defendant compelled Judge Lawson to abstain and send the case to

the military courts. He never pierced the fraud claim. Here, Defendant seeks again to convince an

Article III court to defer to whatever the Army says is fraud.

## IV.  DEFENDANT DID NOT PROVE AN ARTICLE 83 OFFENSE, EVEN ADMINISTRATIVELY, AND FAILED TO OBJECTIVELY ASSESS PLAINTIFF'S SERVICE

The RFGOS decision authority characterized Plaintiff's service as general. That decision

is subject to limited judicial review to the extent it is based upon unfavorable data that should not

have been considered or was not substantially justified. As recognized in the Federal Circuit:

> The Army's express procedural goal in filing unfavorable information is
> that the information be substantiated and objective. [Army Reg] *600-37,*
> Unfavorable Information, paragraph 1-4 ("Objectives of the regulation are
> to ... prevent adverse personnel action based on unsubstantiated derogatory
> information or mistaken identity.") Reviews, letters of reprimand, and other
> unfavorable data which are not objective assessments of the officer's
> performance therefore violate Army procedure.

*Taylor v. U.S.*, 33 Fed.Cl. 54, 59 (1995). Plaintiff's records are subject to judicial correction "if

they are not objective assessments of his performance." *Id.*; *cf. Dodson v. U.S.*, 988 F.2d 1199

(Fed. Cir. 1993) (overturning discharge based on record that contained erroneous test score).

After the Article 32, nobody ever made a finding that Plaintiff committed the Article 83 offense.[4]
*See White v. Sec'y Army*, 878 F.2d 501, 503 (D.C. Cir. 1989) (in choosing a characterization of
service, Army may not assume the result of an assumed proceeding that never occurred).

Four items of unfavorable data were improperly before the RFGOS decision authority:
(1) the GOMOR, (2) the MDW CG's transmittal (AR 2763), (3) a 14-page "Government's
Statement of Facts" document (AR 2781-2794), and (4) the adverse OER. Without these, the
RFGOS might have characterized Plaintiff's service as honorable. The GOMOR proceeding
made no finding of an Article 83 violation. It was not supposed to be issued. (AR 3012-13.) It
unfairly limited Plaintiff's opportunity to respond because the MDW CG kept the court-martial
docketed for trial at the same time. (AR 394-397.)[5] The MDW CG violated Army Reg 600-37 ¶
3-2(a) when he failed to inform Plaintiff of the documents that served as the basis for the
proposed reprimand. (AR 394-95, 403-05.) The MDW CG's RFGOS transmittal stated Plaintiff
violated Article 83, improperly adding to his GOMOR findings. *Cf. Gonzalez v. U.S.*, 44 Fed.Cl.
764, 770 (1999) (similar command conduct results in EAJA fee and expense award against
government). So the MDW CG never made a finding of fraudulent separation, but then told the
Secretary of the Army that he in fact made such a finding. The GOMOR was not supposed to be
issued in the first place. (AR 3012.) The "Statement of Facts" document was a prosecutor-written
argument couching inflammatory inferences as "facts." Among other objectionable material
delivered to the decision makers as "facts," the document included a false conclusion that
Plaintiff abandoned clients, (AR 2794), a reference to "9-11" to inflame the passion of the

---

[4] *See also* discussion at Pl.'s Mem. P. & A. Supp. Mot. Summ. J. at §§ II(B)(1) and III.

[5] Similar to the TRO litigation. Defendant charged Plaintiff with fraudulent separation right after
Plaintiff filed for TRO. By the time of Plaintiff's deposition, Plaintiff's choice to respond was
overcome by the pending criminal charge. This led to an adverse inference against Plaintiff in the
Court's decision. *See Schaefer v. White*, *supra* at n.12.

decision maker, (AR 2791), a false conclusion that CPT Granville Smith was not Plaintiff's commander for purposes of his medical condition, accountability, physical fitness, health care, and disability evaluation, (AR 2782), conclusions strewn throughout as to Plaintiff's *mens rea*, a false conclusion that CPT Granville Smith had no personal knowledge of Plaintiff's physical limitations, (AR 2783), a mischaracterization of Plaintiff's medical diagnosis, (AR 2784), omission of exculpatory evidence, and more. It is believed this document was also used in the GOMOR proceeding. (AR 719.) Throughout the GOMOR - RFGOS process Defendant included Plaintiff's TRO deposition as a supporting document, (AR 597), which violated Army Regulation as described at (AR 1043-44 ¶ 6(b)). All three documents caused the RFGOS decision authority and the ABCMR to take action against Plaintiff for alleged acts of pre-discharge misconduct over which the Army had not yet secured jurisdiction.

An objective assessment of the character of Plaintiff's service could only be based upon an unblemished record depicting Plaintiff, *inter alia*, as an "excellent trainer and motivator," (AR 979), "the best platoon leader I have ever had the opportunity to work with," (AR 1013), "disciplined and selfless," (AR 1005), "totally loyal to the Army and this office," (AR 1002), with unlimited potential in the JAG Corps, (AR 984-987; 1000-1005; 1015-1022), "brutally honest," (AR 1013), having "unmatched candor and willingness to accept responsibility," (AR 928), "an officer of absolute integrity," (AR 929), "no supervisor takes better care of his people," (AR 1016), "willing to make the tough call and stand by his recommendations, regardless of the circumstances. A superb officer and attorney with unquestioned moral and professional standards," (AR 984), "the best Captain in this office and in the top 10% of judge advocate captains with whom I have served," (AR 1020), and "the finest company grade officer and attorney that I have supervised in over eighteen years of military service." (AR 1016.)

## V.  DEFENDANT'S ERRONEOUS "SAME AGENCY" ARGUMENT

### A.  Defendant blurs lines between the Chain of Command

Orders 183-2200 were issued by the Fort Benning Adjutant General, for PERSCOM. Army Reg 600-8-105 ¶ 1-11(b). The ABCMR admits only the Fort Benning Adjutant General could revoke the orders. *Id.* at ¶ 2-21(a) ("Only the organization that published the original order may amend, rescind, or revoke the order"). <u>After</u> PEB #2 but <u>before</u> discharge #1, Defendant knew Plaintiff's counsel was relying upon this "same agency" mandate in advising Plaintiff to continue following Orders 183-2200. (AR 289; 326-27 ¶ 5.)

Before ordering him to return to Fort Benning, the JAG Corps anticipated Plaintiff would apply for a TRO, (AR 1360-1370; 2598), and knew to prepare for Army Reg 600-8-105 ¶ 2-21(a). The JAG Corps wove a contention that USAPDA and PERSCOM are factually indistinct, which we now call Defendant's "same agency" argument. The Article 32 found no merit in this contention. (AR 107-114.) The ABCMR revives it, (Def.'s Mem. P. & A. Supp. Mot. Summ. J. at 7-10) ("Plaintiff's oversimplified version of the system"), but Defendant's "version of the system" has confused everyone, beginning with the first federal judge to look at this case.[6]

The physical disability regulations could not be clearer.[7] The Secretary of Defense directs that "[u]nder the supervision of the Secretary concerned, each DES shall consist of four elements: … Medical evaluation by Medical Evaluation Boards (MEBs), … Physical disability evaluation by Physical Evaluation Board (PEBs), to include appellate review … Service member counseling …[and] Final disposition by appropriate personnel authorities." DOD Instruction

---

[6] *See* Judge Lawson's struggle with Defendant's "same agency" argument. *Schaefer v. White*, at 1382 n.14 ("[T]he Court is unclear as to the relationship between PERSCOM and USAPDA. Defendant referred to PERSCOM and USAPDA interchangeably in its description of the revocation of Plaintiff's orders.").

[7] *Cf.* (Def.'s Mem. P. & A. at n.5.) ("…While the regulation could be clearer…")

1332.38, E3.P1.1.1 - E3.P1.1.4. The Secretary of Defense defines each part. "The *physical disability evaluation* element of the DES shall determine the fitness of Service members with medical impairments to perform their military duties … *Physical disability evaluation shall be conducted by PEBs* …" DOD Instruction 1332.38, E3.P1.3.1 (emphasis added). The *final disposition*, or *personnel*, element of the DES "shall accomplish disposition of the Service member's case. Specifically, *appropriate personnel authorities* shall …[i]ssue orders and instructions to implement the determination of the respective Service's final reviewing authority …" DOD Instruction 1332.38 ¶ E3.P1.5.1 - 5.2.

Simply put, the Secretary of Defense directs that the *medical* folks are separate from the *disability evaluation* folks, who are in turn separate from the *personnel* folks. The Secretary of the Army follows suit, creating a PDES that separates the *medical* folks from the *disability evaluation* folks from the *personnel* folks.[8] Army Reg 635-40 creates a hierarchy that begins with the Secretary of the Army, and from there travels down to the Deputy Chief of Staff for Personnel (DCSPER), to the Commander, U.S. Total Army Personnel Command (Commander, PERSCOM), to the Commander, USAPDA, and further down the line. *See* Chapter 2 ("Responsibilities and Functions"). A plain reading of the regulation shows that PERSCOM are the *personnel* folks, USAPDA and PEBs are the *disability evaluation* folks, and the Military Treatment Facility (MTF) (e.g., the doctors) are the *medical* folks.[9]

Appendix E illustrates the concept of distinct offices and functions. It illustrates the unreasonableness of Defendant's interpretation of ¶ E-9(e):

---

[8] Here we must refer the Court to Plaintiff's exhaustive description of Army Reg 635-40 set forth in Plaintiff's Complaint ¶¶ 17-31, and further in § I of Pl.'s Mot. Summ. J.

[9] The MTF are also the *counseling* folks, the fourth element of DOD's PDES. Army Reg 635-40 ¶ 2-8(b) (MTF Commander "appoints a Physical Evaluation Board Liaison Officer (PEBLO) to counsel soldiers undergoing physical disability processing.")

¶ E-9, subpara. (e). "*Requests for exception to established discharge or retirement date.* Request for deviation from established discharge date or amendment or revocation of retirement orders for other than medical reasons will be submitted, with justification, to PERSCOM (TAPC-PDB)… USAPDA will decide whether the case should be reconsidered by the PEB. USAPDA may request PERSCOM cancel discharge instructions, or amend or revoke retirement orders."

Here we see <u>four</u> <u>separate</u> offices: PERSCOM (TAPC-PDB), USAPDA, PEB, and PERSCOM. PERSCOM (TAPC-PDB) is the "Physical Disability Branch." It is a clerical section with a supervisor, Irene Baker (GS-10), and five clerks. (AR 1549; 750.) Ms. Baker's job is keying data into a computer system called TRANSPROC, and TRANSPROC belongs to PERSCOM. (AR 1557.) Ms. Baker works for PERSCOM, hence the nomenclature of her office and the ownership of her TRANSPROC, but Ms. Baker now thinks she works for USAPDA. Her office moved to Walter Reed Army Medical Center (WRAMC) (closer to USAPDA). (AR 1547; 1549.) Previous to the physical move, when USAPDA submitted something to PERSCOM (TAPC-PDB), USAPDA would fax a hardcopy request. Now they just walk it over. (AR 1565.) Army Reg 635-40 was never amended to indicate that PERSCOM (TAPC-PDB) became USAPDA (TAPC-PDB), (AR 1109 ll.11-12), or that PERSCOM (TAPC-PDB) became PERSCOM. The ABCMR wrongly concludes "the functions of PERSCOM have been assumed in this respect by the Physical Disability Branch." (AR 38 ¶ 2.) The worker does not become the boss by doing the boss's work. ¶ E-9(e) mandates "<u>USAPDA</u> <u>may</u> <u>request</u> <u>PERSCOM</u> cancel discharge instructions." It does not say "USAPDA may request *USAPDA* cancel discharge instructions," it does not say "USAPDA may *direct PERSCOM (TAPC-PDB)* cancel discharge instructions." It does not say "USAPDA may request PERSCOM *(TAPC-PDB)*..."

Defendant is convinced that TAPC-PDB's physical relocation to WRAMC allows a finding that "the same agency authorized both the separation orders and revocation orders," (AR

1063), and that "PERSCOM itself never authorized the Fort Benning Transition Center to cut the

2 July 2001 separation orders, although [Plaintiff] is correct that a literal reading of Paragraph 4-

24 of AR 635 [] requires this." (AR 1055-56.) Defendant concludes "[t]he regulation, however,

is outdated," and describes the PDB as "an adjunct of the USAPDA and under its authority …"

(AR 38.) "PDA and PERSCOM were in effect one and the same organization." (AR 1057.)

The ABCMR decided "PDA's PDB [w]as the responsible office for issuing separation

orders, *not the Secretary of the Army or PERSCOM,*" (AR 1056 n.3) (emphasis added), and that

"there is no evidence to show that PERSCOM was ever involved." (AR 39 ¶ 2.) The USAPDA's

own lawyer, deposed early during the TRO litigation, testified otherwise:

> Q: And, in fact, orders were issued to separate Malcolm Schaefer?
> A: I understand that orders were issued, yes.
> Q: … And those orders were issued through the TRANSPROC
> system?
> A: The TRANSPROC system authorized his installation, Fort
> Benning, to cut orders *based upon Department of the Army and
> PERSCOM saying that it was okay.*
> Q: … So TRANSPROC doesn't issue the actual order?
> A: No.
> Q: Fort Benning does?
> A: Fort Benning does.
> Q: … Now, in normal circumstances, *end of case*. *Right?*
> A: *Yes.*

(emphasis added). (AR 1235 l.12 - 1236 l.6.) Orders 183-2200 were "Format 501" orders. The

regulation for Format 501 orders shows the orders came from the Commanding General,

PERSCOM, not from USAPDA and not from any subordinate of CG, PERSCOM. Format 501

orders, for disability, shall state: "When the disposition instructions *from the CG, PERSCOM,*

contain information pertaining to disability severance pay, include the following statement: "You

are authorized disability severance pay in pay grade" … "based on" … "years," … "months," …

"days of service as computed under 10 USC 1208."  Army Reg 600-8-105, Figure 5-1, n.16

(emphasis added).  Orders 183-2200 contain this statement.

### B.  Missing delegation documents

The agency has oft "theorized" about what they would like the law to be in this case:

> "One may *theorize* that PDA possessed the necessary authority because the commander of PDA, MG Frost, appeared to be 'dual-hatted': … That is, *it seems likely* that the PERSCOM commanding general simply delegated to his PERSCOM subordinate, MG Frost, PERSCOM's authority to take final administrative action in medical disability separations. MG Frost, in her turn, *presumably* delegated her authority to her deputy commander at PDA, COL Bell … *If this theory is correct*, then it means PERSCOM did in fact give its approval to the applicant's separation and recall, contrary to the applicant's argument, via the authority delegated down to COL Bell. This would satisfy the requirement of Paragraph 4-24 of AR 635-40 that PERSCOM take the final administrative action on medical disability separation cases."

(AR 1057) (emphasis added); *see also* (AR 1418)(note-"new facts or new law"). Defendant does not repeat this "theorizing" language in its brief, but relies on the *unstated* but flawed premise that a delegation exists. Defendant's reasoning presupposes that an Army Colonel may arrogate to himself the authority and function of a two-star Major General two levels superior to him. Actually, the Colonel's legal advisor hijacked the Major General's authority. Accommodating the JAG Corps' request to reconsider PEB #1, Dennis Brower hurriedly told Baker Plaintiff was no longer eligible for separation. (AR 750.) "When they recall a case, I don't usually look at the reason. That's up to --  Mr. Brower." (AR 1570.) But Ms. Baker is supposed to channel those requests to her superior, PERSCOM.  She is convinced Brower runs the entire DES. "Q: So you do know enough, however, that it is the PEB who decides eligibility, not Mr. Brower? A: Well, I don't know that, either, no." (AR 1571.) Baker could not explain how Brower, on August 2, could say to her that Plaintiff was "no longer eligible for separation," before he had the August 10 JAG Corps memo and the Texas PEB's August 30 agreement to relook. (AR 1570-72.)

Some duties are delegable, some not. If delegable, a duty must still <u>actually</u> be delegated.

Evidence of a delegation must exist. Here, PERSCOM's authority was nondelegable, and it was never <u>actually</u> delegated. Even if this *Deputy* Commander's role is "an integral part of [the] PERSCOM" Commander's overall PDES mission, (AR 1057), that does not make them "one and the same organization." The regulation makes them separate and distinct.

The Secretary of Defense is clear about his delegations. He withholds the "final decision authority" in two cases, (a) General and Flag Officers, and (b) medical doctors. DODI 1332.38, E3.P7.1.  The Secretary of the Army is clear about his delegations. "Unless otherwise specified in this regulation, the SA reserves all powers, functions, and duties of the Army [PDES]." Army Reg 635-40 ¶ 2-1. The Secretary of the Army delegated final disposition of PDES cases, "*for the SA [Secretary of the Army] ...*" to the Commander, PERSCOM.  ¶ 2-3. The manner in which the ABCMR's Legal Advisor concluded the "delegation" argument is telling:

> …recommend that it would be prudent to obtain advisory opinions from PDA and PERSCOM regarding how each of these agencies interpret Paragraph 4-24 of AR 635-40; whether there was any delegation of PERSCOM authority to PDA and/or PDB at the time of the applicant's case.

(AR 1057.) In her second opinion, the ABCMR legal advisor reiterates, but adds a *verbal* twist:

> recommend that it would be prudent to obtain advisory opinions from PDA and PERSCOM regarding how each of these agencies interpret Paragraph 4-24 of AR 635-40; whether there was any *verbal and/or written* delegation of authority by PERSCOM to PDA at the time of the applicant's case.

(AR 1068) (distinction italicized). No such delegations existed. (AR 1078-1080.) Army regulations cannot be overcome by *verbal* delegations. Stunningly, the ABCMR concludes no harm, no foul. (AR 38 ¶ 3.) ("The applicant was not harmed in any reliance he may have placed on the regulation…") Plaintiff was court-martialed, reprimanded, and issued a general discharge largely because he and his lawyers relied on a plain reading. The most reasonable and plausible purpose for placing the Physical Disability Branch under PERSCOM in ¶ E-9(e) was to give

PERSCOM an opportunity to supervise USAPDA on the recall cases.

## VI.  DEFENDANT'S ERRONEOUS "LEGAL HOLD" THEORY

### A.  Where Defendant's "legal hold" theory originated

Defendant relies on an unsupported contention that (a) self-executing *disability* discharge orders can be verbally revoked or placed on "legal hold," as a substitute for a written revocation, and (b) that verbal revocation of a self-executing *disability* discharge order need not be communicated to the soldier holding the discharge order. This "legal hold" theory first arose as an alternative to another of Defendant's arguments before U.S. District Judge Hugh Lawson.

During the TRO litigation, the Government claimed a revocation was verbally communicated to Fort Benning. To this, Judge Lawson responded: "The Court questions the sufficiency of verbal orders after reviewing transition point employee Nixon's statement to PERSCOM officials that she would need a hard copy of any orders recalling or cancelling Plaintiff's discharge orders before she could effectuate such cancellation." *Schaefer v. White* at 1382 n.13. Notwithstanding, the ABCMR continues to base its decision in part on the "verbal revocation" argument. (AR 40 ¶ 7; 1057; 1067-68.)

"When the situation demands immediate action, normally in a combat situtation, a commander may issue verbal orders." Army Reg 600-8-105 ¶ 1-23 (titled "Authority to Issue Verbal Orders"). Coraritta Belser-Nixon told Irene Baker that "she needed something in writing" if Baker wanted to recall Plaintiff's disability case. (AR 1563.) When questioned by the Article 32 IO, "Q: How are orders revoked, once a set of orders are issued?," Baker answered "Another order is done, different format." (AR 1583-84.) By their express terms, Orders 183-2200 automatically discharged Plaintiff on 14 September 2001 -- e.g., "self-executing orders." Baker attempted to delete the authorization coding in TRANSPROC, but admits this would have no

effect on the discharge date. (AR 1561) ("Q: So the separation date remained September 14th? A: Yeah. No, we don't change that."). That could only be done with a separate written revocation order issued and delivered to Plaintiff by the Fort Benning Adjutant General.

### B.  Defendant's "legal hold" Argument

Discharge Orders 183-2200 were never revoked prior to September 14, 2001. (AR 39 ¶ 6.) To dodge this dispositive fact, Defendant seeks to expand the "legal hold" authority present in military <u>criminal</u> cases into a "legal hold" authority for physical <u>disability</u> cases.

Defendant's "legal hold" argument is this: "The fact that the applicant's case was being reconsidered, that the applicant was aware and acknowledged the PEB reconsideration, obviated the first PEB proceedings." (AR 39 ¶ 4.) It is based on a legal advisor, who opined: "This fact is critical because case law has held that a DD 214 issued after authorization has been revoked is invalid, and consequently the Army retains jurisdiction." (AR 1067.) The advisor grounds her theory in two cases, *U.S. v. Williams*, 53 M.J. 316 (CAAF 2000), and *United States v. Garvin*, 26 M.J. 194, 195-96 (C.M.A. 1988). In turn, Defendant (at 6-11) cites only *Williams* and *Garvin*.

The confusion arises because Private Williams originally received a physical <u>disability</u> discharge, but only after a <u>criminal</u> investigation had begun. The law provides that a <u>criminal</u> <u>investigation</u> can place a "legal hold" on physical disability discharge orders. The law does not provide that <u>reconsideration of a PEB's findings</u> places a "legal hold" on disability discharge orders.  Citing *Williams*, the Army misled Judge Lawson to conclude:

> The Army contends that Plaintiff's discharge orders were properly revoked prior to September 14, 2001. In *United States v. Williams*, 53 M.J. 316 (C.A.A.F. 2000), a service member's disability discharge was placed on 'legal hold' hours before the effective date of his discharge even though his discharge certificate had been mailed to him … The U.S. Court of Appeals for the Armed Forces found that the discharge had been properly rescinded prior to execution and that the military had in personam jurisdiction even though it did not notify the service member of the rescission until after the

> effective date and after he had already received a facially valid certificate of
> discharge … This Court believes that the finding [in *Williams*] that the
> military had in personam jurisdiction was based on the fact that the
> discharge was properly rescinded.

*Schaefer v. White*, 174 F. Supp.2d at1381. *Williams* was the only case Judge Lawson cited on the

threshold issue of the validity of Plaintiff's discharge.[10]

### C. *U.S. v. Williams* was a criminal "continuing jurisdiction" case, not a physical disability case

Private Williams' disability DD-214 was mailed to his home the same day his commander

placed Williams on a "valid legal hold."[11]  This was a pre-discharge revocation of a medical

discharge *for the purpose of prosecuting then-existing criminal allegations*. *Williams* was not a

case about an 11th hour debate over whether Williams was "fit for duty" or "unfit for duty."

*Williams* was an "R.C.M. 202(c)" case. Rule for Courts-Martial (R.C.M.) 202(c) provides:

> Court-martial jurisdiction attaches over a person when *action with a view to
> trial* of that person is taken. Once court-martial jurisdiction over a person
> attaches, such *jurisdiction shall continue* for all purposes of trial, sentence,
> and punishment, notwithstanding the expiration of that person's term of
> service or other period in which that person was subject to the code or trial
> by court-martial. When jurisdiction attaches over a servicemember on active
> duty, the servicemember may be held on active duty over objection pending
> disposition of any offense for which held and shall remain subject to the
> code during the entire period. (2) Procedure. Actions by which court-martial
> jurisdiction attaches include: apprehension; imposition of restraint, such as
> restriction, arrest, or confinement; and preferral of charges.

(emphasis added). A long line of cases applies R.C.M. 202(c). "Continuing jurisdiction" is more

commonly referred to in the field as a "legal hold." *Criminal* investigatory activity focusing on

---

[10] With respect to counsel on brief before this Court, who simply inherited Government
arguments from previous stages in this litigation, Defendant has not been entirely candid in its
citing of case law on this point, failing to make clear that its "legal hold" contention is an
argument for the modification of existing law or the establishment of new law.

[11] Preliminarily, two distinguishing facts must be noted. The *validity* of the commander's pre-
discharge "legal hold" went unrebutted. 53 M.J. at 317. Plaintiff disputes the *validity* of
USAPDA's attempted deletion in TRANSPROC. Second, Williams did not <u>actually receive</u> his
DD-214 until after his discharge date. It was <u>mailed</u> to him, not handed to him.

an accused before discharge preserves the Government's jurisdiction *for criminal prosecution* when the discharge is not yet accomplished. *U.S. v. Lee*, 43 M.J. 794 (N.M.C.C.A. 1995).

The ABCMR misused *Garvin* for a headnote. This becomes evident on a closer look at *Williams* and *Garvin*. The *Williams* Court simply cites *Garvin* and adopts the lower court's opinion. The lower court's opinion makes clear this was an R.C.M. 202(c) "continuing jurisdiction" case. The Navy Marine Corps Court of Criminal Appeals states the facts:

> The [PEB] found [Private Williams] "unfit for duty;" as a result of this finding, [Williams] was to be separated … and was sent home awaiting final disposition of his PEB; … Meanwhile, an investigation … into a series of thefts … focused on [Williams] … Accordingly, on 15 January 1997, appellant was placed on legal hold by his command … [Williams] was ordered by his command to return to SOI in orders dated 17 January 1997 which stated that his "orders awaiting final disposition of a physical evaluation board" were "hereby terminated." … [Williams] returned to Camp Lejuene pursuant to these orders. … [Williams] interposed no objection to his continued retention by the military at any time prior to his court-martial. … he was arraigned on 8 May 1997 … entered mixed pleas … During the ensuing providence inquiry, [Williams] stated under oath to the military judge that he was "currently on active duty" in the U.S. Marine Corps and had never been "discharged or released from active service.

*U.S. v. Williams*, 51 M.J. 592, 594 (N.M.C.C.A. 1999). Based on these facts, the lower court analyzes jurisdiction as follows:

> Jurisdiction of a court-martial depends solely on the accused's status as a member of the military. *Solorio v. United States*, 483 U.S. 435, [ ] (1987). Failure to raise lack of jurisdiction at trial does not waive the issue. R.C.M. 905(e).

> "[T]he delivery of a valid discharge certificate or its equivalent ordinarily serves to terminate court-martial jurisdiction." [citing R.C.M. 202(a), Discussion at ¶ (2)(B)]. … In this instance, appellant never objected to continued jurisdiction below, so that our inquiry must focus upon whether a discharge certificate or its equivalent was delivered to appellant so as to effect his separation prior to "action with a view towards trial." R.C.M. 202(c)(1);

> The issue was not waived by appellant's failure to object below. However, we are mindful of his voluntary submission to military authority…and

sworn submissions to the court below that he was a member of the armed forces on active duty at both the time of the offenses and trial.

We find that court-martial jurisdiction over appellant attached and was never terminated. R.C.M. 202(c)(1); []; (internal citations omitted)

However, in fact, appellant's discharge was to take effect at 2359 on 15 January 1997. The letter placing appellant on legal hold was effective when signed. The legal hold letter took effect, albeit by hours, before appellant's discharge.

The erroneous delivery of an otherwise valid discharge certificate previously revoked does not terminate court-martial jurisdiction over a service member. *United States v. Garvin*, 26 M.J. 194, 195-96 (C.M.A. 1988). The legal hold letter signed on 15 January 1997 voided appellant's DD 214 before the discharge became effective.

### D.  The ABCMR also misused *United States v. Garvin,* another R.C.M. 202(c) case

On November 6 Private Garvin received orders to be discharged on November 13.  On November 9, *the Installation Adjutant General* issued orders revoking the November 6 orders. Garvin did not report to the Transition Center on November 13, but a clerk mailed a DD-214 to his forwarding address. The clerk did not recall receiving the November 9 revocation order. Garvin was later court-martialed. On appeal, Garvin argued the military did not have jurisdiction over him after November 13. The Court of Military Appeals held that "the mistaken delivery of a discharge certificate which had no legal effect and which had previously been revoked did not terminate court-martial jurisdiction." *U.S. v. Garvin*, 26 M.J. 194, 195-96 (C.M.A. 1988). This holding was based in part on the Court's finding that "it was conceded that the orders directing appellant's discharge were rescinded by the commander who issued them in the first instance." *Id.* More important, *Garvin* was an R.C.M. 202(c) case, not a physical disability case. *Garvin* was not a case about whether Private Garvin was "fit for duty" or "unfit for duty."

If *any* comparison to a criminal case is to be made, Plaintiff's case is most like *Smith v. Vanderbush*, 47 M.J. 56 (C.A.A.F. 1997). The Army *delivered* a DD-214 to Vanderbush after he

had been charged with a crime, after he had been arraigned, after he had attended pretrial

hearings, after a trial date was established. The command never "FLAGGED" Vanderbush,

which would have triggered R.C.M. 202(c). Vanderbush had self-executing discharge orders.

The defense moved to dismiss for lack of jurisdiction. The prosecutor asserted "continuing

jurisdiction." The military judge agreed, and concluded the arraignment acted as the "legal hold."

The Court of Appeals for the Armed Forces reversed, holding Vanderbush became a civilian

when the Army delivered him a DD-214. Sergeant Vanderbush had <u>no affirmative duty</u> to alert

the DD-214 clerks of anything His DD-214 was valid despite the miscommunication.[12]

<u>E. A "legal hold" is found in the Army's regulation governing courts-martial, but not within its regulation governing physical disability cases</u>

Attempting to avoid another *Smith v. Vanderbush*, the Army amended its court-martial

regulation, Army Reg 27-10 ¶ 5-15 (b), to provide that the charging instrument itself

*automatically* suspends any pending discharge, and that "any issuance of a discharge certificate

is *void* … and all other favorable personnel actions taken … are *voidable*." (emphasis added).

Army Reg 635-40, on the other hand, does not provide any "legal hold" language. Instead, an

extraordinary "recall" procedure applies. *See* Pl.'s Mem. P. & A. Supp. Mot. Summ. J. at § I.

USAPDA failed to follow that recall procedure, and the *Williams* and *Garvin* "legal hold"

mechanism wouldn't apply anyway because those are R.C.M. 202(c) cases.

VII.  DEFENDANT MISCHARACTERIZES PLAINTIFF'S "RFGOS" AS BEING THE EQUIVALENT OF A GUILTY PLEA, OR PLEA BARGAIN

The ABCMR's Legal Advisor opined "[a] resignation in lieu of court-martial can

certainly be analogized to a plea of guilty, *although apparently there is no case law that is*

---

[12] To be clear, Plaintiff maintains there was no mistake in his case. Plaintiff was found "unfit for duty," that finding never changed prior to September 14, 2001, and Plaintiff was thereafter discharged pursuant to self-executing orders.

*exactly on point for situations like the [Plaintiff's].*" (AR 1059) (emphasis added). The ABCMR

did not repeat that language in its Decision, but Defendant now reinvokes it, referring to

Plaintiff's situation as a "plea agreement" and a "plea bargain," (Def.'s Mem. at 17-18). A

commissioned officer's RFGOS cannot be likened to a guilty plea.  Defendant borrows

improperly from a regulation that does not apply to Plaintiff -- the enlisted soldier's "Chapter 10

Request."[13] An enlisted soldier's Request for Discharge in Lieu of Court-Martial is only

available if the soldier admits he is guilty of a crime. The RFGOS does not require a

commissioned officer to admit anything. A Chapter 10 request can be likened to a guilty plea. It

is only available to an enlisted soldier "who has committed an offense …under the UCMJ."

Army Reg 635-200, ¶ 10-1(a). An enlisted person, when submitting a Chapter 10, must expressly

state the following: "By submitting this request for discharge, I acknowledge that … I am guilty

of the charges against me or a lesser included offense …" Army Reg 635-200, ¶ 10-2(e); (AR

2991-2996.) Officer resignations do not require any admissions. (AR 2987-2990.)

VIII.  DEFENDANT ERRONEOUSLY CLAIMS PLAINTIFF VOLUNTARILY SUBMITTED
TO MILITARY CONTROL

A. Defendant anticipated this case

The same Army lawyers defending the case at bar (same JAG office, not same

individuals) warned this case was coming:

> "4. MAJ Schaefer's resignation, if approved in current form, could easily
> spark another round of civil litigation … The resignation also does not
> resolve the legal issue concerning the validity of MAJ Schaefer's 14
> September 2001 disability discharge, leaving MAJ Schaefer the latitude to
> refile his lawsuit in civil court to resolve that issue, and the Army to defend
> the suit in federal court at the risk of significant adverse policy precedent

---

[13] Under  Chapter 10 of Army Reg 635-200 an enlisted person "who has committed an offense"
may submit a "Request for Discharge in Lieu of Court-Martial," most commonly called a
"Chapter 10" request. (AR 2991-2996.)

and money damages."

> "5. … The likely consequences of approving this resignation are that MAJ Schaefer will again file suit in U.S. district court, this time challenging the lawfulness of the discharge he obtains as a result of this resignation request. If successful, the resignation in lieu of court martial will be void, and the previous disability discharge will be validated. … Approval of this resignation … substantially increases our civil litigation exposure and risk."

(AR 2966-69.) Colonel Fiore *never once* suggests the RFGOS can be interpreted as submission to military control. *See also* Johnson-Naumann Decl. ¶¶ 5-9.[14] Three years later, the ABCMR Legal Advisor decided it did, (AR 1059; 1070), and the ABCMR agreed. (AR 40 ¶¶ 8-9.) To bolster its waiver claim, Defendant refers to Plaintiff's situation as a "plea agreement," a "plea bargain," and a waiver of the Army's burden to establish the fraudulent nature of his discharge.

This is a case of first impression. There is no case on point -- e.g., a RFGOS submitted by someone who claimed civilian status and was not even subject to the military legal proceeding in which he was enmeshed. Article 3(b) is a limited grant of jurisdiction, only permitting jurisdiction "for that trial." It does not provide jurisdiction to take adverse action of any other kind (*including administrative*) against a putative, presumptive, civilian ex-servicemember *until* the predicate conviction is obtained. *U.S. v. Spradley*, 41 M.J. 827 (N.M.C.C.A. 1995).

### B.  Plaintiff attempted to withdraw the RFGOS. The Army either ignored that request or assumed the merits of that request would be decided in the civil courts.

Plaintiff's civilian defense counsel submitted a second request asking the decision maker to ignore the RFGOS and instead to declare discharge #1 legal and binding upon the Army. (AR 1452; 2950-55). One week later, Plaintiff's military defense counsel wrote again:

> To put a stop to this seemly endless string of actions against our client, we ask that you determine that his separation on September 14, 2001 was valid *instead of ruling on the resignation*.

---

[14] Decl. Lauren N. Naumann-Johnson hereafter cited as "AR" and to page number (3011-3013).

(AR 2957) (emphasis added). Another week later, Plaintiff's attorney reinforced the meaning of the second request, by e-mail to the decision maker's Assistant Legal Counsel. (AR 2958-59). An email from Army Review Boards Agency (ARBA) attorney shows the agency anticipated discharge #1 would be litigated later. (AR 2958.) ("…issues outside the purview of ARBA appear likely to linger for both parties"). *See also* (AR 3011-3013.)

C.  Jurisdiction is never waived

A civilian may always attack the military's exercise of jurisdiction. Plaintiff  attacks discharge #2. The issue is whether discharge #2 is void because the military lacked jurisdiction to issue a court-martial-predicated-administrative discharge. Plaintiff was not required to subject himself to trial by court-martial just to challenge jurisdiction. *Machado v. Commanding Officer*, 860 F.2d, 542, 546 (2d. Cir. 1988) (quoting several Supreme Court cases).

In the military, subject matter jurisdiction -- e.g., jurisdiction over the offense -- and *in personam* jurisdiction are the exact same thing -- e.g., military status.[15]  Subject matter jurisdiction can never be waived or forfeited. *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 89 (1998); *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006). If a statutory requirement is jurisdictional, "a court cannot excuse it." *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004). The Army failed to satisfy a statutory requirement that is jurisdictional. The Army failed to satisfy 10 U.S.C. § 802, Article 2, UCMJ, by failing to establish that Plaintiff was a member of the armed forces when it issued him, during 2002, a written reprimand, an adverse evaluation report, and a court-martial-predicated general discharge.

In military cases, personal jurisdiction can never be waived.[16] For the military to assert

---

[15] *Solorio v. United States*, 483 U.S. 435 (1987), *overruling O'Callahan v. Parker*, 395 U.S. 258 (1969), *Relford v. Commandant*, 401 U.S. 355 (1971) and the "service connection" requirement.

[16] *See, e.g., U.S. v. Williams*, 51 M.J. 592, 595 (N.M.C.C.A. 1999), discussed, *supra*.

jurisdiction over a person, that person must have been subject to the UCMJ (a) at the time of offense, (b) at the time of trial, and (c) without any valid intervening termination of military service. Delivery of a discharge certificate terminates military status. *U.S. v. Howard*, 20 M.J. 353 (C.M.A. 1985). Where a discharge is pursuant to "self-executing" orders "the effective date for termination of jurisdiction will normally be the effective date on the orders." [17]

The Supreme Court requires every effort be made "to restrict military tribunals to the narrowest jurisdiction deemed absolutely essential to maintaining discipline among the troops in active service." *Toth v. Quarles*, 350 U.S. 11, 22 (1955). "This theme runs throughout any discussion of subject matter jurisdiction of courts-martial and is primarily based upon the fact that servicemembers tried by court-martial are not entitled to the Fifth Amendment right to indictment by grand jury and a trial by jury." Schleuter, *supra* at § 4-10.

Jurisdiction cannot be waived, not even by a guilty plea. R.C.M. 905(e) provides that the failure to raise certain defenses and objections shall constitute waiver, except for objections relating to lack of jurisdiction. In an Article 3(b) case, the military courts rejected a Government waiver argument. "[J]urisdiction is never waived and may be raised at any stage of the proceedings … Hence, we are unpersuaded by any argument which relies on waiver or concession of jurisdiction." *U.S. v. Reid*, 46 M.J. 236, 240 (CAAF 1997).

Plaintiff was not required to risk criminal prosecution in order to test the merits of his claim and have an adjudication of his rights. *Abbot Labs v. Gardner*, 387 U.S. 136, 152-54 (1967); *Terrace v. Thompson*, 263 U.S. 197, 216 (1923) ("They are not obliged to take the risk of prosecutions, fines, and imprisonment and loss of property in order to secure an adjudication of their rights.") That is precisely the sort of risk the Declaratory Judgment Act was designed to

---

[17] Schleuter, Military Criminal Justice: Practice and Procedure (3d Ed. 1992) § 4-8(B), n.14.

ameliorate. *Abbot Labs*, at 152. On November 1, 2001, Plaintiff sought Declaratory Judgment in the Middle District of Georgia. He was denied on grounds of comity because Defendant charged him that same day with the crime of fraudulent separation and invoked Article 3(b).

### D.  Plaintiff adequately reserved his right to bring this controversy to this court

Plaintiff's explicit reservation of rights must be given force. The Army never objected to Plaintiff's reservations of rights. Every disclaimer and proviso Plaintiff added to documents he signed after September 14, 2001, fairly informed the Army of his position. (AR 2873; 2878-2949; 2972; 2974); *see, generally,* all of "Tab 31" (AR 2871-2996.) The words "without prejudice" or "under protest" and the like are common expressions of well known legal significance. The ABCMR concluded that Plaintiff's reservation of rights -- contained directly within his RFGOS (AR 224)  -- had no legal effect.  If the Army had any difficulty with the reservation of rights, all it had to do was deny the RFGOS as submitted and demand it be resubmitted without the reservation of rights. *See* (AR 3011-3013.)

### E.  The RFGOS regulation demonstrates Plaintiff never waived jurisdiction

Three important aspects of the RFGOS regulation merit discussion. First, the RFGOS regulation does not require one to make any statement admitting jurisdiction. Second, the RFGOS regulation does not require one to admit guilt. Third, Defendant *could have* continued to trial against Plaintiff *despite* the RFGOS. (AR 3012-13.) Plaintiff's court-martial remained pending the entire time the RFGOS was pending. (AR 836.) "The tender of a RFGOS does not preclude or suspend [court-martial] procedures." Army Reg 27-10, ¶ 5-17; Army Reg 600-8-24, ¶ 3-13(b). Defendant voluntarily chose not to go to trial.[18]

### F.  Defendant caused Plaintiff to submit the RFGOS under threat of duress and by other coercion

---

[18] Plaintiff added an unprecedented condition to his resignation, stating within the resignation document "This request becomes void if I am tried and acquitted."

*(i) Plaintiff submitted the RFGOS while illegally detained in violation of Gerstein v. Pugh*

The constitutionality of Clause 2 of Article 3(b) is squarely before this Court on the facts of Plaintiff's case.[19]  The leading case on Article 3(b), UCMJ, recognizes *Gerstein v. Pugh*, 420 U.S. 103 (1975) applies in a fraudulent discharge case. *Wickham v. Hall*, 12 M.J. 145, 152-153 (C.M.A. 1981). Judge Cook directly addressed the custody-pending-trial issue, citing *Gerstein v. Pugh*. Plaintiff was never afforded such a hearing "after apprehension [and] while in the custody of the Armed Forces." The only probable cause determination was the Article 32, on February 5, 2002 -- a finding of no probable cause. R.C.M. 405 governs the Article 32. The editorial analysis of R.C.M. 405 states, "The probable cause standard is based on *United States v. Engle*, 1 M.J. 387, 389 n.4 (C.M.A. 1976) (legislative history citations omitted)." M.C.M. Appendix 21 at R.C.M. 405(j). Footnote 4 in *U.S. v. Engle*, in turn, simply cites *Gerstein v. Pugh*. In short, *Gerstein* controlled throughout.

Six days after the no probable cause determination, Plaintiff petitioned the Army Court of Criminal Appeals (ACCA) on this very issue.  Plaintiff showed ACCA the no probable cause finding, and argued that he was no flight risk. (AR 2917-18.)  Plaintiff asked to be released from active duty pending trial. ACCA denied the petition without comment. After ACCA's denial of Plaintiff's petition on this issue, Plaintiff again demanded the Government release him pending trial. Plaintiff *sua sponte* refused to return. He returned his office keys to the Fort Benning SJA. (AR 2919-2927.) The Government again threatened Plaintiff with arrest. (AR 2998-99.) It is clear. Clause 2 of Article 3(b) was applied unconstitutionally in Plaintiff's case. After the no probable cause determination on February 5, 2002, and until October 1, 2002, for a total of 237

---

[19] "Each person discharged from the armed forces who is later charged with having fraudulently obtained his discharge is … after apprehension subject to [the UCMJ] while in custody of the armed forces for that trial." Article 3(b), Clause 2.

days, the Army unlawfully held Plaintiff in custody in violation of *Gerstein v. Pugh*.

*(ii) Plaintiff submitted the RFGOS only after the Government continued its prosecution despite the finding of no probable cause*

The totality of circumstances depicts an atmosphere that placed Plaintiff under duress. (AR 2998-99.) Emails showed the case was treated by JAG Corps leaders like a corporate team-building exercise. (AR 1360, 1367-1382). Through discovery, Plaintiff learned his case began with over twenty JAG Corps Colonels and Generals who joined as "teammates," (AR 1367-1382), to prepare to "launch" against Plaintiff, (AR 1370, 1372), to ensure the Order to Return to Duty would "sing like a drill sergeant," (AR 1369), to anticipate the desires of "the heavy hitters," (AR 2598-99), and to edit an Executive Summary for The Judge Advocate General of the Army and *even higher*-positioned leaders. (AR 1360).[20] The MDW SJA, Colonel Mortimer Shea,[21] was part of these pep talks. Rarely is a military charge referred to trial after a finding of no probable cause. Plaintiff knew that, through his own experience as a military lawyer. Plaintiff knew then Acting The Judge Advocate General of the Army, Major General Altenburg, through his position and influence, was pushing every aspect of Plaintiff's case. (AR 2975-2980, 2998-99); (AR 2411-2466, 2467-2498); (AR 1167-1169, ll.14-13; 1976-1978). Later, an attorney from Altenburg's office was detailed to second-chair the prosecution. Assuming, *arguendo*, there was insufficient evidence of unlawful command influence, (AR 276-82), it weighed heavy on Plaintiff's mind when <u>the MDW SJA suggested the RFGOS</u>. (AR 2998-3013.)

---

[20] *Cf.* LTC Coe's internal investigation (AR 1436) ("Can they get him back") (AR 1429) ("prefer charges against him" "Art 83" "3(b)" "can get him back"); (AR 1432) ("Give him a chance to see the light"); (AR 1438) ("Aggravating circumstances-termination at time of WTC bombing"); (AR 1439) ("No paper handed to the officer"); (AR 1441) ("Nutty but sincere").

[21] Colonel Shea's Article 34 pretrial advice 3 months later led to the MDW CG referring the case to trial despite the no probable cause finding, (AR 2234), and despite Plaintiff's urging that the MDW CG seek legal advice from someone else, (AR 2227).

G.  The balance of equities and the totality of circumstances weigh against the court's dismissal of Plaintiff's case without even reaching the merits of Plaintiff's claims

A totality of the circumstances test applies. Consider *Robinson v. Resor*, 469 F.2d 944 (D.C. Cir. 1972). A Warrant Officer sued to set aside his discharge which stemmed from his resignation in lieu of court-martial. Judge Wilkey, for a unanimous 3-judge panel, held that Robinson's discharge, on the basis of his resignation, denied him due process though all requirements were technically met, for the following reasons: (a) Robinson's earlier request for honorable discharge had not been forwarded in accordance with regulations, (b) his resignation had been obtained while under "pressures which obviously affected the soundness of Robinson's judgment," (c) the theft and fraud charges were not supported by evidence of specific intent, and (d)  there was evidence hinting at improper motives for unusually harsh treatment. Judge Wilkey found "Robinson's commander or commanders violated Army regulations in order to keep a good man in for the good of the service." *Id.* at n.3.  Even Robinson's prior inconsistent statements about signing the resignation did not move the Court, which remained troubled that Robinson "received abrupt dismissal and years of life under a stigma totally out of proportion to the totality of circumstances surrounding this case." *Id.* at 951. There was evidence that the Army was acting out of institutional self-interest and possibly even out of spite. *Id.* at n.20. Judge Wilkey concludes: "We hold that the relation of the Government to its soldiers, both as to the substantive decisions on their status and the procedures used to arrive at those decisions, must be, 'if not paternal,' 'at least avuncular.' *Id.* at 951, *citing White v. United States*, 270 U.S. 175, 180 (1926) (Holmes, J.).  "The Army must not be allowed to reach, step by technical step, a result which, viewed in its entirety, constitutes an overreaching leap into the arbitrary and inequitable." *Id.; Cf. Winters v. U.S.,* 89 S.Ct. 57, 21 L.Ed.2d 80 (1968) (Douglas, J.). In *Kremenski v. U.S.*, 13 Cl.Ct. 430 (1987), Krzeminski faced administrative elimination for

27

dishonorable failure to pay just debts. He signed a waiver of his hearing rights. Analyzing the

elements of the alleged crime, the court found *no evidence establishing the requisite intent* to

defraud or deceive creditors. The Court of Claims held Krzemnski's waiver was not a voluntary

act, and, citing *Robinson v. Resor*, declared the waiver ineffective.

### IX.  DEFENDANT'S ERRONEOUS CLAIM THAT DISCHARGE #1 WAS REVOKED AFTER-THE-FACT USING THE "WRITTEN CONFIRMATION OF VERBAL ORDERS" AND/OR THE "OBVIOUS ERROR" PRONGS OF ARMY REG 600-8-105 ¶ 2-21(E)

Defendant never before tendered the "obvious error" or the "written confirmation of

verbal orders" prongs of Army Reg 600-8-105 ¶ 2-21(e) as a basis for jurisdiction over Plaintiff.

*Compare Schaefer v. White, 174 F. Supp.2d 1374* (M.D.Ga. 2001) (no mention of ¶ 2-21(e)) *with*

*Huang v. Sec'y of the Army*, 23 F. Supp.2d 1377 (N.D.Ga. 1998) (government expressly asserts ¶

2-21(e)) *and Rooney v. Sec'y of the Army*, 293 F. Supp.2d 111 (D.D.C. 2003) (government

expressly asserts Army Reg 135-175 ¶ 1-10(b)). In the Coe internal investigation, fraudulent

separation and Article 3(b) jurisdiction is the only topic discussed, (AR 293-300), and Army Reg

600-8-105 ¶ 2-21(e) is never cited. Coe never uses the phrase "obvious error" or "written

confirmation of verbal orders." *Id.* Coe discounts the computer glitch and mis-communication as

being of "no great consequence" and "not relevant" to the case. (AR 297 ¶ C, 299 ¶ H.) He refers

to discharge #1 only as a "fraudulent departure from duty," (AR 298), and his only finding for a

claim to jurisdiction was via Article 3(b), (AR 299 at ¶ G).

During the TRO case, the Army's argument that discharge #1 was "invalid" -- based on

the "same agency" and "legal hold" arguments discussed above -- was just the foundation for its

criminal charge of fraudulent separation. Army counsel represented to Judge Lawson as much:

> THE COURT: …I can understand the money, and maybe there's the
> principle involved  -- but if in the Army's view Schaefer is a dishonorable
> officer, why do you want him back?
> MR. AGAR: Your Honor, we have preferred charges against Major

> Schaefer effective the 1st of November of this year.
> THE COURT: So you want him back to court-martial him.
> MR. AGAR: That is correct, Your Honor.

(AR 653 ll. 17-23.) Even as late as the RFGOS, the JAG Corps still did not cite Army Reg 600-8-105 ¶ 2-21(e) as a basis for jurisdiction, speaking only of Article 3(b). (AR 2798-2801.) Defendant's actions against Plaintiff were <u>always</u> about its Article 3(b) claim.

Other evidence dispels these two new justifications. First, the authority to issue verbal orders is very limited. It was not triggered in this case. Army Reg 600-8-105 ¶ 1–23 ("When the situation demands immediate action, normally in a combat situation, a commander may issue verbal orders"). No such urgency existed here. Second, the wording of ¶ 2-21(e) is dispositive. The verbal orders must be "actually issued." Defendant has no evidence of anyone "actually issuing" Plaintiff a verbal order. Third, nothing coming from USAPDA or from Irene Baker was an "order" -- just attempts to cancel an authorization code inside the TRANSPROC computer system. "Authority to issue other-than-travel orders is vested in command." *Id.* ¶ 1-22(a). Only the Fort Benning command could issue Plaintiff a verbal order revoking Orders 183-2200, not USAPDA. Fourth, written orders confirming verbal orders must include a notation by the commanding general or commanding officer stating the date the verbal orders were given, "for example, 'Confirms verbal orders of commanding officer, 20 January 1992.'" *Id.* ¶ 1-23(b). The Army's *post hoc* revocation order included no such language.

Considering the well-established precedent that a discharge is valid even if delivered by mistake, *see* Pl.'s Mem. P. & A. Supp. Mot. Summ. J. at § I, it would have been reckless for the JAG Corps to base its revocation upon the still untested "obvious error" prong of ¶ 2-21(e). That is why the JAG Corps never invoked the "obvious error" provision. Not even the regulation at issue in *Rooney* permits an "obvious error" revocation. Arguably, an "obvious error" and a

"fraudulent separation" are mutually exclusive -- the first defeats the *mens rea* of the second. Assuming, *arguendo*, that Defendant revoked discharge #1 as an "obvious error" under ¶ 2-21(e), then discharge #2, a fraud-court-martial-predicated discharge, is unsubstantiated and was little more than an end-run around 10 U.S.C. § 803(b), Article 3(b), UCMJ.

In other words, Defendant did not *really* utilize the "written confirmation of verbal orders" or the "obvious error" prongs of ¶ 2-21(e). Its claim to jurisdiction over Plaintiff was <u>always</u> about fraud. *Fausto v. Gearan*, No. 93-cv-1863-EGS, 1997 WL 540809 at *13 (D.D.C. Aug. 21, 1997) (reinstating Plaintiff with back pay), *quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("The short-and-sufficient answer to petitioners' submission is that the courts may not accept appellate counsel's *post hoc* rationalizations for agency action.") and *National Black Media Coalition v. FCC*, 775 F.2d 342, 354 (D.C. Cir. 1985) ("This newly asserted justification is no more than counsel's *post hoc* rationalization of agency action. As such it is entitled to little or no weight."). In *Fausto*, all pre-termination discussions concerned allegations of poor job performance. Upon judicial review, the agency argued the termination was also justified by the need to restructure the office. The court rejected the alternative claim as an attempt to justify the termination after-the-fact.

## X.  DEFENDANT'S "NO JAG INPUT" RED HERRING

Certain JAGs were upset because nobody "coordinated this matter with the JAG Corps." (AR 295 § IV last ¶.) The JAG Corps' internal investigation resulted in recommendations to amend policies to guarantee the JAG Corps' PPTO would be involved in future JAG Corps disability cases. (AR 296, Recommendations II-IV.) PPTO sought PEB #2 because Plaintiff had more than 6 months of active duty service obligation ("ADSO"). (AR 1501-03, 3008); *see also* (AR 1164, 1166-68, 1236, 1239, 1619-21, 3009.) PPTO's interest was not *really* about Plaintiff's

fitness for duty. It was about (a) keeping him on active duty, (AR 1501-03, 1643, 3008-09), and (b) sending a message to others with ADSOs not to use the PDES to get out early, (AR 2460-2466). Colonel Tate's question to Dennis Brower was "how can the JAG Corps protect its interests here," (AR 3009), or "what can be done to keep Plaintiff on active duty," (AR 1643).

A soldier's ADSO is an impermissible consideration in the PDES, so "No JAG Input" became the hook for PEB #2. None of the PDES controlling law mandates JAG input in the disability evaluation of a JAG officer. A PEB #1 Board Member testified they had everything they needed to make their "unfit for duty" decision. (AR 1702-07, 1717-18, 1728-30). Army Reg 635-40 establishes two primary boards, ¶ 2-10(a) -- the MEB and PEB -- and three "related" boards, ¶¶ 2-11, 2-12, 2-13 -- the APDAB, ABCMR, and ADRRB. The MMRB is not one of the primary boards. It is not even a "related" board. The MMRB is not part of the PDES, as admitted by USAPDA counsel, (AR 1251 ll. 14-19), and a PEB Board Member, (AR 1692-1695.)

The purpose of an MMRB is to determine if a soldier is worldwide deployable or should be reclassified into a different skill specialty. The MMRB regulation states, at ¶ 3-3(d)(8): "The members will use their own experience, common sense, and judgment in determining whether the soldier can perform under worldwide field conditions." The fact that Fort Benning runs all physical profile cases through an MMRB first does not change the fact that Plaintiff's case went to the PEB *because of the MEB referral*, not because of the MMRB. The PDES and MMRB are separate and distinct. A procedural error in an MMRB does not amount to a defect in a soldier's PDES. Plaintiff opposes Defendant's MMRB-related inferences more fully in Pl.'s Stmt. Genuine Issues Opp. Def.'s Stmt. Material Facts at ¶ 2 thereof.

Two other items of evidence indicate there was no error for lack of coordination with the JAG PPTO. First, there is no requirement in Army Reg 635-40 that a PEB include a JAG

member when evaluating a JAG. Second, discharge orders must only be sent to PPTO if a JAG is being separated because of *nonselection for promotion*. Army Reg 600-8-105, Figure 5-6, Format 501, n.25. Not even disability discharge orders are required to be sent to the JAG PPTO.

XI.  DEFENDANT'S ERRONEOUS CLAIM THAT DISCHARGE #1 WAS REVOKED
AFTER-THE-FACT USING THE FRAUD PRONG OF ARMY REG 600-8-105 ¶ 2-21(E)

A. Plaintiff was judicially returned to military control for court-martial, not administratively
returned to duty

Defendant cites to *Rooney v. Sec'y of the Army*, 293 F. Supp.2d 111 (D.D.C. 2003), *vacated on other grounds*, 405 F.3d 1029 (D.C. Cir. 2005), to argue it did not have to court-martial Plaintiff in the first place. But Plaintiff's case is not a *Rooney* case. As with the "obvious error" and "written confirmation of verbal orders" prongs of Army Reg 600-8-105 ¶ 2-21(e), the same rebuttal applies here -- Defendant never tendered ¶ 2-21(e) as a basis to assert jurisdiction. The only reason we address the fraud prong of ¶ 2-21(e) separately is, as we said before, the Army's claim to jurisdiction over Plaintiff was <u>always</u> about fraud.

Defendant evaded Judge Lawson by asserting Article 3(b) -- by charging Plaintiff with fraudulent separation. *Cf. Parisi v. Davidson*, 405 U.S. 34, 39 (1972) ("If the court-martial charge had not intervened, the District Court would have been wrong in not proceeding to an expeditious consideration of the merits of petitioner's claim.") Hold Defendant to its word. (AR 1749-1756.) Plaintiff was *judicially returned* to military control -- for court-martial. Doctor Rooney was *administratively returned to duty* simply to go back to the operating room. Doctor Rooney was never charged with fraudulent separation, 10 U.S.C. § 803(b). He was not ordered to "show cause," for his alleged fraud, before a "board of inquiry" -- an administrative elimination proceeding pursuant to 10 U.S.C. § 1181 *et. seq.* He was not administered nonjudicial punishment pursuant to Article 15, UCMJ, for the alleged fraud. He was not administratively

32

reprimanded or adversely evaluated. Defendant just put him back to work -- an administrative

return to duty. *Based on these facts*, Judge Bates found that Article 3(b) did not occupy the field.

In Plaintiff's case, Article 3(b) occupies the field. Once the Army charged Plaintiff with

fraudulent separation and invoked Article 3(b), Plaintiff's return to military control was judicial.

That is what Judge Lawson thought was happening. That is why he ruled as he did.

### B. Lack of Substantial Evidence of a Fraudulent Separation Offense

While we can concede <u>nothing</u> about the correctness of the *Rooney* decision, we would

very respectfully tender that, in the case at bar, the Army lacked substantial evidence of

fraudulent separation to return Plaintiff to military control, even by way of a ¶ 2-21(e)

administrative return to duty. The evidence noticeably moved the *Rooney* Court. That same

factor does not apply here. *See* Pl.'s Mem. P. & A. Supp. Mot. Summ. J. at § II.

### C. The *Rooney* Court overlooked a due process forum provided by Congress

To the extent Congress exercises its constitutional power to make rules for the

government and regulation of the land and naval forces, it occupies the field and neither the

President nor the Secretary may encroach thereon. The *Rooney* Court opined that the putative,

presumptive, civilian ex-servicemember was entitled to <u>no</u> pre- or post-deprivation procedural

safeguards. Instead, reasoned the Court, the aggrieved dischargee is not denied due process

because he can challenge his detention by petitioning for a writ of habeas corpus. The *Rooney*

Court overlooked an intermediate form of due process *established by Congress*.

Assuming, *arguendo*, the *Rooney* Court correctly decided Article 3(b) did not occupy the

field *on the facts of that case*, still the Court missed the <u>Court of Inquiry</u>, the third of four

agencies through which military jurisdiction is exercised. "The sources of military jurisdiction

include the Constitution and international law." Manual for Courts-Martial, Part I, § 1. The

"agencies" through which military jurisdiction is exercised include only four: **(1)** Courts-martial for the trial of offenses against military law…**(2)** Military commissions…**(3)** *Courts of inquiry for the investigation of any matter* referred to such court by competent authority. See Article 135 … **(4)** Nonjudicial punishment proceedings of a commander under Article 15 …" *Id.* § 2 (emphasis added). *If* Congress intended Article 3(b) would *not* occupy the field vis-à-vis fraudulent discharges, then Congress intended a Court of Inquiry to be the alternative "agency" through which military jurisdiction is exercised over a putative civilian ex-servicemember.

The Court of Inquiry may "investigate any matter," it may be convened "by any person authorized to convene a general court-martial," it "consists of three or more commissioned officers." 10 U.S.C. § 935; *U.S. v. Shibley*, 112 F. Supp. 734 (S.D. Cal. 1953) (discussing powers of courts of inquiry over civilians). "[A]ny person designated as a party" is afforded an evidentiary trial-type hearing. *Id.*

> A naval or military court of inquiry is not a judicial tribunal. It is instituted solely for the purpose of investigation, as an assistance to the President, the head of the Department, or the commanding officer, in determining whether or not any further proceeding, executive or judicial, ought to be taken in relation to the subject matter of the inquiry. There is no issue joined between parties, and its proceedings are not judicial.

*Shibley* at 743, *citing Walter B. Chester's Owners v. U.S.*, 19 Ct.Cl. 681, 683 (1884). In short, Congress already occupies the *administrative return to duty* field. Again, while we concede nothing about the constitutionality of Article 3(b) or the *Rooney* decision, there are two possible interpretations of the *administrative return to duty* using 10 U.S.C. § 935.

Pre-deprivation, the appropriate authority convenes an *ex parte* Court of Inquiry. If that *ex parte* Court of Inquiry makes an administrative finding of fact that the dischargee committed the 10 U.S.C. § 883(2) offense of fraudulent separation (looking to the 3 elements for the substance of their inquiry), the command would invoke ¶ 2-21(e) for an *administrative return to*

*duty* and require the person to perform military duties again.

Post-deprivation, the military uses 10 U.S.C. § 803(b) and 10 U.S.C. § 935 in tandem. The Army charged the dischargee with fraudulent separation. The appropriate authority convenes a Court of Inquiry. Per 10 U.S.C. § 935, the dischargee is "designated as a party." Having been designated as a party, the "respondent" is provided an evidentiary trial-type hearing (as described in 10 U.S.C. § 935). If the Court of Inquiry makes an administrative finding of fact that the dischargee committed the 10 U.S.C. § 883(2) offense of fraudulent separation, the command would invoke ¶ 2-21(e) for an *administrative return to duty* and require the person to perform military duties again. The command either dismisses the Article 3(b) court-martial and simply puts the person back to work -- *a la Rooney* -- or continues the court-martial to obtain the jurisdiction necessary to take adverse action for the fraud and other pre-discharge misconduct.

The Court of Inquiry is a more rationale alternative. We submit neither Congress nor the Supreme Court intended to permit an unspecified, unnamed, government bureaucrat to make a unilateral, *ex parte*, undocumented finding that a scintilla of evidence of fraudulent circumstances tainted a facially valid discharge -- subject only to a collateral habeas challenge.

D.  Defendant's interpretation of Army Reg 600-8-105 ¶ 2-21 (e) violates the due process clause of the Fifth Amendment and contradicts 10 U.S.C. § 803 (b), which preempts the field

"We have repeatedly admonished federal agencies that jurisdiction may not be presumed based solely on the fact that there is not an express withholding of jurisdiction." *Exxon Mobil Gas Marketing Co. v. F.E.R.C.* 297 F.3d 1071, 1088 (D.C. Cir. 2002) (citations omitted). "We emphatically agree that '[n]eed for regulation cannot alone create authority to regulate.'" *Id.* "Agency authority may not be lightly presumed. 'Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony.'" *Michigan v. E.P.A.*, 268 F.3d 1075, 1082 (D.C. Cir. 2001).

Congress established the moment a discharge becomes final, 10 U.S.C. § 1168(a), and provided one exception, 10 U.S.C. § 803(b). Congress left no gaps to fill. There is no need for ¶ 2-21(e) (fraud). Congress never empowered the Secretary to make an administrative finding of fraudulent separation. The military courts agree: "Congress has provided in Article 3(b) that *a court-martial shall determine* whether the dischargee procured separation from the service by fraud." *Wickham v. Hall*, 12 M.J. 145, 153 (C.M.A. 1981) (emphasis added). "The Government urges us to permit the Secretary of the Army, by regulation, to establish the moment of discharge. We respectfully decline to do so." *U.S. v. Howard*, 20 M.J. 353, 354 (C.M.A. 1985).

What process is due? "Due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972). The quantum and quality of the process due in a situation depend on the need to minimize the risk of error. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). That *need* in cases like Plaintiff's is *brutal*, calling for a pre-deprivation trial-type hearing. *Goldberg v. Kelly*, 397 U.S. 24 (1970). Any ¶ 2-21(e)(fraud) action involves disputed, material adjudicative facts, against a dischargee with protectable liberty and property interests, where no emergency exists. *Matthews*, 424 U.S. 319.

The effects that result from military apprehension and custody after delivery of a facially valid discharge certificate are no less significant than other government actions that require pre-deprivation due process, such as termination of welfare benefits, *Goldberg v. Kelly*, 397 U.S. 254 (1970), termination of unemployment benefits, *Fusari v. Steinberg*, 419 U.S. 375 (1975), civil commitment to a mental institution, *Addington v. Texas*, 441 U.S. 418 (1979), civil forfeiture of real property, *United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993), termination of parental rights, *Santosky v. Kramer*, 455 U.S. 745 (1982), electrical service cutoff, *Memphis Light v. Craft*, 436 U.S. 1 (1979), driver's license revocation, *Bell v. Burson*, 402 U.S.

535 (1971), a 10-day school suspension, *Goss v. Lopez*, 419 U.S. 565 (1975), or involuntary

transfer from prison to a mental facility, *Vitek v. Jones*, 445 U.S. 480 (1980). In *Cleveland Board*

*of Education v. Lowdermill*, 470 U.S. 532 (1985), the Supreme Court held that classified civil

servants had to be afforded a pretermination opportunity to respond, coupled with post-

termination administrative proceedings provided by Ohio statute. The *Lowdermill* Court noted

"the root requirement of the Due Process Clause" as being "that an individual be given an

opportunity for a hearing *before* he is deprived of any significant property interest." *Id.* at 542.

A military discharge invokes greater concerns. Chief Justice Marshall first recognized the

military has no jurisdiction over a person not a member of the military. *Wise v. Withers*, 3

Cranch. 331, 337, 2 L.Ed. 457, 459 (1806). The Supreme Court views this dividing line as one

going to the very "birthright of every American citizen." *Ex Parte Milligan*, 4 Wall. 2, 18 L.Ed.

281, 295 (1866). The revocation of a DD-214 -- particularly on the basis of fraud [22] -- implicates

both liberty and property interests. The revocation of a discharge "does not involve internal

military affairs" governed only by the highly deferential standard for review of agency action.

*Huang*, 23 F. Supp.2d at 1380. Instead, "it involves the power of the military to reach out and

pull a civilian into the military system, and thus substantially involves basic constitutional and

statutory rights." *Id.* Every expansion of military jurisdiction is an encroachment on the

jurisdiction of Article III courts and acts as a deprivation of treasured constitutional protections.

*Reid v. Covert*, 354 U.S. 1, 22 (1957). Any extension military jurisdiction must be the "least

possible power adequate to the end proposed." *Toth v. Quarles,* 350 U.S. 11, 23 (1955).

---

[22] A liberty interest is implicated when government action calls into question the individual's
moral turpitude, good name, character, reputation, honor or integrity or imposes a stigma. *Board
of Regents v. Roth*, 408 U.S. 564, 573 (1972); *Perry v. FBI*, 781 F.2d 1294, 1300 (7th Cir. 1986);
*Doe v. Dep't of Justice*, 753 F.2d 1092, 1102 (D.C. Cir. 1985).

Judicial due process is required. The exception to the rule of irrevocability is that a discharge obtained by fraud is not *void*; rather, it is *voidable* by a court of law. *U.S. v. Reid*, 46 M.J. 236, 238 (C.A.A.F. 1997). Congress provided substantial due process safeguards at this "Constitutional border line between civilian and military authority." *Huang* at 1383. Congress requires a judicial determination as to the validity of a discharge. *Id.*; *Reid*, 46 M.J. at 238. This due process is commensurate with the weighty interests at stake and is designed to minimize the risk of abusive or erroneous government action. *Wickham v. Hall*, 12 M.J. at 153; *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 13 (1979). Army Reg 600-8-105 ¶ 2-21(e) is merely an expression of this military jurisprudence. It does not provide a <u>separate</u> administrative mechanism for determining the validity of a discharge. It provides no procedural protections because the process due is provided by 10 U.S.C. § 803(b), the UCMJ, and the military courts.

Just prior to the enactment of the UCMJ (along with it Article 3(b)), the Southern District of New York confronted the issue of whether the military had jurisdiction over a dischargee who allegedly procured his discharge by fraud. *U.S. ex rel. Flannery v. Commanding General*, 69 F. Supp. 661 (S.D.N.Y. 1946). *Flannery* recognized a discharge revocation implicated "life, liberty and property" interests and that those interests must be "largely and liberally construed in favor of the citizen," *Id.* at 665, and protected by *judicial* due process:

> The cancellation or recall of a discharge for fraud presents a justifiable issue that *only a court* may decide (Article 3), whether the fraud be such as to make the discharge void or such as to make it voidable. The very question whether it be void or voidable is an issue that *only a court* may decide. Any assertion of an arbitrary power to cancel or to recall it is made nugatory by the constitutional requirement of due process.

*Id.* at 664. Modernly, Article 3(b) is interpreted to send the fraud question to Article I military courts, but *Flannery*'s two basic principles remain good law. The revocation of a discharge implicates special interests protected by the due process clause, and the question of whether a

38

person fraudulently obtained his discharge must be determined by a "court of law."

In *U.S. ex rel. Roberson v. Keating*, 121 F. Supp. 477, 479-80 (N.D.Ill. 1949), one year before the enactment of Article 3(b), the Northern District of Illinois examined the military's jurisdiction over a sailor discharged from the service. The Navy inadvertently issued Roberson an honorable discharge and purportedly revoked it three days later. *Id*. at 477. Even though the case did not involve allegations of fraud, the *Roberson* Court, like *Flannery*, recognized the "question of whether an individual is in the armed forces or has been discharged is of serious import," elaborating on the special interests at stake -- including a protected property interest:

> [A]n honorable discharge is an extremely valuable *property* right as well as a personal right, and to deprive a person of an honorable discharge is to deprive him of property rights, as well as civil rights and personal honor. To destroy such a certificate of title, if we wish to call it that, in an arbitrary way on a unilateral proceeding, is contrary to our ideas of democracy.

*Id*. at 479 (emphasis added). The Court stated "when we come to the question of whether or not a citizen is or is not a member of the Navy, the point becomes basic and fundamental under our constitution and must be judged by the civil *courts*." *Id*. at 479 (emphasis added). "[T]he clear-cut naked question of whether a man is or is not in the armed forces must be determined by civilian courts under the rules of due process." *Id*. at 480.

*Flannery* and *Roberson* recognize only a court of law can determine the validity of a discharge. Since *Flannery* and *Roberson*, the only change is that the "court of law" might be an Article I court. In 1950, Congress enacted the UCMJ and jurisdictional limitations on the armed forces. Through Article 3(b) Congress limited the service secretary's authority to revoke a discharge on the basis of fraud. The statute provides that a court-martial shall determine the validity of the discharge. Since 1950, several cases examined the military's statutory authority to challenge the validity of a discharge. Notably, the Supreme Court held in *Toth v. Quarles* the

military has no jurisdiction to subject a dischargee to trial by court-martial for pre-discharge violations of military law. *Toth* found a change from military to civilian status implicates fundamental liberty interests subject to the protection of "regular courts authorized by Article III of the Constitution." *Id.*, 350 U.S. at 18. While *Toth* did not involve a fraudulent separation, it indicates that the military's authority to revoke a discharge must be narrowly construed.

In *U.S. v. Banner*, 22 C.M.R. 510, 515 (A.B.R. 1956), the Army Board of Review recognized Congress limited jurisdiction over a *voidable* discharge to "a *judicial determination* of the fraudulent discharge." *Id.* at 515 (emphasis added), *citing Roberson*. The *Banner* Court noted "[i]t would seem *untenable* to apply one rule upon which to establish or uphold court-martial jurisdiction, and another rule for administrative purposes." *Id.* at 517. That is what Defendant attempts here. It interprets Army Reg 600-8-105 ¶ 2-21(e) as providing an independent administrative power to revoke a discharge on the basis of fraud. Defendant wants the power of 10 U.S.C. § 803(b) without taking on its burdens. *Banner* also recognized that the military's attempt to revoke a discharge implicates due process and requires "a full litigation of the matter at trial level." *Id.* at 518. "[A] person claiming he is a civilian must be afforded due process in regard to a determination of his status as a member of the armed forces." *U.S. v. Cole*, 24 M.J. 18, 21 (C.M.A. 1987); *accord Wickham,* 12 M.J. at 153, *citing Bell v. Burson*, 402 U.S. 535 (1971). "[A]bsent a judicial determination" that the separation was fraudulent, "we may not find that he remained 'subject to the UCMJ' after his separation from active duty." *Spradley*, 41 M.J. at 831. The government alleged Spradley fraudulently obtained his discharge. There was never a judicial determination of that fact. The court found "there is *no basis* upon which to find the appellant's administrative separation invalid." *Id.* (emphasis added).

These cases make clear that a ¶ 2-21(e) revocation is not *a basis* upon which to render a

DD-214 voidable. "Congress has determined that a fraudulent discharge is voidable, not void, and that a court-martial may adjudicate the matter. 'Upon conviction' of the fraudulent separation, the discharge no longer is valid…" *Reid*, 46 M.J. at 238-39, *citing Cole*, *Banner*, and *Spradley*. The consensus opinion that runs through every case is that only a court of law, whether military or civilian, shall determine the validity of a discharge. During Plaintiff's TRO case, the Army acknowledged there must be a judicial determination as to the validity of the discharge and simply argued that the military courts should be permitted to make that determination. Judge Lawson relied on those representations to conclude Plaintiff would be afforded due process. Defendant cannot take the benefits of Article 3(b) without accepting its burdens.

¶ 2-21(e) is intended merely as an expression of Article 3(b) and the long line of discharge-finality cases. *Rooney* at 128 (finding Article 3(b) the source of the mirroring regulation) ("The latter of those provisions-which is also the source of the former"). Defendant provides no evidence describing the history of this regulation suggesting otherwise. ¶ 2-21 (e) does not provide criteria against which a decision to revoke can be evaluated. The absence of criteria does not indicate that none are required. Given Article 3(b) is the source of ¶ 2-21(e) (fraud clause), as the *Rooney* Court recognized, then 10 U.S.C. §§ 803(b), 801-946 provide both the substance and procedure of a discharge revocation for fraud.

Defendant now simultaneously embraces Article 3(b) and its regulation -- claiming two revocations at the same time. In the ¶ 2-21(e) revocation, Defendant simply vaults over the trial phase. Under the Army's interpretation of ¶ 2-21(e), it can revoke a discharge on the basis of fraud: (1) unilaterally (no neutral and detached decision-maker); (2) without notice; (3) without a record; (4) without a hearing or opportunity to be heard, either before or after revocation; (5) without a right to inspect and challenge the government's evidence, or the right to present

evidence; (6) based on an "any evidence" or even "a scintilla of evidence" standard, creating a burden on the plaintiff to prove a negative, essentially an "invisible target"; (7) where the burden is on the dischargee, at his own expense for legal representation, to later prove the Army acted arbitrarily, capriciously or contrary to law or regulation; and (8) with no right of appeal. If anything, ¶ 2-21 (e) was intended to express the Army's *unilateral* discretion to bring a charge of fraudulent separation. That view is more consistent with Article 3(b) and related cases.

## XII.  DEFENDANT'S REBUTTAL TO PLAINTIFF'S CONSTITUTIONAL CLAIMS

We defer to Plaintiff's Complaint which describes his constitutional claims exhaustively. (Compl. Claims 1, 2, and 3, at ¶¶ 110 - 156). Here we address three points. First, in its four sentence rejection of Plaintiff's constitutional claims, the ABCMR short-shrifted those claims, essentially ignored them, and thereby "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). The ABCMR never explored the constitutional claims, *especially as against the unique facts of this case that triggered those claims*. It ended by just "noting" Plaintiff's constitutional claim. (AR 42). It cited back to Plaintiff's own TRO case, a case dealing with a different threshold question and standard of review, and a court that saw the case before the no probable cause finding and the *Gerstein* violation. The other most cited case sustaining Article 3(b) is *U.S. v. Cole*, 24 M.J. 18 (C.M.A. 1987). The holding in *Cole* was more limited than implied by Defendant (at its p. 12).  "We disagree and hold that application of this statute to appellant *under the circumstances of this case* was constitutional and that his conviction can be sustained."  *United States v. Cole*, 24 M.J. 18, 20 (C.M.A. 1987).  The ABCMR never considered *the circumstances* of Plaintiff's case vis-à-vis his constitutional claims. One example, among many, of a *circumstance* the ABCMR ignored is the following: no reported case dealing with fraudulent discharge even resembles Plaintiff's case.

*Wickham v. Hall*, 12 M.J. 145 (C.M.A. 1981) (substituted a pregnant woman's urine as her own

to procure a pregnancy discharge); *U.S. v. Cole*, 24 M.J. 18 (C.M.A. 1987) (forged signatures

and initials on his clearance and outprocessing forms); *U.S. v. Reid*, 46 M.J. 236 (C.A.A.F. 1997)

(submitted falsified clearance documents to the Transition Center official); *U.S. v. Spradley*, 41

M.J. 827 (N.M.C.C.A. 1995) (represented falsely to his command that he made restitution); *U.S.

v. Pou*, 43 M.J. 778 (A.F.C.C.A. 1995) (faked his own death).

      Second point. Defendant avers in a footnote that Plaintiff may not assert Claim 3.[23]

Plaintiff's ABCMR application encompasses the argument that Articles 32 and 34 are

unconstitutional *when applied in an Article 3(b) case*, that "the Army wrongfully applied Article

3(b), UCMJ, to [Plaintiff]." (AR 48.) Plaintiff only asserts that Articles 32 and 34 are

unconstitutional (a) as applied to Plaintiff, (b) as applied in an Article 3(b) case, and (c) as

applied in combination with each other in an Article 3(b) case. *See, e.g.*, Pl's. Compl. ¶¶ 122 and

139. Plaintiff's Claim 3 is that he suffered a constitutional injury when the military continued to

detain him and subject him to the Article 3(b) prosecution after the no probable cause finding.

That is what he argued to the ABCMR, (AR 89-90), to the military appellate courts, (2107-43;

2145-2206; 2283-2322), and to the individuals who detained him, (AR 2208-2216).

      Third point. Plaintiff's constitutional challenge to Article 3(b), and his challenge to

Article 32 and 34 -- *as applied in an Article 3(b) case and as applied to him* -- are squarely

before this Court. Compl. ¶¶ 145 and 155; *see also, generally*, Compl. ¶¶ 122, 133, 134, 139,

147, 148, 150-153. Plaintiff challenges Article 3(b) as applied to him because the Army's Article

32 pretrial investigation and Article 34 pretrial advice -- the military's counterpart to indictment

by  a grand jury -- failed to protect him from a charge that lacked sufficient merit to proceed to

---

[23] Plaintiff cites only to *Doyle v. U.S.*, 599 F.2d 984, 1000 (Ct. Cl. 1979). *Doyle* has been cited
only in Tucker Act cases, and only once outside the Federal Circuit.

trial.[24] In response, Defendant urges this Court to not view Article 32 and 34 as the military's

counterpart to indictment by grand jury. Defendant steers the Court's attention away from

Articles 32 and 34 and points elsewhere for safe harbor -- to the commanding general. Defendant

disregards long-standing precedent. No case states that the commanding general is the military

equivalent to a civilian's right to indictment by grand jury. By contrast, a long line of cases

define the Article 32 pretrial investigation and Article 34 pretrial advice as the military's

counterpart to that due process guarantee. One author describes this "screening mechanism":

> Before charges may be referred to a general court-martial, the highest court-
> martial, two statutory criteria must first be met. First, Article 32, U.C.M.J.
> requires a formal investigation of the charges, and second, Article 34,
> U.C.M.J. requires the general court-martial convening authority to seek the
> formal written advice of his staff judge advocate. These two instruments
> present the general court-martial convening authority with the necessary
> factual and legal predicates for proceeding. This chapter addresses these
> two screening devices, which are most often linked together in discussions
> on military justice because they almost always operate in tandem.

David A. Schlueter, Military Criminal Justice: Practice and Procedure § 7-1 (3d ed. 1992).

This Court recognizes "An Article 32 Investigation is the military counterpart to the

civilian grand jury." *McKinney v. Caldera*, 141 F. Supp.2d 25, 27 n.3 (D.D.C. 2001) (Urbina, J.).

Many other Circuits describe the Article 32 as the military's "counterpart" or "equivalent" to

indictment by a grand jury.[25] Every military court has done so.[26] "The Article 32 investigation is

---

[24] Plaintiff expressly requested the court-martial convening authority seek his Article 34 pretrial advice from someone other than Colonel Mortimer Shea. (AR 2225-2227.)

[25] *Flowers v. First Hawaiian Bank*, 295 F.3d 966, 975-976 (9th Cir. 2002); *Morgan v. Perry*, 142 F.3d 670, 677 (3rd Cir. 1998); *Burns v. Harris*, 340 F.2d 383, 386 (8th Cir. 1965); *Brosius v. Warden, United States Penitentiary*,125 F. Supp.2d 681, 687 (M.D.Pa. 2000).

[26] *U.S. v. Bell*, 44 M.J. 403, 406 (C.A.A.F. 1996); *U.S. v. Nickerson*, 27 M.J. 30, 32 (C.M.A. 1988); *U.S. v. Schaffer*, 12 M.J. 425, 429 (C.M.A. 1982); *U.S. v. Branoff*, 34 M.J. 612, 618 (A.F.C.M.R. 1992) ("The investigation under Article 32 is the functional equivalent of a grand jury under Fed. R. Crim. P. 6"); *U.S. v. Lockwood*, 11 M.J. 818, 823 (A.F.C.M.R. 1981); *U.S. v. Rojas*, 15 M.J. 902, 930 (N.M.C.M.R. 1983); *U.S. v. Powell*, 17 M.J. 975, 976 (A.C.M.R. 1984); *U.S. v Burrell*, 5 M.J. 617 (A.C.M.R. 1978) (application of Jencks Act to Article 32).

the military's counterpart to the civilian grand jury. Both are designed to avoid trials on baseless charges." Schlueter, *supra* at § 7-1, *citing Talbot v. Toth*, 215 F.2d 22 (D.C. Cir. 1954) (Article 32 and 34 combined comprise the military's due process right to indictment by grand jury).

The procedural rules for an Article 32 pretrial investigation are contained in R.C.M. 405. The analysis of R.C.M. 405 compares the Article 32 pretrial investigation to Fed. R. Crim. Proc. 6 (grand jury) and 7 (indictment). M.C.M. Appx. 21, at Rule 405(a). R.C.M. 405 itself states "The *primary* purpose of the investigation required by Article 32 and this rule [R.C.M. 405] is to inquire into the truth of the matters set forth in the charges … The investigation *also* serves as a means of discovery." R.C.M. 405 (Discussion) (emphasis added). Without citation, Defendant flip-flops that text, arguing the *primary* purpose of an Article 32 is to "serve as a discovery mechanism for the accused Soldier." (Def.'s Mem. P. & A. Supp. Mot. Summ. J. at 15.).

It is the <u>combination</u> of Articles 32 and 34 that is supposed to provide this constitutional screening mechanism, as described *U.S. v. Hayes*, 24 M.J. 786, 788 n.3 (A.C.M.R. 1987):

> We believe that the statutory pretrial advice (Article 34(a), UCMJ) is a fundamental procedure of military due process in general courts-martial because, together with the pretrial investigation required by Article 32, UCMJ, 10 U.S.C. § 832, it constitutes the military equivalent of the civilian grand jury process.

After the Article 32 hearing's no probable cause determination, Plaintiff was entitled to have that finding treated like a grand jury's failure to return an indictment. U.S. Const. Amend V. Defendant's motion for summary judgment should be denied. Oral argument is requested.

Respectfully submitted,

__/s/_____
Gary R. Myers (157115) for Plaintiff
78 Clark Mill Road
Weare, New Hampshire 03281
1-800-355-1095; FAX (603) 529-3009

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MALCOLM G. SCHAEFER,        )
                               )
        Plaintiff,         )
                               )     Civil Action No. 1:07-cv-01550 (RJL)
v.                       )
                               )
THE HONORABLE PETE GEREN,  )
SECRETARY OF THE ARMY,    )
                               )
        Defendant.      )

PLAINTIFF'S STATEMENT OF GENUINE ISSUES
(IN OPPOSITION TO DEFENDANT'S STATEMENT OF MATERIAL FACTS
WHICH ARE NOT IN GENUINE DISPUTE)

In accordance with LCvR 7.1(h) and Fed. R. Civ. P. 56, Plaintiff submits the following

Statement of Genuine Issues.  The paragraphs correspond directly to the numbered paragraphs in

Defendant's Statement of Materials Facts, which Defendant filed in support of its Motion for

Summary Judgment.

**2.**  Defendant's statements at its paragraph 2 make three mischaracterizations. Defendant

incorrectly states the MMRB *referred* Plaintiff to the Physical Disability Evaluation System

("PDES"). Defendant erroneously suggests, by its citation to Plaintiff's TRO case, that there was

irregularity in the processing of Plaintiff's PDES case.  Defendant incorrectly states the MMRB

"evaluated Plaintiff's medical fitness."  Further explanation follows:

        (a)    *First*, the MMRB lies outside the PDES. Since the two are separate and

distinct, if irregularity existed in an MMRB it would not be deemed irregularity in the

PDES. The PDES is authorized and governed by 10 U.S.C. § 1201 et. seq., Department

of Defense Directive 1332.18, Department of Defense Instruction 1332.38, and Army

Regulation 635-40, none of which include the MMRB as part of the PDES.

(b)    *Second*, the MMRB is only empowered to make findings and

*recommendations*, and is not empowered to *refer*. *See* Army Regulation 600-60 ¶ 3-4.

The MMRB transmits its findings and *recommendations* to the MMRB Convening

Authority.

(c)    *Third*, the MMRB Convening Authority, before taking action, conducts a

review to ensure all cases are accurate, complete, and were conducted in accordance with

he regulation. *Id.* at ¶ 3-5. In Plaintiff's case, the MMRB Convening Authority was the

Commanding General, U.S. Army Infantry Center and Fort Benning. During the MMRB

Convening Authority's review, the Convening Authority is presumed to have ascertained

whether a Judge Advocate was "reasonably available" to act as a board member. *Id.* at ¶

3-2 (c) and (e). In the absence of any record to the contrary, it is presumed -- consistent

with the presumption of regularity -- that the Convening Authority, before taking action,

determined that a Judge Advocate was *not reasonably available*. There was no Judge

Advocate senior to Plaintiff at Fort Benning that did not have a conflict of interest

prohibiting that person from participating in Plaintiff's MMRB, considering Plaintiff's

assignment there as Senior Defense Counsel.

(d)    *Fourth*, the MMRB Convening Authority may then approve or disapprove

the MMRB's findings and recommendations, or take other action as appropriate. *Id.* at ¶

3-5. In Plaintiff's case, the MMRB Convening Authority, by approving the

recommendation of the MMRB, referred Plaintiff to a Medical Evaluation Board

("MEB"). Plaintiff's treating physician initiated the MEB. The MEB is the first step in the Army's PDES.

(e)     *Fifth*, more likely than not, the referral of Plaintiff's case to the PDES was mandatory, notwithstanding the absence of a Judge Advocate board member, pursuant to ¶ 2-1(g) of the MMRB regulation.

(f)     *Sixth*, Defendant incorrectly states the MMRB "evaluated Plaintiff's medical fitness." Rather, the board members' purpose is to "use their own experience, common sense, and judgment in determining whether the soldier can perform worldwide under field conditions." *Id.* at ¶ 3-3(d)(8).  The MMRB evaluation is to determine if a soldier meets "Current Army policy [which] requires that a soldier be capable of performing the duties of his or her office, grade, rank, or rating under worldwide field conditions." *Id.* at ¶ 2-1(b).

**3.**  The MEB did not "recommend[] that Plaintiff be referred to a Physical Evaluation Board."  Rather, the MEB *referred* Plaintiff to a Physical Evaluation Board.

**4.**  Defendant incorrectly states "Following PEB processing, Army Physical Disability Branch (PDB) authorized Fort Benning to issue discharge orders."  Defendant presupposes that "PEB processing" deviates from the governing Department of Defense and Army regulations. Defendant presupposes that any such deviation is with legal authority. The governing DOD and Army regulations describe the "PEB process" and any deviation from that process in Plaintiff's case prejudiced Plaintiff immeasurably. Defendant may not now rely upon those deviations to support all actions it took against Plaintiff.

**5.** Defendant incorrectly states the Fort Benning Transition Office issued Plaintiff his discharge orders. It was the Fort Benning Adjutant General, for the installation commander, and as a delegee of PERSCOM, who issued the orders.

**6.** Defendant incorrectly states that PDB transmitted a revocation to Fort Benning by phone, fax, and computer system. The PDB failed to provide Fort Benning the written authorization which Fort Benning required to issue a revocation order to Plaintiff, and failed to first obtain approval from PERSCOM to make any change to Plaintiff's pending discharge orders.

**8.** Defendant incorrectly states USAPDA found "procedural errors in the processing of Plaintiff's case." USAPDA found an error outside the PDES, in a board that is neither a primary nor a related board in the PDES.

**10.** Defendant incorrectly states "Plaintiff ordered his subordinates not to come to work on September 14, 2001." Rather, Plaintiff transmitted orders that came directly from the Commanding General of Fort Benning.

**12.** This statement of fact must be supplemented by stating that, on September 18, 2001, Plaintiff's orders were purported to have been revoked by the Fort Benning Adjutant General.

**20.** Defendant incorrectly states the Article 32 "established" Plaintiff committed the offenses of conduct unbecoming and dereliction of duty. Those two offenses were not litigated before the Article 32, and could not have been. The Article 32 only had jurisdiction to investigate pursuant to Article 3(b), UCMJ, and therefore only had jurisdiction to litigate the issue of whether Plaintiff committed the offense of fraudulent separation. Accordingly, the Article 32

lacked jurisdiction to investigate whether Plaintiff committed the offenses of conduct unbecoming or dereliction of duty.

24.  Plaintiff did not voluntarily submit the Resignation for the Good of the Service and in lieu of trial by General Court-Martial.  The resignation was involuntary for the reasons stated within Plaintiff's other filings in this case.

29.  Plaintiff was not discharged on October 1, 2002.  Defendant purported to discharge Plaintiff on October 1, 2002, but Plaintiff had already been discharged on September 14, 2001, and held no military status on October 1, 2002.


Oral argument is requested.

Respectfully submitted,


___/s/_____
Gary R. Myers
D.C. Bar 157115
78 Clark Mill Road
Weare, New Hampshire 03281
1-800-355-1095
FAX (603) 529-3009
Attorney for Plaintiff

5