UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MALCOLM G. SCHAEFER,       )
                                        )
        Plaintiff,          )
                                        )     Civil Action No. 1:07-cv-01550 (RJL)
v.                            )
                                        )
THE HONORABLE PETE GEREN,   )
SECRETARY OF THE ARMY,      )
                                        )
        Defendant.      )

PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

In accordance with Fed. R. Civ. P. 56, Plaintiff moves for summary judgment on Claims 4 through 6 and 7 through 9 of his Complaint, Plaintiff's non-constitutional claims. Plaintiff also moves for summary judgment on Claims 1, 2, and 3 of his Complaint, Plaintiff's constitutional claims.  Oral argument is requested.  The following are attached:

(1)     Proposed Order

(2)     Memorandum of Points and Authorities

(3)     Statement of Material Facts as to Which There is No Genuine Issue

Respectfully submitted,

___/s/_____
Gary R. Myers (157115)
78 Clark Mill Road
Weare, New Hampshire 03281
1-800-355-1095
FAX (603) 529-3009
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MALCOLM G. SCHAEFER,            )
                               )
            Plaintiff,         )
                               )    Civil Action No. 1:07-cv-01550 (RJL)
v.                             )
                               )
THE HONORABLE PETE GEREN,      )
SECRETARY OF THE ARMY,         )
                               )
            Defendant.         )

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Gary R. Myers
D.C. Bar 157115
78 Clark Mill Road
Weare, New Hampshire 03281
1-800-355-1095
FAX (603) 529-3009
Attorney for Plaintiff

TABLE OF CONTENTS

*Page*

Standards of Review ................................................................................................. 1

Argument ................................................................................................................. 3

   I. DISCHARGE #1 WAS A FACIALLY VALID DD-214 .................................. 3

     A. Defendant concedes discharge #1 was a facially valid DD-214 ................... 3

     B. Congress has established the moment of discharge ...................................... 5

     C. Discharge #1 was final agency action ......................................................... 9

     D. Orders 183-2200 obligated Plaintiff to report to the Transition Center on 14 Sep 01. 11

     E. USAPDA's attempted cancellation of authority for Orders 183-2200 was ineffective 13

     F. The regulation-driven finality of PEB #1 .................................................. 13

     G. PEB #1 could only be altered by similarly final agency action ................... 16

     H. PEB #2 was unlawful .............................................................................. 20

       1. Standard of Review ............................................................................ 20

       2. PEB #2 was an improperly constituted board ....................................... 21

       3. PEB #2 was initiated upon misleading and unlawful grounds................. 27

       4. PEB #1 was lawful and final, untainted as was PEB #2 ......................... 29

     I. The ABCMR credited USAPDA's attempted verbal revocation when, in fact, verbal orders were not permitted under these circumstances ...................................... 29

   II. ACTIONS AGAINST PLAINTIFF AFTER DISCHARGE #1 WERE UNLAWFUL ... 30

     A. Standard of Review .................................................................................. 31

     B. Lack of proof as to one or more of the elements causes a fraud claim to fail............. 33

       1. Defendant is unable to establish the *actus reus* ....................................... 34

       2. Defendant is unable to establish the *mens rea* ........................................ 36

       3. Defendant cannot establish the concurrence between the *actus reus* and the *mens rea* ................................................................................................. 37

C. The agency's prior no probable cause determination....................................................... 38

D. The agency's new position focuses on one incredible witness.................................... 39

E.  Red herrings and a compromised internal investigation ............................................. 40

III. DISCHARGE #2 IS STATUTORILY INVALID AND UNLAWFUL ......................... 41

IV. DISCHARGE #2 IS UNCONSTITUTIONAL, ON ITS FACE AND AS APPLIED.... 43

Conclusion ........................................................................................................................... 45

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MALCOLM G. SCHAEFER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:07-cv-01550 (RJL) |
| v. | ) | |
| | ) | |
| THE HONORABLE PETE GEREN, | ) | |
| SECRETARY OF THE ARMY, | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff was discharged twice from the Army. Either one or neither is valid. Both cannot

coexist. If neither is valid, Plaintiff is still in the Army. The entire case boils down to three

questions: (1) Was discharge #1 valid?[1] (2) After discharge #1, were the Army's actions lawful?

and (3) Was discharge #2 valid?[2]

The threshold issue in this case is whether discharge #1 was final. If it was, nothing that

followed matters because Plaintiff no longer was subject to the control of the United States

Army. Discharge #1 was final agency action. It was a facially valid DD-214. It was voidable, but

only if Defendant proved fraudulent separation, Article 83, UCMJ.  Defendant did not do so.

### Standards of Review

This case demands *de novo* review. In a similar case involving military jurisdiction over a

physician after he was issued a discharge certificate, the court observed:

---

[1] "Discharge #1" is the DD Form 214 "Certificate of Release or Discharge from Active Duty"
("DD-214"), (AR 102), delivered to Plaintiff on September 14, 2001, at Fort Benning, Georgia,
characterizing Plaintiff's service as Honorable. Plaintiff still possesses the original document.

[2] "Discharge #2" is the DD-214 dated October 1, 2002. (AR 1014.) It was not delivered to
Plaintiff, was recorded in his military record, and characterizes his service as General.

> While jurisdictional questions generally should be decided initially and before considering the merits, in this case the two issues are so completely interdependent that the jurisdictional issue cannot be decided without deciding the merits. That is so because jurisdiction depends upon status, civilian or military, and that question goes to the merits.

*Huang v. Sec'y of the Army*, 23 F. Supp.2d 1377, 1378 (N.D.Ga. 1998).

The usual summary judgment standards apply. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (no genuine issue for trial); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (facts and inferences in a light most favorable to the non-moving party); Fed.R.Civ.P. 56(e) (nonmoving party may not rely on allegations and conclusory statements to oppose).

The APA requires a court to set aside agency action that is arbitrary, capricious, an abuse of discretion, or not supported by substantial evidence, or contrary to constitutional right, or in excess of statutory authority, or in violation of procedures. All grounds apply here. Plaintiff must provide "cogent and clearly convincing evidence." *Mueller v. England*, 404 F.Supp.2d 51, 55 (D.D.C. 2005) (Leon, J.), *aff'd Mueller v. Winter*, 485 F.3d 1191 (D.C. Cir. 2007), *citing Stem v. England*, 191 F. Supp.2d 1, 3 (D.D.C. 2001) (Urbina, J.). Plaintiff must "overcome the presumption that military administrators discharge their duties correctly, lawfully, and in good faith." *Stem v. England*, 191 F.Supp. at 3, *citing  Smith v. Dalton*, 927 F. Supp. 1, 4 (D.D.C. 1996) (Urbina, J.) (board's imbalanced consideration of evidence was arbitrary and capricious).

In this Circuit, the Federal Circuit, and in military courts, a conspicuous procedural irregularity destroys any presumption of regularity to which the Government otherwise would be entitled. Instead, it gives rise to a rebuttable presumption that Plaintiff was not afforded due process and that military administrators did not perform their duties correctly, lawfully, or in good faith. *U.S. v. Hayes*, 24 M.J. 786, 788 (A.C.M.R. 1987) (failure in pretrial advice

procedure); *Sanders v. U.S.*, 594 F.2d 804, 816 (Ct.Cl. 1979) (improper promotion selection

procedures) ("the ultimate burden should be on the party whose error and obfuscation of the

evidence caused the problem in the first place"); *Smith v. Dalton*, 927 F. Supp. 1 (D.D.C. 1996).[3]

Deference to military decision-making is not synonymous with abdication, especially

where issues of a constitutional dimension are raised. *Rostker v. Goldberg*, 453 U.S. 57, 67

(1981). An agency's decision is entitled to a presumption of regularity, "but that presumption is

not to shield [the agency's] action from a thorough, probing, in-depth review." *Citizens to*

*Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971).

*Argument*

I. DISCHARGE #1 WAS A FACIALLY VALID DD-214

*A. Defendant concedes discharge #1 was a facially valid DD-214*

If this court answers "yes" to question #1, Plaintiff is entitled to the relief requested, or he

is entitled to partial summary judgment which then narrows the remaining issues. Question #1

must be answered before question #2 or question #3. Discharge #1 was a facially valid DD-214

because: **(1)** Discharge Orders 183-2200 were lawfully issued by competent authority and were

not tainted by fraud, (AR 39 ¶ 6),[4] **(2)** when Plaintiff reported for separation on September 14,

2001, Plaintiff was still complying with facially valid orders, (AR 39 ¶ 6), **(3)** the orders were

---

[3] *Wilson v U.S.*, 369 F.2d 198, 200 (D.C. Cir. 1966) ("But that presumption of regularity may be overcome, e.g., by a showing that the acts were based on a misinterpretation of statutory law or in violation of prescribed procedures"); *Frizelle v. Slater*, 111 F.3d 172 (D.C. Cir. 1997) (no performance counseling during OER rating period); *Bond v. U.S.*, 47 Fed.Cl. 641 (2000) (Air Force misclassified Reserve duty to preclude active duty retirement benefits); *Doe v. U.S.*, 132 F.3d 1430, 1434 (Fed. Cir. 1997) (improper use of evidence to prove misconduct); *U.S. v. Adams*, 65 M.J. 552 (N.M.C.C.A. 2006) (unreasonable delay of post-trial processing); *U.S. v. Wright*, 658 F. Supp. 1, 3 (D.Alaska 1986) (presumption of regularity "hardly seems applicable in a case involving repeated administrative errors").

[4] Admitted by ABCMR. ("the applicant complied with facially valid discharge orders").

3

never revoked prior to September 14, 2001, (AR 39 ¶ 4),[5] (**4**) the orders were "self-executing,"[6] (**5**) the Army's attempted second Physical Evaluation Board decision ("PEB #2"), which purported to change Plaintiff's disability rating from "unfit" to "fit," was not final agency action as of the date of discharge #1,[7] (**6**) when Plaintiff reported for separation, he did so in accordance with orders which remained in force on that day,[8] (**7**) PEB #2 did not overturn PEB #1 or obviate Orders 183-2200, because PEB #2 was nonfinal and it was the result of an improperly constituted board,[9] (**8**) Discharge #1, facially valid, was irrevocable (not *"voidable"*) because it was not the result of an Article 83, UCMJ, offense (fraudulent separation).[10]

    <u>The Article 32 got it right</u>. <u>The ABCMR got it wrong</u>. Look closely at Defendant's own Article 32, UCMJ, pretrial investigation.[11] ("the Article 32") (AR 107-114 -- report); (AR 1458-2055 -- verbatim transcript). The Article 32 was the only evidentiary hearing conducted. It was

---

[5] Admitted by ABCMR. ("[t]he orders were not revoked."); *cf.* (AR 744); *cf.* (AR 113, ¶ 2) ("But the blame for this failure rests squarely on the Army, not the [Plaintiff]").

[6] *U.S. v. Smith*, 4 M.J. 265, 266 n.3 (C.M.A. 1978) (self-executing orders are those that "by their own terms automatically become effective on the specified effective date without any further action being required.")

[7] Admitted by ABCMR. (AR 39, ¶ 5.)

[8] (AR 113, n.32) ("In fact, the accused arguably was not only permitted to report to the Transition Center under those circumstances, but was obligated to do so") (citation omitted).

[9] (AR 112 ¶ 4(d)). The ABCMR contradicts the Article 32 on this point.

[10] (AR 112, ¶ 4) ("[T]he investigation did not establish reasonable grounds to believe [Plaintiff] knowingly misrepresented or deliberately concealed a certain material fact or facts about his eligibility for separation"); (AR 112-113, ¶ 4(e)) ("…The allegation that [Plaintiff] knew that basis for his separation orders 'had been overturned' at the time he presented himself for separation is unsupported as a matter of both law and fact"); (AR 114) ("reasonable grounds do not exist to believe [Plaintiff] committed the offense alleged"). The ABCMR contradicted this.

[11] Insofar as that investigation addressed the validity of discharge #1. Plaintiff respectfully continues to disagree with *obiter dicta* therein. The investigator had some question whether Plaintiff failed to satisfy certain professional obligations, an issue beyond the scope of the Article 32, and later proven to be wrong. He intimated Plaintiff's intent, when he kept his disability evaluation private, was unbecoming an officer and gentleman, again not relevant to the validity of discharge #1, and never litigated by the parties.

4

conducted by a senior lawyer, including two days of hearings. The Article 32 concluded, *as a matter of law*, that discharge #1 was valid and irrevocable, and that Plaintiff committed no fraud.

*B. Congress has established the moment of discharge*

Congress has spoken to "the precise question at issue." *Wells Fargo Bank v. FDIC*, 310 F.3d 202, 205 (D.C. Cir. 2002), *quoting Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842 (1984). Because it has, "the inquiry is at an end; the court 'must give effect to the unambiguously expressed intent of Congress.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000), *quoting Chevron*, 467 U.S. at 843. Discharges are governed by 10 U.S.C. § 1168(a):

> A member of an armed force may not be discharged or released from active duty until his discharge certificate or certificate of release from active duty, respectively, and his final pay or a substantial part of that pay, are ready for delivery to him or his next of kin or legal representative. [12]

On September 14, 2001, Plaintiff had completed the clearing process, received a final accounting of pay, and was delivered his DD-214 in-hand by Mayra Hernandez, signed by Coraritta Nixon, discharge officials at Fort Benning. He satisfied the three criteria for a facially valid discharge. *U.S. v. Melanson*, 53 M.J. 1 (C.A.A.F. 2000). "It is black letter law that *in personam* jurisdiction over a military person is lost upon his discharge from the service, absent some saving circumstance or statutory authorization." *U.S. v. Howard*, 20 M.J. 353, 354 (C.M.A. 1985) (citations omitted). A "[d]ischarge is effective upon delivery of the discharge certificate[]." *Howard*, 20 M.J. at 354. Delivery has "significant legal meaning. It shows that the transaction is complete, that full rights have been transferred …" *Id.*; *accord Machado v. Commanding Officer*, 860 F.2d 542, 544 (2nd Cir. 1988); *Allen v. Steele*, 759 F.2d 1469, 1471

---

[12] In *U.S. v. Howard*, the Court of Military Appeals stated "Our examination of the statutory language and the legislative history of 10 U.S.C. § 1168 shows no indication that Congress intended to change the longstanding historical precedent for delivery of the discharge certificate to the time when a servicemember is released from active duty..." 20 M.J. at 354.

(9th Cir. 1985); *Garrett v U.S.*, 625 F.2d 712, 713 (5th Cir. 1980), *cert. denied*, 450 U.S. 918 (1981) ["Congress has clearly stated" in 10 U.S.C. § 1168(a) that a discharge is effective upon receipt of discharge papers]. A district court may not rely on subsequent orders revoking a discharge when determining the validity of that discharge. *Machado*, 860 F.2d at 545-546.

The moment of a discharge cannot be a moving target. The stakes are too high. *Talbot v. Toth*, 215 F.2d 22, 31 (D.C. Cir. 1954) ("[T]ransposition from civilian life back into military life … [is a] violent event."); *cf.* Army Reg 635-5 ¶ 1-11(b)(1) ("[The DD Form 214] is the most vital document [a soldier] will receive from the Army, and it is imperative to safeguard this document carefully"). Irrevocability is for good reason the central element of the <u>statutory</u> scheme. A presumption of irrevocability provides a clearly defined end date for military status. Permitting revocation in the absence of plain fraud would render fuzzy and uncertain what must be both clear and final. In *U.S. v. Howard*, 20 M.J. 353 (C.M.A. 1985), the facts were these:

> Private Howard reported to a Separation Transfer Point pursuant to self-executing discharge orders. He was issued a DD-214. He collected travel pay and turned in his military ID card. By 9:45 a.m., he signed out of his command and was home. Later that afternoon, his commander learned Howard was being investigated for a crime. Acting under the belief (pursuant to an Army regulation) that Howard's discharge was not effective until midnight, the commander directed it be revoked. A revocation order was prepared at 10:00 P.M. that night. Howard was notified nine days later.

"The narrow question we are called upon to decide is to identify *the moment* of discharge. The Government urges us to permit the Secretary of the Army, by regulation, to establish the moment of discharge. We respectfully decline to do so." *Id.* at 354, *discussing* 10 U.S.C. § 1168. The Court envisioned <u>only</u> <u>one</u> <u>exception</u> to this rule of finality, namely, "If…the delivery of the discharge certificate has been accomplished by fraud." *Id.*, *citing Wickham v. Hall*, 12 M.J. 145 (C.M.A. 1981) and *Wickham v. Hall*, 706 F.2d 713 (5th Cir. 1983).

10 U.S.C. § 1168(a) provides no exceptions to this rule of finality. The <u>only</u> exception is

supplied by another Act of Congress -- 10 U.S.C. § 803(b), Article 3(b), UCMJ ("Article 3(b)") -

- which provides for the invalidation of a DD-214 if its delivery was accomplished by fraud.

Discharge #1 was at worst, <u>according</u> to <u>Congress</u>, "voidable, not void." *U.S. v. Reid*, 46 M.J.

236, 238 (C.A.A.F. 1997) ("Congress has determined that a fraudulent discharge is voidable, not

void"); *U.S. v. Spradley*, 41 M.J. 827 (N.M.C.C.A. 1995). The Secretary of the Army may not,

by regulation, tinker with the finality of a discharge. Consider the Supreme Court's comment on

the deference due <u>to</u> <u>Congress</u> -- <u>not to military bureaucrats</u> -- in military affairs:

> Many of the Framers of the Constitution had recently experienced the rigors
> of military life and were well aware of the differences between it and
> civilian life … It is clear that the Constitution contemplated that the
> Legislative Branch has plenary control over rights, duties, and
> responsibilities in the framework of the military establishment, including
> regulations, procedures and remedies related to military discipline []."
> *Chappell v. Wallace*, 462 U.S. 296, 300-301 (1983) (Burger, C.J.).

Even a DD-214 delivered by mistake is still a facially "valid" discharge. *U.S. v. Banner*,

22 C.M.R. 510, 514 (A.B.R. 1956). Administrative mistakes, computer glitches and mis-

communication are held against the government, not the servicemember. If the military delivers

a discharge certificate by mistake through proper channels, the servicemember may rely on such

delivery. *Machado v. Commanding Officer*, 860 F.2d 542, 544 (2nd Cir. 1988) (citations

omitted); *Huang v. Sec'y of the Army*, 23 F. Supp.2d 1377 (N.D.Ga. 1998) (Army doctor

discharged due to a glitch in Army personnel computer system). "[A] mistake of fact on the part

of the Army does not vitiate a purported discharge, even though the mistaken fact was <u>necessary</u>

<u>to the authority of the discharging officer to order the discharge</u>." *Huang,* at 1379 (emphasis

added), *citing United States ex rel. Hirshberg v. Cooke*, 336 U.S. 210 (1949), *quoting Banner*

and also *quoting* Judge Advocate General of the Army Opinion 1953/7621 (5 Oct 1953) ["even

an official with limited discharge authority, if purporting to act within the limits of the authority

granted him, may (in the absence of fraud) validly effect an irrevocable discharge although he has been acting under a mistake of fact"].

The ABCMR admits Coraritta Nixon and Mayra Hernandez are the "competent authority" and "proper channel" to discharge a soldier at Fort Benning. (AR 38 ¶ 3). This is consistent with Army Reg 635-10 ¶ 1-1(b) and ¶ 1-7, which limits separation authority to installation commanders. Orders 183-2200 were issued by the Fort Benning Adjutant General "For the Commander." Army Reg 600-8-105 ¶ 1-11(b) ("Orders are the function of the Adjutant General…"). Ms. Nixon was "Authorized to Sign" block 22 of the DD-214. She did. (AR 102.)

The near-legendary case of miscommunication was *Smith v. Vanderbush*, 47 M.J. 56 (C.A.A.F. 1997). Sergeant Vanderbush had been arraigned for court-martial. The judge set a date for trial. Discharge officials delivered Vanderbush a DD-214 six days before trial. They didn't know about the court-martial. Vanderbush's command failed to "flag" his personnel record, which would have stopped the discharge. The military's highest court held the mis-communication between the prosecutor, command, and separation officials did not change the fact that Vanderbush's discharge certificate was "valid" and made him a civilian. *Cf. U.S. v. Reid*, 46 M.J. 236, 237 (C.A.A.F. 1996) (in seminal Article 3(b) case, court notes commander correctly "flagged" Reid to suspend "favorable personnel actions such as a medical discharge").

Even when a discharge authority mistakenly believes he or she has the *regulatory authority* to issue a DD-214, the certificate remains valid and irrevocable. In *U.S. v. Banner*, 22 C.M.R. 510 (A.B.R. 1956), a commander was informed Banner was confined in state prison. A regulation gave the commander authority to discharge a soldier convicted in civilian courts. That authority was limited in that it required the soldier be physically in the custody of the civilian authorities. The commander thought Banner was still confined in the state prison. He issued a

discharge certificate pursuant to this regulation. He forwarded the certificate to the state authorities for delivery to Banner. Banner had been released prior to when the commander ordered the discharge, so the Army administratively revoked the discharge. Banner was later returned to military control and convicted of desertion. The *Banner* Court found that, since Banner was not physically in the custody of the civil authorities when his discharge was ordered, the commander did not have the *regulatory authority* he thought he had to issue the discharge. However, the Court held, that did not affect the validity of the discharge, even though the mistaken belief went "to the very essence of that officer's authority to discharge." *Id.* at 515. The Court held the administrative revocation of Banner's discharge, "without any fraud involved," was a nullity. *Id.*; *U.S. v. Cole*, 24 MJ 18, 27 (CMA 1987) (Cox, J., concurring) (finding Art. 3(b) constitutional, but "If the form is properly issued, even if by mistake, jurisdiction is, of course, lost"). Neither a computer glitch nor miscommunication leads to a legal conclusion that a DD-214 was *improperly issued*. It may be *voidable* -- as the result of having been obtained by fraud -- but it is "valid" nonetheless. That is the "unambiguously expressed intent of Congress" as interpreted for 60 years. The ABCMR, contrary to law, denied relief because it concluded that discharge #1 was invalid, "ineffective," as the result of an "administrative snafu," (AR 39 ¶ 6).[13]

### C. Discharge #1 was final agency action

The final agency action at issue is discharge #1, not Orders 183-2200 or PEB #1. Upon delivery of discharge #1, previous actions were subsumed by it -- they merged into discharge #1. "Final agency action" is action which marks the "consummation of the agency's decision-making process -- it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*,

---

[13] Plaintiff disputes there was administrative error, because the claimed administrative error occurred part and parcel to Defendant's regulatory abuses. *See* § II (E)-(I), *infra*. For the sake of argument, though, the claimed mistakes still did not affect the "validity" of discharge #1.

520 U.S. 154, 178 (1997), *citing C&S Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948). An administrative order is final when "rights or obligations have been determined or legal consequences will flow" from the action. *Id., citing Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970). "A final agency action is one that imposes an obligation, denies a right, or fixes a legal relationship." *C&S Air Lines, Inc.,* 333 U.S. at 113. On the other hand, an agency's <u>initiation</u> of proceedings has no legal force except to require a response. *F.T.C. v. Standard Oil of California*, 449 U.S. 232, 241-242 (1980).

A discharge is final agency action. 10 U.S.C. § 1168(a), as construed, compels that result. Another line of cases views the discharge as final agency action. *Walters v. Sec'y of Defense*, 725 F.2d 107, 114 (D.C. Cir. 1983) (SOL begins to run upon discharge); *Martinez v. U.S.*, 333 F.3d 1295, 1310 (Fed. Cir. 2003) (en banc) (cause of action for unlawful discharge accrues at time of discharge); *Geyen v. Marsh*, 775 F.2d 1303, 1308 (5th Cir. 1985); *Nichols v. Hughes*, 721 F.2d 657, 659 (9th Cir. 1983); *Ballenger v. Marsh*, 708 F.2d 349, 350 (8th Cir. 1983).

*Smith v. Vanderbush* provides another important rule relevant here. A DD-214 can effect a discharge *even when other legal action is pending*. Another example -- a disability evaluation is pending, but an intervening adverse administrative discharge *for misconduct* cuts off the disability evaluation process. Army Reg 635-40 ¶ 4-3. Another example -- a disability discharge cuts off an adverse administrative action based on *substandard performance*. *Id.*, ¶ 4-15(k).

Government lawyers routinely rely upon the finality of a discharge to cut-off ex-soldiers' claims seeking to correct or upgrade their discharges or disability ratings. They routinely, and successfully, file motions to dismiss cases as time-barred using this rationale, within this

Circuit,[14] and within the Federal Circuit,[15] many cases expressly citing 10 U.S.C. § 1168(a).

*D. Orders 183-2200 obligated Plaintiff to report to the Transition Center on 14 Sep 01*

Army Reg 635-10 ¶ 3-1.1(b) mandated Plaintiff "will physically report to the [Transition Point] for final transition processing on the date and time listed …[in Orders 183-2200]." "All persons in the military service are required to strictly obey and promptly execute the legal orders of their lawful seniors." Army Reg 600-20 ¶ 4-2 (titled "Obedience to Orders"). "It is a bedrock principle of military law that obedience to an apparently lawful order is a defense to any offense punishable by court-martial." *U.S. v. Pacheco*, 56 M.J. 1, 18 (2001) (Sullivan, J., dissenting), *citing* R.C.M. 916(d). Judge Sullivan went on to discuss the basic tenets of military orders:

> An order given to a servicemember to perform a military duty is presumed lawful; a subordinate disobeys an order at his peril. As this Court, quoting Winthrop, stated in its disposition of the case of First Lieutenant William Calley, Jr…. :
>
>> For the inferior to assume to determine the question of the lawfulness of an order given him by a superior would of itself, as a general rule, amount to insubordination, and such an assumption carried into practice would subvert military discipline. Where the order is apparently regular and lawful on its face, he is not to go behind it to satisfy himself that his superior has proceeded with authority, but is to obey it according to its terms, the only exceptions recognized to the rule of obedience being cases of orders so manifestly beyond the legal power or discretion of the commander as to admit of no rational doubt of their unlawfulness. . . Except in such instances of palpable illegality, which must be of rare occurrence, the inferior should <u>presume that the order</u> was lawful and authorized and obey it accordingly,

---

[14] *Walters v. Sec'y of Defense*, 725 F.2d 107, 113 (D.C. Cir. 1983) (string of citations from other circuits omitted); *Saffron v. Department of the Navy*, 561 F.2d 938 (D.C. Cir. 1977); *Kendall v. Army Bd. for Correction of Military Records*. 996 F.2d 362 (D.C. Cir. 1993); *White v. Sec'y of Army*, 629 F. Supp. 64 (D.D.C. 1984); *Aguilar Mortega v. Department of Defense*, 520 F. Supp.2d 1 (D.D.C. 2007) (Sullivan, J.); *Payne v. Brownlee*, Case No. 04-cv-2175-RCL, 2006 WL 785296 (D.D.C. March 24, 2006); *Carter v. Department of the Navy*, Case No. 05-cv-0775-RBW, 2006 WL 2471520 (D.D.C. August 24, 2006).

[15] *Wilkinson v. U.S.*, 27 Fed.Cl. 180 (1992) (dismissed upon Army motion that 10 U.S.C. § 1168(a) cut-off military status); *Earl v. U.S.*, 27 Fed.Cl. 36 (1992) (same); *Bish v. U.S.*, 26 Cl.Ct. 1243, 1244 (1992) (same); *Hamon v. U.S.*, 10 Cl.Ct. 681 (1986) (same); *Spehr v. U.S.*, 51 Fed.Cl. 69 (2001) (same).

and in obeying it can scarcely fail to be held justified by a military court.

Not even "the freedom to think and believe" can excuse disobedience of a lawful order, because "allowing private judgment by a soldier as to which orders to obey would be 'unthinkable and unworkable'." *U.S. v. New*, 55 M.J. 95, 108 (2001) (citations omitted) (failure to obey order to wear U.N. accoutrements on deployment to Macedonia), *post-conviction habeas denied*, *New v. Rumsfeld*, 350 F. Supp.2d 80 (D.D.C. 2004), *aff'd New v. Rumsfeld*, 448 F.3d 403 (D.C. Cir. 2006), *cert. denied New v. Gates*, 127 S.Ct. 2096 (2007). The inference of an order's lawfulness applies to all but the most egregious of circumstances, namely "patently illegal orders," characterized as "[an order] that directs the commission of a crime." *New*, 55 M.J. at 106, *citing* ¶ 14c(2)(a)(i), Part IV, Manual for Courts-Martial. In the My Lai case of Lieutenant Calley, 46 C.M.R. 1131 (A.C.M.R. 1973), the order at issue was one that required Calley to commit murder and war crimes. It was Lieutenant Calley's obligation to follow every military order he ever received except that one. Plaintiff was never ordered to commit murder, only to report to the Transition Center on 14 Sep 01. Plaintiff would have disobeyed "at his own peril."

The ABCMR admits only Fort Benning could *issue* Plaintiff's discharge orders. (AR 38 ¶ 3).; *cf.* Army Reg 635-40 ¶ 2-3. Therefore, only the Fort Benning Adjutant General could *revoke* Orders 183-2200. Army Reg 600-8-105 ¶ 2-21(a) ("Only the organization that published the original order may amend, rescind, or revoke the order"). By regulation, PEB #1 merged into Orders 183-2200, and the physical disability evaluation ended. "Orders are required for … separation." *Id.* at ¶ 1-15. "The requirements for orders and permanent orders *and their contents* as described in this regulation *take precedence over conflicting instructions in other directives or regulations*." *Id.* (emphasis added). The *contents* of Orders 183-2200 stated: "After processing, you are discharged…" and "Date of discharge unless changed or rescinded: 14 September 2001."

Orders 183-2200 took precedence, even over PEB #1 and PEB #2.

*E. USAPDA's attempted cancellation of authority for Orders 183-2200 was ineffective*

Defendant concluded Plaintiff was not functioning under validly existing orders to separate, (AR 40 ¶ 7), because PEB #2 convened, found Plaintiff fit for duty and so informed him on September 5, 2001.[16] This is contrary to law. As discussed, *supra*, (a) PEB #1 merged into Orders 183-2200, which merged into discharge #1, so only discharge #1 is subject to judicial review now, and (b) the administrative snafu cannot be held against Plaintiff to revoke discharge #1 after-the-fact. (AR 113 ¶ 2, 110 ¶ 11). Defendant's premise that USAPDA had authority to *de-authorize* Orders 183-2200, (AR 38 ¶ 3), is flawed. *See* §§ F-I, *infra*. Defendant's premise that Orders 183-2200 were automatically *de-authorized* by the pendency of PEB #2, (AR 39 ¶ 4), is flawed. *See* §§ F-H, *infra*. PEB #1 constituted final agency action which could only be altered by similarly final agency action. *See* §§ F and G, *infra*. Thus, the only agency finding that existed was the Secretary's finding of "unfit for duty." That authorized and obligated Coraritta B. Nixon and Mayra Hernandez, the "competent authority" and "proper channel" to discharge a soldier at Fort Benning, to adhere to Orders 183-2200 and issue Plaintiff a DD-214. Finally, PEB #2 was unlawful and violated Plaintiff's due process. *See* § H. Being contrary to law, PEB #2 could not de-authorize Orders 183-2200 or obviate PEB #1. *See* § H.

*F. The regulation-driven finality of PEB #1*

"PEB #1" constituted "final agency action." PEB #1 found Plaintiff "unfit for duty" and recommended a discharge with severance pay. Thereafter the PEB Liaison Officer (PEBLO) advises each soldier "PEB findings and recommendations are not final until approved for the

---

[16] Defendant then *speculates* Plaintiff was on notice that the basis for his orders had been overturned. (AR 39 ¶ 5), *inter alia*, "The applicant … knew that the proceedings of the second PEB would *probably* be approved and that he would be returned to duty." (emphasis added)

SA," Army Reg 635-40, App. C, ¶ C-7(e)(2), giving the soldier reason to rely on the issuance of

discharge orders as a signal that, under 10 U.S.C. § 1203(a), the Secretary determined the soldier

"unfit to perform the duties of [his] office, grade, rank, or rating because of physical disability …

[and that] [the soldier will] be separated … with severance pay." After Plaintiff was counseled,

his case was returned to the PEB President, ¶ 4-20(d)(2), and then governed by ¶ 4-20(e):

> Disposition by PEB.  Upon receipt of the soldier's completed DA Form 199
> from the PEBLO, the PEB will take the following actions as applicable.  (1)
> If the soldier accepts the findings and recommendations of the informal
> PEB, … the proceedings <u>will</u> be <u>approved for the SA and forwarded to
> PERSCOM for final disposition</u>.  (Emphasis added.)

PEB Presidents have authority to approve PEB findings for the Secretary of the Army

(SA) in all but six scenarios. ¶ 4-19(b). The only one relevant here is the sixth. "The PEB may

approve for the SA all but the following cases: …(6) Any case previously forwarded to

USAPDA for review and approval, which was returned to the PEB for reconsideration or

rehearing." ¶ 4-19(b). The Texas PEB President had authority to act on behalf of the Secretary in

PEB #1, but not PEB #2. PEB #2 could never have been made "final" by the Texas PEB

President, leaving the Secretary's original determination of "unfit for duty" intact.

"<u>Before final action</u> on a case, the proceedings of a properly constituted PEB may be

returned to the same board for further consideration of findings, correction of errors, or other

reasons."  ¶ 4-19(p)(1) (emphasis added). <u>After</u> a case is forwarded to PERSCOM for final

disposition, a case cannot be reconsidered by a PEB President or USAPDA *sua sponte*. After a

case is in PERSCOM's hands, the PEB or USAPDA can only reconsider a case after they first

get it back from PERSCOM. A disability case physically moves from the PEB to the USAPDA

to the PERSCOM. Jurisdiction over a disability case transfers as it moves through the channels.

This concept is reinforced in the regulation. Consider ¶ 4-21(r) (emphasis added):

Findings and recommendations, ... (2) The PEB may change, modify, or correct its findings and recommendations <u>at any time before the record of proceedings is delivered to the CG, USAPDA or Commander, PERSCOM.</u>

Consider ¶ 4-20(f)(2) (emphasis added):

[W]hen additional <u>medical</u> evidence or an addendum to the <u>MEB</u> is received <u>after the PEB has forwarded the case</u> and the PEB determines that such evidence would change any findings or recommendations, the case will be recalled by the PEB and a new DA Form 199 issued.

This last provision highlights the distinction between "medical evidence" and "non-medical evidence." Plaintiff's case was returned to PEB #2 only upon addition of "non-medical evidence," also called "performance data." (AR 1102, l. 10-12.) There was no evidence questioning his medical condition. There was only evidence of his outstanding performance as a JAG and his hallmark qualities of excellence, hard work, integrity, and leadership.

Once USAPDA review is complete, USAPDA must "forward the case to PERSCOM for disposition." ¶ 4-22(g)(5).  Final disposition by PERSCOM is described in ¶ 4-24:

PERSCOM will dispose of the case by publishing orders or issuing proper instructions to subordinate headquarters, or return any disability evaluation case to USAPDA for clarification or reconsideration when newly discovered evidence becomes available and is not reflected in the findings and recommendations.
...
b.  Final disposition.  Based upon the final decision of USAPDA or APDAB, PERSCOM will issue retirement orders or other disposition instructions as follows: ...(3)  Separation for physical disability with severance pay []."

PERSCOM did not return Plaintiff's case to USAPDA. PERSCOM "publish[ed] orders [and] issu[ed] proper instructions to [Headquarters, Fort Benning.]" Once Orders 183-2200 were issued, (a) PEB #1's "unfit for duty" became a final Secretarial determination,  per ¶ 4-20(e), and (b) PERSCOM's "final disposition" on behalf of the SA was complete. "The ultimate decision to discharge the service member is finally carried out by the Personnel Command for the Secretary

15

of the Army. [citations omitted]. But there is no provision for convening a [PEB] after the discharge of a member to address disability claims." *Chambers v. U.S.*, 417 F.3d 1218, 1228 (Fed. Cir. 2005) (Dyk, J., dissenting) (SOL case) (citing ¶¶ 4-19(b), 4-22(g)(5), and 4-24).

USAPDA is not without a remedy if it questions a fitness determination after it forwards a case to PERSCOM. USAPDA is, however, limited in the methods they must use to reconsider a "final disposition." A final disposition is subject to modification only pursuant to an extraordinary "recall" procedure. The "recall" procedure requires the CG, USAPDA to request from the CG, PERSCOM, that a case be returned. When the desired "recall" is based solely on non-medical evidence, USAPDA must provide justification for its request. *See* App. E, ¶ E-9(e):

> Request for deviation from established discharge date or amendment or revocation of retirement orders <u>for other than medical reasons</u> will be submitted, <u>with justification</u>, to PERSCOM (TAPC-PDB) … USAPDA may <u>request PERSCOM</u> cancel discharge instructions, or amend or revoke retirement orders. (Emphasis added.)

Even though the "new evidence" in Plaintiff's case was <u>non-medical</u>, no justification was submitted to PERSCOM. USAPDA acted unilaterally and without PERSCOM's authority.

PEB #1 went through every screening mechanism built into the system and then it was handed to the CG, PERSCOM. The fact that Orders 183-2200 were issued is evidence that PEB #1 went <u>from</u> the USAPDA <u>to</u> the CG, PERSCOM, and that the SA took final action. The status of PEB #2, between 30 August and 14 September 2001, was a tentative or interlocutory decision. The PEBLO testified so. (AR 1933-1940.) The entire Army PDES is geared to the conclusion that a non-final fitness determination is subject to attack and change. PEB #2 could not supercede an earlier Secretarial determination until it wound its way through the system and achieved its own status as a Secretarial determination. Without a recall, the orders stood.

*G. PEB #1 could only be altered by similarly final agency action*

The ABCMR does not conclude PEB #2 *revoked* Orders 183-2200, only that PEB #2 *obviated* PEB #1 -- but even that conclusion is contrary to law. A valid DD-214 can be delivered and effect a discharge *even when other legal action is pending*. Defendant's argument -- that PEB #2 obviated the Transition Center's authority to discharge Plaintiff -- is merely a recycled version of arguments made in *U.S. v. Banner*, 22 C.M.R. 510 (A.B.R. 1956) and *Smith v. Vanderbush*, 47 M.J. 56 (C.A.A.F. 1997). In *Smith v. Vanderbush*, all three government arguments were rejected. First, the government argued the discharge authority would not have issued a DD-214 *had she known* court-martial charges were pending, she was operating under a mistake of fact, and the discharge was not an "informed action." *Id.* at 596. The Court concluded the discharging official's check of her computer database did not indicate Vanderbush had been "flagged," and she was therefore obliged to infer no prosecutorial intent existed. Second, the government argued the pending trial meant the Army did not actually intend for the DD-214 to sever military status. The Court refused to impute the court-martial convening authority's intent to the discharge official. Instead, the Court would only "[j]udg[e] the Army's intent through the eyes of the person authorized by the Army to discharge the petitioner." *Id.* at 597. Third, the government argued "mistake of law," in that "the discharge authority acted beyond the scope of the authority delegated to commanders." *Id.* at 597. The court rejected this argument, stating "arraignment by court-martial does not operate automatically either to restrict a soldier's eligibility for ETS discharge or to limit the actual authority of a properly appointed discharge official to issue a valid ETS discharge. 'Separations will be accomplished by the [transition point by] ... processing the soldier for separation ... *per the separation orders issued by the appropriate commander*." *Id.* at 598 (emphasis added). Any claim that Coraritta B. Nixon and Mayra Hernandez would not have issued Plaintiff a DD-214 *had they known* of PEB #2, or that they

17

acted beyond their legal authority, or that the intent of PEB #2 was imputed to them, are just the same arguments already made and rejected.

The United States Court of Claims has often recognized the principle that a determination of "unfit for duty," "having once received the approval of the Secretary of the Army, [is] thereafter barred from further reevaluation save on grounds of substantial new evidence," *Wason v. U.S.*, 179 Ct.Cl. 623, 625 (1967), *citing Lerner v. United States*, 168 Ct. Cl. 247 (1964) and *Barnes v. United States*, 163 Ct. Cl. 321 (1963) (second board, finding Barnes not permanently incapacitated, preempted by first board finding him permanently incapacitated). Further, that an "essential consideration" of the disability evaluation process is "the recognition of finality that attaches to administratively determined findings of fact." *Wason* at 630. The Army's disability regulations have changed since *Wason*, but the concept has remained. Orders 183-2200 signaled the moment PEB #1 "received the approval of the Secretary of the Army." He was even told so by the PEBLO Counselor. (Compl. ¶ 29.) PEB #2 created no new obligation for Plaintiff except the obligation to respond to it by September 17, 2001, a date after his separation.

The concept of finality is deeply imbedded in Army Reg 635-40. In addition to the paragraphs of the regulation described in the preceding section, see also ¶ 4-20(f), ¶ 4-21(r) and App. E, ¶ E-9 (final disposition instructions).

An analogy can be drawn to the doctrine of *functus officio*, a fundamental common law principle which literally means a task performed.  As it relates to arbitration, it is the termination of an arbitrator's authority after rendering and delivering an award.  *National Football League Players Ass'n v. Pro Football, Inc.*, 56 F.3d 1525 (D.C. Cir. 1995) ("[O]nce an arbitrator has made and published a final award his authority is exhausted and he is functus officio and can do nothing more in regard to the subject matter of the arbitration"); *Washington-Baltimore*

*Newspaper Guild, Local 35 v. Washington Post Co.,* 442 F.2d 1234, 1238 (D.C. Cir.1971)

(citation omitted); *see also McClatchy Newspapers v. Central Valley Typographical Union No.*

*46*, 686 F.2d 731, 733-34 (9th Cir.), *cert. denied*, 459 U.S. 1071 (1982) ("The policy which lies

behind this is an unwillingness to permit one who is not a judicial officer and who acts

informally and sporadically, to re-examine a final decision which he has already rendered,

because of the potential evil of outside communication and unilateral influence which might

affect a new conclusion.")

    While it is true USAPDA may "[r]eturn the case to the PEB for reconsideration" when

"such action is in the best interests of the soldier or the Army," ¶ 4-22(c)(2), that authority only

lasts until adjudication is complete.[17] Adjudication is deemed complete when USAPDA forwards

the case to PERSCOM for final disposition, ¶¶ 4-22 and 4-24.[18] After that, a disability case is

controlled by Section VI ("Disposition Subsequent to Adjudication"), ¶¶ 4-24, 4-25, and 4-26.

    Interestingly, in *Wason*, 179 Ct.Cl. 623 (1967), Wason was separated for disability with a

20% rating. He later sought to increase his disability rating to 30% based on a post-discharge

hospitalization. The Army Physical Disability Appeal Board agreed. The Judge Advocate

General stopped the upgrade, saying Wason's earlier separation could not legally be revoked to

substitute a different fitness determination. *Id.* at 627. By contrast, the Army has revoked

Plaintiff's disability discharge in order to substitute therefor a "fit for duty" determination.

    At any step along the PEB #2 appeal process, the findings of PEB #2 could have been

reversed. Because PEB #2 remained nonfinal prior to discharge #1, only a Secretarial

determination of "unfit for duty" existed on September 14, 2001. The "basis" for Orders 183-

---

[17] ABCMR concludes USAPDA ¶ 4-22(c)(2) authority is unlimited. (AR 38 ¶¶ 1, 3; 34 ¶ 59.)

[18] In Plaintiff's case, during its "Review and Confirmation" USAPDA "did nothing to change or alter the result," (AR 1235 ll. 7-14), and, therefore, the adjudication phase was deemed complete, "end of case," (AR 1236 ll. 4-6) (USAPDA Counsel Dennis Brower).

2200 was not "overturned" as Defendant alleged when it charged Plaintiff with the crime of

fraudulent separation. The Article 32 got it right. [AR 112 ¶ 4(d).] The ABCMR got it wrong. [19]

### H. PEB #2 was unlawful

The ABCMR violated the APA by presuming administrative regularity in PEB #2. PEB

#2 violated the *Accardi* doctrine, denying Plaintiff administrative due process. PEB #2 was

"improperly constituted," per Army Reg 635-40. It had no authority to reconsider -- referring

back to the doctrine of *functus officio*. Defendant initiated PEB #2 on unlawful grounds. The

stigma of Plaintiff's general discharge illustrates the equities weigh in Plaintiff's favor.

### 1. Standard of Review

An agency must comply with its own regulations. *Accardi v. Shaughnessy*, 347 U.S. 260,

267 (1954); *Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959), and must do so strictly. *Esch v.

Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989). That includes procedures which require the

approval of a certain official in the agency before others may take a specified employment-

related action. *Service v. Dulles*, 354 U.S. 363, 372 (1957) (lack of required approval of Deputy

Undersecretary).[20] "This judicially evolved rule of administrative law is now firmly established

and, if I may add, rightly so. He that takes the procedural sword shall perish with that sword."

*Vitarelli v. Seaton*, 359 U.S. at 547 (Frankfurter, J.). "Federal agencies must follow their own

rules, even gratuitous procedural rules that limit otherwise discretionary actions." *S.E.C. v.

Selden*, 445 F. Supp.2d 11, 14 (D.D.C. 2006) (Urbina, J.), *citing Accardi v. Shaughnessy*.

---

[19] Please read the testimony of PEB #1 and #2 Board Member Tittle, (AR 1684-1731), for a complete and objective description of what happened at the Texas PEB in Plaintiff's case. His testimony fleshes out many points made in § I (E)-(H) of this brief.

[20] In *Service v. Dulles*, the Court found "the Regulation left the Secretary *functus officio* with respect to such cases once the Deputy Under Secretary had made a determination … when the Deputy Under Secretary approved the [Board's] action …, under these Regulations the case against Service was closed." *Id.*, 354 U.S. at 386. The doctrine of *functus officio* applies similarly in Plaintiff's case. *See* discussion of *functus officio*, *supra*, § I (G) and *infra* at § I (H)(2).

This court will reverse ABCMR actions when the agency uses unlawful procedure. *Lipsman v. Secretary of Army*, 335 F.Supp.2d 48 (D.D.C. 2004) (Urbina, J.) (regulation giving ABCMR staff power over reconsideration requests invalid), *af'm'ly citing Bond v. U.S.*, 47 Fed.Cl. 641, 653 (2000). "On procedural matters … The court is not called upon to exercise any discretion reserved for the military, it merely determines whether the procedures were followed by applying the facts to the statutory or regulatory standard." *Bond v. U.S.*, 47 Fed.Cl. 641, 648 (2000) (Air Force misclassified Reserve duty to preclude active duty retirement benefits).

"It is established beyond peradventure that the military, like any other agency, is bound by its own regulations." *Martin v. Sec'y of Army*, 455 F.Supp. 634, 638 (D.D.C. 1977) (citations omitted); *Viles v. Claytor*, 481 F. Supp. 465 (D.D.C. 1979) (applying *Accardi* to violation of Navy's promotion board policies); *U.S. ex rel. Brooks v. Clifford*, 409 F.2d 700 (4th Cir. 1969) (applying *Accardi* to a DOD Directive); *Smith v. Resor*, 406 F.2d 141, 143-144 (2nd Cir. 1969) (applying *Accardi* to published Army policies). *Accardi* has been applied to other entities that enjoy judicial deference just as broad as the military. *Yellin v. U.S.*, 374 U.S. 109 (1963) (applied to Congress) *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987) (applied to FBI).

## 2. PEB #2 was an improperly constituted board

For an exhaustive outline of the congressional statutes, DOD and Army regulations, which control the Army's Physical Disability Evaluation System ("PDES"), please refer to Plaintiff's Complaint, ¶¶ 17-30, ¶¶ 58, 67-69, and Claims 4-6 (¶¶ 157-185). Army Reg 635-40 ¶ 4-19(p)(2) provides: "Proceedings of an improperly constituted PEB are null and void." Army Reg 635-40 provides due process to soldiers going through the PDES.  It contemplates a four element system, the MEB, PEB, USAPDA, and PERSCOM, each acting after the other, in order. ¶¶ 2-3, 2-4, 2-10. This conforms to controlling DOD regulations. By regulation, the functions of

PERSCOM and the USAPDA are separate and distinct. PERSCOM is the superior organization with the USAPDA falling under its control. ¶ 2-3. The reality is otherwise, however. The oversight function of PERSCOM has been eliminated without a concomitant change in the regulation. (AR 1109, ll. 3-12.) Previously, PERSCOM and USAPDA were operating as separate entities and in accordance with Army Reg 635-40. (AR 1107-1108, ll.18-20.) Plaintiff relied upon the plain meaning of Army Reg 635-40 without knowing that his administrative due process rights had been dramatically altered. USAPDA contorted the four-element structure of administrative due process provided in Army Reg 635-40.  The Deputy Commander of the USAPDA, Colonel ("COL") Austin Bell, admitted that Army Reg 635-40 was not followed in Plaintiff's case.[21] COL Bell didn't recognize that his agency was operating without authority. Instead, he was of the opinion the regulation was wrong and his operation was better. (AR 1107, l.10) ("There's a problem with the regulation.") The command structure of USAPDA was, during 2001, as follows: COL Bell, as Deputy Commander, USAPDA, reported to Major General (MG) Catherine Frost, Commander, USAPDA. (AR 1091, ll.2-7.) The Commander, USAPDA, reported to MG Adair, Commander of PERSCOM. (AR 1095-1096, ll.18-12.) There is also a "Physical Disability Branch." It's nomenclature is TAPC-PDB. By regulation, it is part of PERSCOM, but COL Bell considers it his own. (AR 1099, ll.6 - 20); (AR 1108-1109, ll.11-18.) COL Bell did not ask PERSCOM or anyone else for permission to cancel Orders 183-2200, (AR 1109-1110, ll.19-11), but he admitted the regulation was in place. (AR 1109, ll.11-12.)

USAPDA had arrogated to itself the functions of PERSCOM. There was no change in the regulation and no delegation document from PERSCOM or the Secretary of the Army. USAPDA was taking all final administrative actions in processing disability cases, Army Reg

---

[21] Video of three important depositions on file with Clerk, including Bell, Tate, and Brower.

635-40 ¶ 2-3(b), and making final dispositions under ¶¶ 4-20(e)(1), (2), and (3). (AR 1107-1108, ll.2- 2.) Even operational control by PERSCOM over USAPDA under Army Reg 635-40 ¶ 2-4 appears nonexistent, despite the regulation. COL Bell declared, "I am PERSCOM." (AR 1106 l. 20); (AR 1105-1106, ll.20-20.) [22]

Any oversight and attendant administrative due process rights facially given Plaintiff under the regulation did not exist. Army Reg 635-40 ¶ 4-24 provides:

> PERSCOM will dispose of the case by publishing orders or issuing proper instructions to subordinate headquarters, or return any disability evaluation cases to USAPDA for clarification or reconsideration when newly discovered evidence becomes available and is not reflected in the findings and recommendations.

Plaintiff was entitled to rely on this provision and to assume PERSCOM would review "new evidence" before PERSCOM returned a case to USAPDA for reconsideration. That reliance was misplaced. Instead, USAPDA General Counsel, Dennis Brower, simply decided Plaintiff's case would be reconsidered without requesting permission from any higher authority. (AR 1110, l.4-11); (AR 1115, ll.6-13.) Unbeknownst to Plaintiff on August 10, 2001, the USAPDA received "new evidence" in the nature of a letter from the JAG Corps attaching two officer evaluation reports. (AR 1239-1242); (AR 1119-1122, ll.1-7); (AR 1166-1170, ll.19-1). Bell testified this type of submission falls in the category of non-medical reasons, also known as "performance data." (AR 1103, ll.3-22.) Before any "new evidence" was received, USAPDA unilaterally, without contacting PERSCOM, initiated an attempt to cancel the authorization coding in the Army's personnel computer system. (AR 1245, ll.3-6.)

Q:    I'm going to read to you from Army Reg 635-40 and this is paragraph - - App. (E)(9)(e).  "USAPDA may request PERSCOM cancel discharge instructions or amend or revoke retirement orders."  Now, are you both the

---

[22] COL Bell never explained how he had functions expressly delegated by Army Regulation to his superior's superior -- to MG Frost's superior, MG Adair.

PDA and PERSCOM?

A:    Yes.

Q:    Well, then, perhaps you can explain to me what that sentence means.

A:    There's a problem with the regulation.

(AR 1107, ll.2-10) (Bell).

Q:    Okay.  So when I read the regulation that says "request for deviation from established discharge date or amendment or revocation of retirement orders for <u>other</u> <u>than</u> <u>medical</u> <u>reasons</u> will be submitted <u>with</u> <u>justification</u> to PERSCOM, TAPC PDB", that can't happen now?

A:    That's correct.

Q:    And I was reading, again, from App. (E)(9) - -

A:    Yes.

Q:    - - subparagraph E, first sentence.  Do you know if there is a document out there that alters this regulatory scheme in any way?  If you know, fine.  If you don't, you don't know.

A:    No.  That is the regulation.

(AR 1108-1109, ll.14-6) (Bell) (emphasis added). USAPDA did not comply with the regulation's requirements to change a set of discharge orders. The "new evidence" was non-medical, but no justification was submitted to PERSCOM. Instead, Bell did it on his own, (AR 1122, ll.8-19).

On August 20, 2001, an unknown GS-9 employee signed a document over the signature block of a staff officer (not for a commander) returning PEB #1 to the Texas PEB "per conversation" between two people with no authority to recall. (AR 520.) While reconsidering PEB #1, the PEB #2 board members were under the false impression USAPDA had properly recalled the case from PERSCOM. (AR 1705-1708). They did not re-check their PDCAP system, which would have shown Plaintiff's case as still finalized and closed out. (AR 1706.)

On August 30 the second PEB returned a decision of "fit for duty".  This result was communicated to Plaintiff on September 5. He non-concurred, told the PEBLO Orders 183-2200 were not revoked, (AR 1915-1916), and then he sought legal counsel. At that moment, Plaintiff and his lawyer were entitled to rely upon Army Reg 635-40 ¶ E-9(e). This provision is the <u>only</u> reference to USAPDA's authority to rescind an existing order. It provides in pertinent part:

"USAPDA may <u>request</u> PERSCOM cancel discharge instructions. . . ." (emphasis added). Based upon the plain meaning of the word "<u>request</u>," USAPDA had no unilateral authority to cancel Plaintiff's discharge instructions. Yet it did so -- or tried to. The only right USAPDA had was to <u>request</u> of PERSCOM that the orders be revoked. As the superior authority, PERSCOM could grant or deny that request. This provision guaranteed Plaintiff that a revocation would be subject to an administrative due process review. The word "may" in the regulation merely identifies the USAPDA as an entity which has the right to seek an order's revocation. Individuals affected by those orders also have that right. "May" does not mean that USAPDA has an independent right under the regulation to revoke orders. Only PERSCOM has that right.

USAPDA usurped the PERSCOM function and answered to no one. Yet, the regulation had not changed. Without oversight, USAPDA unilaterally reconsidered PEB #1. There was no "request" because Bell viewed that there was no entity to whom a request could be made. One man, COL Bell (more accurately, his Legal Advisor Brower), was the sole authority in Plaintiff's case, and his/their actions went completely unchecked. "I am PERSCOM." (AR 1106, l. 20.)

Even the format of the request from USAPDA to PERSCOM is mandated by the regulation. App. E, ¶ E-9(e) says: "Request for deviation from established discharge date <u>for other than medical reasons</u> will be submitted, <u>with justification</u>, to PERSCOM (TAPC-PDB)," (emphasis added). This sentence illustrates how "TAPC-PDB" is the go-between office that routes recall requests <u>from</u> USAPDA <u>to</u> PERSCOM. Plaintiff's case falls squarely into the "for other than medical reasons" category. The deviation from the established discharge date of 14 Sep 01 was based exclusively on "performance data." (AR 1102-1104.) The requirement for justification in Army Reg 635-40 is an administrative due process protection afforded soldiers in cases where abuses of discretion relating to non-medical issues are possible. This provision

assures that USAPDA will not act arbitrarily or yield to internal pressures from other agencies in reaching decisions regarding disability -- the same rationale underlying the doctrine of *functus officio*. In Plaintiff's case, then acting Judge Advocate General of the Army, MG John Altenburg, through his position and influence, sought PEB #2. (AR 1167-1169, 1976-1978).

Defendant's failure to follow its own regulations worked dramatic harm and prejudice upon Plaintiff. Evidence of that prejudice is the Memorandum of Attorney Gary Myers, counsel for Plaintiff, dated September 13, 2001, addressed to the President of the PEB. (AR 289); [AR 326-327, ¶ 5(b) and (c)]. That letter presumed the regulation was implemented as worded. Plaintiff relied on that plain reading when he continued to adhere to Orders 183-2200.

The attempted deletion of the discharge coding in TRANSPROC was void on two grounds. First, it was not *requested of* PERSCOM, bypassing the due process safeguards of ¶ E-9(e). Second, it was not *issued by* PERSCOM within the meaning of Army Reg 635-40 ¶ 2-3(b) or Army Reg 600-8-105 ¶ 2-21(a). Next, the initiation of PEB #2 was itself contrary to regulation. Army Reg 635-40 ¶ 4-24 was not followed. There was no review of the case by PERSCOM to determine if the new evidence warranted a reconsideration. That review was required because a <u>Secretarial</u> <u>fitness</u> <u>determination</u> was in place. ¶ 4-24(b). USAPDA has no authority to seek reconsideration after final disposition unless the case is returned to it by PERSCOM. ¶ 4-19(p)(1). USAPDA's Legal Adviser agreed that ¶ 4-19(p)(2) renders action of an improperly constituted board "null and void." (AR 1259-1260, ll.4- 5.) PEB #2 was improperly constituted. It lacked jurisdiction to reconsider PEB #1. It had no authority to reconsider -- referring back to the doctrine of *functus officio*. Plaintiff's case was returned to PEB #2 in violation of the agency's own regulations. PEB #2 violated Plaintiff's rights to due process. Accordingly, the finding of "fit for duty" by the PEB #2 was a nullity and only the Secretarial

determination of "unfit for duty" existed on the day of discharge stated in the orders, 14 Sep 01.

Defendant now decides that Plaintiff's reliance upon the regulation's distinction between USAPDA and PERSCOM was misplaced. (AR 38 ¶¶ 2-3.) But the USAPDA's lawyer's own testimony destroys Defendant's present interpretation of ¶ E-9(e) (the "recall" provision). (AR 1235-36, ll.12-5) ("Q: And those orders were issued through the TRANSPROC system? A: The TRANSPROC system authorized his installation, Fort Benning, to cut orders *based upon Department of the Army and PERSCOM saying that it was okay*.") (emphasis added).

<u>3. PEB #2 was initiated upon misleading and unlawful grounds</u>

PPTO sought PEB #2 because Plaintiff had more than 6 months of active duty service obligation ("ADSO"). (AR 1501-03); *see also* (AR 1164, 1166-68, 1236, 1239, 1619-21). A soldier's ADSO is an impermissible consideration in the PDES. PPTO's interest was not *really* about Plaintiff's fitness for duty. It was about (a) keeping him on active duty, (AR 1501-03, 1643), and (b) sending a message to others with ADSOs not to use the PDES to get out early. (AR 2460-2466.) Next, COL Tate wrote USAPDA on 10 August 2001 advising that Plaintiff could essentially perform desk duty, attaching evaluations ranking Plaintiff as "outstanding." (AR 819.) His letter cited a critical shortage in company grade officers, and expressed a need for Plaintiff's continued services. *Id.* ¶ 4. As the personnel director for the JAG Corps, PPTO Chief, COL Tate was aware Plaintiff was due to be promoted from company grade to field grade three weeks later, and thus would not be part of any company grade shortage.

USAPDA's lawyer never told Plaintiff his orders were revoked. (AR 1249.) He did, however, tell Plaintiff that JAG cases should be treated like doctor cases. (Compl. ¶¶ 23-24, 69, 184.) He made this statement to Lieutenant Colonel (LTC) Mark Sposato, and also made clear that he was only interested in hearing from Sposato that Plaintiff could "still sit behind a desk.

27

That was all he was looking for." (AR 2857.) Brower made the same comment to LTC Coe -- that JAG disability cases should be handled like doctors' cases. (AR 10, § IV, third ¶.)

By DOD Instruction 1332.38 ¶ E3.P3.4.2., JAGs are not judged as to their "inability to perform specialized duties," as are doctors. A PEB Board Member said JAGs should not be judged against their inability to perform specialized legal duties. (AR 1702-05.) JAGs are "Soldiers First, Lawyers Always!", or "Soldiers, who just happen to be lawyers!" "The most important thing we do is…to create judge advocate soldiers who can stand at the commander's side on the battlefield and operate across the spectrum of conflict." MG Walter B. Huffman, Judge Advocate General of the Army (8/5/97-9/30/01), "Time to Train Soldier-Lawyers!" The Army Lawyer (June 2000).[23] Plaintiff, a former Infantryman, believed this warrior ethos, as did MG Altenburg, a Special Forces Vietnam veteran. That is why his disability took the wind out of his sails, caused him to doubt his potential. (AR 413 ¶ 2, 1610, 1612, 1634, 2853-2856.) But MG Altenburg imagined Plaintiff's actions as an attempt to cut a year off his ADSO, and Altenburg influenced every action against Plaintiff. (AR 1167-69, 1976-78, 2411-17, 2458-63, 276-283.)

PEB #2 had only two new items of evidence -- COL Tate's letter and a memo by Brower about his phone conversation with Sposato. [AR 817 (Block 8.b, fourth ¶).] The grounds upon which PPTO sought PEB #2 were impermissible. The grounds upon which Brower caused PEB #2 to occur were misleading and contradicted the laws described in Pl.'s Compl. ¶¶ 23 - 24, 69, 184. Brower initiated PEB #2 on a misleading statement that the JAG Corps was short on company grade officers, on a standard that Plaintiff could continue desk duty, and on the unlawful view that Plaintiff's disability case should be treated like a doctor's case.

---

[23] *See also*, Article, "JAGs Take a More Central Battlefield Role," Ari Shapiro, Morning Edition, 04/05/2007, www.npr.org ["The soldier-lawyers called JAGs (members of the military's Judge Advocate General Corps) are trained to offer legal advice in the heat of battle. These days, they're playing a far greater role than before in making combat decisions."]

<u>4. PEB #1 was lawful and final, untainted as was PEB #2</u>

The PEB President had plenary authority to stop the proceedings in favor of obtaining

further evidence.[24] The PEB is not made up of a bunch of dolts. It has 3 voting members -- a

medical officer, a personnel management officer, and a line officer. ¶ 4-17(b). All 3 were

"experienced officers … thoroughly familiar with board procedures." *Id.* The board members

were well aware of what a "JAG" does. Plaintiff's packet made clear he was a JAG, and what his

JAG job was. The PEB works with JAGs everyday, and could have spoken to one. ¶ 4-17(h).

One Army lawyer estimated he presented two PEB cases a day. Thaddeus A. Hoffmeister, "A

Practitioner's Note on Physical Evaluation Boards," The Army Lawyer (February 2001) at 54,

n.69. If board members thought OERs and input from a JAG supervisor were necessary to make

a fitness determination, they would have asked for it. PEB #1 was an autonomous look at the

evidence. PEB #1 was untainted by the subsequent heavy-handed influence of PPTO.[25] If the

PDES were ruled by branch assignments officers claiming they can assign anybody to desk duty,

no soldier would be discharged for disability.[26] *Beckham v. U.S.*, 392 F.2d 619, 623 (Ct.Cl. 1968)

(court changes fit finding to unfit, saying standard is not whether "the Navy can[] shift an officer

from assignment to assignment until a job is located that is not affected by the officer's physical

disability"). PEB #1 chose not to seek other evidence. It is presumed the evidence before them

was sufficient to render a decision -- consistent with the presumption of regularity.

*I. The ABCMR credited USAPDA's attempted verbal revocation when, in fact, verbal orders
were not permitted under these circumstances*

---

[24] *See, e.g.,* ¶ 4-18(a)-(c); ¶ 4-19(n); (AR 1231-1232, ll.16-6) (Brower).

[25] Efforts to cancel orders allegedly began <u>before</u> USAPDA received new evidence. (AR 750.).

[26] Upwards of 9,800 soldiers pass through the Army PDES each year. (AR 1107-1108.) In FY 83, the Army separated or retired for disability approximately 4,000 active duty service members. Chuck R. Pardue, *Military Disability in a Nutshell*, 109 Mil. L. Rev. 149, n.1 (1985).

The ABCMR concedes the 14 August 2001 attempted TRANSPROC entry was verbal, not written. (AR 1064.) Oral recitations by anyone at USAPDA mean nothing. USAPDA is not an orders issuance authority, and not in Plaintiff's chain of command. Only Fort Benning could revoke Orders 183-2200. Plaintiff was never shown or told of any revocation order. The authority to issue verbal orders is strictly circumscribed by Army Reg 600-8-105, ¶ 1-23, as follows: "Authority to issue verbal orders. When the situation demands immediate action, normally in a combat situation, a commander may issue verbal orders." (emphasis added). There was no demand for such immediacy in Plaintiff's disability case. The regulation provides a boilerplate format for revocation orders. The format calls for hard copy orders for revocations or rescissions, not verbal. Army Reg 600-8-105, Figure 2-6, Format 705, n.3; *see also* Figure 2-3, n.7. The ABCMR ignored Coraritta Nixon's unequivocal and unchallenged testimony that she "informed Ms. Baker that I needed some type of documentation in order to revoke his orders and she said, 'OK'," and further that "I [Ms. Nixon] also understand, however, that my office, Transition, could not do anything without proper documentation authorizing me to revoke my transaction." (AR 442, 135-136, 138, 1829, 1831-1833.) Even Mayra Hernandez, after discharge #1, still required USAPDA to get her written authorization before she would issue a revocation order on behalf of the Fort Benning Adjutant General. (AR 440.)

## II. ACTIONS AGAINST PLAINTIFF AFTER DISCHARGE #1 WERE UNLAWFUL

The agency's conclusion that "the revocation of the [Plaintiff's] discharge was proper" (AR 39 ¶ 6), was unsupported by substantial evidence.[27] Everything Defendant did after discharge #1 was based upon a claim of fraud lacking a substantial basis in law or fact, depriving Plaintiff of constitutionally protected liberties and violating the APA. A "discharge" is defined as

---

[27] *See also* Pl.'s Mot. Dismiss for Failure to Charge an Offense. (AR 2498-2522.)

"complete severance from all military status gained by the enlistment or appointment concerned." Army Reg 635-5, Section II (Terms). After September 14, 2001, Plaintiff held the status, at a minimum, of a putative, presumptive, civilian ex-servicemember. Congress provided only <u>one</u> exception to 10 U.S.C. § 1168 -- that is 10 U.S.C. § 803(b) (fraudulent separation).

Although Defendant confuses terms (invalid, void, ineffective, and voidable), its aim was to render discharge #1 *voidable* pursuant to Article 3(b). "One claiming the benefit of a statutory exception must bring himself explicitly within it." *Vondermuhll v. Helvering*, 75 F.2d 656, 657 (D.C. Cir. 1935) (Supreme Court citations omitted). In *Hiatt v. Brown*, 175 F.2d 273 (1949), *citing Vondermuhll v. Helvering*, the Fifth Circuit held Brown's conviction was invalid. His court-martial lacked jurisdiction. One member lacked the statutorily-required qualifications. Recognizing "It is well settled that a court-martial is a military court of limited statutory jurisdiction," and further "[i]t is well settled that a party claiming the benefit of a statutory exception must bring himself squarely within its terms," the Court sustained Brown's writ of habeas corpus. *Id.* at 275-76.

## A. Standard of Review

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619-20 (1966) (internal citations omitted). "[The APA's] enactment meant stricter judicial review of agency factfinding than Congress believed some courts had previously conducted." *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999). "[T]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight," *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 284 (1974), including exculpatory evidence. *A.T.&T. v. F.C.C.*, 86 F.3d 242 (D.C. Cir. 1996). A finding of wrongdoing that is based mostly

upon circumstantial evidence is suspect. *Robinson v. NTSB*, 28 F.3d 210 (D.C. Cir. 1994) (overturning revocation of pilot license based on circumstantial evidence). A court is obligated "to guard against an agency's drawing inferences that are 'arbitrary' in relation to the facts found, no matter how substantial may be the support for those facts. (citation omitted). The court therefore must engage in a 'thorough, probing, in-depth review,' of the agency's asserted basis for decision." *Midtec Paper Corp. v. I.C.C.*, 857 F.2d 1487, 1498 (D.C. Cir. 1988).

"Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *Morall v. D.E.A.*, 412 F.3d 165, 176 (D.C. Cir. 2005) (citation omitted) (finding of dishonesty unsupported by record). In *Morall*, the ALJ made credibility findings in Dr. Morall's favor and recommended no adverse action. The Deputy Administrator revoked Dr. Morall's registration. The Court reasoned:

> In reaching this judgment, the Deputy Administrator relied almost exclusively on the testimony of the DEA Investigator, almost as if no other testimony or evidence was in the record. The Deputy Administrator's decision takes no account whatsoever of the ALJ's credibility findings, completely ignores the testimony of Dr. Greenfield and of Dr. Teich, and substantially fails to acknowledge the testimony given by Dr. Morall that explains or disputes the DEA Investigator's claims. The agency decision is, in short, stunningly one-sided in its focus and, thus, utterly arbitrary and capricious … We hold that DEA's decision cannot withstand review, because it fails to consider contradictory record evidence where such evidence is precisely on point. Such a lapse of reasonable and fair decisionmaking is particularly acute where, as here, the decision entirely ignores the ALJ's credibility findings.

*Id.*, at 167. The credibility findings of an ALJ are not binding on the agency, *U.S. v. Raddatz*, 447 U.S. 667, 680 (1980), but "[f]ederal reviewing courts [] give special weight to ALJs' credibility findings." *Moore v. Ross*, 687 F.2d 604, 609 (2nd Cir. 1982), *cert. denied* 459 U.S. 1115 (1983) (citations omitted). In this Circuit, it has been said that an agency finding must "reflect attentive consideration" to an ALJ's decision, *Morall* at 177, and further that an agency

32

"may not upset [the ALJ's findings] unless its reversal is supported by substantial evidence."
*WHW Enterprises, Inc. v. F.C.C.*, 753 F.2d 1132, 1141 (D.C. Cir. 1985), citing *Moore v. Ross*
(Board misconstrued the thrust of ALJ's determination and relied on irrelevant assertions).

A court may not "rubber-stamp the Board's decision simply because the supporting
evidence may be substantial when considered by itself and in isolation from the evidence that
fairly detracts from the Board's conclusion." *Smith v. Dalton*, 927 F. Supp. 1, 4 (D.D.C. 1996)
(Urbina, J.), *citing Swann v. Garrett*, 811 F.Supp. 1336, 1340 (N.D.Ind. 1992). "We must take
into account the entire record, including the <u>evidence</u> opposed to the Board's view <u>from which
conflicting inferences reasonably could be drawn</u>." *Swann v. Garrett* at 1340 (emphasis added).
An agency must explain why evidence contrary to its decision was "disregarded or given less
weight." *Smith v. Dalton* at 5 (decision not based on balanced consideration of all evidence).[28]

### B. Lack of proof as to one or more of the elements causes a fraud claim to fail

"[L]ack of proof as to one or more of the elements causes a fraud claim to fail." *Redmond
v. Birkel*, 933 F. Supp. 1, 3-4 (D.D.C. 1996). To oust jurisdiction from U.S. District Judge Hugh
Lawson, and thereafter to take every action it took, Defendant charged Plaintiff with a violation
of Article 83. Defendant alleged Plaintiff "by means of <u>knowingly false representations</u> that he
was eligible for discharge from the U.S. Army based upon ORDERS 183-2200 dated 02 July
2001, when in fact he knew the basis for those orders had been overturned, procure himself to be
separated from the U.S. Army." (AR 2269.)  Per the Article 32, Defendant could prove neither
the second, (AR 112), nor third, (AR 113), elements of the offense. Article 83, UCMJ, provides:

---

[28] *Crane v. Sec'y of Army*, 92 F. Supp.2d 155 (W.D.N.Y. 2000) (Curtin, J.) (discharge for weight
problems supported by little evidence compared to evidence favoring retention. "Most of that
evidence are first-hand accounts from the officers and individuals who had frequent and long
contact with Crane and who all concluded that he presented an appropriate military
appearance.")

> Any person who procures his own separation from the armed forces by knowingly false representation or deliberate concealment <u>as to his eligibility for that separation</u> shall be punished as a court-martial may direct.

(emphasis added). From the outset, the JAG Corps pointed to items of conduct to create an impression of deception. But the Article does not speak to false representations about staying in the Army or remaining silent about a medical board or about having an affirmative duty to say anything. The word "eligibility" goes to the question of whether Plaintiff did anything to knowingly misrepresent his "eligibility" for medical separation. Only Coraritta Nixon and Mayra Hernandez are relevant to that inquiry, not Plaintiff's colleagues or opposing counsel or the guests at his promotion party two weeks earlier. Not even the PEBLO, who testified anyway that Plaintiff misrepresented nothing to her on September 5. (AR 415-419.) Plaintiff's "eligibility" was fixed by Orders 183-2200.[29] Plaintiff had no duty to say anything to Ms. Nixon or Ms. Hernandez about PEB #2.[30] The government wants to create a duty to speak out of whole cloth. Case law recognizes no such duty. This notion that merely presenting himself to the separation point was fraud, is unsustainable. The case dispositive of this question is *Smith v. Vanderbush*, 47 M.J. 56 (C.A.A.F. 1997). Sergeant Vanderbush out-processed and obtained his DD-214 just days before his scheduled court-martial. The C.A.A.F. did not believe Sergeant Vanderbush had an affirmative duty to tell the out-processing clerks of his pending trial date.

<u>1. Defendant is unable to establish the *actus reus*</u>

Article 83 speaks to knowingly false representations or deliberate concealment relating to eligibility for separation, like feigning pregnancy or forging signatures on separation

---

[29] Which were not revoked prior to discharge #1. Admitted by ABCMR. (AR 39 ¶ 6.)

[30] The ABCMR ignored the jurisdictional "hook" in the record and invented a new one. It made no administrative finding of "knowingly false representations." It decided Plaintiff committed a "sin of omission" by "concealment of the truth concerning his situation." (AR 39 ¶ 6.)

documents. Plaintiff committed no act of fraud during PEB #1,[31] so no conduct by Plaintiff prior to July 2, 2001, is relevant to whether he committed the offense of fraudulent separation. The JAG Corps and USAPDA kept their actions secret from Plaintiff until he discovered them by accident on August 6, 2001, so no conduct by Plaintiff prior to August 6, 2001, is relevant to that inquiry. Plaintiff learned of PEB #2 on September 5, 2001, so no conduct by Plaintiff prior to September 5 is relevant to whether he committed fraudulent separation -- even his speculation that he would stay in and go to the Grad Course. Between September 5 and 14, Orders 183-2200 remained unrevoked, so Plaintiff's conduct amounted only to following his orders.

"A discharge is an affirmative action taken by a military service to separate a person," [citations omitted], "In the case of a fraudulent discharge, the military service takes an affirmative action to separate the individual, based on a misrepresentation by that person." *Cf. U.S. v. Pou*, 43 M.J. 778, 780 (A.F.C.C.A. 1995) (Pou faked his own death). Defendant charged Plaintiff with obtaining discharge #1 "by means of knowingly false <u>representations</u>," but:

> 15. On 14 September 2001, the accused reported to the Fort Benning Transition Center for separation … The accused did not make any verbal representation during his separation processing regarding his eligibility for separation.

(AR 110) (Article 32 finding). Coraritta Nixon, Chief, Army Transition Center Fort Benning, signed and authorized Plaintiff's DD-214, and testified Plaintiff *did nothing* wrong that contributed to being discharged, and that the first time Orders 183-2200 were validly revoked was after discharge #1. (AR 135-36, 1837-39, 1864). The Article 32 was the only neutral and detached fact finder to assess Ms. Nixon's demeanor and credibility. (AR 110, ¶ 11.)

The following is dispositive:[32] The ABCMR never made an administrative finding that

---

[31] Admitted by failure to rebut Article 32. (AR 109 ¶ 8, 113 ¶ 3).

[32] This ¶ supplements § III of this brief and § IV of Pl.'s Mem. Opp. Def.'s Mot. Summ. J.

Plaintiff committed the offense of fraudulent separation. Fraudulent separation is the <u>only</u>

exception to 10 U.S.C. 1168(a) as discussed, *supra*.[33] None of its findings amount to an Article

83 violation. "Duplicitousness," (AR 39 ¶ 5), and "the applicant's own misconduct," (AR 41 ¶

12), are not an administrative finding of a "knowingly false representation as to his eligibility for

that separation." Neither a "sin of omission," "concealment of the truth," nor "had he been

honest…he would not have been separated," (AR 39 ¶ 6), amount to "<u>deliberate</u> concealment as

to his eligibility." *U.S. v. Pettit*, 19 C.M.R. 706 (A.F.B.R. 1955) (Article 83 case discussing

distinction between mere concealment and <u>deliberate</u> concealment). *Pettit's* high burden to prove

<u>deliberate</u> concealment probably led the Government to pursue the "knowingly false

representations" theory in the first place. *Id.* (mere nondisclosure insufficient).

2. Defendant is unable to establish the <i>mens rea</i>

The requisite intent for a violation of Article 83, UCMJ, is the specific intent to defraud,

knowledge of the falsity of the material fact(s) represented, knowledge of the ineligibility for

discharge, and an intent for the separation officials to rely upon the representation(s) made -- to

*induce* the separation officials into issuing the DD-214. In other cases where evidence of specific

intent was insufficient, federal courts have overturned general discharges. *See Robinson v. Resor*,

469 F.2d 944 (D.C. Cir. 1972); *Kremenski v. U.S.*, 13 Cl.Ct. 430 (1987).

Defendant repeatedly overlooks facts that defeat an allegation of fraud. *Cf.* (AR 637-639)

(Court questions Government why obedience-to-orders standard would be different for a JAG).

The attempted TRANSPROC data entry was never communicated to Plaintiff. The JAG Corps'

and USAPDA's own secrecy about PEB #2 is exculpatory. (Comp. ¶¶ 40-44; AR 1504-07.) His

second-line JAG supervisor, in August, told Plaintiff he "didn't know what was going to

---

[33] We argue a *judicial* finding of an Article 3(b) offense was required in Plaintiff's case to render his DD-214 voidable. For argument's sake, not even an *administrative* finding was made here.

happen." (AR 1507.) His first-line JAG supervisor, during August, was uncertain whether PEB #1 was altered. (AR 437.) Plaintiff's colleague saw, during all of August, that Plaintiff showed "uneasiness and not knowing what was going to happen." (AR 1985-1986.) Plaintiff told his second-line JAG supervisor on August 30 that his discharge orders had not been revoked. (AR 1516-18.) Plaintiff told the PEBLO on September 5 his orders had not been revoked. (AR 1915-1916.) The PEBLO notified Plaintiff of PEB #2 on September 5. She was unable to tell him what legal effect PEB #2 had on Orders 183-2200, (AR 1915-1916), and, regardless, she was just a hospital counselor, an *ombudsman* to Plaintiff, and not in a position of authority vis-à-vis Plaintiff's <u>eligibility</u> to separate. Plaintiff then sought the advice of experienced counsel, and between September 5 and 14 he relied on his lawyers' advice to continue outprocessing.

> 14. By letter dated 13 September 2001, the [Plaintiff's] legal counsel informed the PEB that he had advised the [Plaintiff] to report for separation on 14 September 2001 and that the accused intended to do so.
> 16. In reporting for separation on 14 September 2001, the accused acted in reliance on the advice of legal counsel.

(AR 110, Art. 32); (AR 289, 326-27, 312-13). The Benning command, after discharge #1, refused the JAG Corps' request to list Plaintiff as AWOL because the "unit had what appeared to be a valid separation order." (AR 1519-20); (AR 2748 - expected testimony of Seay.)[34] Plaintiff had no duty or authorization to revoke his own orders. PEB #2 was a recommendation of "fit," not a finding. (AR 1714.) It had no status other than to require Plaintiff to concur or nonconcur. Plaintiff not only *believed* he was acting on valid orders, he *was* acting on valid orders.

   3. <u>Defendant cannot establish the concurrence between the *actus reus* and the *mens rea*</u>

   The third element of an Article 83 offense requires proof discharge #1 was obtained by

---

[34] Corroborated by Coe notes. (AR 1415) ("Personnel File A Co. 1/11[th] Inf."); (AR 1421) ("call A Co.…get info…"); (AR 1433) ("call the company commander"); (AR 1437) ("speak with company commander"). After all that, Coe never got a statement from the company commander. Coe omitted this exculpatory evidence from his report.

Plaintiff's knowingly false representations. Just like the elements of fraud in this Circuit -- there must be an intent to mislead another into relying on the representation, reasonable reliance, and injury as a result of reliance. Counsel's September 13 letter to Defendant illustrates no detrimental reliance by the Army. A day before Plaintiff's discharge, a Captain (CPT) Clements had reason to believe Plaintiff was still separating and she did nothing. (AR 2012-2013.) PEB #2, and the disagreement over its validity, was not peculiarly within Plaintiff's own knowledge. USAPDA failed to exercise reasonable diligence to finish the undertaking it sought. It failed to get hard copy orders from PERSCOM to Fort Benning, when asked for such by Coraritta Nixon. His orders were self-executing. Plaintiff *did nothing* wrong *that contributed* to his being discharged. So says the discharge official *who signed his DD-214*. (AR 135-136, 1837-1839, 1864.) The Army could have, but didn't, "flag" Plaintiff. The *Vanderbush* Court rested blame for such foul-up on the Army. The Army had the means to prevent Vanderbush's discharge, and the Army failed to use them properly. The Army cannot show Plaintiff made any representation that its discharge officials reasonably relied on to their detriment, the truth of which the Army could not have discovered by the exercise of reasonable diligence. The Army is the author of its own asserted misfortune: it delivered Plaintiff his Honorable Discharge. Failure to respond to these non-frivolous arguments was arbitrary. *Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997).

### C. The agency's prior no probable cause determination

The Article 32 included two days of hearings, one in Washington, D.C., [AR 115-134 (summarized transcript); AR 1458-1813 (verbatim transcript)], and one at Fort Benning, [AR 134-149 (summarized transcript); AR 1814-2055 (verbatim transcript)]. The Article 32 concluded there was not probable cause to believe Plaintiff committed Fraudulent Separation, (AR 107-114), and recommended the charge be dismissed. The Article 32 found, *inter alia*:

…the investigation did not establish reasonable grounds to believe that [Plaintiff] knowingly misrepresented or deliberately concealed a certain material fact or facts about his eligibility for separation.

The Government also argued that [Plaintiff's] efforts … to conceal the fact that he was being processed for medical separation and to create the false impression that the outcome separation processing was beyond his control constituted false representations for purposes of Article 83. Plainly, however, none of these statements could be deemed to be false representations for purpose of Article 83 because they were not made to a separation official and did not relate to [Plaintiff's] qualification for separation. (AR 112, n.28)

…the allegation that [Plaintiff] knew that basis for his separation orders 'had been overturned' at the time he presented himself for separation is unsupported as a matter of both law and fact.

(AR 112-114). Defendant relies on conjecture. "He knew those orders would be revoked." (AR 39 ¶ 6). "[Plaintiff] knew [PEB #2] would probably be approved." (AR 39 ¶ 5).  Yet, on 14 Sep 01, PPTO was advertising the position as a vacancy. (Compl. ¶ 39, AR 699-700, 1499, 1601.)

*D. The agency's new position focuses on one incredible witness*

Defendant tiptoes around the fact nobody at Fort Benning told Plaintiff his orders were revoked. *Cf.* Army Reg 600-8-105 ¶ 2-19(b) ("Commanders issuing orders will establish strict controls to ensure that … [o]rders are sent promptly to each individual ...") Defendant went to great lengths to keep its action secret, (Compl. ¶¶ 40-44); (AR 2855-56); (AR 118; 743-44; 1504-08); (AR 1172-73), even creating the illusion in Plaintiff's mind that he was getting an end-of-service award, (AR 1500-01) (Compl. ¶ 41), and continuing to advertise his job. Defendant concluded Plaintiff committed a "sin of omission" largely on a finding that Major Mulligan "informed the applicant as early as 8 August 2001 that he would not be separated and that his separation orders were going to be revoked." (AR 39 ¶ 6); (AR 1628)("Q: But you never told him they were revoked? A: No. I don't have enough authority to revoke them.")

No lawyer would speak so presumptuously -- like Defendant telling Plaintiff <u>today</u> that

Plaintiff <u>will</u> lose this case. The ABCMR ignored that Mulligan had been in that job less than a month, (AR 1619), had zero knowledge of how the PDES works, (AR 1624), and incorrectly believed the composition of a PEB required a JAG officer, (AR 1622).[35] The ABCMR ignored that Mulligan's conversations occurred (a) before COL Tate's letter to USAPDA asking for PEB #2, (b) before Brower contacted Sposato for input, and (c) before the Texas PEB agreed to conduct PEB #2. A review of Mulligan's pre-discharge #1 statement to Sposato, (AR 2857), post-discharge #1 statement to internal investigator Coe, (AR 454-458), and then his post-TRO testimony (AR 1618-1637), shows his account morphed each time. Taken as a whole, he does not tell Plaintiff anything of certainty. He speculates. Plaintiff's description of what he was told between August 6 and 10 is more reasonable and credible. (AR 55-56 ¶¶ 25-27); Compl. ¶ 41-45.

### E.  Red herrings and a compromised internal investigation

A submissive ABCMR merely rubber-stamped the sentiment of high ranking JAGs vexed by Plaintiff.[36] Plaintiff kept his medical condition private to protect his career potential. Plaintiff drafted letters for CPT Smith. The parties agree no fraud occurred prior to Orders 183-2200, so CPT Smith's letters have no relevance to whether Plaintiff made knowingly false representations <u>as to his eligibility for that separation</u>. It is common for commanders to sign documents drafted for them. The nexus between CPT Granville's letters and Ms. Hernandez and Ms. Nixon's discharge action is too attenuated to evidence fraudulent separation. Defendant points to Plaintiff telling others PPTO was messing with his discharge, would vindictively reassign him, that he

---

[35] *Cf.* AR 647 (Army lawyer misinforms J. Lawson that PEB required a JAG and branch input).

[36] For example, the ABCMR spotlights that Plaintiff "orchestrated his separation … taking pains to ensure that the processing for his discharge was kept as secret as possible…" (AR 39 ¶ 5.) Every soldier has a right to medical privacy. Defendant cites no regulation that required Plaintiff to notify the JAG Corps. In fact, Defendant's internal investigation recommended that the JAG Corps amend its own personnel policies to create such an affirmative obligation. (AR 296, Recommendations II, III, and IV.) Plaintiff had a legal right to advocate for a finding of "unfit for duty" so long as he did not falsify evidence submitted to the board.

would stay in, that he would attend the Grad Course. To Plaintiff, given what he knew and believed up to the moment Mayra Hernandez handed him a DD-214, those were <u>true</u> statements, as possible as the possibility of separating. *Urban Investments Inc. v. Branham*, 464 A.2d 93, 98 (D.D.C. 1983); *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. Ct. App. 1977). Defendant points to Plaintiff calling Ms. Nixon at home September 13. Plaintiff had a mandatory appointment with her that morning at 10:45 a.m. (AR 2819, 2829.) He was required to report to her with installation and unit clearance records, medical and dental records, and more. (AR 2829.) Defendant has often used and mischaracterized that call.

The JAG Corps' internal investigator persuaded CPT Smith to change his statement to add derogatory information, (1312-1313), when CPT Smith's original statement contained no derogatory information, (1307-1311). The record shows Coe influenced *at least one* witness to omit exculpatory matters. [AR 1344, ¶ 2(d)-(e)] ("Between you and me…but I do not believe it is necessary to reveal that fact…") Coe preferred to include only the harshest allegations. Coe omitted evidence that the Benning Command refused the JAG Corps' request to list Plaintiff AWOL. Coe wrote Baker's statement for her. (AR 1322-27.)

### III. DISCHARGE #2 IS STATUTORILY INVALID AND UNLAWFUL

Discharge #2 is invalid for all the reasons discussed to this point. In addition, it violates 10 U.S.C. § 803(b) -- a limited grant of jurisdiction. It permits apprehension of, and custody over, a person charged with having fraudulently obtained his discharge, *"for that trial,"* and not *"for adverse administrative proceedings"* like a written reprimand, an adverse performance evaluation, or an administrative discharge. On this point, we adopt and incorporate by reference the legal analysis of the agency's own lawyers. (AR 2798-2801.)[37]

---

[37] The author of that opinion memo is cited 30 times as government counsel in this Circuit.

"One claiming the benefit of a statutory exception must bring himself explicitly within it." *Vondermuhll v. Helvering*, 75 F.2d  at 657, *supra*; Sutherland Statutes and Statutory Construction § 47:11 (2007). "It is an ancient rule of statutory construction that penal statutes should be strictly construed against the government ... and in favor of the persons on whom penalties are sought to be imposed." Sutherland Statutory Construction § 59.03 (5th ed. 1992). A corollary to the rule of strict construction is the rule of lenity. Ambiguities in penal statutes are resolved in favor of lenity. *Id.* Military courts apply the rule of lenity. If ambiguity in the application of Article 3(b) exists, it must be construed in Plaintiff's favor. *U.S. v. Starr*, 51 M.J. 528, 532 (A.F.C.C.A. 1999); *U.S. v. Ferguson*, 40 M.J. 823, 830 (N.M.C.M.R. 1994). Of course, first look to the plain language and give the operative terms of a statute their ordinary meaning before deciding ambiguity exists. *Moskal v. U.S.*, 498 U.S. 103 (1990); *U.S. v. Falk*, 50 M.J. 385, 390 (1999). Plaintiff contends Article 3(b) unambiguously requires a <u>trial</u>.

Second, discharge #2 violated 10 U.S.C. § 803(b) because discharge #2 and its characterization as a general discharge were based upon (a) acts *other than* fraudulent separation, (b) acts alleged to have occurred *prior to* discharge #1, and (c) acts alleged to have occurred *prior to* a conviction for an Article 83 offense. [38] "'Only those who a court-martial finds were fraudulently separated from active duty face this travail' of court-martial for offenses that occurred prior to that separation." *U.S. v. Reid*, 46 M.J. 236, 239 (C.A.A.F. 1997). Discharge #2 relied upon conclusions by some that Plaintiff committed offenses such as desertion, dereliction of duty, larceny, and conduct unbecoming, (AR 295, 299, 390-91, 1647, 2781-2794). Discharge #2 is a court-martial-predicated discharge. At that time, the Army had no jurisdiction to court-martial Plaintiff for desertion, dereliction of duty, larceny, or conduct unbecoming, and therefore

---

[38] *Cf.* § II (B) (1), *supra*, and Article 32 explanation at (AR 113 ¶ 1.)

had no jurisdiction to reprimand him, adversely evaluate him, or discharge him for any of these reasons. The Secretary acted in excess of his powers. The combination of 10 U.S.C. § 1168(a) and 10 U.S.C. § 803(b) does not authorize, nor support any regulation purporting to authorize, consideration of Plaintiff's pre-discharge #1 activities. *Cf. Harmon v. Brucker*, 355 U.S. 579 (1958) (holding a "harmonious reading" of two statutes discharge-related prohibited Secretary from considering pre-induction activities when determining characterization of service).

Third, discharge #2 was statutorily invalid because it relied upon defective administrative findings by others.[39] MG Jackson failed to articulate why he referred the case to trial despite the no probable cause finding. (AR 2225-27; 2234-35.) Neither he nor his SJA provided a record to explain why their reasoning was better. MG Jackson made no administrative finding of fraudulent separation in his reprimand. (AR 390). The RFGOS decision authority made no findings of fact or conclusions of law at all, instead relying on the reprimand proceeding, but MG Jackson did not make a finding that Plaintiff violated Article 83, UCMJ. These decisions failed to state why their reasoning was better than the Article 32, or the Litigation Division's opinion, (AR 2798-2801), given each relied upon the same evidence. The ABCMR relied on these items. The ABCMR made no administrative finding that Plaintiff committed an Article 83 offense.

## IV. DISCHARGE #2 IS UNCONSTITUTIONAL, ON ITS FACE AND AS APPLIED

The following discussion is not intended to signal any waiver or de-emphasis of the constitutional claims made in Claims 1, 2, and 3. Those weighty issues merit substantial discussion, unavailable here. We must adopt, incorporate, and respectfully refer the Court to all of Plaintiff's previously articulated constitutional claims, including Plaintiff's pending Complaint, Pl'.s Compl. for TRO, *Schaefer v. White*, 174 F. Supp.2d 1374 (M.D.Ga. 2001), First

---

[39] On this point, *see also* Pl.'s Mem. P. & A. Opp. Def.'s Mot. Summ. J. at § IV.

Pet. for Writ of Habeas Corpus, (AR 2107-2123), Second Pet. for Writ of Habeas Corpus, (AR 2145-88; 2204-06), Third Pet. for Writ of Habeas Corpus, (AR 2283-2310), Mot. to Dismiss, (AR 2498- 2522), ABCMR Application (AR 58-94), *Gerstein* and other points (Pl.'s Mem. P. & A. Opp. Def. Mot. Summ. J. §§ VIII(F) and XI-XII). Even if each irregularity cited does not constitute a denial of due process in itself, their cumulative effect does. *See May v. Gray*, 708 F. Supp. 716 (E.D.N.C. 1988) (overturning discharge for procedural violations amounting to due process violation); *Cf. Rucker v. Sec'y of the Army*, 702 F.2d 966 (11th Cir. 1983) (overturning fraudulent enlistment discharge for procedural violations before reaching due process claims).

Plaintiff was entitled to a pre-deprivation trial-type hearing before return to military control. *Goldberg v. Kelly*, 397 U.S. 24 (1970). He was entitled to a *Gerstein* hearing within 48 hours of return, and he was entitled to be released after the finding of no probable cause. U.S. Const. Amend IV. Plaintiff was entitled to have the Article 32 no-probable-cause-finding treated like a grand jury's failure to return an indictment. U.S. Const. Amend V. Defendant and/or Article 3(b) should have provided Plaintiff clear notice of who his "immediate custodian" was for 28 U.S.C. § 2241 purposes. U.S. Const. Art. I § 9.

10 U.S.C. § 803(b), on its face and as applied, contravenes the Fifth Amendment's guarantee of equal protection. The means chosen by Congress to address fraudulent discharges treat a presumptive civilian holding a facially valid DD-214 differently from a member of a reserve component not on active duty but subject to military jurisdiction under 10 U.S.C. § 802(d). The first class -- persons subject to 10 U.S.C. § 803(b) -- remain under military control, are required to perform military duties, and must leave their civilian liberties and occupations behind, continuously from the day the charge is preferred through trial. The second class -- persons subject to 10 U.S.C. § 802(d) -- are permitted to remain in their civilian status except on

44

the day(s) pretrial or trial hearings are actually in session. Strict scrutiny is required, because these classifications affect that constitional divide between military and civilian, and military status burdens fundamental rights. The first class has less tie to the military, and presumptively no tie at all until convicted. The exercise of military control over the first class should be more limited than over the second. 10 U.S.C. § 802(d) exercises military control in a manner that is "the least possible power adequate to the end proposed," as is constitutionally required, *Toth*, 350 U.S. at 23. 10 U.S.C. § 803(b) grants the military more power than necessary to render *voidable* a fraudulently obtained DD-214. Defendant cannot meet its burden of proving that disparate treatment is necessary to achieve that purpose,[40] because the military already achieves its "primary" function "to fight or be ready to fight wars," *Toth*, 350 U.S. at 22-23, using the less burdensome treatment of 10 U.S.C. § 802(d).

### Conclusion

Discharge #1 was final agency action. It was a facially valid DD-214. It was voidable, but only if Defendant proved fraudulent separation, Article 83, UCMJ.  Defendant did not do so.

Respectfully submitted,

__/s/_____
Gary R. Myers (157115) for Plaintiff
78 Clark Mill Road
Weare, New Hampshire 03281
1-800-355-1095
FAX (603) 529-3009

---

[40] Plaintiff agrees that the revocation of a discharge determined by a court of law to have been fraudulently obtained is a compelling government interest.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MALCOLM G. SCHAEFER,            )
                               )
        Plaintiff,             )
                               )        Civil Action No. 1:07-cv-01550 (RJL)
v.                             )
                               )
THE HONORABLE PETE GEREN,      )
SECRETARY OF THE ARMY,         )
                               )
        Defendant.             )


PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE


1.    Plaintiff graduated from West Point in 1990. He served in the Infantry from 1990 to

      1996. After his graduation from the University of Virginia School of Law, he served in

      the U.S. Army Judge Advocate General's Corps (hereinafter "JAG Corps" or "JAG")

      from 1996 to 2001. (Compl. ¶ 5.)

2.    Prior to September 14, 2001, Plaintiff's military career was unblemished.

3.    A review of Plaintiff's official military personnel file reveals the following matters

      entered in his record prior to September 14, 2001:

      a.    Prior to 1991, Plaintiff completed training as a Parachutist, Ranger, Pathfinder,

            and Infantry Platoon Leader, and was awarded the Expert Infantryman's Badge.

      b.    Between 1990 and 1996, Plaintiff received exemplary ratings as an outstanding

            infantry officer with unlimited potential and extremely personal high standards.

            (AR 967-983.) He was hand-picked ahead of other senior lieutenants to perform

            certain duties. (AR 906; 969.) He was considered an "excellent trainer and

motivator," (AR 979), who "leads from the front … and truly takes care of his troops. Steady and level-headed even in the most stressful and fluid situations." (AR 944.) One commander rated Plaintiff as "the best platoon leader I have ever had the opportunity to work with." (AR 1013.)

c.   As a Judge Advocate between 1996 and 2001, Plaintiff was rated as "one of the most impressive JAG officers I have seen," (AR 1005), "disciplined and selfless," (AR 1005), "totally loyal to the Army and this office," (AR 1002), with unlimited potential in the JAG Corps. (AR 984-987; 1000-1005; 1015-1022.) In June 2001, a rater commented Plaintiff was "the finest company grade officer and attorney that I have supervised in over eighteen years of military service," and a senior rater commented that "no supervisor takes better care of his people." (AR 1016.) Another senior rater commented that Plaintiff was "the best Captain in this office and in the top 10% of judge advocate captains with whom I have served." (AR 1020.) In July 2001, a JAG Corps personnel assignments officer in Washington, D.C., considered Plaintiff to be "one of our top guys…He was very well thought of." (AR 1610.)

d.   Relevant to professional ethics, including the traits of dedication, loyalty, honor, integrity, moral courage, selflessness, and moral standards, Plaintiff consistently received top ratings between 1990 and 2001. (AR 920-944; 967-985; 1000-1013; 1015-1022; 1034.) During that period of time, he was evaluated by various superiors as "brutally honest," (AR 1013), having "unmatched candor and willingness to accept responsibility," (AR 928), "an officer of absolute integrity," (AR 929), "his moral and professional standards are unquestioned," (AR 930),

2

"every inch the professional soldier," (AR 933), "[u]nquestioned integrity; adheres to highest ethical standards," (AR 935), "unquestionable integrity and moral standards," (AR 937), "trust him implicitly," (AR 939), "integrity is beyond reproach," (AR 941), "moral standards are above reproach," (AR 943), and "[h]e is willing to make the tough call and stand by his recommendations, regardless of the circumstances. A superb officer and attorney with unquestioned moral and professional standards." (AR 984.) The Professor and Head of the Department of Law at the U.S. Military Academy commented that Plaintiff had a "superb reputation … regarded as an officer of outstanding character and integrity." (AR 909.) Plaintiff was granted a top secret clearance, (AR 915), with special authorization for Presidential Support Duty Access in Washington, D.C., (AR 905), to execute contingency missions and security operations alongside the U.S. Secret Service at The White House, Department of State, and Department of Defense. (AR 939.)

4.      Plaintiff completed the Infantry Officer Basic Course, U.S. Army Ranger School and Pathfinder School between 1990 and 1991.  Plaintiff was then stationed as an Honor Guard platoon leader in the 3d U.S. Infantry (The Old Guard) at Fort Myer, Virginia. (AR 225-29); (Compl. ¶ 11).

5.      Plaintiff's duties as an Infantry Lieutenant required him to conduct daily physical training, rucksack marching, and tactical field training.  Plaintiff's duties in the Honor Guard required Plaintiff to conduct ceremonial duties that included long marches in specialized built-up shoes and extremely long periods of standing with knees locked. Beginning in 1991, Plaintiff began experiencing knee pain in both knees. The pain would

cause him to stop during the middle of a run and walk. His symptoms occurred as flare-ups, and the flare-ups occurred daily and lasted hours, depending upon use and activity level. His symptoms included pain, weakness, stiffness, inflammation, fatigue, and lack of endurance. (AR 225-29; 777-779); (Compl. ¶ 11).

6.     Beginning with, during, and as a result of his service as an Infantry Lieutenant, Plaintiff's knees deteriorated to the point that he underwent left knee surgery in 1996 and then right knee surgery in January 1999. (AR 225-29; 777-779); (Compl. ¶ 12).

7.     Despite very determined efforts at physical therapy and second medical opinions, Plaintiff's condition worsened after his right knee surgery. (AR 225-29; 479-491; 777-779; 2853-2854; 2855-2856); (Compl. ¶ 13-15).

8.     On 27 September 2000, a MOS Medical Retention Board (MMRB) proceeding found that Plaintiff was incapable of performing all the duties expected of a soldier in his specialty; that his medical profile limited him from fully functioning in a worldwide field environment; and recommended that he be referred to a Medical Evaluation Board / Physical Evaluation Board.  (AR 109 ¶ 1, 228 ¶ 8.)

9.     On an "Acknowledgment of Notification" form presented to Plaintiff by Defendant prior to the MMRB, Plaintiff indicated that he waived his right to appear before the MMRB. The form provided him the option to request or decline that a Judge Advocate General board member be present, and Plaintiff declined. He submitted a personal statement and other matters for the board's consideration. (AR 774.)

10.     On 29 May 2001, a Medical Evaluation Board (MEB) proceeding referred Plaintiff to a Physical Evaluation Board (PEB) for chronic bilateral knee pain syndrome. (AR 775-76, 785.)

11. Plaintiff's MEB was composed of three military physicians. (AR 775-786.) The MEB unanimously referred his case to a PEB for disposition. (AR 775-786.)

12. On 5 June 2001, Plaintiff indicated that he concurred with the findings and recommendations of the MEB. (776.)

13. The Physical Disability Evaluation System (PDES) is authorized and governed by 10 U.S.C. § 1201 et. seq., Department of Defense Directive (hereinafter "DODD") 1332.18 and Department of Defense Instruction (hereinafter "DODI") 1332.38.

14. The governing regulation for the Army PDES is Army Regulation ("Army Reg") 635-40.

15. 10 U.S.C. § 1203 provides for the separation of service members who have served on active duty more than thirty (30) days.  At all times relevant to this action, Plaintiff was an eligible member for the application of 10 U.S.C. § 1203 because, as defined at 10 U.S.C. § 1201 (c), Plaintiff was a "member of a regular component of the armed forces entitled to basic pay."

16. 10 U.S.C. § 1203 (a) provides in pertinent part that "[u]pon a determination by the Secretary concerned that a member described in section 1201(c) of this title is unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay ... , the member may be separated from the member's armed force, with severance pay computed under section 1212 ..."

17. The Secretary of Defense has directed that "[t]he [P]DES shall consist of four elements: medical evaluation; physical disability evaluation, to include appellate review; counseling; and final disposition." DODD 1332.18 para. 3.2.

18.  According to Army Reg 635-40, the Army's PDES consists of two primary boards, ¶ 2-10(a) -- the MEB and PEB -- and three "related" boards, ¶¶ 2-11, 2-12, 2-13 -- the APDAB, ABCMR, and ADRRB.

19.  The MMRB is not part of the Army's PDES. (AR 1251 ll. 14-19.)

20.  The Army divides responsibility for the four elements of the PDES (medical evaluation, physical disability evaluation, counseling and final disposition) among four separate entities. Those are the Medical Evaluation Board ("MEB"), the Physical Evaluation Board ("PEB"), the U.S. Army Physical Disability Agency ("USAPDA"), and the U.S. Total Army Personnel Command ("PERSCOM").

21.  General, Flag, and Medical Officers are treated separately from others in the PDES. The Secretary of Defense has instructed that "[a]n officer in pay grade O-7 or higher or a medical officer in any grade shall not be determined unfit because of physical disability if the member can be expected to perform satisfactorily in an assignment appropriate to his or her grade, qualifications, and experience." The Secretary of Defense has further instructed that in the disability evaluation of a General, Flag, or Medical Officer, "the inability to perform specialized duties or the fact the member has a condition which is cause for referral to a PEB is not justification for a finding of unfitness." DODI 1332.38, Encl 3, Part 3, ¶ E3.P3.4.2.

22.  The PEBs do not evaluate Judge Advocates the same as they evaluate General, Flag, or Medical Officers. (AR 1702-1705.)

23.  There are three Army PEBs -- one in Texas, one in Washington state, and one in Washington, D.C. Each PEB is composed of a "PEB President" and two other senior

officers.  The PEBs are supervised by the Commanding General, USAPDA, located in Washington, D.C.

24.   Plaintiff's case went to the Texas PEB. (Compl. ¶ 26-27).

25.   On 11 June 2001, an informal PEB proceeding found Plaintiff to be unfit for continued military service because of his medical and physical impairment. (AR 109); (Compl. ¶ 28-29).

26.   On 13 June 2001, Plaintiff concurred with the findings and recommendations of the PEB and waived his right to a formal hearing. (AR 109.)

27.   On 13 June 2001, the Fort Benning PEB Liaison Officer (Alternate), Ms. Debbie Koons, informed Plaintiff of the PEB results, informed him of his legal rights, and counseled him as required by Army Reg 635-40, Appendix C ("Counseling").  Among other things, she counseled him that the "PEB findings and recommendations are not final until approved for the SA [Secretary of the Army]."  *Id.*, ¶ C-7(e).  Ms. Koons told Plaintiff that his case would still be subject to review and modification by the USAPDA.  She told him that if the USAPDA made no changes, the USAPDA would forward the case to the U.S. Total Army Personnel Command (PERSCOM) for the issuance of discharge orders.  She told him he would know that his disability discharge case was final when he received discharge orders from the Fort Benning U.S. Army Transition Center. *Id.,* ¶ C-7(e)(2); (Compl. ¶ 29).

28.   After the PEBLO counseled Plaintiff, the PEBLO returned his case to the Texas PEB President, in accordance with Army Reg 635-40 ¶ 4-20(d)(2). Thereafter, the Texas PEB approved the 11 June 2001 informal PEB proceeding for the Secretary of the Army, in accordance with Army Reg 635-40 ¶ 4-20(e).

29.     The Texas PEB next forwarded Plaintiff's case to the USAPDA located at Walter Reed Army Medical Center, Washington, D.C.. (AR 1705-1706.)

30.     The USAPDA screens PEB cases before forwarding them for final disposition, in accordance with Army Reg 635-40 ¶ 4-22.

31.     In Plaintiff's case, USAPDA review was discretionary, not mandatory. Army Reg 635-40 ¶ 4-22 (a).

32.     USAPDA review would have been mandatory if Plaintiff was a General, Flag, or Medical Officers, but no such special review rules apply to Judge Advocates' cases. Army Reg 635-40 ¶ 4-22 (a).

33.     The USAPDA approved Plaintiff's 11 June 2001 informal PEB proceeding. Army Reg 635-40 ¶ 4-22(c)(1); (AR 1235 ll. 7-14); (AR 1236 ll. 4-6).

34.     Plaintiff committed no act of fraud or misrepresentation in connection with the evaluation of his physical disability. (AR 109, 113.)

35.     Plaintiff committed no act of fraud or misrepresentation in connection with the 27 September 2000 MMRB, the 29 May 2001 MEB, or the 11 June 2001 informal PEB. (AR 109, 113.)

36.     There was no irregularity in the processing of Plaintiff's case by the 27 September 2000 MMRB, the 29 May 2001 MEB, or the 11 June 2001 informal PEB. (AR 109 ¶ 8.)

37.     On 2 July 2001, the Fort Benning U.S. Army Transition Center, Fort Benning, Georgia, issued Discharge Orders 183-2200 directing that Plaintiff report for separation from the Army on 14 September 2001. (AR 98-99.)

38.     Discharge Orders 183-2200 were validly issued and were not tainted by any fraud. (AR 39 ¶ 6); (AR 109 ¶ 9).

39.   On 3 July 2001, the Fort Benning Transition Center called Plaintiff and told him his orders were ready for pick-up. (Compl. ¶ 31); (AR 109).

40.   The next day, 4 July 2001, was a training holiday.

41.   On the morning of 5 July 2001, Plaintiff called his Judge Advocate technical branch supervisor, Colonel James Quinn, and told Colonel Quinn about Discharge Orders 183-2200. (AR 1494-95); (Compl. ¶¶ 32, 37).

42.   Orders 183-2200 stated: "After processing, you are discharged from the Component shown."  The orders further stated:  "Any temporary commissions or appointments held are terminated."   Orders 183-2200 also stated: "Date of discharge unless changed or rescinded: 14 September 2001."   By their express terms, Orders 183-2200 discharged Plaintiff on 14 September 2001. (AR 98-99.)

43.   Orders 183-2200 show that Plaintiff's Component was the "RA," or Regular Army. Plaintiff was a Regular Army commissioned officer. (AR 98-99.)

44.   When a Regular Army officer is discharged for disability with severance pay, pursuant to 10 U.S.C. § 1203, that officer becomes a "full-fledged civilian," meaning he or she then holds a civilian status without any continued obligation to the U.S. Army Reserves, Individual Ready Reserve, or any other Component of any armed forces.

45.   Orders 183-2200 were issued by the Adjutant General of Fort Benning, Georgia, for the Commanding General of Fort Benning.  (AR 98-99.)

46.   Installation Adjutants General have authority to issue discharge orders on behalf of the Commander, U.S. Army Total Personnel Command ("PERSCOM"). Army Reg 600-8-15, paragraph 1-11b ("Orders are the function of the Adjutant General ...").

47.   Orders 183-2200 were not issued by the USAPDA. These orders could not have been issued by the USAPDA, because the USAPDA is not an orders issuance authority. (AR 38.)

48.   On 13 July 2001, Colonel Quinn and Plaintiff called Lieutenant Colonel David Diner, the JAG Corps Company-Grade Assignments Officer, located at the JAG Corps Personnel, Plans & Training Office (PPTO) in Washington, D.C. They told Diner that Plaintiff's discharge date was September 14, 2001. (AR 413); (Compl. ¶ 38).

49.   Beginning 16 July 2001, PPTO advertised the Plaintiff's slot as an upcoming September vacancy on a website known as the "Weekly Captains Assignments News." There were no other Captains scheduled to leave the Fort Benning Trial Defense Service office anytime in 2001, so other officers in that office surmised Plaintiff was bound to depart in September. (AR 699-700, 1499); (Compl. ¶ 39).

50.   After 13 July 2001, personnel assignments officer Lieutenant Colonel David Diner put Plaintiff's position down on his list as an upcoming vacancy and spoke to other JAGs about that upcoming vacancy. (AR 1601.)

51.   Between late July and the first week of August 2001, two individuals from PPTO, Mr. Bruce Fresh and Colonel Clyde "Butch" Tate, Chief, PPTO, contacted the USAPDA Legal Advisor, Mr. Dennis Brower, (AR 1164, 1166-68, 1236, 1239, 1619-21), and asked Mr. Brower what could be done to keep Plaintiff on active duty, (AR 1501-03, 1643), or words to that effect, because Plaintiff still had a remaining active duty service obligation, (AR 1501-03); (Compl. ¶ 40).

52.   After the initial phone calls between Mr. Dennis Brower and PPTO, Colonel Tate asked then-acting The Judge Advocate General of the Army, Major General John Altenburg, for

guidance regarding Plaintiff's pending disability discharge. (AR 1167-68.) Major General Altenburg directed Colonel Tate to get Plaintiff's disability evaluation case file from Mr. Brower. *Id.* Mr. Brower sent Plaintiff's disability evaluation case file to Colonel Tate. (AR 1168.) Colonel Tate reviewed that file and reported back to Major General Altenburg for further guidance. (AR 1169.)

53. Between 16 July 2001 and 5 September 2001, PPTO sought reconsideration of Plaintiff's "unfit for duty" finding and kept their efforts a secret from Plaintiff.  (Compl. ¶¶ 40-44); (AR 118, 743-44, 1504-08, 2855-2856); (Compl. ¶ 40-41).

54. Sometime between 16 July 2001 and 6 August 2001, Colonel Tate directed Colonel James Quinn, Plaintiff's Judge Advocate technical branch supervisor, not to tell Plaintiff about any action being taken to seek a reconsideration of his "unfit for duty" disability evaluation. (AR 118, 743-744, 1504-1508); (Compl. ¶ 40).

55. Unbeknownst to Plaintiff, Colonel Tate submitted a letter dated 10 August 2001 to the USAPDA regarding the accused's fitness for continued military service. (AR 819-20, 1168-70); (Compl. ¶¶ 46-47).

56. During the time Plaintiff was out-processing, Colonel Quinn instructed his Acting Regional Defense Counsel, Major Martha Foss, to prepare an end-of-service award to be awarded to Plaintiff upon his separation. (AR 1500-1501); (Compl. ¶ 41).

57. On or about 29 July 2001, Colonel Quinn spoke to Plaintiff by phone. Colonel Quinn told Plaintiff he was "just checking up" on him and his family, and how the Plaintiff's plans for civilian life were going. (Compl. ¶ 41.) As directed by Colonel Tate, Colonel Quinn did not inform Plaintiff of PPTO's interest in reversing Plaintiff's disability discharge. (AR 118, 743-744, 1504-1508); (Compl. ¶ 41).

58.   Lieutenant Colonel Pete Zolper became Plaintiff's new Regional Defense Counsel on or about 5 August 2001. (Compl. ¶ 42.) Plaintiff spoke to Zolper on 6 August. Colonel Quinn had earlier instructed Zolper not to tell Plaintiff about PPTO's interest in reversing Plaintiff's disability discharge. (AR 743). However, Zolper mistakenly told Plaintiff that PPTO was "trying to get a re-look board." (AR 743, 1504-08).

59.   Between 6 and 10 August 2001, Plaintiff had several phone conversations with several individuals about the status of his case. Nobody told him Discharge Orders 183-2200 were revoked because in fact they were not revoked. (Compl. ¶ 43-44.)

60.   On 6 August 2001, Colonel Quinn told Plaintiff that Colonel Quinn "didn't know what was going to happen." (AR 1507); (Compl. ¶¶ 43-44).

61.   Between 10 August and 14 September, 2001, nobody told Plaintiff Discharge Orders 183-2200 were revoked because in fact they were not revoked.

62.   Between 2 July and 14 September 2001, Discharge Orders 183-2200 were not revoked and Plaintiff was complying with facially valid orders. (AR 39, ¶¶ 4, 6); (AR 109, ¶ 9); (AR 113, n.32); (AR 110, ¶ 11); (Compl. ¶¶ 48, 55).

63.   Between 2 July 2001 and 14 September 2001, Discharge Orders 183-2200 were never rescinded or revoked by the Fort Benning Transition Center. (AR 39 ¶ 4, 135-36, 440, 744, 1837-39, 1864); (Compl. ¶¶ 48-50, 55).

64.   The Plaintiff did not do anything that contributed to the Fort Benning Transition Center's actions in not rescinding or revoking Discharge Orders 183-2200. (AR 113, ¶ 2.)

65.   The USAPDA is not an orders issuing authority. Between 2 July 2001 and 14 September 2001, only the Fort Benning Adjutant General could issue an order rescinding or revoking Discharge Orders 183-2200. (AR 38.)

66.    On 10 August 2001, Dennis Brower, the USAPDA's Legal Advisor, called a Lieutenant Colonel Mark Sposato and asked Lieutenant Colonel Sposato about Plaintiff's duty performance. (AR 2857.) Dennis Brower asked Lieutenant Colonel Sposato if Plaintiff could continue to sit behind a desk despite his physical disability. Lieutenant Colonel Sposato informed Dennis Brower that although Plaintiff could no longer run, he could still sit behind a desk. *Id.*

67.    Plaintiff's colleague testified that Plaintiff, during all of August, showed "uneasiness and not knowing what was going to happen." (AR 1985-1986.)

68.    During August Lieutenant Colonel Zolper was unaware if any further action had occurred in Plaintiff's disability evaluation case. (AR 1656-57.)

69.    Plaintiff told Colonel Quinn on or about 30 August 2001 that his discharge orders had not been revoked. (Compl. ¶ 45); (AR 1516-18).

70.    On 30 August 2001, a second PEB reconsidered the findings of the first PEB and found Plaintiff fit for duty, based on Colonel Tate's 10 August 2001 letter, Plaintiff's two most recent Officer Evaluation Reports, and a Memorandum for Record by Dennis Brower, the USAPDA's Command Legal Advisor, memorializing his 10 August 2001 phone conversation with Lieutenant Colonel Mark Sposato.

71.    The new evidence considered by the second PEB was not new medical evidence.  It was non-medical evidence.  There was no evidence questioning Plaintiff's medical condition and his physical limitations. This is commonly referred to, in the disability evaluation community, as "performance data."  (Compl. ¶ 47.)

72.    On 5 September 2001 the Fort Benning PEBLO, Ms. Kathryn Sneddon, notified Plaintiff of the 30 August 2001 PEB. (AR 101.)

73.   On 5 September 2001 Plaintiff told the PEBLO his orders had not been revoked and that he was still outprocessing. (AR 1915-1916.)  The PEBLO was unable to tell Plaintiff what legal effect the 30 August 2001 PEB had on Orders 183-2200 (AR 1915-1916.) The PEBLO advised Plaintiff he could concur or non-concur with the findings of the 30 August 2001 PEB. (AR 101, 141-144); (Compl. ¶¶ 61-65).

74.   Plaintiff indicated that he non-concurred with the 30 August 2001 PEB and that he intended to submit a written appeal.  The PEBLO advised Plaintiff to submit his appeal to her not later than 17 September 2001. (AR 101); (Compl. ¶¶ 61-65).

75.   The "fit for duty" finding of the 30 August 2001 PEB was a recommendation or proposed modification of the "unfit for duty" finding of the 11 June 2001 PEB. (AR 1714.)

76.   The 30 August 2001 PEB was not final as of 14 September 2001. (AR 39.)

77.   By letter dated 13 September 2001, the accused's lawyer informed the Texas PEB President that he had advised Plaintiff to report for separation on 14 September 2001 and that the Plaintiff intended to do so. (AR 289, 326-27, 312-13); (Compl. ¶ 49, 65).

78.   In reporting to the Fort Benning Transition Center for separation on 14 September 2001, the Plaintiff acted in reliance on the advice of legal counsel. (AR 110); (Compl. ¶¶ 49, 55).

79.   Military orders, if valid at the time they are first issued, remain effective and enforceable unless revoked.

80.   Between 2 July 2001 and 14 September 2001, Discharge Orders 183-2200 were never revoked. ABCMR at (AR 39); *see also* (AR 110, 113, 135-36, 138, 440, 442, 744, 1516-18, 1829, 1831-1833, 1837-39, 1864, 1915-1916, 1985-1986); (Compl. ¶¶ 48, 50, 55).

14

81.    In reporting to the Fort Benning Transition Center on 14 September 2001, the Plaintiff was complying with facially valid discharge orders. (AR 39, ¶¶ 4, 6); (AR 109, ¶ 9);  (AR 113, n.32); (AR 110, ¶ 11); (Compl. ¶¶ 55, 65).

82.    On 14 September 2001, in conjunction with his discharge outprocessing, Plaintiff surrendered his military ID card and his wife's military dependent ID card to discharge official Mayra Hernandez, a representative of the U.S. Army Transition Center, Fort Benning, Georgia.  (AR 812-813); (Compl. ¶ 51).

83.    On 14 September 2001, Mayra Hernandez handed Plaintiff a DD Form 214 discharge certificate, a *Certificate of Discharge or Release from Active Duty.* (AR 102); (Compl. ¶ 53).

84.    The DD Form 214 was signed by Coraritta Belser-Nixon, the Chief, U.S. Army Transition Center, Fort Benning, Georgia. (AR 102.)

85.    On 14 September 2001, the Plaintiff did not make any verbal representations to Mayra Hernandez or to Coraritta Belser-Nixon regarding his eligibility for separation. (AR 110 ¶ 15, 135-36, 1837-39, 1864.)

86.    On 14 September 2001, Plaintiff's command at Fort Benning, Georgia, signed him out of its personnel register at 12:19 p.m. for "separation." (AR 2839.)

87.    Between September 14, 2001 and October 1, 2002,  Defendant never re-issued Plaintiff a military ID card. (Compl. ¶ 83.)

88.    After September 14, 2001, Defendant never re-issued Plaintiff's wife a dependent ID card. (Compl. ¶ 83.)

89.    After September 14, 2001, Defendant never re-enrolled Plaintiff, his wife and his two daughters in the DEERS military healthcare system.  Plaintiff never went through any personnel in-processing at any time after September 14, 2001. *See, e.g.,* Compl. ¶ 83.

90.    After September 14, 2001, Plaintiff began a private law practice in Columbus, Georgia. He created the partnership of Araguel & Schaefer, LLP.  (AR 225-234.)

91.    On 29 October 2001, JAG Colonel John Phelps mailed Plaintiff a letter titled "Order to Return to Duty." The letter and attachments ordered Plaintiff to report for duty to the Staff Judge Advocate at Fort Benning, Georgia, at 9:00 a.m. on November 5, 2001. (1372-1386.)

92.    Plaintiff did not comply with the 29 October 2001 letter.

93.    On November 1, 2001, Plaintiff filed a Complaint for Declaratory Judgment and Injunctive Relief in the District Court, Middle District of Georgia. *Schaefer v. White*, 174 F.Supp.2d 1374 (M.D.Ga. 2001). Plaintiff sought a Temporary Restraining Order (TRO) and Preliminary and Permanent Injunctive Relief.  Plaintiff was a resident of Columbus, Georgia, at that time.

94.    In his application for a TRO, Plaintiff sought to have the Article III court determine the validity of discharge #1.

95.    The District Court, Middle District of Georgia, upon the grounds of comity and abstention, declined to rule on the validity of Plaintiff's discharge.

96.    On November 1, 2001, at a hearing before U.S. District Judge Hugh Lawson, government counsel furnished Plaintiff and his attorney a criminal charge sheet. (AR 631-32, 667-69.)

97.    The Government's charge alleged that Plaintiff "did, at or near Fort Benning, Georgia, on or about 14 September 2001, by means of knowingly presenting ORDERS 183-220[0]

16

dated 01 July 2001 authorizing his release from active duty, when in fact he knew those orders were void, procure himself to be separated from the U.S. Army." (2058-2059.)

98.    On November 15, 2001, Plaintiff involuntarily returned to active duty, because the U.S. District Court, Middle District of Georgia, ordered him to do so.

99.    The U.S. District Court, Middle District of Georgia, order obligated Plaintiff to return to military duty *at Fort Benning, Georgia*, as was specified in the Defendant's Order to Return to Duty that was the subject of that TRO litigation. He was assigned to a JAG agency located in Arlington, Virginia, but did not report there for duty. (1381, 1389, 1396.)

100.    On December 3, 2001, Plaintiff's counsel wrote Defendant demanding (AR 2141-42):

a.    That the U.S. Army renounce any claim of personal jurisdiction over Plaintiff except for his physical presence at any pretrial hearing or court-martial. In effect, this request was to treat Plaintiff the same as Article 2(d), UCMJ, 10 U.S.C. § 802(d), treats military reservists during court-martial proceedings. (AR 2141-42)

b.    That Defendant expedite efforts to obtain Plaintiff a military defense counsel. (AR 2141-42)

c.    That Defendant expedite the initiation of the Article 32, UCMJ, pretrial investigation in recognition of Plaintiff's speedy trial rights. (AR 2141-42)

d.    On December 3, 2001, Defendant responded by denying the request set forth in subparagraph (a), above. (AR 2101.)

e.    Immediately after the Defendant denied Plaintiff's request described in subparagraph (a), above, Plaintiff sought the same relief by way of a habeas

petition filed on December 6, 2001, in the Court of Appeals for the Armed Forces (CAAF).  (AR 2107-43.)

101.  On December 5, 2001, Defendant reassigned and reattached Plaintiff *to Fort Myer, Virginia*, placing him under the control of Fort Myer's garrison commander.  He remained assigned to a JAG agency in Arlington, Virginia, but did not report there for duty. (AR 2062.)

102.  After Plaintiff's involuntary return to service, Defendant never sent Plaintiff to Arlington, Virginia, to Fort Myer, Virginia, or to Washington, D.C., to perform military duties (only for legal proceedings).  Instead, Plaintiff was always required to report for duty at Fort Benning, Georgia.(AR 222-23.)

103.  On December 6, 2001, Plaintiff filed his <u>first</u> of three Petitions for Writ of Habeas Corpus.  This first habeas petition was filed in the United States Court of Appeals for the Armed Forces (CAAF), located in Washington, D.C. (AR 2107-43.)

    a.  The named respondent was the Commanding Officer of the U.S. Army Legal Services Agency, located in Arlington, Virginia.  This was the official that initiated the court-martial against Plaintiff.   (AR 2059.)

    b.  The stated issue was "[w]hether, during the pendency of a court-martial where the sole charge is a violation of Article 83, UCMJ, fraudulent discharge, an individual with a facially valid DD-214 can be maintained under military control." (AR 2112.)

    c.  This relief requested was the same as that requested, and then denied, in the exchange of letters between Plaintiff's counsel and Defendant on December 3, 2001 (AR 2141-42, AR 2101.)

104. Defendant amended its charge against Plaintiff on December 7, 2001. (2060-2064, 2269-70.) The amended charge alleged that Plaintiff "did, at or near Fort Benning, Georgia, on or about 14 September 2001, by means of knowingly false representations that he was eligible for discharge from the U.S. Army based on ORDERS 183-2200 dated 2 July 2001, when in fact he knew the basis for those orders had been overturned, procure himself to be separated from the U.S. Army." (AR 2236.)

105. After being returned to military control, Plaintiff signed no document in the capacity of Army Major. (Compl. ¶ 82); (*See, e.g.*, AR 2218-2231, 2812, 2845.)  He filed petitions styled in his name followed by the parenthetical "(Formerly Major, Judge Advocate General's Corps)." (AR 2109, 2115, 2145.) He filed all pleadings and papers in his civilian capacity. (AR 2289, 2327, 2390, 2408, 2411, 2498, 2538, 2578). Documents he signed included the proviso that "[t]his is submitted for administrative purposes only. I do not recognize jurisdiction over me by the US Army. I am a civilian." (Compl. ¶ 82); *see, e.g.,* (AR 2812).

106. In the court-martial case against Plaintiff, the Article 32 investigation began on December 10, 2001. (AR 107-114 -- report); (AR 1458-2055 -- verbatim transcript) The Article 32 Investigating Officer ("IO") was a senior JAG lawyer.

107. The Article 32 included two days of hearings, one on January 15, 2002, at Fort McNair, Washington, D.C., (AR 115-134 summarized transcript, AR 1458-1813 verbatim transcript), and one on January 23, 2002, at Fort Benning, Georgia, (AR 134-149 summarized transcript, AR 1814-2055 verbatim transcript).

108.   On January 18, 2002, between the two Article 32 hearings, the Court of Appeals for the Armed Forces (CAAF) summarily denied, without analysis or opinion, Plaintiff's <u>first</u> Petition for a Writ of Habeas Corpus (first of three).  (AR 2107-08.)

109.   On January 24, 2002, Plaintiff filed a <u>second</u> Petition for Writ of Habeas Corpus, this time with the Army Court of Criminal Appeals (ACCA), located in Arlington, Virginia. (AR 2144-2206.)

   a.   The named respondent was the Fort Myer, Virginia, Garrison Commander.  This was the command to which Plaintiff was reassigned on or about December 5, 2001.   (AR 2145, 2206.)

   b.   The stated issue was "[w]hether, during the pendency of a court-martial where the sole charge is a violation of Article 83, UCMJ, fraudulent discharge, an individual with a facially valid DD-214 can be maintained under military control." (AR 2150.)

   c.   The stated issue was the same as Plaintiff's first Petition for Writ of Habeas Corpus, except that it was now raised in a different court and against a different respondent.

110.   On February 5, 2002, the Article 32 investigation concluded there was no probable cause to believe Plaintiff fraudulently procured his discharge. (AR 114).

111.   On February 5, 2002, the Article 32 concluded that the charge should be dismissed and that no court-martial should be convened.  The Article 32 Investigating Officer found, *inter alia*, that, (AR 107-114):

a.    "When the [Plaintiff] reported for separation processing, he did so in accordance with orders that had been lawfully issued and which remained in effect at the time of his separation."

b.    "…the Army's attempted revocation of [Plaintiff's] separation orders on 18 September 2001, four days after his separation, was a legal nullity."

c.    "…the investigation did not establish reasonable grounds to believe that [Plaintiff] knowingly misrepresented or deliberately concealed a certain material fact or facts about his eligibility for separation."

d.    "…the allegation that [Plaintiff] knew that basis for his separation orders 'had been overturned' at the time he presented himself for separation is unsupported as a matter of both law and fact."

e.    "The investigation did not reveal evidence that [Plaintiff] committed any act of fraud in the processing of his medical separation case."

f.    "I conclude that reasonable grounds do not exist to believe that [Plaintiff] committed the offense alleged."

112.    On February 11, 2002, Plaintiff filed a Reply Brief in the Army Court of Criminal Appeals (ACCA) to supplement his habeas petition. (AR 2204-05.)

a.    This supplement showed ACCA the Article 32's no probable cause finding; and,

b.    It attached a copy of the Article 32 report of investigation; and,

c.    It averred and argued "Without analysis Respondent has concluded that relief will undermine good order and discipline and increase the risk of flight … Petitioner is not a flight risk."

113.  On February 15, 2002, the Army Court of Criminal Appeals (ACCA), summarily denied, without analysis or opinion, Plaintiff's <u>second</u> Petition for a Writ of Habeas Corpus. (AR 2206.)

114.  On or about February 20, 2002, after the Article 32's finding of no probable cause, Plaintiff again refused to return to Fort Benning. (AR 2218-2231.)

115.  On February 22, 2002, Defendant threatened to apprehend Plaintiff and place Plaintiff in pretrial confinement if Plaintiff did not report to Fort Benning by 9:00 a.m. on Monday, February 25.  (AR 2218-2231.)  Plaintiff involuntarily returned to duty. (AR 2218-2231.)

116.  After the no probable cause determination on February 5, 2002, and until October 1, 2002 (discharge #2), the Army continued to hold Plaintiff in the armed forces under military control.

117.  Between September 14, 2001, and October 1, 2002, Plaintiff tried to continue his law practice despite the Army's protestations. (AR 2229.)

118.  On February 24, 2002, Plaintiff's counsel wrote the Commanding General, U.S. Army Military District of Washington -- the Army commander asserting military control, custody, and court-martial jurisdiction over Plaintiff at the time. (AR 2225-27, 2230-31.) In that letter, Plaintiff's counsel:

   a.  notified Major General James Jackson that the Army's continued custody and court-martial of Plaintiff amounted to malicious prosecution;

   b.  warned General Jackson of Plaintiff's viable cause of action for malicious prosecution, citing both Georgia state law and federal law on that topic.

   c.  asked General Jackson to seek his Article 34 Pretrial Advice from someone other than his then Staff Judge Advocate Colonel Mortimer Shea. (AR 2227.)

119.  On February 26, 2002, Colonel Stephen J. Harper (retired), told Plaintiff and his civilian defense counsel that Major General John Altenburg, The Assistant Judge Advocate General of the Army, was interested in using Plaintiff's case to "send a message" to other Judge Advocates, and further that Major General Altenburg's interest in Plaintiff's case had been communicated down to other senior leaders in the JAG Corps.  Colonel Harper's expected testimony was reduced to writing in the exchange of letters at (AR 2458-2463). That evidence was added to another individual's affidavit, (AR 2465-66), and a defense motion to compel depositions, (AR 2467-2497), and a defense motion to dismiss for unlawful command influence and/or vindictive prosecution, (2411-2417.)

120.  On March 1, 2002, the Staff Judge Advocate for the Military District of Washington ("MDW SJA"), Colonel Mortimer Shea provided the Commanding General, Military District of Washington, with an Article 34, UCMJ, pretrial advice memorandum recommending referral of the charge to a court-martial.  (AR 2234.)

121.  On March 1, 2002, the Commanding General referred the charge to the general court-martial he had convened. (AR 2235-37.)

122.  On March 13, 2002, Plaintiff was arraigned before a U.S. Army Military Judge, (2239-2280), and the following events occurred during the hearing:

    a.    The U.S. Army Military Judge recused himself from the case for perceived conflicts. (2239-2280.)

    b.    According to the judge, the perceived conflict stemmed from the fact that the U.S. Army Trial Judiciary fell under the administrative supervision of the same JAG department that had charged Plaintiff.  (2239-2280.)

23

c.   The judge informed the parties that the Army's Chief Trial Judge determined, prior to the arraignment, that all U.S. Army Trial Judges were conflicted from hearing the case.  (2239-2280.)

d.   The Army's Chief Trial Judge, prior to the arraignment, had contacted the Navy's Chief Trial Judge and requested that the Navy's Chief Trial Judge appoint a Naval Service judge to the case. (2239-2280.)

e.   A Marine Corps judge was assigned to the case pursuant to that request. (2239-2280.)

f.   Questioning by defense counsel suggested the Army's Chief Trial Judge had not considered requesting an Air Force judge.  She also did not consider requesting the Department of Defense General Counsel to locate a judge from among all other services.  (2239-2280.)

123.   On March 29, 2002, Plaintiff's counsel sought to voir dire the Marine Corps judge and did so.  The Marine Corps judge provided his knowledge of his appointment to the case. Upon being asked to recuse himself, he refused. (AR 2661-2729, 2369-2388.)

124.   Between November 15, 2001, and the end of March, 2002, the Government denied Plaintiff's six separate requests for conflict-free detailed military counsel and individual military counsel, including a request submitted for two different Air Force JAGs. (2066-2099, 2486-87, 2491.)

a.   In early April, 2002, the Military Judge ordered the Government to find a conflict-free military defense counsel.

b.   On April 8, 2002, the court martial convening authority, the Commanding General, Military District of Washington, submitted a request to The Judge

24

Advocate General of the Army (TJAG) asking the Army TJAG to find a conflict-free JAG to detail to Plaintiff's defense. (AR 2097.)

c.    On April 17, 2002, a United States Air Force JAG was detailed to Plaintiff's defense. (AR 2099.)

125.   On or about May 7, 2002, the Office of The Judge Advocate General detailed a JAG from its own office to second-chair the Military District of Washington's prosecution team.

126.   On May 7, 2002, Plaintiff filed a <u>third</u> Petition for Writ of Habeas Corpus.  (AR 2283-2322.) This third Petition for Writ of Habeas Corpus was filed in the Court of Appeals for the Armed Forces (CAAF).  The named respondent was the United States of America. This petition sought an order permanently removing Plaintiff from military control, declaring Article 3(b), UCMJ, 10 U.S.C. § 803(b), unconstitutional on its face, and declaring Article 3(b), UCMJ, unconstitutional as applied to Plaintiff.

127.   The Marine Corps judge set the trial to begin on June 17, 2002.

128.   On May 24, 2002, Plaintiff filed a Petition in the United States Court of Appeals for the Armed Forces (CAAF) styled as a "Petition for Extraordinary Relief, Writ of Prohibition and for a Stay of Proceedings."  (AR 2326-2388.)  Plaintiff sought an order prohibiting the Marine Corps judge from presiding over the court-martial and directing the Secretary of Defense or his designee to appoint a military judge.

129.   On May 31, 2002, the Court of Appeals for the Armed Forces (CAAF), summarily denied, without analysis or opinion, Plaintiff's <u>third</u> Petition for Writ of Habeas Corpus relating to the constitutionality of Article 3(b), UCMJ.  (AR 2283.)

130.   On June 18, 2002, the Court of Appeals for the Armed Forces (CAAF), summarily denied, without analysis or opinion, Plaintiff's "Petition for Extraordinary Relief, Writ of

Prohibition and for a Stay of Proceedings" relating to the Marine Corps judge. (AR 2326.)

131.   Plaintiff was issued a General Officer Memorandum of Reprimand (hereinafter "GOMOR"), (AR 2810-2812, 2804-09, 2813-15, 390-405), and an adverse Officer Evaluation Report (hereinafter "OER"), (AR 2840-50).

132.   Plaintiff's return to the Fort Benning military reservation on November 15, 2001, was compelled by U.S. District Judge Hugh Lawson when he decided Plaintiff's discharge would be reviewed by the military court system instead of his Court. *Schaefer v. White*, 174 F.Supp.2d 1374, 1384 (M.D.Ga. 2001).

133.   In all of Plaintiff's various Petitions for Habeas Corpus, Injunctive Relief or other Extraordinary Relief, Plaintiff appeared in his capacity as a civilian ("Malcolm G. Schaefer, Formerly Major, Judge Advocate General's Corps, Petitioner").  Plaintiff stated he was a civilian, a discharged ex-servicemember, and that he returned to military control involuntarily to avoid threatened arrest and because of the U.S. District Judge's denial of his application for TRO. (AR 2107-23, 2145-88, 2204-06.)

134.   On May 27, 2002, Plaintiff submitted a Resignation for the Good of the Service in Lieu of Court-Martial (RFGOS) including the proviso: "Because of my unique circumstance, I have been advised by counsel to include in this document that I have not voluntarily submitted to jurisdiction over me by the United States Army."  Plaintiff did not refer to himself as "Major" anywhere in the document. (AR 2949 ¶ 6.)

135.   While the RFGOS was filtering through command channels to the decision maker,[41] Plaintiff's civilian defense counsel submitted a second request asking the decision maker to ignore the RFGOS and instead to declare the September 14, 2001, DD-214 legal and binding upon the Army. (AR 1451-57, 2768-72.)

136.   Plaintiff's civilian defense counsel told the decision maker:

> "[Plaintiff's] separation was according to law and should be affirmed.  In addition prior to separating Mr. Schaefer sought the advice of two experienced civilian counsel both of whom advised him that he could follow his unrevoked and validly existing orders. We ask that you declare his separation on 14 Sep 01 legal and binding upon the Army." (AR 1451 ¶ 1, 2768.)

137.   One week later, Plaintiff's military defense counsel wrote the decision maker again asking the following, (AR 2773-2780):

> "3.   We ask that you consider these matters in reaching your decision on Malcolm Schaefer's case.  While we recommended our client submit a resignation in this case, we did so that someone outside the Army Judge Advocate's Corps would look at the case. To put a stop to this seemly endless string of actions against our client, we ask that you determine that his separation on September 14, 2001 was valid *instead of ruling on the resignation*."   (AR 2957, 2778) (emphasis added).

138.   On July 10, 2002, while Mr. Schneider was away on vacation, his assistant legal counsel emailed Plaintiff's military defense counsel for clarification and understanding of the two letters to Karl Schneider described above. (AR 2773-2780.)  In the email from Assistant Legal Counsel, Army Review Boards Agency, to various recipients, he stated:

> "I just wanted to be sure that it was clear, and that any requests or expectations were 'on the record.'  Regardless of the decision on the resignation (and the request), issues outside the purview of

---

[41] The decision maker, by regulation, was the Office of the Assistant Secretary of the Army for Manpower & Reserve Affairs (Director, Army Council of Review Boards).

ARBA appear likely to linger for both parties, so a clear record is in everyone's interest." (AR 2775.)

139. To this email, Plaintiff's military defense counsel responded:

"Malcolm Schaefer through his attorneys specifically intended that the correspondence be considered as a request for a ruling by the Secretary of the Army, or an appropriate designee, this his 14 September 2001 separation from the United States Army was valid. It is our understanding that Mr. Schneider in his capacity as head of the Army's Board for Military Corrections could make this ruling. However, if the decision is not within his purview, we request that it be forwarded to the appropriate person within the Office of the Secretary for a decision." (AR 2776.)

140. Plaintiff's counsel never received a response from the Secretary of the Army on the substituted request.

141. No Government official ever told Plaintiff or his attorneys that a RFGOS would not be received, processed, or approved unless Plaintiff waived his dispute over jurisdiction.

142. No Government official ever told Plaintiff or his attorneys that a RFGOS would only be received, processed, and/or approved if there was an understanding between all parties that the RFGOS would be officially recognized as a submission by Plaintiff to military control.

143. No Government official ever told Plaintiff or his attorneys that Plainiff's RFGOS would be officially recognized as a submission by Plaintiff to military control.

144. No Government official ever told Plaintiff or his attorneys that a RFGOS would not be received, processed, or approved, if at the same time Plaintiff denied his status as a servicemember.

145. Between May 29, 2002, and June 7, 2002, the RFGOS was transmitted together with recommendations and case documents, from the Fort Myer Headquarters Battalion,

through the Commanding General, Military District of Washington, through the Commander, PERSCOM, to the Deputy Assistant Secretary, Military Review Boards Agency. (AR 2762-2767.)

146. While the RFGOS was filtering through command channels to the decision maker, the Chief of the Army's Civil Litigation Division, Colonel Uldric Fiore, advised the decision maker by way of a 3-page legal opinion not to accept the RFGOS as worded. (AR 2798-2801.) In that letter, Colonel Fiore made the following statements:

a. "(d) … Hypothetically, if Schaefer is truly a civilian, then it begs the question whether a resignation from the service is even possible. Case law suggests that it is not … [citations and discussion omitted] … The court martial in this case derives its jurisdiction from Art. 3(b) of the UCMJ; this limited grant of jurisdiction only extends to cases of fraudulent separation. While this article permits trial, it does not expressly permit a resignation request …"

b. "4. MAJ Schaefer's resignation, if approved in current form, could easily spark another round of civil litigation. The fundamental defects in his RFGOS in lieu of court martial and accompanying paperwork will create significant obstacles in any later civil suit challenging his separation, resignation, or characterization of service. It will also handicap our efforts to obtain reimbursement in a civil lawsuit of the money owed the government. The resignation also does not resolve the legal issue concerning the validity of MAJ Schaefer's 14 September 2001 disability discharge, leaving MAJ Schaefer the latitude to refile his lawsuit in civil court to resolve that issue, and the Army to defend the suit in federal court at the risk of significant adverse policy precedent and money damages."

c.   "5. These inherit problems strike at the actual validity of any separation accomplished by this resignation. The likely consequences of approving this resignation are that MAJ Schaefer will again file suit in U.S. district court, this time challenging the lawfulness of the discharge he obtains as a result of this resignation request. If successful, the resignation in lieu of court martial will be void, and the previous disability discharge will be validated. This in turn will erase his ADSO, all indebtedness to the government, and any recoupment issues for his FLEP education. Approval of this resignation, with its many defects and given the posture of this case in civil litigation and before a military court-martial, substantially increases our civil litigation exposure and risk."

147.   On June 7, 2002, Major General Jackson presented Plaintiff with a written reprimand and required Plaintiff to sign for receipt of the document. (AR 2808-09.)

a.   Plaintiff signed for receipt of the document with the proviso: "I am a civilian and not a servicemember." (AR 2812.)

b.   This reprimand, together with Plaintiff's acknowledgment and assertion "I am a civilian and not a servicemember," were included among the documents transmitted with Plaintiff's RFGOS to the decision maker at the Office of the Deputy Assistant Secretary, Military Review Boards Agency .

148.   On August 9, 2002, the Fort Benning SJA Colonel Dick Gordon completed an Officer Evaluation Report on Plaintiff.  In that OER, the Rater, Deputy Staff Judge Advocate Laurel Wilkerson, stated in her comments, "Throughout this rating period , MAJ Schaefer continued to assert he was a civilian."  Colonel Gordon, in his comment block,

stated "A DA Form 67-9-1 was never completed as this officer continued to assert he was a civilian," and further that "officer refused to sign." (AR 2840-2850.)

149. On October 1, 2002, Defendant issued a second DD-214, this one indicating a general discharge in lieu of court-martial. (AR 1014.)

150. Plaintiff did not present himself to the U.S. Army Transition Center on October 1, 2002. Plaintiff did not sign or receive a copy of this second DD-214. (AR 1014.)

151. The court-martial was dismissed on 14 May 2003. (AR 836-37.)

152. The processing of a RFGOS is governed by Army Regulation 600-8-24 ¶¶ 3-13 and 3-14. The boilerplate RFGOS form is depicted at Army Regulation 600-8-24 Figure 3-4. The continuation of court-martial proceedings pending a RFGOS is additionally governed by Army Regulation 27-10 ¶ 5-17.

153. An enlisted soldier's Request for Discharge in Lieu of Court-Martial is governed by Chapter 10 of Army Regulation 635-200, Active Duty Enlisted Administrative Separations. An enlisted person, when submitting a Chapter 10, must expressly state the following: "By submitting this request for discharge, I acknowledge that I understand the elements of the offenses charged and I am guilty of the charges against me …" Figure 10-1, ¶ 2. An enlisted soldier must admit he is "guilty of the charge." Army Reg 635-200, Chapter 10, Section 10-2(e).

Respectfully submitted,

___/s/_____
Gary R. Myers (157115)
78 Clark Mill Road
Weare, New Hampshire 03281
1-800-355-1095
FAX (603) 529-3009
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MALCOLM G. SCHAEFER,              )
                                  )
        Plaintiff,                )
                                  )        Civil Action No. 1:07-cv-01550 (RJL)
v.                                )
                                  )
THE HONORABLE PETE GEREN,         )
SECRETARY OF THE ARMY,            )
                                  )
        Defendant.                )

**ORDER**

UPON CONSIDERATION of Defendant's Motion for Summary Judgment, Plaintiff's

Cross-Motion for Summary Judgment, the Memoranda in Support of and in Opposition to each

party's motion, Plaintiff's motions to supplement the administrative record, and the entire record,

it is hereby

**ORDERED** that Plaintiff's Cross-Motion for Summary Judgment is GRANTED; and

**FURTHER ORDERED** that Defendant's Motion for Summary Judgment is DENIED;

and it is hereby

**FURTHER ORDERED** that Plaintiff shall be granted relief consistent with this opinion.

Dated this _____ day of _____, 2008,

RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

Copies to:
Counsel for parties via ECF