UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MALCOLM G. SCHAEFER,       )
                                   )
       Plaintiff,          )
                                   )     Civil Action No. 1:07-cv-01550 (RJL)
v.                             )
                                   )
THE HONORABLE PETE GEREN,    )
SECRETARY OF THE ARMY,       )
                                 )
       Defendant.      )

PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-
MOTION FOR SUMMARY JUDGMENT

Gary R. Myers
D.C. Bar 157115
78 Clark Mill Road
Weare, New Hampshire 03281
1-800-355-1095
FAX (603) 529-3009
Attorney for Plaintiff

TABLE OF CONTENTS

*Page*

Standard of Review.................................................................................................. 1

Argument .................................................................................................................. 3

  I.  PLAINTIFF REMAINED "ELIGIBLE FOR DISCHARGE" ON 14 SEPTEMBER 2001 .. 3

  II. PLAINTIFF HAD NO AFFIRMATIVE DUTY TO SPEAK ................................................ 5

  III.  "COMPLIANCE WITH FACIALLY VALID ORDERS IS OF NO LEGAL SIGNIFICANCE" ?? ........................................................................................................... 7

  IV. DISCHARGE #2 VIOLATES STATUTE .......................................................... 7

  V.  DEFENDANT NOW QUESTIONS PLAINTIFF'S DOCTORS........................................ 8

  VI.  DEFENDANT'S NEW COMPANY COMMANDER LETTER THEORY OF FRAUD 10

    A.  The Commander Letter provided accurate information.................................. 11

    B.  The Alpha Company Commander was Plaintiff's Commander for the purposes of physical fitness and medical evaluation.................................................................. 13

    C.  The MMRB and PEBLO instructed the Company Commander to submit the letter...... 14

  VII.  DEFENDANT'S OTHER NEW FRAUD CLAIMS ....................................................... 14

    A.  *Post Hoc* Rationalization, Generally............................................................ 16

    B.  The presumption of regularity cuts both ways .............................................. 16

    C.  The Personnel Records Were Required theory of fraud ................................ 17

    D.  The MMRB theory of fraud ......................................................................... 18

    E.  The PEBLO theory of fraud ......................................................................... 20

  VIII.  DEFENDANT'S REGULATORY JUSTIFICATIONS................................................. 22

  IX.  THE "OBVIOUS ERROR" PRONG OF ARMY REG 600-8-105 ¶ 2-21(E) VIOLATES LONG-STANDING PRECEDENT ....................................................................... 23

  X.  DEFENDANT'S CLAIM THAT DISCHARGE #1 WAS REVOKED AFTER-THE-FACT USING THE FRAUD PRONG OF ARMY REG 600-8-105 ¶ 2-21(E) ...................... 24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MALCOLM G. SCHAEFER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:07-cv-01550 (RJL) |
| v. | ) | |
| | ) | |
| THE HONORABLE PETE GEREN, | ) | |
| SECRETARY OF THE ARMY, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff was discharged twice from the U.S. Army. Either one or neither is valid. Both cannot coexist. If neither is valid, Plaintiff is still in the Army. The case boils down to three questions: (1) Was discharge #1 valid? (2) After discharge #1, were the Army's actions lawful? and (3) Was discharge #2 valid? Question #1 must be answered before question #2 or question #3. The threshold issue in this case is whether Plaintiff's initial separation on September 14, 2001, was a facially valid discharge certificate ("discharge #1"). If it was, nothing that followed matters because Plaintiff no longer was subject to the control of the United States Army. Discharge #1 was final agency action. It was a facially valid DD-214, as Plaintiff outlined throughout § I of his Mem. P. & A. Supp. Pl.'s Cross-Mot. Summ. J. Discharge # 1 was voidable, under 10 U.S.C. § 803(b), but only if Defendant proved fraudulent separation, a felony offense in violation of Article 83, UCMJ, at a court-martial trial. Defendant never did so.

***Standard of Review***

This case is unique because the ABCMR was called upon to review an underlying "final agency action" claim and a threshold jurisdictional challenge. One court observed:

While jurisdictional questions generally should be decided initially and before

> considering the merits, in this case the two issues are so completely interdependent that the jurisdictional issue cannot be decided without deciding the merits. That is so because jurisdiction depends upon status, civilian or military, and that question goes to the merits.

*Huang v. Sec'y of the Army*, 23 F. Supp.2d 1377, 1378 (N.D.Ga. 1998). More exacting scrutiny is useful when the presumption of regularity is rebutted, as when there is evidence of procedural irregularity [1] or where the agency has shown undue bias towards an individual in a case. [2] Both apply here. "[W]hether an agency decision is entitled to deference depends on whether the agency's conclusion is based on factual interpretations or is purely a question of law." *Beverly Enterprises, Inc. v. Herman*, 130 F. Supp.2d 1, 12-13 (D.D.C. 2000) (Urbina, J.), concluding:

> Based on these standards, the court will: (1) review de novo the legal standard used by the agency in deciding the Fourth Amendment claim; (2) review under the substantial evidence standard the factual findings that supported the Board's conclusion that the search does not violate the Fourth Amendment and (3) review de novo the plaintiff's legal arguments under the Fifth Amendment

Regardless of whether the claims in this case should be separated into constitutional and non-constitutional claims, Plaintiff's constitutional claims are cognizable under the APA. A threshold issue is whether Defendant applied Article 3(b), UCMJ, to Plaintiff's situation in an unconstitutional manner, or whether Article 3(b) should not have been applied at all because it is

---

[1] *Sanders v. U.S.*, 594 F.2d 804, 816 (Ct.Cl. 1979) (improper promotion selection procedures) ("the ultimate burden should be on the party whose error and obfuscation of the evidence caused the problem in the first place"); *Smith v. Dalton*, 927 F. Supp. 1 (D.D.C. 1996); *Wilson v U.S.*, 369 F.2d 198, 200 (D.C. Cir. 1966) ("But that presumption of regularity may be overcome, e.g., by a showing that the acts were based on a misinterpretation of statutory law or in violation of prescribed procedures"); *Frizelle v. Slater*, 111 F.3d 172 (D.C. Cir. 1997) (no performance counseling during OER rating period); *Bond v. U.S.*, 47 Fed.Cl. 641 (2000) (Air Force misclassified Reserve duty to preclude active duty retirement benefits); *Doe v. U.S.*, 132 F.3d 1430, 1434 (Fed. Cir. 1997) (improper use of evidence to prove misconduct).

[2] *See, e. g., Central Florida Enterprises v. FCC*, 598 F.2d 37 (D.C. Cir. 1978); *Robinson v. Resor*, 469 F.2d 944, n.3 (D.C. Cir. 1972) (evidence hinting at improper motives for unusually harsh treatment; "Robinson's commander or commanders violated Army regulations in order to keep a good man in for the good of the service."); *Morall v. D.E.A.*, 412 F.3d 165, 167 (D.C. Cir. 2005) (citation omitted) (finding of dishonesty unsupported by record; Deputy Administrator's decision was "stunningly one-sided in its focus and, thus, utterly arbitrary and capricious").

unconstitutional on its face. If either of those is correct, the ABCMR may not rubberstamp the underlying unconstitutional acts of Army personnel. It is the constitutional role and function of the judiciary to interpret the Constitution. *Marbury v. Madison*, 5 U.S. 137 (1803), resolves this issue. The underlying acts of Army personnel prior to ABCMR also violated the other, non-constitutional, APA grounds, and more exacting scrutiny of those underlying acts is appropriate because those acts are dispositive to a question of personal jurisdiction.

*Argument*

I.  PLAINTIFF REMAINED "ELIGIBLE FOR DISCHARGE" ON 14 SEPTEMBER 2001

Plaintiff remained "eligible for discharge" on 14 Sep 01 because Orders 183-2200 had not been revoked and he had not been "flagged," just as Sergeant Vanderbush, in the seminal case of *Smith v. Vanderbush*, 47 M.J. 56, 58-9 (C.A.A.F. 1997), remained "eligible for discharge" because he had not been "flagged" and was pending the expiration of his term of service (ETS) -- e.g., self-executing orders. The Court of Appeals for the Armed Forces found "[t]he reasoning of the court below is persuasive." *Id.*, 47 M.J. at 60. The lower court reasoned:

> [A]rraignment by court-martial does not operate automatically either to restrict a soldier's eligibility for ETS discharge or to limit the actual authority of a properly appointed discharge official to issue a valid ETS discharge. 'Separations will be accomplished by the [transition point by] ... processing the soldier for separation ... per the separation orders issued by the appropriate commander.' [citation omitted]. To limit the authority of the discharge official to issue a valid discharge, the [Court Martial Convening Authority] must do two things: (1) take appropriate action with a view towards court-martial; and, (2) take steps to effectively authorize the discharge authority to withhold the ETS discharge. The method specified in Army regulations for communicating the lawful authority to withhold an ETS discharge is a flagging action with the imprimatur of the [Court Martial Convening Authority]. … Therefore, we hold that the petitioner is a civil person not subject to court-martial jurisdiction for offenses committed prior to his discharge, unless he is later convicted by court-martial of obtaining his discharge by fraud in violation of Article 83, UCMJ, or subsequently re-enlists in the Army.

*Vanderbush v. Smith*, 45 M.J. 590, 598 (A.C.C.A. 1996).

3

Similarly, Coraritta Nixon, Chief, Army Transition Center Fort Benning, was "Authorized to Sign" block 22 of Plaintiff's DD-214. She did. (AR 102.) She testified Plaintiff *did nothing* wrong that contributed to being discharged. (AR 135-36, 1837-39, 1864). Plaintiff's "eligibility" was fixed by Orders 183-2200.[3]  By their express terms, Orders 183-2200 automatically discharged Plaintiff on 14 September 2001 -- e.g., self-executing orders. Ms. Nixon "informed Ms. Baker that I needed some type of documentation in order to revoke his orders and she said, 'OK'," and further that "I [Ms. Nixon] also understand, however, that my office, Transition, could not do anything without proper documentation authorizing me to revoke my transaction." (AR 442, 135-136, 138, 1829, 1831-1833.) When questioned by the Article 32 IO, "Q: How are orders revoked, once a set of orders are issued?," Irene Baker answered "Another order is done, different format." (AR 1583-84.)

Compare *U.S. v. Reid*, 46 M.J. 236, 237 (C.A.A.F. 1996), an Article 3(b) case, where the court noted that the commander correctly "flagged" Reid to suspend "favorable personnel actions such as a medical discharge." *See also U.S. v. Banner*, 22 C.M.R. 510, 514 (A.B.R. 1956), *quoting* Judge Advocate General of the Army Opinion 1953/7621 (5 Oct 1953) which provides:

> . . It may therefore be concluded that the correct rule is that even an official with limited discharge authority, if purporting to act within the limits of the authority granted him, may (in the absence of fraud) validly effect an irrevocable discharge although he has been acting under a mistake of fact [citation omitted] including a mistake of fact which goes to the very essence of the delegated authority. Opinions of this office which indicate a contrary view should no longer be followed. . . .

Defendant adds additional argument that Orders 183-2200 were in fact revoked prior to September 14. That claim is simply not true. Coraritta Nixon testified:

> I did speak to Ms. Baker before 14 September. I spoke with her reference Schaefer. She stated that he would be recalled. I needed the official

---

[3] Which were not revoked prior to discharge #1. Admitted by ABCMR. (AR 39 ¶¶ 4, 6.)

authorization in order to stop processing his case. I never received any information to revoke Schaefer's orders. I cannot recall the exact date received the authorization to revoke his orders. Ms. Baker informed me that Schaefer would be recalled, but because I never received that authorization. I could not stop him from outprocessing. I needed written documentation giving me authorization to revoke his orders. In my opinion, Major Schaefer did not make a mistake. The orders were revoked after the 14th of September because that is when received the authorization to revoke them.

(AR 135-36, summarized transcript) (Ms. Nixon's verbatim testimony is at AR 1821-83). Irene

Baker attempted to delete the authorization coding in TRANSPROC, but admits this would

actually have no effect on the discharge date. (AR 1561) ("Q: So the separation date remained

September 14th? A: Yeah. No, we don't change that.").

## II. PLAINTIFF HAD NO AFFIRMATIVE DUTY TO SPEAK

Even District Judge Lawson struggled with the Army's search for an affirmative duty:

> MR. FLANAGAN: Your Honor, my point is that at that point in time before these orders, that certainly are questionable at this point, that is, the validity of these orders are questionable, at that point in time, the plaintiff knows this, and being an attorney in the Army and also getting an awful lot of education in military law he knows how to resolve --

> THE COURT: Wait a minute, wait a minute. Are you telling me, though, that with respect to the processing of and reaction to orders received by JAG officers that the standard is different for JAG officers than it is for soldiers who are not JAG officers?

> MR. FLANAGAN: No, no, not at all, Your Honor. What it gets to is --

> THE COURT: Because when you're -- you don't seem to disagree with the facts recited by Attorney Myles, you seem to be, arguing to me that the Court should take a different view of the administrative actions of the Army in this case because Major Schaefer was aware that there was a possibility that his orders were invalid.

> MR. FLANAGAN: Your Honor, here's what we're saying. This September 13 letter demonstrates -- demonstrates to the Court that, at best -- well, it proves two things. Number one, that there is a big question mark as to the validity of the first orders. Now, legally he's hired a lawyer who says Major Schaefer the changing orders are not valid; you can go by your first order. But at least there's a question there. But what this letter does establish is that in that time frame,

before he goes to the separation point and gets a DD-214, before that happens, he has an obligation to pursue a remedy to clarify what his status is.

THE COURT: Wait a minute, wait a minute. What do you base that assertion he has an obligation to pursue a remedy to clarify his situation? What is that based on?

MR. FLANAGAN: Your Honor, because he had already been told, he had been informed, and he acknowledged that, that his physical evaluation board, the basis upon which the separation orders were issued, that was reversed.

THE COURT: He had been told that.
MR. FLANAGAN: He'd been told that.

THE COURT: Apparently you, don't disagree with that.
MR. EASTWOOD: No. And we won't disagree that he got the PEB saying he was fit and had 10 days to file a rebuttal.

THE COURT: Now, Mr. Flanagan, what rule says that he has an obligation to clarify his situation? I mean, you may argue that he had a moral obligation to do it, that as a lawyer and an officer and a gentleman declared by the United States Congress he had an obligation to do it, but is there an Army rule that says he had an obligation to do it?

MR. FLANAGAN: Your Honor, I guess -- I feel very confident that I could get some research on this issue, but let me explain. When he goes to that separation point and sits down in front of the government employee who looks in a computer and spits out a discharge order, it would be our contention that at that point in time he has an obligation to raise an issue of, is this valid, because I've been told my PEB is reversed, and the orders have been rescinded or revoked.

THE COURT: Well, I understand you say that, but based on what? Where in the book does it say he has an obligation to raise the point? I mean, this is precisely the thing that Mr. Eastwood was talking about in the *Smith* case, isn't it?

(AR 637-39.)  Compare Mr. Eastwood's later rebuttal at (AR 684):

MR. EASTWOOD: Plaintiff's Exhibit Four is Army Regulation 635-10 on processing people for personnel. I can't cite a page in there because I've gone through it, and I find nothing in that regulation that places a duty on a soldier to say there's something wrong with his discharge. Your Honor had asked earlier who has the burden here. Does the soldier; does the command. Who's suppose to do it. We have submitted that regulation on processing in and out of the service for the proposition as to how it's done, but there's nothing in there that provides a vehicle for what they contend a duty on my client to have spoken out.

### III. "COMPLIANCE WITH FACIALLY VALID ORDERS IS OF NO LEGAL SIGNIFICANCE" ??

With great lack of clarity, Defendant vacillates between describing Orders 183-2200 as revoked, null and void, even fraudulent, almost entirely ignoring that the ABCMR has already conceded that Plaintiff "complied with facially valid discharge orders," (AR 39 ¶ 6), and that "the orders were not revoked," (AR 39 ¶ 4). Defendant finally grapples with this issue by contending that "[c]ompliance with facially valid orders is of no legal significance." (Def.'s Opp. Pl.'s Stat. Material Facts, R. # 44 at 10, ¶ 62.) This opinion contradicts decades, perhaps centuries, of well-settled military law that soldier's must obey orders, with very narrow exception. That law is spelled out at § I (D) of Pl.'s Mem. P. & A. Supp. Pl.'s Cross-Mot. Summ. J.  Most important here, compliance with facially valid orders defeats the *mens rea* element of fraudulent separation -- a specific intent crime.

### IV. DISCHARGE #2 VIOLATES STATUTE

Defendant always had the burden of proof, of persuasion, and of going forward. The Government's argument keeps shifting some kind of burden to Plaintiff to prove lack of jurisdiction and absence of fraud at trial. Plaintiff held a DD-214 and was presumed innocent of the charge. The unique aspect of this case is that because Plaintiff was always presumed innocent of the charge, he was *ipso facto* presumed free from the jurisdiction of the Army.

Article 2, UCMJ, is titled "Persons subject to this chapter" while Article 3 is titled "Jurisdiction to try certain personnel." Article 3(b) offers no jurisdiction other than "to try certain personnel." Defendant asserts it had jurisdiction to administratively separate Plaintiff with a general discharge. Jurisdiction to administratively separate arises under Article 2, because a person must first be a "person subject to this chapter" before he can be separated from being a "person subject to this chapter." An administrative discharge is an affirmative act taken by the

Secretary. The only affirmative act in the Secretary's scope of authority was "to try" Plaintiff.

## V.  DEFENDANT NOW QUESTIONS PLAINTIFF'S DOCTORS

For the first time ever in almost 7 years of litigation, Army lawyers now question the competence and professionalism of Plaintiff's doctors, arguing his doctors had insufficient and inaccurate duty performance information to refer Plaintiff to PEB # 1. (Def.'s Opp. and Reply at 25-29.) In doing so, Defendant ignores that these three doctors included a Major, a Lieutenant Colonel, and a Colonel, who voted unanimously to refer Plaintiff to PEB # 1, whose experience ostensibly included many more MEB's than just Plaintiff's, who were aware of what a JAG does, who performed surgery on Plaintiff's body, who directed and then monitored the course of Plaintiff's physical therapy, who benefited from the second opinions of another orthopedic surgeon and another physical therapist, who over the course of long-term care came to know Plaintiff and his job, whose integrity as medical evaluators had never been challenged, and who understood Plaintiff's medical condition and limitations better than anyone else involved.

Defendant criticizes Plaintiff's medical diagnosis in a chain of logic that concludes Plaintiff committed the offense of fraudulent separation by hiding his performance evaluations and his JAG supervisor from his doctors and by submitting a fraudulent Commander's Evaluation Letter. Plaintiff did not come to this Court to argue his medical condition, but must now show the Court the Commander's Evaluation Letter provided accurate information about Plaintiff's physical limitations. Defense counsel infuse their argument with their own medical opinion. They ignore the medical evidence the MMRB, MEB, and PEB # 1 had, such as:

> [Plaintiff] was followed by me from 28 Jan 99 to 15 Jun 99 following his left knee arthroscopy. His post-operative course was complicated by reflex inhibition of his [VMO] muscle … This residual decrease in function is despite his extraordinary dedication to his rehabilitation and consistency in compliance with all treatment plans. (AR 489.)

[Plaintiff] was a patient of mine from July 1999 - February 2000. His rehabilitation consisted of quad development, flexibility, and patella mobilization … each time we would progress to a more intense functional training (treadmill, running, biking, stairmaster) his response was not positive. His knee cannot withstand the reaction forces involved with running and high impact activities which was displayed through an increase in joint effusion and pain. (AR 491.)

He has been on an aggressive rehabilitation course that has included squatting exercises and leg extension exercises to try to build up his quadriceps. However, he has continued to have some quadricep atrophy and decreased tone in his quadriceps … He also has significant retinacular tightness with essentially no patellar mobility. He also has some retinacular tightness in the left knee, but it is not as severe as the right knee. (AR 486-87.)

Despite long-standing treatment with medications, therapy and rehab the patient has continued to have significant residual weakness of his leg and residual difficulties … [limitations listed] … I think these limitations are permanent. (AR 479.) … He has ½ inch measurable atrophy on the right thigh compared to the left … He has moderate patellofemoral crepitus … His left knee shows some anterior knee crepitus … (AR 480.)

He is in the early stages of bilateral degenerative joint disease and I suspect that osteoarthritis, especially chondromalacial type degeneration in the kneecaps and eventually meniscii will occur … continued active duty especially the physical training requirements will perpetuate his knee problems and possibly exacerbate them … (AR 482-83.)

I think the intrinsic tightness of his retinaculum is increasing a lot of his patellofemoral pressures … he is still giving away a little bit when he steps on his leg … (AR 484-85.)

<u>Importantly, several lay witnesses corroborated this medical evidence</u>:

I thought we would see him again on our lunchtime runs but this was not the case. He had some complications with his recovery and suffered from atrophy of the muscles in his right thigh. At one point, he showed me his right thigh that was noticeably smaller in diameter than the other. Within the last year MAJ Schaefer approached me and asked if he could run with me and another member of the office. We run at a much slower pace over a shorter distance … He indicated his desire to rehabilitate his knees … He would start out with me but fall back almost immediately. He appeared to be in a good deal of pain … He was never able to finish even one mile of these runs. MAJ Schaefer finally admitted defeat and stopped trying to run with us … I have heard a senior military and a senior civilian attorney make

comments critical of MAJ Schaefer's physical abilities with regard to PT. These comments were intended as humorous, however, I saw no humor in criticizing MAJ Schaefer, a former infantry officer … (AR 2855-56.)

I was surprised that CPT Schaefer had a lot of trouble keeping up with me as we walked. He had something of a limp and had to take many breaks … He really did not want to talk about his problem. He struck me as the kind of fellow who will not speak openly about any pain that he is feeling because of his pride as an Airborne-Ranger Officer. It bothered him that he had trouble keeping up with me. I teased him about it a little bit since I was fifty eight years old … (AR 2853-54.)

Defendant refers to acts that were inherent to Plaintiff's medical care -- like seeking a second medical opinion or protecting the privacy of his medical condition -- or inherent to his procedural rights in the disability evaluation process -- like advocating for a finding of unfit for duty -- as acts of fraud. Where is the fraud in those acts? Defendant glosses over the elements of an Article 83, UCMJ, offense. Should thousands of Army soldiers who go through the PDES this year fear exercising their procedural rights or fear getting second medical opinions because some Army lawyer might later argue they fraudulently manipulated the system?

VI.  DEFENDANT'S NEW COMPANY COMMANDER LETTER THEORY OF FRAUD

A central premise to Defendant's new fraud theories is that when Plaintiff went before the MMRB and MEB he submitted a letter from Captain Granville Smith, his local unit commander, but not a letter from his JAG technical supervisor. Further, that the MMRB did not have the required evaluation from Plaintiff's actual commander, his JAG technical supervisor. And, finally, that Plaintiff wrote Captain Smith's evaluation letter, and that it was deliberately misleading. This entire theory -- that Plaintiff fraudulently procured PEB # 1 by submitting a letter from Captain Smith -- implodes when one considers that the content of the letter was accurate, the content of the letter was consistent with what other witnesses saw, and, dispositively, the content of the letter was consistent with what his JAG Supervisor knew. We

also address the allegation that Plaintiff's local unit company commander, Captain Granville

Smith, was not the appropriate person to submit the letter, and, finally, the allegation that

Plaintiff fraudulently substituted Captain Smith to provide the commander's evaluation.

### A.  The Commander Letter provided accurate information

Even if the A Company Commander was not Plaintiff's Commander for the purposes of

the physical disability evaluation, Captain Smith provided only accurate information. Evidence

of that conclusion is provided in five ways: (a) a plain reading of his letter, (b) Captain Smith's

sworn statement about the letter, (c) corroboration by medical witnesses, *supra*, (d) corroboration

by colleagues, *supra*, and (e) corroboration by Plaintiff's JAG Supervisor.

A plain reading of Captain Smith's letter, (AR 477-78), shows the following: Captain

Smith answered each question he was directed to answer in the instruction letter he received.

(AR 863.)[4] Captain Smith accurately portrayed Plaintiff's participation in the unit's physical

fitness training program without exaggeration. (AR 477.) Captain Smith disclosed that Plaintiff

passed the alternate (swim) Army Physical Fitness Test (APFT).

Captain Smith's sworn statement about the letter shows nothing out of the ordinary

occurred in its preparation or content. (AR 1307-09, email version; AR 1310-11 fax version;

1311-13 version as altered by JAG investigator). Captain Smith stated:

> He spoke with me concerning his medical condition and offered to write
> the letter that would be subject to my approval. This is standard
> procedure … He presented the [MMRB] letter to me for review, and
> after review, I signed it because I believed it to be an accurate
> assessment of his situation … He drafted this [MEB] letter as well, and
> presented it to me for review. Upon review of this letter, I again signed
> in good faith because it, too, was an accurate representation of his
> situation … As the OIC of the Trial Defense Service, none of MAJ
> Schaefer's actions seemed inappropriate at that time. I therefore

---

[4] More specifically, AR 2867-68 if this Court grants Plaintiff's Motion to Reconsider Based
Upon New Facts [under Fed. R. Civ. P. 54 (b)] filed contemporaneously with this Reply brief.

performed all of the above stated actions in good faith.

The JAG Corps' internal investigator persuaded Captain Smith to change his statement to add the last paragraph including derogatory information, (1312-1313), when Captain Smith's original statement, (AR 1309), contained no derogatory information.

Astonishingly, every Army reviewing official and counsel in this case has overlooked the fact that Plaintiff's JAG Supervisor, Lieutenant Colonel (LTC) Mark Sposato, substantially agreed with the contents of Captain Granville Smith's letter -- and told this to the USAPDA! He told the USAPDA Legal Advisor:

> Brower said your file went to the PEB without branch input, which in the case of Docs and lawyers is highly unusual. He asked about your limitations, and I told him about our discussions, as well as all that you had done to resolve the situation. Bottom line -- I told him that although you could not run, you could still sit behind a desk. That was all he was looking for.

(AR 2857.) Even if Plaintiff's JAG technical supervisor had submitted the letter, all evidence points to the conclusion that his letter would not have been different. Defendant has never produced any evidence to the contrary, even though it had every opportunity to call LTC Sposato as a witness or obtain a sworn statement from him during its internal investigation.

Plaintiff never portrayed himself as not being capable of continuing to sit behind a desk. Neither did Captain Smith or LTC Sposato. Neither the MMRB, MEB, nor PEB # 1, were fooled into believing Plaintiff was incapable of desk duty. It follows that the MMRB, in a 5-0 vote, decided that the ability of a Judge Advocate to perform desk duty alone did not satisfy:

> Current Army Policy [which] requires that a soldier be capable of performing the duties of his or her office, grade, rank, or rating under worldwide field conditions … In order to perform in a worldwide field environment, soldiers should be reasonably capable of accomplishing basic soldier physical tasks.

Army Reg 600-60 ¶ 2-1(b). It follows PEB # 1, in a 3-0 vote, decided the ability of a JAG to perform desk duty alone did not satisfy the standard that a soldier be "physically fit to perform the duties of the soldier's office, grade, rank, or rating." Army Reg 635-40 ¶ 4-19(a)(1).

### B. The Alpha Company Commander was Plaintiff's Commander for the purposes of physical fitness and medical evaluation

Captain Smith answered each question he was directed to answer in the instruction letter addressed to him personally. (AR 863.) [5] He answered questions that could not have been answered by Plaintiff's JAG Supervisor. Plaintiff's JAG Supervisor could not have answered questions about Plaintiff's weapons qualification ratings, his sick call attendance, his performance at daily physical training workouts. (AR 863.) Captain Smith answered these questions based upon his personal knowledge. Plaintiff's JAG technical supervisors were located hundreds of miles away from Fort Benning, saw Plaintiff very infrequently if at all, and had no personal knowledge about these questions. That fact alone suggests that the Alpha Company Commander, Plaintiff's local unit commander, was Plaintiff's commander for the purpose of physical fitness and medical evaluation. The PEBLO went to other Fort Benning directorates, not to the JAG Corps, to generate the file that went before PEB # 1. (AR 861.)

Defendant contends that Plaintiff's JAG technical supervisors were required to submit the Commander's Evaluation for the MMRB and PEB # 1. That is inconsistent with the Army Regulation that created the division between Plaintiff's local unit command and the U.S. Army Legal Services Agency (Plaintiff's JAG technical supervisory chain).

> Commanders of installations selected as duty stations for USATDS counsel will provide administrative and logistical support for USATDS personnel including, but not limited to -- … b. Maintenance of financial records …

---

[5] AR 2867-68 if this Court grants Plaintiff's Motion to Reconsider Based Upon New Facts.

> c. Maintenance of military personnel records, officer qualification records, leave records, Standard Installation/Division Personnel System (SIDPERS) responsibilities, <u>and similar personnel requirements</u>."

Army Reg 27-10, Military Justice (24 June 1996), ¶ 6-4. (emphasis ours).  A soldier's health record is a military personnel record.  Thus, a health-related administrative matter, such as a soldier's processing through the Physical Disability Evaluation System (PDES), would fall under Plaintiff's Fort Benning installation command, not under the U.S. Army Legal Services Agency (USALSA) -- Plaintiff's JAG technical supervisory chain -- located in Arlington, Virginia.

Further evidence that the local unit commander is the relevant commander for a JAG medical board is the following: Discharge orders must only be sent to PPTO if a JAG is being separated because of *nonselection for promotion*. Army Reg 600-8-105, Figure 5-6, Format 501, n.25. Disability discharge orders are not required to be sent to the JAG PPTO.

<u>C.  The MMRB and PEBLO instructed the Company Commander to submit the letter</u>

Plaintiff was not told to choose who would submit the commander letter. Captain Smith received instructions, first from the MMRB and then from the PEBLO, to submit the letter. (AR 863.) [6] All notifications between the hospital, the MMRB, and the PEBLO were specifically addressed to the Commander, Company A, 1st Battalion, 11th Infantry Regiment, namely, Captain Smith. (AR 863.) Those notifications expressly instructed Captain Smith to perform certain functions relative to Plaintiff's medical review board. (AR 863.) Those instructions outlined the expected content of the commander's evaluation letter. (AR 863.)

VII.  DEFENDANT'S OTHER NEW FRAUD CLAIMS

We apply the proper standard of review, which required the Secretary to support a finding of fraudulent separation, in violation of Art. 83, UCMJ, with substantial evidence.

---

[6] AR 2867-68 if this Court grants Plaintiff's Motion to Reconsider Based Upon New Facts.

Plaintiff argued this point extensively at § II (pp. 30-40) of his Mem. P. & A. Supp. Pl.'s Cross-Mot. Summ. J. Defendant ignored a mountain of exculpatory evidence in favor of (a) cherry-picking alleged half-truths,[7] (b) interpreting acts that were a normal part of the process or that were the Army's own mistakes as having been acts of deception by Plaintiff, (c) speculating what others would have done without having obtained evidence of same, and (d) speculating different outcomes in the PEB # 1 process.

In a vacuum of evidence, the Army now contends Plaintiff committed the offense of fraudulent separation by knowingly false representations to his doctors, to the MMRB, to PEB # 1, and, lastly, on 5 September 2001, nine days before his scheduled separation, to his PEBLO. (Def.'s Opp. and Reply at 18-19, 22-29.) The Government never sought the testimony or a sworn statement from any doctor, voting member of the MMRB, or staff member of the MMRB. By contrast, Plaintiff called as witnesses the President of PEB # 1 and a voting member of PEB # 1. Colonel Williams' testimony was brief, (AR 1756-64), but the Government elicited zero evidence from him on the elements of fraudulent separation.[8] Lieutenant Colonel Tittle discussed PEB # 1 at length, and he testified they had everything they needed to make their "unfit for duty" decision, that there was no defect in the proceeding. (AR 1702-07, 1717-18, 1728-30.)

Plaintiff's counsel pointed out once before, when JAG Corps operatives sought relentlessly to smear Plaintiff's character … "No mention is made of the fact in April [2002] Colonel Shea [Military District of Washington Staff Judge Advocate] agreed to a resolution in this case that included Malcolm Schaefer continuing on active duty for more than a year as a

---

[7] Defendant alternatively describes this cherry-picking as having "conducted its own independent analysis of the Article 32, UCMJ, hearing and extracted the most relevant evidence regarding the claims in [Plaintiff's] application." (Def.'s Opp. and Reply at 30.)

[8] COL Williams' only other evidence is a 20 Sep 01 letter to Plaintiff's counsel acknowledging a 13 Sep 01 letter informing him of Plaintiff's position regarding PEB # 2. (AR 289, 312-13.)

judge advocate." (AR 2777.) If they thought Plaintiff was so bad, why did they want Plaintiff to continue serving in the JAG Corps ?

### A.  *Post Hoc* Rationalization, Generally

When it charged Plaintiff with the crime of fraudulent separation, the Government set down its theory of the fraud … that Plaintiff did, "by means of knowingly false representations that he was eligible for discharge from the U.S. Army based upon ORDERS 183-2200 dated 02 July 2001, when in fact he knew the basis for those orders had been overturned, procure himself to be separated from the U.S. Army." (AR 2269.) Four years later, the ABCMR invented a new theory of the fraud. It decided Plaintiff committed a "sin of omission" by "concealment of the truth concerning his situation." (AR 39 ¶ 6.) "Had he been honest on 14 September 2001 to the separation officials, he would not have been discharged." *Id.* While the ABCMR was itself guilty of *post hoc* rationalization, Defendant's new theories surpass the ABCMR.

Counsel's *post-hoc* rationalizations cannot substitute for the agency's reasons. *See, e.g., Matlovich v. Secretary of the Air Force*, 591 F.2d 852, 860-61 n.20 (D.C. Cir. 1978). *Post-hoc* rationalizations are especially unavailing where, as here, the agency has so clearly indicated reliance on a different rationale, *Carlton v. Babbit*, 900 F.Supp. 526, 531 (D.D.C. 1995), namely, the offense as Defendant charged it. The Army "is not entitled to a second [and third] bite of the apple just because it made a poor decision—if that were the case, administrative law would be a never ending loop from which aggrieved parties would never receive justice." *McDonnell Douglas Corporation v. NASA*, 895 F. Supp. 316, 319 (D.D.C. 1995).

### B.  The presumption of regularity cuts both ways

Defendant asks this Court to apply a presumption of regularity to every act by every employee that touched Plaintiff's case beginning with PEB # 2, but then ignores the presumption

also applies to the MMRB, MEB, PEB # 1, Orders 183-2200, and discharge #1. Defendant must provide "cogent and clearly convincing evidence" sufficient to "overcome the presumption that military administrators discharge their duties correctly, lawfully, and in good faith." *Stem v. England*, 191 F. Supp.2d 1, 3 (D.D.C. 2001). Plaintiff has done that. Defendant has not.

### C.  The Personnel Records Were Required theory of fraud

In one new fraud theory, which itself springs from a regulatory argument, Defendant misrepresents the content of Army Reg 635-40. Defendant first argues that personnel records like Plaintiff's performance evaluations had to be submitted to PEB # 1. Defendant then argues that Plaintiff intentionally failed to submit those performance evaluations. Defendant extrapolates that Plaintiff deliberately misled the MMRB and PEB # 1 by failing to submit his performance evaluations. (Def.'s Opp. and Reply at 24-25) ("When this letter is compared with Plaintiff's OER's for the same time period, the fraudulent taint is readily apparent.").

Defendant first states that the PEB must consider a soldier's case "by reviewing the MEB results and all of the soldier's medical and *personnel records*." (Def.'s Opp. and Reply at 17) (Defendant's emphasis). Here, Defendant cites Army Reg ¶ 4-20(a). That section, ¶ 4-20(a), says nothing about personnel records, and it certainly does not place any duty on Plaintiff to submit personnel records. In the undersigned counsel's nearly 40 years of military law practice, there has never been any suggestion that a soldier has a duty to submit performance evaluations. By contrast, the regulation expressly provides that a soldier "may provide additional information to the MTF commander to forward to the PEB. The information may be from the unit commander, supervisor, or other persons who have knowledge regarding the effect the condition has on the Soldier's ability to perform the duties of the office, grade, rank, or rating." *Id.* at ¶ 4-13(b).

17

All these new fraud theories are a continuation of the "No JAG Input Red Herring" Plaintiff discussed at § X of Pl.'s Mem. P. & A. Opp. Def.'s Mot. Summ. J.  A voting member from PEB #1 describes the difference between reviewing a doctor and lawyer at the PEB:

> Q. I'd just like your interpretation of how the board applies the standard.
> A. .... And I think that we, in a lot of cases there will ask that if we have a commander, say a headquarters company commander that signed off on the commander's letter that says this guy can't perform his medical duties, then we go and ask, okay, where is that medical supervisor? You know, this doctor definitely works for another doctor. We want something more because we're looking at a specialized field. And I can't recall the last general officer I voted, but you know, medical officers we see come through here, medical and dental. But the medical officers, we usually ask for a medical supervisor's, you know, statement as far as his capabilities to perform his medical duties.
> Q. But you don't do that with JAG officers.
> A. No, sir, it's not required under the [Army Regulation].
> Q. Because it's not in the reg.
> A. Yes, sir.

(AR 1704-05.)  Defendant applied a different standard to Plaintiff after PEB # 1. Defendant goes a step further now and contends that since Plaintiff's case was supposed to be judged like a doctor's case, and since Plaintiff kept the JAG Corps out of the loop, then Plaintiff fraudulently procured PEB # 1. But that is not the law and PEB # 1 should be judged on the law as it existed at the time. We will not debate whether it is smart or dumb. It was the law of Plaintiff's case.

### D.  The MMRB theory of fraud

The MMRB regulation does not require a JAG voting member. It requires a JAG voting member, senior to the respondent, only "if reasonably available." Army Reg 600-60 ¶ 3-2(e). Defendant speculates that a JAG senior to Plaintiff was reasonably available. There is no evidence of that fact in the record, and there never was. Without ever determining that a JAG senior to Plaintiff was reasonably available, everyone involved in this case -- starting with the USAPDA Legal Advisor who sought PEB # 2 solely upon these grounds -- assumed there was a procedural defect in the MMRB. The only evidence in the record is that Plaintiff was the Senior

Defense Counsel on Fort Benning, that he was a very senior Captain, and that he had a <u>conflict of interest</u> with every other senior JAG on Fort Benning because of his position. Also, in his capacity, he managed the litigation against the prosecutions brought by other Staff Judge Advocate offices throughout Georgia, Florida, Alabama, and Puerto Rico.[9] Even broader, he acted as Regional Defense Counsel for the entire Southeast U.S. Region in his absence. Based on that evidence alone, it is more likely than not there was no Judge Advocate senior to Plaintiff at Fort Benning, or <u>anywhere in the Southeast U.S.</u>, that did not have a conflict of interest prohibiting that person from participating in Plaintiff's MMRB.

Most disturbing of all is that, based upon this scant evidence, Defendant now accuses Plaintiff of essentially what amounts to jury tampering -- rigging the composition of the MMRB. Defendant ignores that Plaintiff was, and is, a licensed attorney with a spotless record of professional conduct. On an "Acknowledgment of Notification" form presented to Plaintiff by the Fort Benning Adjutant General prior to the MMRB, Plaintiff indicated he waived his right to appear before the MMRB. The form provided him the option to request or decline a Judge Advocate board member, and Plaintiff declined. (AR 774.)

There is no evidence that a voting member of the MMRB believed they were fraudulently induced to vote a certain way. Consider Army Reg 600-60 ¶ 3-3d(8):

> members will use their own experience, common sense, and judgment in determining whether the soldier can perform under worldwide field conditions. If necessary, the board may have individuals appear during the proceeding who can provide the necessary insight into the physical requirements of a particular officer.

The MMRB recommendation was a 5-0 vote. Defendant speculates that a JAG would have voted differently or altered the majority vote. The MMRB Convening Authority, before

---

[9] *See* description and scope of Plaintiff's duties in his OER at (AR 1015, Part III, center of page).

taking action, conducts a review to ensure all cases are accurate, complete, and were conducted in accordance with the regulation. *Id.* at ¶ 3-5. In Plaintiff's case, the MMRB Convening Authority was the Commanding General, U.S. Army Infantry Center and Fort Benning. During the MMRB Convening Authority's review, the Convening Authority is presumed to have ascertained whether a Judge Advocate was "reasonably available" to act as a board member. Army Reg 600-60 ¶ 3-2 (c) and (e). In the absence of any record to the contrary, it is presumed -- consistent with the presumption of regularity -- that the Convening Authority, before taking action, determined that a Judge Advocate was *not reasonably available*.

Still, a procedural error in an MMRB does not amount to a defect in a soldier's PDES, because the MMRB is not part of the PDES, as admitted by USAPDA counsel, (AR 1251 ll. 14-19). One PEB # 1 voting member testified "…again, sir, we don't require an MMRB to process the PEB. There's no requirement." (AR 1635.)

Plaintiff opposes Defendant's MMRB-related inferences more fully in Pl.'s Stmt. Genuine Issues Opp. Def.'s Stmt. Material Facts at ¶ 2 and further in Pl.'s Mem. P. & A. Opp. Def.'s Mot. Summ. J. at § X (titled "Defendant's 'No JAG Input' Red Herring").

### E.  The PEBLO theory of fraud

Statements by Plaintiff to a PEBLO cannot be construed as evidence of fraud. First, each PEBLO acted in the capacity of counselor to Plaintiff, and "[a]s such, the PEBLO is primarily concerned with the soldier's interests." Army Reg 635-40 ¶ 4-20(d). While it is unclear whether PEBLO-soldier communications are privileged like doctor-patient communications, the regulation, taken as a whole, suggests a PEBLO holds a position of special trust, such as a lay representative (from a Veterans' Service Organization) in a claim for benefits before the Board of Veterans Appeals. This suggests a PEBLO has a duty not to later cast a soldier in a negative

light, testify against him, or reveal his personal medical information to third parties. See also, e.g., Army Reg 635-40, Appendix C-7(b)(1) (PEBLO to ensure the PEB has not overlooked anything that might entitle the soldier to more money) and C-8(d) (PEBLO available to assist soldier with rebuttal). This calls to question the legality of the Fort Benning SJA's secretive efforts to obtain Plaintiff's personal medical information from the PEBLO. (AR 2855-56.) [10]

Second, this relationship is inconsistent with any claim that Plaintiff *fraudulently* negotiated an erroneous deadline to file his rebuttal, (Def.'s Opp. and Reply at 18-19), that he thereby "misled the PEBLO," (AR 39 ¶ 4), that "Plaintiff intentionally deceived her by his deliberate omission of not providing the rebuttal to the PEBLO [on 17 Sep 2001]," (Def.'s Reply at 19), that Plaintiff committed some sort of wrong by "not even inform[ing] her of his actions on 13 September 2001 …," (Def.'s Reply at 19).[11] This relationship is inconsistent with any claim that Plaintiff could *fraudulently* ignore his PEBLO's comments about the legal effect of PEB # 2.

Let us be blunt. The Army had a duty to provide Plaintiff 10 days to rebut. Plaintiff had no duty therein, but rather had certain rights. He had the right to concur, to not concur and rebut, or to not concur and not rebut. He had the right to change his mind and submit nothing. He had the right to seek the advice of counsel during those 10 days, to allow his attorney to communicate on his behalf with whomever, to disagree with the PEBLO's guesses about the legal effect of PEB # 2 and agree with his attorney, and to cease communication with the PEBLO while being advised by an attorney with nearly 35 years experience in military disability cases. All these rights Plaintiff exercised. The exercise of those rights is what Defendant calls fraud.

---

[10] The same individual who wrote the adverse evaluation (OER) at issue here. (Compl. Claim 7.)

[11] This was not an "active request for a delay." The PEBLO proposed an erroneous deadline, failing to account for a 10-day rebuttal period based upon notification on 5 Sep 01. A 14 Sep 01 deadline would have provided only 9 days, and 15 Sep 2001 was a Saturday. Yet, Defendant insists Plaintiff's preservation of his rights constituted evidence of fraudulent discharge.

## VIII.  DEFENDANT'S REGULATORY JUSTIFICATIONS

Defendant's discussion of the physical disability regulations is not supported by the plain language of the regulations. Please enforce the plain language of the regulation.

> There are practical reasons why we should accept whenever possible the meaning which an enactment reveals on its face. Laws are intended for all of our people to live by; and the people go to law offices to learn what their rights under those laws are.

*Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 396 (1951) (Jackson, J., concurring) (unnecessary to consider legislative history of the Act). The Army's regulatory arguments are arbitrary in many respects. On the issue of the missing delegation documents, Defendant replies that "[t]he ABCMR properly concluded that an authorization or delegation of authority *within the circumstances of this case* did not have to be in writing." Under what circumstances is a written delegation to be expected? Does authority in any given disability case vacillate between the Commander USAPDA and the Deputy Commander USAPDA depending on circumstances? Plaintiff's case on the regulation is stated in depth at §§ I (E) through (I) (pp. 12-30) of his Mem. P. & A. Supp. Pl.'s Cross-Mot. Summ. J. and in Pl.'s Complaint ¶¶ 17-31.

Defendant reiterates, essentially, the ABCMR conclusion that "the functions of PERSCOM have been assumed in this respect by the Physical Disability Branch." The worker does not become the boss by doing the boss's work. ¶ E-9(e) mandates "USAPDA may request PERSCOM cancel discharge instructions." Such a request, when it is for other than medical reasons (i.e., performance data), "will be submitted, with justification, to PERSCOM (TAPC-PDB)." *Id.* The Secretary of the Army gave Commander PERSCOM oversight power over Commander USAPDA. *Id.* at ¶ 2-3(a). This is not a trivial, ministerial, power. The most reasonable and plausible purpose for placing the Physical Disability Branch under PERSCOM in ¶ E-9(e) was to give PERSCOM an oversight opportunity -- an opportunity to supervise

USAPDA on the recall cases. When PERSCOM acts by issuing disability discharge orders, it does so "for the [Secretary of the Army]," *Id.* at ¶ 2-3(b) -- not for the Commander USAPDA in the diminutive customer service role Defendant portrays. That is why the USAPDA Legal Advisor was forced to concede that Plaintiff's discharge orders were issued "based upon Department of the Army and PERSCOM saying that it was okay." (AR 1235-36.) Defendant correctly states Army Reg 635-40, ¶ E-9, does not "change the authority of the USAPDA or PERSCOM within the disability system." Rather, that section *corroborates* the chain-of-authority between the USAPDA and PERSCOM established elsewhere in the regulation.

On this central argument, Defendant says "[I]f there are non-medical or medical reasons to change the disability or discharge, the PDB cannot act on existing orders until informed to do so by the USAPDA." (Def.'s Opp. and Reply n.6.) Defendant cites for this proposition Army Reg 635-40 ¶¶ 2-3(b), 2-4(f), and E-9(e). None of those sections say that, and no such inference can be drawn. USAPDA does not *direct* PERSCOM. Rather, sometimes USAPDA provides input to PERSCOM upon which PERSCOM must act. At other times, the USAPDA "may request," sometimes "with justification," that PERSCOM perform an act.

Contrary to Defendant's argument that the regulation provides USAPDA a specific grant of interpretation authority, nevertheless the USAPDA Deputy Commander and his JAG Legal Advisor, in a JAG's disability case (nor in any case), cannot interpret the Commander USAPDA, the Commander PERSCOM, and the Secretary of the Army right out of the regulation.

IX.  THE "OBVIOUS ERROR" PRONG OF ARMY REG 600-8-105 ¶ 2-21(E) VIOLATES LONG-STANDING PRECEDENT

In *Huang v. Sec'y of the Army*, 23 F. Supp.2d 1377, 1379-1381 (N.D.Ga. 1998), the Army invoked the "obvious error" provision of Army Reg 600-8-105 ¶ 2-21(e) to revoke a discharge that resulted from a glitch in the Army's personnel computer system. The dischargee,

however, was a Reserve Officer, and so the Court applied the revocation provisions of a corresponding Army Reserve regulation, Army Reg 135-175 ¶ 1-10(b). In comparing Army Reg 135-175 ¶ 1-10(b) (no provision to revoke a discharge for "obvious error") and Army Reg 600-8-105 ¶ 2-21(e) (purporting to provide authority to revoke a discharge for "obvious error"), the *Huang* court noted that "AR 135-175 conforms to the Army's own long established rule that the certificate of discharge is valid and effective even if in conflict with an Army Reg." *Huang v. Sec'y of the Army*, 23 F. Supp.2d 1377, 1380 (N.D.Ga. 1998). The *Huang* court did not analyze Army Reg 600-8-105 ¶ 2-21(e)'s "obvious error" further. The Court was clear, though, that long-standing precedent establishes that a discharge is valid "even if there was some mistake or administrative error, obvious or not, in the authority to grant the discharge." *Id.* at 1379.

There is no legislative history indicating the Army has authority to revoke a discharge for alleged obvious error, and a "[l]ong-standing, prior unchallenged precedent of the Army's own tribunals that a mistake of fact on the part of the Army does not vitiate a purported discharge … may not be lightly overturned *sub silentio*." *Id.* at 1381 (citations omitted).

## X. DEFENDANT'S CLAIM THAT DISCHARGE #1 WAS REVOKED AFTER-THE-FACT USING THE FRAUD PRONG OF ARMY REG 600-8-105 ¶ 2-21(E)

Plaintiff was entitled to be informed by Defendant with more specificity of the nature and cause of the accusation, not the ever-shifting simultaneous criminal-administrative-void-voidable approach that Defendant used. U.S. Const. Amend VI. Plaintiff has provided ample authority for the rule of law that conviction by court-martial is a prerequisite to invalidate a fraudulent discharge. Consider again the case of *Vanderbush v. Smith*:

> The government asserts that the petitioner's discharge should be disregarded because it was obtained by fraud. Though the military judge did not find actual fraud, he found facts that suggest that the petitioner may have obtained his discharge through a material misrepresentation. Congress has established the procedures of Article 3(b), UCMJ, as the *exclusive means* by which military

authorities may exercise in personam jurisdiction over pre-discharge offenses committed by those who have subsequently obtained facially valid discharges. Those procedures require a predicate conviction of the fraudulent discharge at a separate trial by court-martial before jurisdiction over pre-discharge offenses may be asserted. *See United States v. Reid*, 43 M.J. 906 (Army Ct.Crim.App. 1996). We find no basis to conclude that Congress intended for military courts to permit the impeachment, on the basis of fraud, of a facially valid discharge through *any other procedure* than that provided for in Article 3(b), UCMJ.

*Vanderbush v. Smith*, 45 M.J. 590, 596 (Army Ct.Crim.App. 1996) (emphasis added). In sum, just because some faceless Army bureaucrat says it is so, does not make it so.

Defendant's interpretation of Army Reg 600-8-105 ¶ 2-21 (e) violates the due process clause of the Fifth Amendment. The fundamental flaw in the Army's fraud theory is that it assumes discharge # 1 was obtained by fraud. That, however, is a legal conclusion which is precisely the issue at stake, and only a court of law can make such a determination.

Finally, there is substantial evidence in the record that Plaintiff did not voluntarily return to the Army by accepting pay and allowances after September 14, 2001.[12]  Defendant should not be allowed to "create" facts. It may not force Plaintiff to return to duty for court-martial, force Plaintiff to perform legal services while there, force him to travel to court-martial hearings, force his name back into its finance system, and then claim Plaintiff voluntarily accepted military pay and allowances and performed duties as a legal assistance attorney.

Respectfully submitted,

__/s/_Gary R. Myers_____
Gary R. Myers (157115) for Plaintiff
78 Clark Mill Road
Weare, New Hampshire 03281
1-800-355-1095; FAX (603) 529-3009

---

[12] *Passim*; *but see also* AR 2890-2904 if this Court grants Plaintiff's Motion to Reconsider Based Upon New Facts.