## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MALCOLM G. SCHAEFER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No. 07-1550 (RJL)** |
| | ) | |
| **PETE GEREN,** | ) | |
| **SECRETARY OF THE ARMY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

*rd*

## MEMORANDUM OPINION
(March **23** 2009) [#s 10, 42]

Malcolm Schaefer ("plaintiff"), a former U.S. Army officer, brings this action against Pete Geren ("defendant"), in his official capacity as Secretary of the Army, seeking to reverse the Army Board for Correction of Military Records' ("ABCMR") decision denying his request that certain records in his official military personnel file be altered or expunged. Before the Court are plaintiff's and defendant's cross-motions for summary judgment. Because the ABCMR's decision was neither arbitrary, capricious, nor unlawful, plaintiff's motion for summary judgment is DENIED and defendant's motion for summary judgment is GRANTED.

### BACKGROUND

In the fall of 2000, plaintiff was an active member of the U.S. Army Judge Advocate General's Corps ("JAG Corps") assigned to the Trial Defense Service field office at Fort Benning, Georgia. (Compl. ¶¶ 11, 13 [Dkt. #1].)  He had attended the University of Virginia School of Law at the Army's expense, graduating in 1996, and

was serving a six-year active duty service obligation.  (A.R. 226.)  Due to the physical

deterioration of his knees, plaintiff's physician referred him to an administrative

screening board, known as a Medical/MSO Retention Board ("MMRB"), for evaluation

of his ability to perform the physical requirements of his specialty in a worldwide field

environment.[1]  (A.R. 228); *see generally* Physical Performance Evaluation System, Army

Reg. 600-60 ¶ 2-1 (Oct. 31, 1985).[2]  On September 27, 2000, upon plaintiff's request, the

MMRB Convening Authority referred plaintiff's case to a Medical Evaluation Board

("MEB") after finding that his "ability to satisfactorily perform [his] duties . . . is

questionable."  (A.R. 476, 492.)  A MEB is the first step in the Army's Physical

Disability Evaluation System ("PDES"), which determines whether a solider is unfit

because of a physical disability to perform his or her duties and, as a result, should be

discharged.  *See generally* Physical Evaluation for Retention, Retirement, or Separation,

Army Reg. 635-40 (Aug. 15, 1990).

On May 29, 2001, the MEB determined that plaintiff did not meet the medical

qualifications for retention and referred his case to a Physical Evaluation Board ("PEB"),

the second step in the PDES process.[3]  (A.R. 496-500.)  On June 11, 2001, the PEB at

---

[1]     Plaintiff was unable to run, parachute, walk long distances, march with a rucksack, or
conduct other military activities that included impact on his knees.  (Compl. ¶ 14.)

[2]     Since the filing of the Complaint in this case on August 30, 2007, many of the regulations
governing the relevant Army conduct have been revised.  *E.g.*, Physical Performance Evaluation
System, Army Reg. 600-60 (Feb. 28, 2008).  For purposes of this decision, the Court references
and applies the versions of the regulations that were in force at the time of the conduct at issue.

[3]     MEBs are tasked with determining whether a solider is medically qualified for retention
based on certain medical criteria.  *See* Army Reg. 635-40 ¶ 4-10.  PEBs subsequently evaluate
the soldier's medical condition against the physical requirements of the soldier's particular
office, grade, rank, or rating and make findings and recommendations as to the soldier's
eligibility to be separated.  *See id.* ¶ 4-17.

Fort Sam in Houston, Texas, determined that plaintiff was medically unfit and

recommend he be separated from the Army with severance pay and a zero percent

disability (the "first PEB"). (A.R. 96.) After plaintiff concurred with the findings, the

PEB forwarded plaintiff's case to the U.S. Army Physical Disability Agency

("USAPDA") in Washington, DC – the third step in the PDES process – which reviewed

the unopposed recommendation. (A.R. 97, 406, 750, 1235, 1705-06.) At USAPDA's

direction, the Physical Disability Branch ("PDB") then used the TRANSPROC computer

notification system to authorize the Fort Benning transition office to issue discharge

orders – the fourth and final step in the process.[4] (A.R. 528, 750, 767, 772.) On July 2,

2001, Fort Benning printed Orders 183-2200, which ordered plaintiff to take certain

preparatory actions and to appear at the transition point for processing on his appointed

discharge date, September 14, 2001. (A.R. 98.)

    During this process, plaintiff had taken care to keep his progression quiet from the

JAG Corps.[5] In late July, however, an employee in the JAG Corps Personnel Plans &

Training Office ("PPTO") discovered plaintiff's pending discharge while updating the

office's database and, due to his surprise, contacted Dennis Brower, the legal advisor to

---

[4]    The record indicates that "TRANSPROC is an electronic notification system that is an
interoffice network connecting the [USAPDA] . . . with installation transition centers/points."
(A.R. 750.)

[5]    Only plaintiff's administrative commander – the commander of his local unit to which he
was attached for administrative support – knew from the outset that plaintiff was being
considered for a medical discharge, and plaintiff asked him to keep it confidential. (A.R. 408,
460.) Following the PEB's recommendation that he was unfit, plaintiff asked the PEB Liaison
Officer "keep all of this quiet" out of concern that if his JAG supervisors found out, they would
try to cancel the PEB and retain him on active duty. (A.R. 410.) Indeed, plaintiff did not inform
anyone in his supervisory chain in the JAG Corps until after he received his discharge orders on
July 2, 2001, and, even then, he asked those who he told to tell as few people as possible. (A.R.
413, 460.)

USAPDA.  (A.R. 449, 1236.)  Upon his review, Brower determined that plaintiff's case

file was deficient for lack of performance reviews from plaintiff's JAG Corps

supervisors.  (A.R. 449, 1238.)  Brower asked Colonel Clyde Tate, chief of PPTO,

whether the JAG Corps was interested in submitting performance information about

plaintiff, to which Col. Tate answered it was.  (A.R. 446.)  The JAG Corps thereafter

submitted several of plaintiff's officer evaluation reports and, on August 10, 2001, Col.

Tate submitted a memorandum to USAPDA stating that he had reviewed medical facts in

plaintiff's file and "conclude[d] with certainty that [plaintiff] can effectively perform his

assigned duties as a judge advocate."  (A.R. 517-18, 769.)

　　　Based on the JAG Corps' assessment, Colonel Austin Bell, deputy commander of

USAPDA, directed Brower to send the new information to the PEB in Texas to see if the

PEB wanted to reconsider its previous findings, which it said it did.  (A.R. 761, 769.)   In

addition, at Col. Bell's direction, PDB took steps to revoke the authorization to discharge

plaintiff and to put his case "on hold."  (A.R. 762, 769-770, 772.)  On approximately

August 2, 2001, PDB attempted to revoke the authorization in the TRANSPROC system;

the system, however, was not working properly.  (A.R. 444.)  PDB accordingly contacted

the Fort Benning transition point both by telephone and by facsimile to let them know

that plaintiff was no longer authorized for separation and that PDB would make the

appropriate change in TRANSPROC when it was again operational.  (A.R. 442, 444,

947-48, 1563-64.)  On approximately August 14, 2001, a PDB analyst again attempted to

revoke the authorization in the TRANSPROC system, this time supposedly with success.

(A.R. 444.)

On August 30, 2001, the PEB issued a new determination that plaintiff was, in fact, fit for continued active duty (the "second PEB"), which the Fort Benning PEB Liaison Officer ("PEBLO") communicated to plaintiff on September 5th. (A.R. 100-01.) Plaintiff did not concur with the finding. (*Id.*) The PEBLO informed plaintiff that he had ten days in which to submit a written appeal, which plaintiff and the PEBLO agreed would be due Monday, September 17th. (A.R. 101, 406.) In response to plaintiff's comment during the meeting that he had discharge orders and was in the process of clearing, the PEBLO responded that his case was "on hold."[6] (A.R. 406.) On the advice of counsel, however, plaintiff nevertheless proceeded to move forward with his out-processing and, on September 14th, three days after the terrorist attacks of September 11, 2001, plaintiff appeared at the transition point and presented his July 2, 2001 discharge orders. (A.R. 326-27, 439.) Despite PDB's multiple attempts to effectuate the revocation of Fort Benning's authority to discharge plaintiff, the code in TRANSPROC authorizing plaintiff's discharge was inadvertently reentered into the system and the personnel clerk issued plaintiff a DD Form 214 discharge certificate. (A.R. 102, 439, 1826-31.) Plaintiff subsequently left Fort Benning, his discharge certificate in hand.

The following Monday, September 17, 2001, the JAG Corps discovered plaintiff's empty office and contacted Brower at USAPDA. (A.R. 449, 471.) Brower responded

---

[6]    Following plaintiff's meeting with the PEBLO, plaintiff told a colleague of his in the JAG Corps that he would not be discharged because the JAG Corps had stopped his medical board. (A.R. 462.) Plaintiff had also made similar comments prior to the PEB's formal "fit" determination. Following a conversation with Brower in which Brower informed plaintiff that his PEB determination was likely going to be reversed and that his case was on hold, plaintiff told both his subordinate and his supervisor that he would not be leaving the Army and that he intended to attend the JAG graduate course the following year. (A.R. 437, 449, 464.)

that the authorization for plaintiff's discharge had been revoked and that Fort Benning

had no authority to separate him.  (A.R. 449.)  Having not received an appeal from

plaintiff concerning his second PEB, USAPDA, through PDB, directed Fort Benning to

issue a formal order revoking plaintiff's July 2nd discharge order, which Fort Benning

did.  (A.R. 104, 440, 449.)  Fort Benning informed plaintiff later that day that his

discharge orders had been revoked.  (A.R. 441.)

The Army soon thereafter conducted an investigation into plaintiff's separation

pursuant to Rule for Court-Martial 303.  The investigation concluded that plaintiff's

separation was invalid and he had knowingly and fraudulently procured his separation.

(A.R. 12-16.)  On October 29, 2001, the Army sent plaintiff a memorandum notifying

him that it had concluded that he obtained an invalid separation and ordering him to

report back to duty by November 5, 2001, else the Army would take "appropriate

measures to return [him] to military control."  (A.R. E105.)  The Army also preferred a

court-martial charge against plaintiff on November 1, 2001 for obtaining a fraudulent

discharge in violation of Article 83 of the Uniform Code of Military Justice ("UCMJ"),

10 U.S.C. § 883.[7]  (A.R. 105.)  The charge stated that plaintiff "on or about 14 September

2001, by means of knowingly presenting ORDERS 183-220 [sic] dated 01 July 2001

authorizing his release from active duty, when in fact he knew those orders were void,

procure himself to be separated from the U.S. Army."  (*Id.*)

---

[7]      Article 83 provides that "Any person who . . . (2) procures his own separation from the
armed forces by knowingly false representation or deliberate concealment as to his eligibility for
that separation . . . shall be punished as a court-martial may direct."  10 U.S.C. § 883.

Plaintiff immediately filed a lawsuit in the Middle District of Georgia seeking a temporary restraining order and a preliminary injunction enjoining the Army from enforcing the October 29, 2001 orders and declaring that plaintiff was a civilian and not subject to military control.  Plaintiff contended that he had received a valid discharge and that the Army could not assert jurisdiction over him either on the basis that his discharge was invalid or under Article 3(b) of the UCMJ, 10 U.S.C. § 803(b), which plaintiff contended was unconstitutional.  Article 3(b) provides:

> Each person discharged from the armed forces who is later charged with having fraudulently obtained his discharge is . . . subject to trial by court-martial on that charge and is after apprehension subject to this chapter while in the custody of the armed forces for that trial.

10 U.S.C. § 803(b).  Judge Lawson denied plaintiff's motion on November 14, 2001, holding that Article 3(b) was constitutional, that the military therefore had jurisdiction to court-martial plaintiff for fraudulent separation, and that a military tribunal was the best forum for determining whether plaintiff's discharge was valid, given the military's relative competence and expertise in the subject. *Schaefer v. White*, 174 F. Supp. 2d 1374, 1383-84 (M.D. Ga. 2001).

Despite his continuing objection to the Army's jurisdiction, plaintiff thereafter returned to duty at Fort Benning and was assigned to work as a legal assistance attorney assisting service members and their families with a variety of legal issues. (A.R. 222.)  In December 2001, the Army moved forward with the court-martial and appointed a JAG attorney as an investigating officer (IO) for purpose of conducting an impartial investigation into plaintiff's separation and to make a non-binding recommendation

concerning the charges, as required by Article 32 of the UCMJ, 10 U.S.C. § 832.[8] (A.R. 217.) The IO issued his report on January 15, 2002, concluding that plaintiff's conduct, while duplicitous and unbecoming of an officer, was not fraudulent because the bases for the discharge orders had not been overturned or revoked on September 14, 2001, when he presented himself for separation. (A.R. 107-14.) The Commanding General, however, nevertheless determined otherwise on the recommendation of his Staff Judge Advocate, pursuant to Article 34 of the UCMJ, 10 U.S.C. § 834, and referred the fraudulent separation charge to a general court-martial on March 1, 2002.[9] (A.R. 219.)      Rather than proceed with his defense to the general court-martial, set to begin trial June 17, 2002, plaintiff thereafter submitted a voluntary Resignation for the Good of the Service ("RFGOS") on May 27, 2002. (A.R. 733.) Plaintiff's RFGOS stated that it was conditioned on plaintiff receiving a "General under Honorable Conditions Discharge."

---

[8]   Article 32(a) provides:

> No charge or specification may be referred to a general court-martial for trial until a thorough and impartial investigation of all the matters set forth therein has been made. This investigation shall include inquiry as to the truth of the matter set forth in the charges, consideration of the form of charges, and a recommendation as to the disposition which should be made of the case in the interest of justice and discipline.

10 U.S.C. § 832(a).

[9]   Article 34(a) provides:

> Before directing the trial of any charge by general court-martial, the convening authority shall refer it to his staff judge advocate for consideration and advice. The convening authority may not refer a specification under a charge to a general court-martial for trial unless he has been advised in writing by the staff judge advocate that (1) the specification alleges an offense under this chapter; (2) the specification is warranted by the evidence indicated in the report of investigation under [Article 32] . . .; and (3) a court-martial would have jurisdiction over the accused and the offense.

10 U.S.C. § 834(a).

(*Id.*)  On June 3, 2002, the Commanding General issued plaintiff a General Officer

Memorandum of Reprimand ("GOMOR"), which stated that plaintiff was being

"reprimanded for wrongfully obtaining a [discharge certificate] when [he] fully knew that

the basis for the issuance of [his] separation orders had been overturned."  (A.R. 220-21.)

The GOMOR recounted plaintiff's conduct surrounding his discharge, concluding that

plaintiff "traded [his] integrity for selfish gain and in the process proved [himself]

completely untrustworthy."  (*Id.*)  Plaintiff was also issued an adverse Officer Evaluation

Report for the year preceding May 2002, which concluded that while plaintiff's work was

"legally sufficient and generally satisfactory," he "did not perform at the level one would

expect of a major" and "does not display any leadership skills nor Army values . . . as he

is self-serving and puts himself over the mission."  (A.R. 223.)  Plaintiff received a

second discharge certificate on October 1, 2002, discharging plaintiff from the Army.

(A.R. 1014.)

On September 8, 2004, plaintiff applied to the ABCMR for relief pursuant to 10

U.S.C. § 1552.[10]  Plaintiff requested that the ABCMR declare his October 2002 discharge

certificate null and void, reissue plaintiff a discharge certificate stating that he was

discharged on September 14, 2001, expunge from his military file his GOMOR, OER,

and any references to his RFGOS, and stop the Army from its efforts to recoup the

severance pay he received in September 2001.  (A.R. 3.)  In a 41-page decision, the

ABCMR denied plaintiff's requests on November 8, 2005, concluding that: 1) plaintiff's

---

[10]    10 U.S.C. § 1552(a)(1) provides:  "The Secretary of a military department may correct
any military record of the Secretary's department when the Secretary considers it necessary to
correct an error or remove an injustice."

first discharge was without legal effect and would not have been issued but for an "administrative snafu"; 2) the Army was justified in revoking his discharge orders and directing that he return to duty; 3) the Army was justified in preferring fraudulent separation charges against him; and 4) he failed to demonstrate that his GOMOR, his OER, and references to his RFGOS should be expunged from his file on account of error or injustice.[11]  (A.R. 38-42.)  Plaintiff thereafter filed this lawsuit on August 30, 2007, in which he alleges that the ABCMR acted arbitrarily, capriciously, and contrary to law in failing to award his requested relief.  (Compl. ¶¶ 157-92.)  Plaintiff also alleges that Article 3(b) is unconstitutional, both on its face and as applied to plaintiff.  (Compl. ¶¶ 110-56.)  Defendant moved for summary judgment on January 4, 2008 and plaintiff cross-moved for summary judgment on June 26, 2008.

## DISCUSSION

## I.    Legal Standard

## A.    *Legal Standard for Summary Judgment*

Summary judgment should be rendered if the pleadings and the record "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The burden of establishing that there is no genuine issue of material fact is on the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[11]    The ABCMR also noted that it agreed with the case law holding Article 3(b) of the UCMJ constitutional, citing *Wickham v. Hall*, 12 M.J. 145 (CMA 1981) and *Schaefer*, 174 F. Supp. 2d at 1374.  (A.R. 42.)

242, 248 (1986).  The Court must view the facts in the light most favorable to the

nonmovant, giving the nonmovant the benefit of all justifiable inferences derived from

the evidence.  *Id.* at 255.  The nonmovant, however, may not rely merely on allegations,

conclusory statements, or denials in its own pleading, but must set out specific facts that

would enable a reasonable jury to find in its favor.  Fed. R. Civ. P. 56(e); *Greene v.*

*Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

**B.**     ***Legal Standard for Review of ABCMR Decisions***

Judicial review of ABCMR decisions issued pursuant to 10 U.S.C. § 1552 is

authorized under the Administrative Procedure Act ("APA").  5 U.S.C. §§ 701, *et seq.*;

*Piersall v. Winter*, 435 F.3d 319, 324 (D.C. Cir. 2006).  Under the APA, a Court may

only set aside agency action that is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  To prevail, a plaintiff

must provide "cogent and clearly convincing evidence" satisfying this standard, *Mueller*

*v. England*, 404 F. Supp. 2d 51, 55 (D.D.C. 2005), and must "overcome the 'strong, but

rebuttable, presumption that administrators of the military, like other public officers,

discharge their duties correctly, lawfully, and in good faith,'" *Frizelle v. Slater*, 111 F.3d

172, 177 (D.C. Cir. 1997) (quoting *Collins v. United States*, 24 Cl. Ct. 32, 38 (1991)).  In

addition, as to those aspects of the ABCMR's decision that "rel[y] on a broad delegation

from Congress of discretion to use its inherent judgment to assess the merits of an

application, the court . . . appl[ies] an especially deferential standard of review."  *Epstein*

*v. Geren*, 539 F. Supp. 2d 267, 275 (D.D.C. 2008) (citing *Cone v. Caldera*, 223 F.3d 789,

793 (D.C. Cir. 2000)).  The Court must "determine only whether the Secretary's decision

making process was deficient, not whether his decision was correct." *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989). Indeed, "the function of [the Court] is not to serve as a super correction board that reweighs the evidence." *Charette v. Walker*, 996 F. Supp. 43, 50 (D.D.C. 1998).

## III.    Analysis

### A.    *Validity of the First Discharge*

Plaintiff contends that the ABCMR acted arbitrarily, capriciously, and contrary to law by allowing the Army to violate its own regulations governing the reconsideration of a medical discharge and, in turn, in determining that the September 14, 2001 discharge was without legal effect. (Tr. of Mot. Hr'g at 10-11, Aug. 19, 2008.) If the Court agrees, plaintiff contends, the Court must find the second discharge, the OER, and the GOMOR null and void because there is no indication of fraud in the record and therefore the Army was without jurisdiction over the plaintiff after September 14, 2001. (*Id.* at 18.) Defendant contends, conversely, that the ABCMR did not act arbitrarily, capriciously, or contrary to law in determining that plaintiff's alleged first discharge on September 14, 2001 was a legal nullity and that the Army's actions thereafter were justified. (Def.'s Mot. for Summ. J. at 7-11 [Dkt. #10].) For the following reasons, I agree.

Plaintiff's threshold attack on the ABCMR decision is that he received a facially valid discharge certificate based on orders that were not revoked until after his discharge and, therefore, under *Smith v. Vanderbush*, 47 M.J. 56 (C.A.A.F. 1997), the Army – not plaintiff – must bear the cost of the Army's "administrative snafu" involving TRANSPROC. (Pl.'s Cross-Mot. for Summ. J. at 3-9 [Dkt. #42].) As noted by Judge

Lawson, however, *Vanderbush* did not involve a discharge of questionable validity.

*Schaefer*, 174 F. Supp. 2d at 1380. In *Vanderbush*, the Army intended, but failed, to

"flag" the soldier's file, which would have suspended any favorable personnel actions,

and defendant received a discharge based on the expiration of his term of service.

*Vanderbush*, 47 M.J. at 57. The U.S. Court of Appeals for the Armed Forces held that

the Army could not assert continuing jurisdiction over the discharged soldier in order to

court-martial him, despite the administrative error, because the defendant had received a

discharge for which the underlying basis was valid: namely, his duty obligation had

ended. *Id.* at 60-61; *see also U.S. v. Howard*, 20 M.J. 353, 354-55 (C.M.A. 1985) (no

continuing jurisdiction over soldier where "commander made an informed decision to

allow appellant to be discharged" and only later attempted to revoke the discharge in

order to court-martial him). Here, by contrast, USAPDA revoked the authority for

plaintiff's discharge well before September 14, 2001. When the underlying authority for

the discharge is timely revoked, an error in delivering a discharge certificate does not

effectuate a *valid* discharge. *See U.S. v. Williams*, 53 M.J. 316, 317 (C.A.A.F. 2000)

(facially valid discharge certificate was properly revoked when military placed legal hold

on soldier hours prior to delivery of the discharge certificate); *U.S. v. Garvin*, 26 M.J.

194, 195-96 (C.M.A. 1988) (where discharge authority revoked discharge orders prior to

delivery "the mistaken delivery of [the] discharge certificate . . . was not accomplished

with the intent required to effect a valid discharge"); *see also U.S. v. Harmon*, 63 M.J. 98,

101 (C.A.A.F. 2006) ("the discharge authority must have intended the discharge to take

effect" in order for the delivery of the discharge certificate to terminate military

jurisdiction). Accordingly, the ABCMR was not arbitrary, capricious, or contrary to law in determining that plaintiff's first discharge was "without legal effect," (A.R. 40), based on the USAPDA's revocation of the authority to issue the discharge prior to plaintiff's receipt of the discharge certificate.

Plaintiff's second attack centers on his interpretation of Army Regulation 635-40, which governs the PDES process. Notwithstanding the regulation's complexity, plaintiff contends that the regulation sets forth a clear division of labor between USAPDA and U.S. Total Army Personnel Command ("PERSCOM"). While USAPDA is responsible for making the final decisions concerning whether a soldier is unfit for duty, PERSCOM is responsible for effecting final disposition after it receives USAPDA's decision.[12] Included in that division of labor, plaintiff contends, are material limitations on USAPDA's authority to reconsider cases in which discharge orders have been issued by PERSCOM such that USAPDA's *sua sponte* reconsideration of plaintiff's case, without having received it back from PERSCOM, rendered void both the PEB's reconsideration and USAPDA's revocation of Fort Benning's authority to discharge plaintiff. Therefore, plaintiff contends, his discharge on September 14, 2001 was, in fact, valid and the

---

[12]      Chapter 2 of the regulation, entitled "Responsibilities and Functions," provides that PERSCOM will, among other things, "(a) Operate the [PDES] . . . [and] (b) Accomplish final administrative actions in processing physical disability cases; issue needed orders or other instructions for the [Secretary of the Army], based on decisions of [USAPDA]." Army Reg. 635-40 ¶ 2-3(a)-(b). In contrast, the chapter provides that USAPDA, "under the operational control of [PERSCOM]," will, among other things, "operate the [PDES], to include . . . (b) Developing the policies, procedures, and programs of the system . . . [and] (f) Making the final decision whether a solider is unfit because of physical disability." *Id.* ¶ 2-4(b), (f).

ABCMR was arbitrary, capricious, and contrary to law to find otherwise.  (Pl.'s Cross-Mot. for Summ. J. at 13-27.)  I disagree.

The record reflects that at some time prior to 2001, the PERSCOM office responsible for accomplishing final administrative actions in the PDES process – the Physical Disability Branch ("PDB") – physically moved from PERSCOM to Walter Reed Army Medical Center, the location of USAPDA.  (A.R. 251, 274, 1549, 1566.)  As a result, PDB became, in effect, an adjunct of USAPDA.  Rather than fax USAPDA's final decisions to PDB for final disposition, as it had previously done, USAPDA was able to walk down the hall and instruct PDB to transmit the appropriate instructions, via the TRANSPROC system, to the appropriate installation.  (A.R. 274, 1557-58.)  Thus, when USAPDA approved the PEB's first finding that plaintiff was unfit, USAPDA, without ever contacting PERSCOM's headquarters, instructed PDB to transmit the necessary authorization to Fort Benning for it to issue plaintiff's July 2, 2001 discharge orders.  (A.R. 444.)  And similarly, when USAPDA received the JAG Corps' assessment of plaintiff's physical capabilities in early August 2001, it instructed PDB to revoke the authorization to discharge plaintiff, again without contacting PERSCOM's headquarters.[13]  (A.R. 255, 444.)

It is well-settled that federal agencies, including the Army, are required to follow their own rules and regulations.  *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) (construing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)); *see also*

---

[13]    Col. Bell, who was deputy commander for USAPDA at the time and had final authority over its day-to-day operations, testified during the Middle District of Georgia action that as a result of PDB's move to USAPDA, he was both USAPDA and PERSCOM.  (A.R. 250, 251.)

*Martin v. Sec'y of Army*, 455 F. Supp. 634, 638 (D.D.C. 1977) ("It is established beyond

peradventure that the military, like any other agency, is bound by its own regulations.").

Contrary to plaintiff's contentions, however, the ABCMR's decision did not overtly or

implicitly bless a violation of the Army's own regulations.  Rather, the ABCMR found,

after an extensive review of the facts and relevant regulations, that the USAPDA was

within its authority under the regulation to return plaintiff's case to the PEB for

reconsideration and that, as a result, the second PEB obviated the first and the first

discharge lacked validity because the authority underlying the discharge had been

revoked. (A.R. 38-40.)  According the ABCMR the due deference it is owed and

recognizing the military's relative expertise in interpreting military regulations and

procedures, *see Lawrence v. McCarthy*, 344 F.3d 467, 473-74 (5th Cir. 2003), this Court

does not find the ABCMR's interpretation arbitrary, capricious, or otherwise not in

accordance with law.

It is clear from the ABCMR's 41-page memorandum decision that it considered

both the structure and the specific provisions of Army Regulation 635-40, as well as

plaintiff's proffered interpretation.  (A.R. 8-9, 33-35, 38-39.)  The ABCMR determined

that "the authority to act upon PEB proceedings for the Secretary of the Army rests with

the PEB itself, or as in this case, the USAPDA" and that "[c]ounsel's argument that

[plaintiff's] case could not be reconsidered by PEB or the USAPDA until after they

received the case back from PERSCOM is without merit."  (A.R. 38.)  Noting that while

the "regulation . . . is outdated" and "the functions of PERSCOM in this respect have

been assumed by the [PDB]," the ABCMR found that "the first PEB finding never went

to PERSCOM, and so the requirement for PERSCOM to authorize reconsideration was not triggered, contrary to [plaintiff's] claim." (*Id.*)

The ABCMR's interpretation is sufficiently supported by the regulation and the regulation's implementation in practice to withstand review. The regulation makes clear that USAPDA is the final decision-making authority in the PDES process, the authority responsible for reviewing PEB proceedings and findings, and the authority responsible for "developing the policies, procedures, and programs of the system." Army Reg. 635-40 ¶ 2-4(b), (e), (f). PERSCOM, by contrast, is tasked with the purely ministerial role of issuing orders or disposition instructions "[b]ased on the final decision of USAPDA." *Id.* ¶ 4-24(b); *see also id.* ¶ 2-3(b) (PERSCOM will "[a]ccomplish final administrative actions in processing physical disability cases; issue needed orders or other instructions . . . based on the decisions of [USAPDA]"). While USAPDA operates formally under the PERSCOM umbrella, *id.* ¶ 2-3, USAPDA has day-to-day responsibility for overseeing the PDES process and for acting on PEB proceedings. For example, USAPDA – not PERSCOM – is responsible for reviewing case records to ensure the findings are "just, equitable, consistent with the facts, and in keeping with the provisions of law and regulations," *id.* ¶ 4-22(b)(3), and USAPDA – not PERSCOM – is responsible for returning cases to PEB when "case records show such action is in the best interests of the solider or the Army," *id.* ¶ 4-22(c)(2).

USAPDA's authority in this regard is born out by record. Even prior to PDB's physical re-location from PERSCOM to USAPDA's office at Walter Reed, PDB effected and revoked final dispositions at USAPDA's direction, without independent review on

PERSCOM's part.  (A.R. 1566-67.)  PDB, consistent with the ministerial role given

PERSCOM in the regulation, merely took the actions necessary to implement USAPDA's

decisions, including whether to recall certain cases.  (*Id.*)

PDB's practice in this respect is at least equally as consistent with the regulation

as plaintiff's interpretation.  Plaintiff relies heavily on paragraph 4-24 and Appendix

paragraph E-9(e) of the regulation, which state, respectively:

> 4-24.  Disposition by PERSCOM
> PERSCOM will dispose of the case by publishing orders or issuing proper
> instructions to subordinate headquarters, or return any disability evaluation
> case to USAPDA for clarification or reconsideration when newly
> discovered evidence becomes available and is not reflected in the findings
> and recommendations.

and

> E-9. Final disposition instructions.
>                      . . .
> e.  *Requests for exception to established discharge or retirement date.*
> Request for deviation from established discharge date or amendment or
> revocation of retirement orders for other than medical reasons will be
> submitted, with justification, to PERSCOM ([Physical Disability Branch]).
> . . . USAPDA will decide whether the case should be reconsidered by the
> PEB.  USAPDA may request PERSCOM cancel discharge instructions, or
> amend or revoke retirement orders.

Army Reg. 635-40 ¶¶ 4-24, App. E-9(e).  While plaintiff argues that these provisions

require that PERSCOM review each case in which discharge orders have been issued to

determine if the new evidence warrants reconsideration, neither provision explicitly gives

PERSCOM such an affirmative role.  Rather, both indicate that it is USAPDA that has

the decision-making role, while PERSCOM is tasked only with formally returning the

case to USAPDA or canceling discharge orders at USAPDA's request.  The ABCMR's

decision that USAPDA was within its authority to reconsider plaintiff's case and revoke

the authority for his discharge is thus neither arbitrary, capricious, nor contrary to law.

Moreover, and perhaps most critically, plaintiff's interpretation of PERSCOM's

role in the PDES process does not square with the conclusion that he contends this Court

should reach: namely, that his first discharge was valid.  Plaintiff's first PEB finding,

which resulted in his July 2, 2001 discharge orders, never went to or through PERSCOM,

but rather, went from USAPDA to the Fort Benning transition point via PDB.  (A.R.

444.)  Accordingly, if the second PEB and USAPDA's revocation of authority to

discharge plaintiff were invalid due to USAPDA's failure to request plaintiff's case back

from PERSCOM, as plaintiff contends, so too were plaintiff's first discharge orders

invalid due to USAPDA's failure to send plaintiff's case to PERSCOM for final

disposition.  In short, plaintiff's argument is one of form over substance on steroids!

Accordingly, I do not find the ABCMR's decision that USAPDA and the PEB had

the authority to reconsider plaintiff's case arbitrary, capricious, or contrary to law.  I also

do not find arbitrary, capricious, or contrary to law the ABCMR's related conclusions

that the second PEB's reconsideration obviated the first PEB's findings and that

USAPDA effectively revoked the authority for the September 14, 2001 discharge before

that date.  (A.R. 39-40.)  Indeed, the form transmitting the second PEB's "fit"

determination, which plaintiff reviewed and signed, stated on its face that the PEB's first

determination was superseded.[14] (A.R. 100, 406.) And while the second PEB's findings were not yet final until after the period for plaintiff's filing of an appeal ran, on September 17, 2001, the record reflects that if the clerk at the Fort Benning transition point had remembered that the authorization for plaintiff's discharge had been revoked, she would not have given plaintiff a discharge certificate. (A.R. 439.) The ABCMR, therefore, was not arbitrary, capricious, or contrary to law to determine that plaintiff's September 14, 2001 discharge was a legal nullity and that the Army's formal revocation of his discharge orders and order that plaintiff return to duty were justified. (A.R. 40); *Garvin*, 26 M.J. at 195-96.

## B.    *Plaintiff's Remaining Claims*

Plaintiff also asserts facial and as-applied challenges to the constitutionality of Article 3(b) of the UCMJ, 10 U.S.C. § 803(b).[15] Plaintiff, however, lacks standing to do so. "To have Article III standing, a plaintiff must demonstrate an 'actual or immediate' 'injury-in-fact' that is 'fairly traceable' to the challenged conduct and 'likely' to be 'redressed by a favorable decision.'" *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 307 (D.C. Cir. 2001) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)). Here, plaintiff chose to voluntarily resign from the Army in October

---

[14]    Indeed, paragraph 4-19(p)(1) of Army Regulation 635-40 provides that "[w]hen new findings are made by the PEB, they become the only findings on which later action will be taken." Army Reg. 635-40 ¶ 4-19(p)(1).

[15]    Plaintiff's Article 3(b) challenge is essentially a reassertion of the arguments he presented to the Middle District of Georgia in support of his motion for a temporary restraining order and preliminary injunction, which was denied. *See Schaefer*, 174 F. Supp. 2d at 1382-83. Plaintiff's challenge differs in this case only in that plaintiff adds related as-applied challenges to the constitutionality of Articles 32 and 34 of the UCMJ, 10 U.S.C. §§ 832, 834.

2002 rather than proceed with his defense to the court-martial proceeding that was then

pending.  Accordingly, even if the Court were to declare Article 3(b) unconstitutional, as

plaintiff requests, such a declaration would not redress any injury plaintiff alleges he has

suffered.  *See Miller v. Roche*, No. 03-1742, 2006 WL 326006, *3-4 (D.D.C. Feb. 10,

2006).  Such a declaration would not invalidate his October 2002 discharge or lead this

Court to order that his military file be expunged of all materials related to events after

September 14, 2001, because this Court has already held above that the ABCMR's

decision that plaintiff's first discharge was a legal nullity was neither arbitrary,

capricious, nor contrary to law.[16]  Accordingly, because I can issue no order that would

redress plaintiff's alleged injury, he lacks standing to pursue his constitutional claims.

Finally, the Court finds no reason to overturn the ABCMR's refusal to remove

from plaintiff's official military file his 2001-2002 OER, June 2002 GOMOR, or

references to his RFGOS.  Beyond alleging that the Army lacked jurisdiction over

plaintiff to issue these documents, plaintiff provides no basis on which to find the

ABCMR's decision arbitrary or capricious.  Moreover, in this area courts must give the

ABCMR "an unusually deferential application of the 'arbitrary and capricious' standard'

of the APA."  *Kreis*, 866 F.2d at 1514.  Here again, the ABCMR's decision contains an

extensive review of the facts and provides explicit reasons for denying plaintiff's

requested relief.  (A.R 40-41); *Kreis*, 866 F.2d at 1514-15 (the Army "must give a reason

---

[16]    Nevertheless, even if I had jurisdiction to consider plaintiff's constitutional challenges, I
see no reason to deviate from Judge Lawson's earlier determination that Article 3(b) is
constitutional.  *Schaefer*, 174 F. Supp. 2d at 1382-83 (citing *United States v. Cole*, 24 M.J. 18, 22
(CMA 1987)).

that a court can measure, albeit with all due deference, against the 'arbitrary and capricious' standard of the APA"). The ABCMR neither failed to consider any of plaintiff's arguments nor issued a decision as to any of the documents that was arbitrary or capricious.

## CONCLUSION

Thus, for all of the above reasons, the Court GRANTS defendant's Motion for Summary Judgment and DENIES plaintiff's Cross-Motion for Summary Judgment. An appropriate Order will issue with this Memorandum Opinion.

RICHARD J. LEON
United States District Judge